Page 1

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

RUSSELL SCOTT FARIA,      )
                          )
        Plaintiff,        ) Cause No. 4:16CV-01175-JAR
                          )
vs.                       )
                          )
SERGEANT RYAN J. MCCARRICK, )
et al.,                   )
                          )
        Defendants.       )

VIDEO DEPOSITION OF LEAH L. ASKEY
VOLUME ONE
Taken on behalf of the Plaintiff
Monday - October 23, 2017

Reported by Jane Rich, CCR #411
COURT REPORTING ASSOCIATES
P.O. BOX 440014
BRENTWOOD, MO 63144
(314) 961-6306 - 265-4602 (Cell)

---

Page 2

1   IN THE UNITED STATES DISTRICT COURT
        EASTERN DISTRICT OF MISSOURI
2              EASTERN DIVISION
3   RUSSELL SCOTT FARIA,      )
                             )
4       Plaintiff,           ) Cause No. 4:16CV-01175-JAR
                             )
5   vs.                      )
                             )
6   SERGEANT RYAN J. MCCARRICK, )
    et al.,                  )
7                            )
        Defendants.          )
8
9       VIDEO DEPOSITION OF LEAH L. ASKEY, taken on
10  behalf of the Plaintiff, on the 23rd day of October, 2017,
11  between the hours of eight o'clock in the forenoon and six
12  o'clock in the evening of that day, in the conference room
13  of the law offices of Barklage, Brett & Hamill, P.C., 211
14  North Third Street, St. Charles, Missouri, before Jane M.
15  Rich, Missouri CCR license #411.
16
17       A P P E A R A N C E S
18       The Plaintiff was represented by Mr. W. Bevis
19  Schock, Attorney at Law, 7777 Bonhomme, Suite 1300,
20  Clayton, Missouri 63105. Also present: Mr. Nathan
21  Swanson, co-counsel.
22       The Defendant, McCarrick, was represented by Mr.
23  Jason Retter, with the law firm of King, Krehbiel &
24  Hellmich, 2000 North Hanley, St. Louis, Missouri 63144.
25       The Defendant, Askey, was represented by Mr.

---

Page 3

1   Christopher L. Heigele, with the law firm of Coronado,
2   Katz, LLC, 14 West Third Street, Suite 200, Kansas City,
3   Missouri 64105. Also present: Ms. Leah Askey and Mr.
4   Neil Bruntrager, personal counsel for Ms. Askey.
5       The Defendant, Lincoln County, was represented
6   by Mr. Joel D. Brett, with the law firm of Barklage, Brett
7   & Hamill, P.C., 211 North Third Street, St. Charles,
8   Missouri 63301.
9       The Defendant, Merkel, was represented by Mr. J.
10  C. Pleban, with the law firm of Pleban, Petruska Law, LLC,
11  2010 S. Big Bend Blvd., St. Louis, Missouri 63117.
12      Also present: Mr. Mike Merkel.
13
14
15
16
17
18
19
20
21                  Exhibit
22                     2
23
24
25

---

Page 4

1               o-0-o
2          LEAH L. ASKEY,
3   of lawful age, having been first duly sworn to testify to
4   the truth, the whole truth, and nothing but the truth,
5   deposes and says on behalf of the Plaintiff as follows:
6          DIRECT EXAMINATION
7   QUESTIONS BY MR. SCHOCK:
8       Q   Miss Askey, as you know, my name's Bevis
9   Schock.
10      A   Yes.
11      Q   Would you please state your name?
12      A   My name is Leah Lenay Womack Askey.
13      MR. SCHOCK:  And let's do our announcements.
14  I represent the plaintiff, Russell Faria.
15      MR. SWANSON:  Nathan Swanson for plaintiff.
16      MR. RETTER:  Jason Retter for defendants
17  McCarrick, Merkel and Harney.
18      MR. PLEBAN:  J.C. Pleban for Merkel.
19      MR. MERKEL:  Mike Merkel.
20      MR. BRETT:  Joel Brett for Lincoln County.
21      MR. HEIGELE:  Chris Heigele for defendant
22  Askey.
23      MR. SCHOCK:  Miss Askey, I want to start by
24  stopping and waiting for the lawn mower to go by.
25      [Whereupon, there was a short pause.]

Page 5

1    Q   (By Mr. Schock)  Okay.  Let's get going again.
2  Kind of a false start there.
3        Ma'am, I want to ask you a little bit about your
4  training and your life.  So you went to college at San
5  Diego; right?
6    A   I did.
7    Q   And then you went to law school at St. Louis
8  University?
9    A   Correct.
10    Q   And when did you getting get out of St. Louis
11  University?
12    A   2006.
13    Q   And tell me what -- when you were admitted to
14  the bar?
15    A   October of 2006.
16    Q   And did you work in the legal field right
17  away?
18    A   I did.
19    Q   Who did you work for?
20    A   Myself.
21    Q   So you started a solo practice?
22    A   I did.
23    Q   Where was that?
24    A   In Troy.
25    Q   And how long did you do that?

Page 6

1    A   Until I became the elected prosecutor.
2    Q   Tell me what kind of cases you handled as
3  the -- in private practice.
4    A   A little bit of everything.
5    Q   Some criminal?
6    A   Yes.
7    Q   Domestic?
8    A   Yes.
9    Q   Personal injury?
10    A   Yes, I think so, yeah a couple of those.
11    Q   Did you try any cases to jury verdict in
12  private practice?
13    A   One.
14    Q   What kind of case was that?
15    A   It was a civil case.
16    Q   Tell me a little bit about it, just very
17  briefly.
18    A   It was a -- I represented a guy who had a
19  Rrainbow vacuum franchise and he was being sued by, for,
20  I think there was like unfair debt collection issues,
21  and he was being sued by the person who purchased the
22  Rainbow vacuum, but didn't pay for it, and so I
23  represented him.
24    Q   And that went to jury verdict?
25    A   Correct.

Page 7

1    Q   So when you became the elected prosecutor,
2  that was your only jury trial; is that right?
3    A   That's correct.
4    Q   Now you started prosecutors in two thousand --
5    A   Eleven.
6    Q   And that was?
7    A   January 1st.
8    Q   January?
9    A   Uh-huh.
10    Q   And this murder happened very late in 2011
11  right?
12    A   Correct.
13    Q   How many jury trials did you try during your
14  first year?
15    A   I don't know.
16    Q   Did you try any?
17    A   Yes.  I think my first trial was in January of
18  2011.
19    Q   And is that a crime -- I assume they're all
20  criminal cases?
21    A   Correct.
22    Q   Okay.  And so you really can't tell me how
23  many you have done?
24    A   I, I can't, no.
25    Q   Do you think you've done as many as one or two

Page 8

1  a month?
2    A   No.  Probably -- I mean, I would just be
3  guessing, but I would average probably five or six a
4  year, I would say.
5    Q   I understand.  When you became the elected
6  prosecutor, did you have any special training, either
7  before you ran, during the campaign, after your
8  election, before your swearing in and beginning office,
9  in how a prosecutor is supposed to function in the
10  Missouri justice system?
11    A   Can you rephrase that?
12    Q   Sure.  So we got -- You decided to run at some
13  point; right?
14    A   Correct.
15    Q   And you ran a campaign?
16    A   I did.
17    Q   And you won?
18    A   I did.
19    Q   Okay.  And during the time up to that
20  election, did you take any special training, go to any
21  classes given by the Attorney General, or anybody else,
22  about how one works as a prosecutor in the State of
23  Missouri justice system?
24    A   No.
25    Q   How about after your election, but before you

Page 9

1  assumed office?
2      A   No.
3      Q   How about after you assumed office until --
4  well, for the whole first year, 2011?
5      A   Yes.
6      Q   Okay. Tell me about that.
7      A   My first training was on January 13th of 2011,
8  and it was an elected prosecutor's meeting and training
9  for newly elective, and I went to that in Jefferson
10  City.
11         And then thereafter, we always -- the
12  Prosecutor's Association, Missouri Association of
13  Prosecuting Attorneys, we have two conferences each year
14  that specialize in just prosecution, and that type of
15  training, case law updates, changes in the law, anything
16  like that.
17      Q   Did -- Let's take that very first one on
18  January 13. So you're there with the other rookies;
19  right?
20      A   All of the electives that could be there, but
21  there were some of us that were newly elected.
22      Q   I understand. And how many days was that?
23      A   I don't remember.
24      Q   I mean, was it two or three days? I mean, was
25  it just a morning long, or give me a sense of it?

Page 10

1      A   Well, I know I stayed in a hotel at least a
2  couple of days, I think, but I don't remember how many
3  days, or how many hours it counted for.
4      Q   Various seminars and speakers, that sort of
5  thing?
6      A   Correct.
7      Q   Would you say that there's any specific one or
8  two major take-aways from that? I am curious whether
9  there are any, and what they are.
10      A   I don't remember specifically.
11      Q   Would you say one of them is, you're supposed
12  to do justice?
13      A   I don't remember specifically that we had a
14  specific class regarding that.
15      Q   You've held the office of prosecuting attorney
16  now for six or seven years; right?
17      A   Seven, yeah.
18      Q   Almost seven?
19      A   Yeah.
20      Q   Do you believe that it is the prosecutor's
21  first duty to do justice?
22      A   I believe that's one of our duties.
23      Q   What are some of the other primary duties of
24  of a prosecutor?
25         MR. HEIGELE: As far as her opinion?

Page 11

1      Q   (By Mr. Schock) Based on your understanding
2  today of the job, based on your knowledge, your
3  experience, your life experience, your attorney
4  training, everything, the whole bit.
5      A   I think part of the job is to serve my
6  community; part of my job is to be a good steward of the
7  tax dollar; part of my job is to see to it that justice
8  is served and that our witnesses are protected; part of
9  it is to provide safety, or ensure safety, and educate
10  about safety in our community where we live; part of it
11  is to serve as liaison between our law enforcement
12  agencies within the county that I work; part of it is to
13  work with my county commission to do the best job I can
14  to be a good steward of the tax dollar and to represent
15  the county in the best way that I know how.
16         I think there are just a lot of, a lot of things
17  that go into the job that I do.
18      Q   Would you agree that one of the jobs is to
19  scrupulously follow the Missouri Rules of Court?
20      A   Sure.
21      Q   In all prosecutions; right?
22      A   Sure.
23      Q   How many attorneys work in your office, other
24  than you today?
25      A   Currently, five.

Page 12

1      Q   How many when you first started in 2011?
2      A   I don't remember.
3      Q   Okay. When you assumed office -- First of
4  all, were you in a contested election that first time?
5      A   I was in -- I'm rethinking. I actually now
6  have four. We offered a job to another attorney, but he
7  isn't currently working there, so I have four attorneys
8  and then myself. Five total. Sorry.
9      Q   And I appreciate your correcting yourself.
10  And any time today that you figured out that you've made
11  an answer and it needs to be corrected, just stop and
12  we'll correct it; okay?
13      A   Perfect.
14      Q   And if you forget something and then you
15  remember it after the deposition, or you want to correct
16  it later, let your attorney know and he'll let me know;
17  fair enough?
18      A   Fair enough.
19      Q   So let's go back to this election. Was it a
20  contested election in 2011?
21      A   Yes.
22      Q   Primary and general, or both?
23      A   Just primary.
24      Q   There's a contested primary, so there was no
25  Democrat that ran?

Page 13

1    A  We were both Democrats.
2    Q  You were both Democrats.  Sorry.
3        And was the, was the person you ran against the
4  sitting prosecuting attorney?
5    A  He was.
6    Q  So unseated someone who would had been in that
7  office?
8    A  Correct.
9    Q  And who was that person?
10   A  G. John Richards.
11   Q  And did Mr. Richards have some attorneys
12 working for him in 2010 before you became the
13 prosecutor?
14   A  He did.
15   Q  And what happened to those people, as far as
16 retention into your administration?
17   A  Some of them stayed and worked with me, and
18 some of them chose not to.
19   Q  How many stayed?
20   A  Three.
21   Q  And how many were -- How many didn't stay?
22   A  Two.
23   Q  So that would have been, he had five?
24   A  I don't know that.  I know of two that didn't
25 stay.  I don't know if he had more than that.

Page 14

1      I gave them the opportunity to interview if they
2  wanted the position, and the ones that interviewed, I
3  hired.
4    Q  And you hired some new people, too?
5    A  Not right away.  Actually, three attorneys
6  stayed, I believe.
7    Q  I'm not too worried about the exact number.
8  I'm just trying to get a feel for this office is all I'm
9  trying to do right now.
10   A  Yeah.  I think I hired one attorney, I brought
11 one attorney in.
12   Q  And all the people who work as attorneys in
13 your office report to you; is that right?
14   A  What do you mean report to me?
15   Q  Well, you're their boss?
16   A  I am.  But what do you mean -- I don't
17 understand report to.
18   Q  Well, by just report to, I mean that that
19 person has to treat you as the boss, and you set policy
20 in the office and run the office; right?
21   A  I am the boss in the office, but to say anyone
22 comes in and reports to me on a daily basis would be
23 inaccurate.
24   Q  Are you responsible for assigning cases, for
25 example?

Page 15

1    A  Yes.
2    Q  Is there a system you put in place for that?
3    A  Correct.
4    Q  Was that put in place pretty early after you
5  became prosecutor?
6    A  It's been an evolving system depending on
7  who's working there, and depending on our case load.
8    Q  Okay.  When you hired in 2011, if I heard you
9  right, maybe there was just one new hire and then some
10 retained; is that right?
11   A  I believe so.
12   Q  What did you consider to be the qualifications
13 for a person to serve as a prosecutor when you made that
14 hire?
15   A  Well, obviously, they had to have their law
16 license.  The person that I hired had 25 years
17 experience, I think.
18   Q  As a lawyer, or as a prosecutor?
19   A  As a lawyer, as a prosecutor, as a judge, all
20 of those things.
21   Q  And who was that?
22   A  George Gundy.
23   Q  Does he still work for you?
24   A  No.  He retired.
25   Q  When you hired those people, did you tell them

Page 16

1  that --
2    A  Let me go back.
3    Q  Okay.
4    A  He, he retired, but he does still do special
5  appointments on different types of cases that may be
6  over, overly burdensome for the office to handle, so he
7  still does that on a contract basis with the county.
8    Q  Would you agree with the statement then when
9  you made that hire, you expected that person to do
10 justice?
11   A  Sure.
12   Q  In other words, I want to draw a distinction
13 between just getting convictions and doing justice.
14       Do you agree that to do justice means that if
15 you're in a prosecution and you reach a personal
16 conclusion that the defendant is not guilty, that the
17 charge should be dismissed?
18   A  I do.
19   Q  Do you believe that all your people should
20 follow that?
21   A  I do.
22   Q  Let's go right to this murder.  When did you
23 first become aware that there had been a murder on Sumac
24 Drive in Lincoln County?
25       And let me just give you, the date might help.

Page 17

1   The murder happened on the evening of the 27th of
2   December, 2011.
3       You agree with that date; right?
4       A   Correct.
5       Q   So tell me in reference to that time when you
6   first learned there was something.
7       A   When I first learned that there was a murder,
8   or I first learned that there was a death?
9       Q   Very good correction. Let's go with death.
10      A   That evening of the 27th.
11      Q   And how did you learn about that?
12      A   I don't remember exactly who called me, but
13  typically when there is a death, someone, either
14  dispatch, or someone from law enforcement will call and
15  let me know that they're headed to a scene because there
16  is a death, and they'll keep me posted if something is
17  amiss.
18      Q   Okay. Now, when you talk about a death of
19  some very old person, dies in the hospital, that's not
20  what we're talking about; right?
21      A   Correct.
22      Q   So this is a death that is of any suspicious
23  circumstances?
24      A   I wouldn't say any suspicious circumstances,
25  and that, again, has kind of evolved.

Page 18

1       Q   Talking about 2011 right now.
2       A   And I don't really remember in 2011 what the
3   situation was with regard to when they would contact me.
4       I just remember I got a call that they were
5   going out to a, to a residence that had been called in as
6   a suicide, and they let me know if, in fact, it was.
7       So normally, if there's a suicide, or something
8   like that, that's when I get a call. Not if someone, you
9   know, dies in their sleep, or whatever.
10      Q   Right. Of course. I understand.
11      They gave you the address?
12      A   No.
13      Q   They gave you the name?
14      A   No.
15      Q   Just told you they were on their way to a
16  situation?
17      A   Yeah. Basically, make sure your phone's on
18  and don't be in a sound sleep, essentially, you know,
19  giving me a heads-up, it's late in the evening, and just
20  giving me a heads-up that --
21      Q   So why do you think that you personally were
22  called?
23      A   Because I'm the prosecutor.
24      Q   Was it your procedure in place that they would
25  always call you?

Page 19

1       A   I don't think I had a procedure in place with
2   regard to that. I think they probably -- I would just
3   be speculating.
4       Q   Okay. That's fine. Did -- We've said "they."
5   I think you said you don't remember who called?
6       A   Correct.
7       Q   Is it your presumption it might have been
8   somebody from the sheriff's office, or dispatch in the
9   sheriff's office; does that sound right?
10      A   It would have been somebody that knew of the
11  call, so I don't, I don't know if it was the sheriff, or
12  the sheriff's office, you know, a deputy, or -- I don't
13  know exactly who it was. Or it may have been dispatch
14  for that matter.
15      [Whereupon, Mr. Neil Bruntrager entered the
16  room].
17      Q   What did you do in response to that phone
18  call?
19      A   Nothing.
20      Q   So it was late at night probably?
21      A   Yes.
22      Q   Did you just go to bed?
23      A   Yes.
24      Q   Kept your phone in a position where you could
25  be awakened?

Page 20

1       A   Correct.
2       Q   And what was your next contact regarding the
3   situation?
4       A   I don't remember specifically. That I, I
5   don't remember specifically.
6       Q   Do you think they called you that night?
7       A   I don't believe so.
8       Q   Now you're aware now that the Major Case Squad
9   was called out that night; correct?
10      A   Correct.
11      Q   Did you know that evening that the Major Case
12  Squad was going to be involved?
13      A   No.
14      Q   So you don't remember being called that night,
15  so is it a fair bet that you got up the next morning and
16  somehow had further involvement in this situation?
17      A   Yeah. As I recall, if memory serves me
18  correctly, I got a call that morning when I was getting
19  ready.
20      Q   To go to work?
21      A   Uh-huh. Getting my kids ready, yeah, and
22  said, you know, when will you be in, essentially.
23      Q   To the office?
24      A   Correct.
25      Q   And you said pretty soon?

Page 21

1    A   As soon as I drop the kids off, right.
2    Q   And you went in?
3    A   Correct.
4    Q   Now what happened in connection, your
5   involvement in this situation after you got to work that
6   morning?
7    A   I don't remember specifics.  I mean, I would
8   have gone next-door to the sheriff's office where the
9   Major Case Squad would have set up shop just to say I'm
10   here, I'm around, I'm next-door.
11    Q   You just said you would have.  Did you do
12   that?
13    A   I'm sure I did at some point.  I don't know if
14   I did that as soon as I got there, if I went into my
15   office first, I don't remember if there was a docket
16   that day.  I don't know.
17    Q   You had your regular duties?
18    A   Correct.
19    Q   So when you went into the Major Case Squad, do
20   you remember who was there?
21    A   No.
22    Q   There was a guy named Schimweg who was head of
23   the Major Case Squad for this murder; correct?
24    A   Correct.
25    Q   Do you think he was there?  Do you know him?

Page 22

1    A   I know him.
2    Q   Was he there?
3    A   I don't remember if he was there when I got
4   there, or not.
5    Q   How about, was McCarrick, Mr. McCarrick?
6    A   Again, I don't remember specifically who was
7   in the room.
8    Q   Did you gain knowledge when you went over
9   there about what was known at that point by law
10   enforcement?
11        Did you talk to them about the murder?
12    A   I don't remember specifically speaking to
13   anyone specific.
14        I know that -- Again, I would be, I would be
15   speculating what typically would happen.
16        I'm sure the sheriff was around, McCarrick was
17   probably around, because I think he was the report writer,
18   so he would have likely been there.
19        I don't remember when Lieutenant Schimweg
20   arrived, if he had arrived prior to me getting there, or
21   after.  I don't, I don't know those things.
22    Q   Okay.  That's fine.  Do -- Mr. McCarrick said
23   that there were meetings each day of the Major Case
24   Squad personnel, and I think he said that only the
25   people who were available would come, but these meetings

Page 23

1   would happen two or three times a day.
2        Do you remember when he said that?  Were you
3   present for his deposition?
4    A   I was.
5    Q   And do you remember when he said that?
6    A   I do.
7    Q   Is that consistent with your memory?
8    A   The Major Case Squad commander would have
9   briefings usually in the morning and in the afternoon
10   for whomever had returned from whatever lead they were
11   on.
12    Q   And did you attend any of those briefings?
13    A   I did.
14    Q   So it went on for the 28th, 29th, 30th, and
15   31st, according to Mr. McCarrick; does that sound right
16   for you?
17    A   That sounds correct.
18    Q   So roughly, two a day of these briefings;
19   right?
20        I'm not saying exactly, because he wasn't sure,
21   but that range; does that sound right?
22    A   Yeah.  I don't know if they had more, or less
23   than that.  I wasn't there all day.  I didn't sit over
24   there.  So, if I was in the building, or if I knew that
25   they were going to have a briefing at a specific time

Page 24

1   and I was available, and not in court, or doing
2   something else, I would come over to hear, to listen.
3    Q   Somehow you got word of what time they were
4   going to be?
5    A   Correct.
6    Q   So let's just talk about this very first day.
7        Did you go to a briefing on the 28th?
8    A   I don't remember if I did, or didn't.
9    Q   When did you find out that this death,
10   apparently, was a murder?
11    A   Some time on the 28th.
12    Q   And Mr. McCarrick seemed pretty confident
13   that -- there was a consensus in law enforcement very
14   quickly that it was a murder and not a suicide; do you
15   remember that in his depo?
16    A   That's correct.
17    Q   Okay.  And is that -- is your memory of those
18   early meetings on the 28th with the Major Case Squad
19   consistent with that, that it was a murder, not a
20   suicide?
21    A   Yes.
22    Q   Now, it turns out that that morning there were
23   some interviews by Major Case Squad with Pam Hupp, and
24   with people who had been known later as the alibi
25   witnesses.

Page 25

1    Do you remember learning on the 28th that those
2 interviews had taken place?
3    A   No.
4    Q   Did you learn that day that Russ Faria was a
5 suspect?
6    A   No.
7    Q   When do you think you learned that?
8    A   I don't recall.
9    Q   Now when you said you -- I think the question
10 was, did you learn Russ Faria was a suspect on the first
11 day, is it that you don't remember, or you're certain
12 you didn't learn of that the first day?
13    A   I don't remember what day I learned of it.
14    Q   Do you remember whether, on that first day,
15 you gave any directives to law enforcement about how to
16 conduct the investigation?
17    A   I never gave any directives to law
18 enforcement.
19    Q   Would you say that that applies to all four
20 days of the Major Case Squad call-out?
21    A   Yes.
22    Q   So I don't have to ask anymore questions about
23 that, you are a hundred -- I'm not trying to beat the
24 horse here, but I just want to make absolute clear, is
25 it your position that you gave no directives to anybody

Page 26

1 in law enforcement during the Major Case Squad call-out?
2    A   I did not direct any investigation, nor have I
3 ever.
4    MR. HEIGELE:  Excuse me, excuse me.
5    Q   (By Mr. Schock)  Slightly different question
6 than that.
7    Did you give any directives, any, any
8 statements, such as try this, or give that lead to anybody
9 in law enforcement during those first four days?
10    A   No.
11    Q   Would you say that you were an observer during
12 those briefings, as opposed to a participant?
13    MR. HEIGELE:  To the extent it's vague, I
14 object, but if you understand what he's saying.
15    A   I don't really understand what you're --
16    Q   (By Mr. Schock)  Sure.  Well, you said you
17 went to some of these briefings, we don't have a number,
18 we don't remember the exact number; fair enough?
19    A   Fair enough.
20    Q   But you went to some of them?
21    A   Correct.
22    Q   And they're having them roughly two a day;
23 right?
24    A   I don't know how many they were having, but I
25 know that they would typically have at least in the

Page 27

1 morning and in the afternoon, evening, but I don't know
2 if they had others during the daytime.
3    Q   We've already covered that.  I don't mean to
4 be going over the same material again.
5    I'm trying to get at your role in those
6 briefings.  You said you attended some of them, you don't
7 remember how many; right?
8    A   Correct.
9    Q   And do you think you ever spoke at any of
10 those meetings?
11    A   Sure.
12    Q   Okay.  Tell me some of the things you said.
13    A   I don't have any idea.
14    Q   Did you, for example, ever say that the law
15 enforcement should be looking at all possible suspects?
16    A   No, I don't -- I mean, I don't remember
17 anything specifically that I said.
18    Q   Do you -- So I guess we can just leave it like
19 that.  Let me just ask the question one more time to be
20 sure.
21    So as you're sitting here today, you don't
22 remember anything you said at any of those briefings?
23    A   No.  I mean, nothing specific.  I would have
24 just been communicating.  I mean, I didn't sit there
25 silently.

Page 28

1    Q   And I, I understand, so I'm trying to get at,
2 do you remember anybody saying anything that you
3 responded to, any sort of remark made by somebody where
4 you spoke up?
5    A   Not specifically in this investigation, I
6 don't recall.  I mean, I, I could tell you some of the
7 things that I might say in meetings like that.
8    Q   Well, I don't think I'd care about what you
9 might have said.  I think I care about what you remember
10 that you did say.
11    A   I don't remember specifically, you know,
12 anything.  I'm sure I asked, you know, questions with
13 regard to locations of different things, or which gas
14 station, or what bank, or what, you know, just for my
15 own personal knowledge, because I grew up around there
16 and I kind of know geographically where things are, so I
17 would have asked questions like that.
18    Q   So you said your questions might relate to
19 where Russ Faria went that night; would that be a fair
20 statement?
21    A   Not necessarily where he went, but I can --
22 and again, I'm completely speculating, but --
23    Q   Well, I don't want you to completely
24 speculate.
25    A   Okay.



Page 29

1    Q   I thought when you were talking a moment ago
2  you began to have some recall of some of the things you
3  said, and that's what I'm interested in.
4    A   I'm just recalling my role typically in a
5  situation, but I don't remember specifically about this
6  Major Case call-out.  I don't remember specific
7  questions that I would have asked.
8       I just know typically the kinds of questions I
9  would ask.
10   Q   Okay.  So let me go into some specifics about
11 the case and see if that triggers some of your memory.
12      There's been some discussion about a paw print
13 from the Faria dog on the pos derriere of the victim,
14 Betsy Faria.
15      Do you remember anything about the paw print?
16   A   I remember that someone said there was a paw
17 print.
18   Q   Do you know who that someone was?
19   A   It was someone in the briefing.
20   Q   And do you remember whether you made any
21 comments, or made any suggestions about such a paw
22 print?
23   A   I don't remember making any suggestions, or
24 comments.
25   Q   Okay.  Do you remember anything about any

Page 30

1  suggestions that the dogs paws be checked for blood?
2    A   I remember that that's -- Wait.  Can you
3  rephrase that question?
4    Q   Sure.  There's an issue in the case that
5  relates to the question whether the dog's paws would be
6  checked to see if there was blood on them.
7       And my question is, do you remember you're
8  having any role in regard to that issue?
9    A   I don't remember any role that I played, no.
10   Q   There's -- So when was the first time you
11 visited the crime scene?
12   A   I think it would have been the 28th.
13   Q   So the day after the murder?
14   A   It was either the 28th -- I mean, it was some
15 time during the Major Case call-out.  I can't remember
16 if it was the first day, or the second, or the third,
17 but it was some time shortly after.
18   Q   How did it come about that you went to the
19 crime scene?
20   A   I don't understand the question.
21   Q   Sure.  So one moment you are in your office,
22 or you're in court, or you're at the Major Case Squad
23 briefing, and the next minute you're going to that crime
24 scene, what led to that decision to go to the crime
25 scene?

Page 31

1    A   I don't know what led to it, or if I just
2  said, I want to go out there whenever it's clear that I
3  can go out there.
4    Q   So did you ask someone whether you could go?
5    A   I, I don't, I don't recall specifically, but I
6  probably told the commander that.
7    Q   That you wanted to go?
8    A   That's, that's typical, that the prosecutor
9  would go to the crime scene, so I let him know that I
10 would like to go whenever the crime scene was cleared.
11   Q   And Schimweg, is that who you're talking
12 about, or McCarrick, or who?
13   A   I don't remember if I told Schimweg, or I told
14 McCarrick, or I told the sheriff, but I know that it was
15 someone in higher rank than me knew that I wanted to go
16 out when the crime scene was cleared, for me to be able
17 to walk into it.
18   Q   When you say higher rank, what do you mean by
19 that?
20   A   I mean they were conducting an investigation
21 and I didn't want to interfere with that, I couldn't go
22 in until that investigation and the crime scene had been
23 cleared, so to speak, for me to be able to go in once
24 they were done doing all the things that they do.
25   Q   Now the word clear is, just to resolve any

Page 32

1  ambiguity, sometimes the word clear means that there's
2  no more bad guys hiding in the house, and sometimes it
3  means that they're finished taking measurements, and
4  photos, and that sort of thing; right?
5    A   Correct.  Not clearing a residence for safety
6  purposes, but clearing so that other people can walk
7  into it, so it doesn't contaminate the scene.
8    Q   Right.  Do, do you recall that there were
9  gloves at the scene on the sofa near where Betsy Faria's
10 body was?
11   A   Based on my recollection of being at the
12 scene?
13   Q   Any part of your knowledge of the case.
14      Do you know, as you sit here now, that there
15 were gloves on the sofa?
16   A   I know that there were photographs -- I
17 remember a photograph of gloves on the sofa, but I don't
18 recall seeing those when I was there.
19   Q   Do you recall any discussions during the Major
20 Case Squad call-out regarding the gloves?
21   A   No.
22   Q   Do you recall any discussions about checking
23 the gloves for blood?
24   A   No.
25   Q   When you were involved in those briefings, did

Page 33

1  it seem to you that the Major Case Squad had identified
2  a primary suspect?
3      A   I don't recall.
4      Q   When you were involved in those briefings, did
5  it seem to you that the Major Case Squad was considering
6  more than one suspect?
7      A   Yes.
8      Q   Okay. Who were they considering as suspects?
9      A   They ran down hundreds of leads for -- I mean,
10  various leads they had people going out on.
11      Q   Yeah, the daughters; right?
12      A   I, I recall the daughter and maybe her
13  boyfriend. There was an ex-husband, I believe.
14      Q   Somebody in Florida; right? A relative, or
15  somebody? Maybe that was the ex. Does that ring a
16  bell?
17      A   I don't remember where he was located.
18      Q   McCarrick spoke about somebody out of town;
19  right?
20      A   I believe so. I know there were several
21  different ideas, or avenues they went down.
22      Q   Okay. Fair enough. Do you remember whether
23  there was any discussion in the Major Case Squad
24  briefings that perhaps Pam Hupp had committed the murder
25  of Betsy Faria?

Page 34

1      A   I know that they were looking at Pam Hupp as
2  well.
3      Q   Let me just try to ask that question more
4  specifically.
5          Do you remember whether there was any discussion
6  in any Major Case Squad briefing that Pam Hupp was a
7  suspect in the murder of Betsy Faria?
8      A   I don't remember there being any discussion of
9  anyone being a suspect, so to speak.
10      Q   Well, you knew that Russ Faria was in custody;
11  didn't you? The first day. I mean, you knew that;
12  right?
13      A   He was -- I didn't think he was in custody the
14  first day. I don't remember when, and I don't know that
15  I know, or knew when they placed him on a 24-hour hold.
16      Q   Well, okay, let me -- got to be careful of our
17  semantics here.
18          When you got to the briefing -- Well, when you
19  got to the Major Case Squad headquarters, did you learn
20  that Russ Faria was at the police station, and/or had
21  been, been in discussions with law enforcement during the
22  course of the prior night?
23      A   I learned that Betsy Faria's husband was a
24  cooperating witness. That's what I learned when I first
25  got there.

Page 35

1      Q   What's the next thing you learned about Russ
2  Faria's involvement in the murder?
3      A   I don't recall.
4      Q   Do you understand as you sit here now that in
5  the afternoon of the 28th, we'll call it roughly two
6  o'clock, that Mr. Faria went to Lake St. Louis for a
7  polygraph?
8      A   I know that he went for a polygraph, but I
9  didn't know where he went.
10      Q   Did you have any influence in the decision
11  that he would be taken for a polygraph?
12      A   No.
13      Q   When did you learn the results of the
14  polygraph?
15      A   I don't remember.
16      Q   Did you learn it during the call-out?
17      A   Yes.
18      Q   Mr. McCarrick stated that once he had the
19  results of the polygraph that he concluded that Russ
20  Faria was, "his guy," I think was his term. Do you
21  remember that in that meeting, in those meetings?
22      A   No.
23      Q   Have you ever seen the raw data results of
24  that polygraph?
25      A   No.

Page 36

1      Q   Do you know where they are today?
2      A   No.
3      Q   Do you know if the polygraph examiner actually
4  obtained raw data?
5          Now raw data, what I mean is, in a polygraph
6  they check things like respiration, blood pressure, heart
7  rate, sweating, things like that; right?
8          Do you understand that?
9      A   If you're explaining that to me, I don't know
10  much about polygraphs and how they work.
11      Q   Okay. Well, I'll submit to you that a
12  polygraph checks attributes of the body when the person
13  is asked questions. Does that sound right to you?
14      A   Yes.
15      Q   And some of the things that are checked are
16  the things that I mentioned. Does that sound right to
17  you?
18      A   I don't know what's checked, but I know that
19  they register certain things.
20      Q   Okay. Do you understand that a polygraph
21  examiner normally has a formal written record of those
22  bodily responses?
23          MR. HEIGELE: Calls for speculation.
24      Q   (By Mr. Schock) I'm asking if she knows it.
25  That's not speculation, that's, does she know?

23

9 (Pages 33 to 36)

Page 37

1    A   I don't know what typically occurs.
2    Q   Okay.
3        MR. HEIGELE:  Hence, my objection.
4    Q   (By Mr. Schock)  Have you ever spoken to the
5   polygraph examiner in the case, the one who examined
6   Russ Faria on the 28th?  About this, about this.  That
7   polygraph?
8    A   At what period of time?
9    Q   Any time since the -- since he took that
10  polygraph, have you ever discussed that polygraph with
11  him?
12   A   I have spoken with him.  I have not discussed
13  the polygraph itself.
14   Q   Okay.  Tell me about your -- First of all,
15  when did you have the conversation with the polygraph
16  examiner?
17   A   After the first trial, before the second.
18   Q   What was the substance of the conversation?
19   A   Do you have any other reports?  Because
20  defense attorney is now asking for them.
21   Q   And what did he say?
22   A   He said something to the effect of, I can't be
23  specific, because I don't know exactly what he said, but
24  he said he was -- I think he was at a different location
25  at that point, a different agency, and he would have to

Page 38

1   check with the agency, or wherever he was before and get
2   back to me.
3    Q   Did he get back to you?
4    A   He did.
5    Q   What did he say?
6    A   He said that those records were -- something
7   to do with his computer, or their computer, or
8   somebody's computer, at any rate, had not retained those
9   records, mostly, I guess -- well, I'm speculating as to
10  why they weren't retained.  I don't know why they
11  weren't retained, but nonetheless, he didn't have them.
12   Q   Is it your understanding as you sit here today
13  that those records do not exist because of some sort of
14  computer mechanical?
15       I mean, do you believe what he said?
16   A   I have no reason to doubt him.
17   Q   Well, that's not what I asked.  Do you believe
18  him?
19   A   Sure.
20   Q   And do you have any explanation as to why
21  those computers, mechanical systems failed to retain
22  that data?
23   A   I don't know that they failed to retain the
24  data, or that the data was -- had been either gotten rid
25  of, or lost after the first trial.

Page 39

1        I don't know that they've -- It failed to retain
2   it from the beginning, but they were never requested at
3   the beginning, because by agreement, actually, by request
4   of the defense counsel, there was no reference to be made
5   to the polygraph, and so...
6    Q   Well, polygraphs are inadmissible in court;
7   right?
8    A   Correct.
9    Q   So that would be normal; right?
10   A   Correct.  So there was no reason to retain it.
11   Q   Well, you understood that -- Did you
12  understand during the Major Case call-out, Major Case
13  Squad call-out that Mr. McCarrick believed that the
14  results of the polygraph were dispositive as to who had
15  committed the murder?
16   A   No, I don't remember any conversation about
17  what McCarrick thought about the polygraph.
18   Q   As you sit here right now, do you have any
19  knowledge of any way to obtain the raw data from that
20  polygraph?
21   A   Can you ask that again?
22   Q   Sure.  Do you know any way we could get that
23  raw data?
24   A   I don't.
25   Q   Fair enough.

Page 40

1        MR. HEIGELE:  You could do it now.
2    Q   (By Mr. Schock)  Let's go to the release of --
3   Well, first of all, let me back up.
4        You understand that two officers went and
5   interviewed Pam Hupp early in the morning on the 28th,
6   roughly 6:00, 6:30 in the morning.
7        Do you know that?
8    A   I do now.
9    Q   When did you first learn of that interview of
10  Miss Hupp?
11   A   I don't remember.  Some time during the Major
12  Case call-out.
13   Q   Okay.  Do you remember that it was an officer
14  named Kaiser, or maybe one named Smith who did that
15  interview?  Does that ring a bell?
16   A   I remember Stephanie Kaiser.
17   Q   She was one of the people who was there;
18  right?
19   A   Correct.
20   Q   Do you remember Miss Kaiser making any oral
21  report about that interview in any briefing that you
22  were in at the Major Case Squad?
23   A   I remember her talking about having gone
24  there.
25   Q   Do you remember anything she said about the

Page 41

1   specifics of her conversation?
2       A   Just that she was cooperative.
3       Q   Do you remember anything that Miss Kaiser, or
4   I will submit to you the other officer was named Smith;
5   does that sound right?
6       A   It could be.
7       Q   Well, let's just assume I'm right on that;
8   fair enough?
9       A   Okay.
10      Q   I'm pretty sure I'm right on that.  Do you
11  remember any details such as statements by Miss Hupp
12  that Russ Faria had made comments to Betsy about
13  smothering her with a pillow?
14      A   Do I remember any -- Can you rephrase that?
15      Q   Sure.  I think you've said that you recall
16  that Kaiser and Smith made some sort of report about
17  their -- oral report now -- about their interview of
18  Miss Hupp; right?
19      A   Correct.
20      Q   And you were there and you heard that; right?
21      A   I heard a report by them, but I don't remember
22  them talking about a pillow.  The only thing I remember
23  specifically in their report back was that she was
24  cooperative.
25      Q   Okay.  And I want to kind of probe a little

Page 42

1   bit, maybe I'll trigger some memories.
2       Do you remember anything said by -- in their
3   report that Russ Faria had been abusive to his wife?
4       MR. HEIGELE:  The oral report?
5       Q   (By Mr. Schock)  Yeah.  We're starting with
6   the oral report.
7       A   I don't remember hearing that in a, in a Major
8   Case briefing setting at all.
9       Q   You know now that that's what she said; right?
10      A   I don't remember her saying that he was
11  abusive.
12      Q   Well, there's a, there's a transcript of that;
13  right?  Of that meeting with them, with Hupp and with
14  Kaiser and Smith that morning on the 28th; right?
15      A   If there is, then Mr. Schwartz's office put
16  that together.  I've not read it.
17      Q   Tell me how you have obtained knowledge about
18  the interview of Miss Hupp by Kaiser and Smith?
19      A   I don't remember specifically.  I just know
20  that over these last several years I've gained knowledge
21  of it.
22      Q   Okay.  And do you remember reading a report
23  that they wrote during the four-day call-out?
24      A   I wouldn't have read it during the four-day
25  call out.

Page 43

1       Q   Okay.  Might have been prepared later?
2       A   Yeah.  I, I wouldn't have gotten those binders
3   for several months probably.
4       Q   And -- But you do remember that they did come
5   and make some kind of an oral report?
6       A   I remember Stephanie Kaiser saying that, that
7   Pam Hupp was cooperative, that's the extent of my memory
8   of those -- that oral report anyway.
9       Q   Fair enough.  Let's go now to the alibi
10  witnesses.  Is it your recall that during the first day
11  there was a discussion of Russ Faria's whereabouts the
12  night of the murder?
13      A   I don't know that I recall that, but I'm sure
14  that that was the case.
15      Q   Okay.  That's good enough.  Do you recall that
16  they were looking closely at his whereabouts during the
17  day, and that he'd been -- it was pretty much
18  established that he'd been at his home office at work
19  until one o'clock; right?
20      Does that sound right?
21      A   I know that's what he said.
22      Q   How do you know that's what he said?
23      A   Because I remember -- Well, because I've
24  watched the interview and know he said that.
25      Q   And I'm not really as interested in -- Well,

Page 44

1   I'm interested in the interview depending on when you
2   watched it.
3       When did you watch that interview?
4       A   Before trial.
5       Q   Okay.  Before trial's a long period of time.
6   Did you see it in December of 2011?
7       A   Oh.  No, not in December.
8       Q   The first four days after the murder?
9       A   No.
10      Q   Did you see it before January 4th, say, after
11  Mr. Faria was in jail?
12      A   I would doubt it.  I don't think so.
13      Q   All right.
14      A   I may have.  I don't remember.
15      Q   All right.  Fair enough.  Do you remember that
16  the Major Case Squad was interested in Mr. Faria's
17  whereabouts on the 27th of December, 2011?
18      A   Yes.
19      Q   That was, that was pretty important to them;
20  wasn't it?
21      A   Correct.
22      Q   And we know now that he was at work that day;
23  right?
24      Do you question that, or do you agree with that,
25  until five o'clock?

Page 45

1    A   I don't know where he was. I know where he
2    says he was until five o'clock that day.
3    Q   Okay. Well, did you do any checking of his
4    records with his employer, because he worked on
5    computers and phone calls for his employer; right?
6    A   Correct.
7    Q   I mean, did you check with them to see whether
8    he, in fact, had engaged in his job during that period
9    of time, until five o'clock?
10   A   I did not.
11   Q   Did anybody?
12   A   I believe so.
13   Q   Who did that?
14   A   I can't recall.
15   Q   Was that a known fact during the call-out?
16   A   What?
17   Q   That he'd worked that day until five o'clock?
18   A   I don't, I don't know if it was a known fact
19   to anybody. It may have been, but it wasn't to me.
20   Q   Okay. How about that he went to various
21   places to get the dog food, and the cigarettes, and the
22   gas between 5:00 and 6:00 p.m. on the 27th, did you know
23   that during the Major Case Squad call-out?
24   A   Yes.
25   Q   How did you learn that during the Major Case

Page 46

1    Squad call-out?
2    A   I think somebody reported it.
3    Q   In one of those briefings?
4    A   I believe so.
5    Q   Did you believe that he had gone to those
6    places?
7    A   I believe so. I don't remember at the time
8    what I thought. I think they provided video footage, or
9    something, so I would have -- whenever I saw that, I
10   would have believed it, sure.
11   Q   Sure. I mean, there he was --
12   A   Yes.
13   Q   -- pumping gas.
14   A   Right. But I don't know when I saw those.
15   Q   Okay. Fair enough. Is it your recall that an
16   issue in the matter was where he -- was his whereabouts
17   between 6:00 and 9:00 that night?
18   A   I don't recall.
19   Q   During, during the Major Case Squad call-out,
20   was an issue going around in the discussions of law
21   enforcement as they investigated the crime, his
22   whereabouts between 6:00 and 9:00?
23   A   I recall that the issue was where he was after
24   his wife got home.
25   Q   Okay. Because it was kind of a known fact

Page 47

1    that she had gotten home around 7:00, or 7:15; right?
2    That was a pretty much known fact?
3    A   That was the belief.
4    Q   Okay. I mean, the evidence pointed to that;
5    right?
6    A   That's what -- That was the belief based on
7    witness statements.
8    Q   Sure. Including Pam Hupp; right?
9    A   Correct.
10   Q   And including, there was some kind of phone
11   call between Pam Hupp and her husband, and maybe Betsy
12   had gotten on the phone; right? About 7:15, does that
13   ring a bell?
14   A   Betsy had left a message for Pam Hupp's
15   husband, as I recall.
16   Q   Right. And that was a known fact because
17   they'd looked, because some investigators had looked at
18   the husband's phone?
19   A   It was a known fact that she left the message,
20   but it was not a known fact as to where she was when she
21   left the message.
22   Q   Fair enough. But it was a pretty solid fact
23   that she was alive a little after 7:00; right?
24   A   It was a solid fact that she was alive when
25   she left the message, whatever time that was.

Page 48

1    Q   And was it your understanding that that was a
2    few minutes after seven?
3    A   It was after seven, but I can't tell you what
4    time.
5    Q   You think it was before eight?
6    A   Correct.
7    Q   So it was some time before 7:30, does that
8    sound right?
9    A   That sounds correct.
10   Q   So she was alive between 7:00 and 7:30, and
11   that was a known fact in the investigation; right?
12   A   Correct.
13   Q   So there really wasn't a lot of thought that
14   Russ Faria had killed his wife before he left his home
15   to go to get the dog food, and the gas, and all that;
16   right?
17   A   Correct.
18   Q   Now, are you aware that Russ Faria asserted
19   that between 6:00 and 9:00, and when I say asserted, I
20   mean what he had said in his interviews in the course of
21   the night after the murder, that he'd been at some
22   friends for game night, a regular event that he had with
23   his pals?
24   A   Am I aware that he said that?
25   Q   Yes.



Page 49

1    A   Yes, I'm aware.
2    Q   And you were aware during the call-out that
3  that was what he said; correct?
4    A   Correct.
5    Q   Because you went to the briefings; right?  At
6  least some of them?
7    A   At least some of them.
8    Q   And that was a subject of major discussion;
9  right?
10   A   Not in all of them, but it was, it was
11 certainly discussed at some point.
12   Q   Okay.  And so it's a fair statement that if
13 Russell Faria was at game night between 6:00 and 9:00
14 with his friends, he couldn't be at home at 7:15; right?
15   A   Can you ask that again?
16   Q   You can't be two places at once; right?
17   A   I will agree you can't be two places at once.
18   Q   So if the alibi witnesses were telling the
19 truth, he was with them between, as we said, roughly
20 7:00 to 7:30; right?
21   A   I don't understand the question.
22   Q   Well, sure.  If Russ Faria said in his
23 statements, we've established that, and you knew about
24 it during the call-out, that he'd been with his friends
25 from 6:00 to 9:00; right?

Page 50

1    A   Yes, he said that.
2    Q   And that's, that's an alibi in this case;
3  right?
4    A   Correct.
5    Q   Okay.  And you knew that the office -- some
6  officers had gone and interviewed the alibi witnesses;
7  right?
8    A   I knew that they did at some point, yes.
9    Q   Well, you knew they did it the morning after
10 the murder; right?
11   A   I don't know when I learned that they had done
12 that.
13   Q   Well, that was a major discussion in the Major
14 Case Squad; wasn't it?
15       MR. HEIGELE:  Misstates her testimony as to
16 quote, unquote, "major" that she was a part of.
17   A   I don't remember when I learned that they had
18 been there to talk to the people that Russ said he was
19 with that night.
20   Q   (By Mr. Schock)  We're talking about Corbin,
21 Sweeney, Holian, Bach, maybe one other I can't remember;
22 right?
23   A   That's all.
24   Q   Okay.  So you're not, as you sit here now, you
25 don't remember discussions on, for example, the first

Page 51

1  day about officers having interviewed those alibi
2  witnesses; is that true?
3    A   I don't remember specific discussions.  I'm
4  sure they would have said somebody went and followed
5  this lead and talked to these people, but I don't
6  remember anything specific about that.
7    Q   Now in his deposition, Mr. McCarrick said that
8  he believed that Mr. Faria was, in fact, at the alibi
9  witness, Corbin's house, from 6:00 to 9:00.
10       Do you remember that that was a conclusion of
11 the Major Case Squad, a consensus of the people working on
12 it?
13       MR. HEIGELE:  That misstates his testimony.
14 That's not the consensus of the Major Case Squad.  It
15 was the belief of Detective McCarrick.
16       MR. RETTER:  I'll join.
17       MR. SCHOCK:  And I think that's correct, and I
18 want to restate.  Thank you very much.
19       MR. HEIGELE:  That's why I'm here.
20       MR. SCHOCK:  Just to help, right?
21   Q   (By Mr. Schock)  Let's go back.  You were
22 present for McCarrick's testimony; right?  His, his
23 deposition a few weeks ago?
24   A   I was.
25   Q   And he said that it was his opinion that the

Page 52

1  alibi witnesses were telling the truth, and that Russ
2  Faria was at Corbin's house from 6:00 to 9:00; do you
3  remember that?
4    A   I remember that he said he thought that Faria
5  was there.  I don't remember that he said that he
6  thought they were telling the truth.
7    Q   All right.  But he definitely believed that;
8  right?
9    A   That's what, that's what he stated.
10   Q   Okay.  And do you remember any discussion of
11 whether, in fact, Faria was at Corbin's house in Major
12 Case Squad discussions during the call-out?
13   A   I don't understand the question.
14   Q   Sure.  Let me ask it again.  Call-out went for
15 four days?
16   A   Yes.
17   Q   Purpose of the Major Case Squad was to
18 investigate the murder of Betsy Faria; right?
19   A   Correct.
20   Q   Russ Faria was a suspect; right?
21   A   At some point.
22   Q   Lady was alive at 7:15; right?
23   A   She was alive some time around 7:00.
24   Q   Okay.  Close enough.  And she was dead by
25 9:40; right?

27                              13 (Pages 49 to 52)

Page 53

1    A   Correct.
2    Q   The Case Squad's investigation included
3  whether Russ Faria could have committed the murder;
4  right?
5    A   Correct.
6    Q   I mean, you can't charge somebody with a
7  murder unless there is a way that he can have done it,
8  which is consistent with the known forensic physical
9  evidence; true?
10   A   You can't charge someone with a murder without
11  probable cause to do so.
12   Q   Which means there has to be a way to believe
13  that the person's whereabouts and ability to do the
14  murder is consistent with the physical evidence;
15  correct? And the other, and the oral evidence; correct?
16   A   I think it's a matter of semantics, if a crime
17  has been committed, and you have probable cause to
18  believe that a person committed a crime, you can charge
19  the crime.
20       And a lot of things go into whether or not you
21  have probable cause. The person's whereabouts is not the
22  only thing that would go into it.
23   Q   Of course. Do you agree with the statement,
24  though, that if, let's say, a person is a suspect in a
25  crime, take, take the relative, I think it was Florida,

Page 54

1  let's just say it was Florida, right, and because the
2  person was a relative, maybe that person was a suspect;
3  right? Had to be checked; right?
4       MR. HEIGELE: Just a check, I think it was an
5  ex-husband instead of a relative.
6    Q   (By Mr. Schock) Okay. Correct?
7    A   He had to be checked as to --
8    Q   Whether he was going to be somebody who
9  committed the murder; right?
10   A   Well, yes.
11   Q   And that guy turned out to have been out of
12  state?
13   A   Correct.
14   Q   So he really wasn't a suspect anymore; right?
15   A   Correct.
16   Q   Because he wasn't there; right?
17   A   Correct.
18   Q   So do you agree that if someone is not with
19  the person who was murdered at the time of the murder,
20  then they didn't commit the murder; is that true?
21   A   I believe if a person isn't with the victim at
22  the time of the murder, they didn't personally commit
23  the murder.
24   Q   Okay. That's pretty logical; right? Nothing
25  complicated about that?

Page 55

1    A   That's true.
2    Q   And that's why alibi testimony in a murder
3  case, where there's a suspect is very important; is that
4  a true statement?
5    A   That would be true.
6    Q   Okay. And so McCarrick said that he believed
7  that Russ Faria was with Michael Corbin and the others
8  at Corbin's house from 6:00 to 9:00; right?
9    A   That's what McCarrick said, yes.
10   Q   Now you were at some of those meetings. Was
11  it your sense that that was just McCarrick's opinion, or
12  it was the opinion of, sort of a concensus of the people
13  in the briefings on the Major Case Squad?
14   A   I don't remember McCarrick ever offering his
15  opinion at the briefings. His job was to be the report
16  writer.
17       I don't remember him offering any opinion,
18  because he didn't follow any leads.
19   Q   Well, was it -- You're familiar with how the
20  Major Case Squad works; right?
21   A   Correct.
22   Q   Officers rely on each other; right?
23   A   They do.
24   Q   And the point is, someone might go out and
25  investigate a lead and they come back and report on what

Page 56

1  they found; right?
2    A   That's correct.
3    Q   And then that information's put in the mix;
4  right?
5    A   That's correct.
6    Q   It's customary, in fact, to rely on what
7  officers say about what happened when they go out and
8  investigate a lead; right?
9    A   Absolutely.
10   Q   They trust each other; right?
11   A   That's correct.
12   Q   That's the essence of what they're doing, is
13  to work together; right?
14   A   Yes.
15   Q   Okay. Do you remember whether various
16  discussions occurred during the Major Case Squad
17  call-out, during these briefings -- And were the
18  briefings someone standing up and saying what they knew,
19  or were they discussions? What about that?
20   A   The briefings that I was present for involved
21  the commander asking whomever was at the table what they
22  learned on the specific leads they went out on.
23   Q   Perfect.
24   A   Those people would say.
25   Q   And then would there be discussion among the

Page 57

1  group about how that fit into the larger context of the
2  investigation?
3      A   Not typically at that point. They would just
4  report on what they found, and then that would determine
5  whether or not it led to another lead.
6      Q   Well, you had to discuss the meaning of the
7  lead to do that; right?
8      A   I don't understand the question.
9      Q   Well, you just said that when they finished a
10  report on a lead, then that information would be put
11  into the mix to decide whether to continue to pursue a
12  given lead, to go in a different direction, that
13  involved discussion; right?
14      A   But the discussion wasn't specifically about
15  the, the report that they said, as I recall.
16      Q   Well, all -- Lots of leads were coming in all
17  the time; right?
18      A   Correct.
19      Q   People were going out and investigating,
20  things; right?
21      A   Correct.
22      Q   And these discussions, or the point was to try
23  to assemble information to find out the truth; correct?
24      A   It was -- The purpose was to try to manage the
25  leads with the manpower that was there to handle them.

Page 58

1      Q   But the overriding purpose was determined, was
2  to determine who killed Betsy Faria; right?
3      A   The overriding purpose was to gather as much
4  information as possible in a short amount of time.
5      Q   Well, there was no purpose to sift through
6  that information and determine who the murderer was?
7          Was it only to gather information, or was it
8  also to draw conclusions?
9      A   I don't think the -- I don't think it's their
10  goal. I would be speculating as to what their goal is,
11  because I don't know.
12      Q   Do you think one of their objectives was to
13  exclude people who surely didn't commit the murder, like
14  the ex-husband in Florida. Was that an objective?
15      A   I don't know.
16      MR. SCHOCK: Do you want to take a break?
17      MR. BRUNTRAGER: I do.
18      MR. SCHOCK: It's 10:11, should we go off the
19  record?
20      MR. HEIGELE: I was going to ask if you were
21  at a breaking spot.
22      MR. SCHOCK: Let's go off the record.
23      [Whereupon, there was a short break].
24      Q   (By Mr. Schock) Miss Askey, where we were was
25  discussing this Major Case Squad thought, collective

Page 59

1  thought maybe of Russell Faria's whereabouts from 6:00
2  to 9:00.
3          And I want to know -- I guess we've established
4  that McCarrick stated that it was his opinion in the
5  briefings that Russ Faria was at Corbin's house from 6:00
6  to 9:00.
7          Do you remember that?
8          MR. HEIGELE: It's misstates the testimony.
9  You're talking about his deposition.
10      Q   (By Mr. Schock) He said at the deposition for
11  sure; right?
12      A   At the deposition he said that that was his
13  belief, correct.
14      Q   And let's now go back -- Thank you,
15  Mr. Heigele -- let's now go back to those briefings.
16          Do you remember any discussions in those
17  briefings about the question as to whether Russell Faria
18  was or was not at Corbin's house from 6:00 to 9:00?
19      A   I remember discussion that he said that he was
20  at Corbin's house from 6:00 to 9:00, and I remember
21  discussion that Corbin and the other three said he was
22  there during that evening.
23      Q   Do you remember whether there was any
24  discussion of the credibility of those statements?
25      A   I don't remember discussion regarding the

Page 60

1  credibility, no.
2      Q   I mean, do you agree that -- Well, you said
3  that the purpose of the Major Case Squad was to gather
4  information?
5      A   Correct.
6      Q   And I started to ask you, I guess maybe that's
7  when we stopped, whether it was also to obtain the truth
8  as to what happened, as opposed to just gathering
9  information, but actually figure out what occurred?
10      A   Well, that would be the ultimate hope, sure.
11      Q   Right. That's the object of the game; right?
12      A   Correct.
13      Q   Do you agree with the statement that to do
14  that, people on the Major Case Squad have to discuss
15  leads, weigh credibility of witnesses, things like that?
16      MR. HEIGELE: Vague, but go ahead.
17      A   They certainly discuss leads and do their best
18  to verify what they're told.
19      Q   (By Mr. Schock) Do you remember whether
20  McCarrick said in any Major Case Squad meetings that he
21  believed that Russ Faria was at Corbin's house that
22  night?
23      A   No.
24      Q   So you don't remember either way, or you
25  remember he didn't say that?

Page 61

1    A   I don't remember McCarrick speaking in those
2   meetings.
3    Q   Okay.  Do you remember anybody else stating
4   that it was their belief, based on all the information
5   that had been gathered through the point of the
6   statement that Russ Faria was, in fact, at Corbin's
7   house?
8    A   No.
9    Q   So you don't remember anybody really saying
10   that in those meetings?
11    A   No.
12    Q   Do you remember a discussion which was in the
13   other direction, oh, gosh, he wasn't there?
14    A   No.
15    Q   So you don't remember either way any
16   discussions about Faria's whereabouts between 6:00 and
17   9:00 on the 27th of December, 2011?
18    A   I remember just the discussions that I told
19   you about, that he said he was there, and that they said
20   he was there, but not whether anyone believed that to be
21   truthful, or not truthful, for that matter.
22    Q   Do you remember any discussions about the
23   first responders' remarks about the condition of the
24   body when they arrived at roughly -- You agree they
25   arrived at roughly 9:50 on the 27th, is that about the

Page 62

1   time they got there?  Pretty close?
2    A   Give or take five or 10 minutes.
3    Q   Okay.  So do you remember any discussions in
4   the Major Case Squad, meetings about what the first
5   responders, fire and ambulance said about the condition
6   of the body?
7    A   Vaguely.
8    Q   What do you remember?
9    A   I remember that someone was
10   assigned to talk to them.
11    Q   Right.
12    A   Well --
13    Q   There's reports about that?
14    A   Well, I'm not, I not sure that I remember
15   that.  I don't know if they made statements to our, the
16   deputies that were first on scene and that's how the
17   information trickled back, or if someone was assigned
18   specifically to speak with them.
19         But somehow, I remember that some of their
20   statements came back to the Major Case Squad.
21    Q   Okay.  How many Major Case Squad
22   investigations have you been involved in in your role as
23   prosecutor?
24    A   Now?
25    Q   Yes.  Through today.

Page 63

1    A   I think five.
2    Q   How many had you done at the time of this
3   murder?
4    A   That was my second.
5    Q   Okay.  Tell me about the first one.  What
6   happened?
7         What was the subject of the first one?
8    A   It was a murder.
9    Q   In Lincoln County?
10    A   Correct.
11    Q   And did that murder end up with -- Did that
12   investigation reach a conclusion as to who had committed
13   the murder?
14    A   Yes.
15    Q   Was that person prosecuted by you?
16    A   He was.
17    Q   What happened in that prosecution?
18    A   The prosecution prevailed.
19    Q   Plea, or trial?
20    A   Trial.
21    Q   Did you try that case yourself?
22    A   I did.
23    Q   Do you believe that the person who was found
24   guilty of that murder did, in fact, commit that murder?
25    A   I do.

Page 64

1    Q   So at the time of this Major Case Squad
2   call-out, it wasn't your first time, you were familiar
3   with their procedures; right?
4    A   Somewhat.
5    Q   And you were familiar with the fact that they
6   relied on each others' thoughts and conclusions; right?
7         If an officer went out and pursued a lead and
8   came back and reported on it, the people on the Major Case
9   Squad presumed that the officer who went out and pursued
10   the lead had done it competently, and brought back an
11   accurate report; correct?
12    A   Correct.
13    Q   Now, as you sit here now, we were talking
14   about the fire and ambulance first responders, as you
15   sit here now, do you remember that they reported that
16   the body's condition indicated that the body had been
17   dead for an hour or two when they got there?
18    A   No, that's not what I recall.
19    Q   What do you recall?
20    A   I just recall that there was conflicting
21   perspectives as to what those individuals witnessed, or
22   believed that they witnessed, compared to what the law
23   enforcement officers that were on the scene witnessed,
24   or believed they witnessed, I recall that it was
25   conflicting.

Page 65

1    Q   So McCarrick talked about this extensively in
2  his depo; right?
3    A   I don't remember that, but he may have.
4    Q   Well, he said something along the lines that
5  the blood was --
6        MR. HEIGELE:  Sopping, I believe he said.
7    Q   (By Mr. Schock)  Sopping, is that what the
8  word was?  We had confusion over the word.  But the
9  blood was still wet.  Do you remember that?
10   A   I remember that he said someone said that,
11  yes.
12   Q   And you remember that he also said that the
13  first responders said that the body had rigor mortis?
14   A   I don't recall him saying that.
15   Q   Do you remember anybody saying that?
16   A   No.
17   Q   Do you remember anybody saying that the body
18  was cold, that it was not the temperature of a live
19  body, but was colder?
20   A   I don't remember anyone comparing it to a live
21  body.
22   Q   Do you remember any statement that it was cool
23  to the touch?
24   A   I remember a statement that it was cool to the
25  touch.

Page 66

1    Q   Okay.  And do you, when you talk about that
2  process of relying on each other, do you understand that
3  the firemen and the ambulance were actually not on the
4  Major Case Squad; correct?
5    A   Correct.
6    Q   Do you remember that any inclination either
7  way, whether people on the Major Case Squad normally
8  relied on observations of first responders, such as fire
9  and ambulance?
10       MR. HEIGELE:  Calls for speculation.
11   Q   (By Mr. Schock)  I'm asking if she knows.
12   A   I don't know.
13   Q   As to the condition of the blood, do you
14  remember what was said by different people during the
15  Major Case Squad meetings about the condition of the
16  blood when the first responders arrived, police, fire,
17  ambulance?
18   A   I don't remember what they said with regard to
19  when the first responders arrived.  I remember what they
20  said as to their own observations of the blood.
21   Q   Okay.  What did they say?
22   A   I don't remember the word exactly, but it
23  wasn't dry.
24   Q   Was it coagulated?  Does that word ring a
25  bell?

Page 67

1    A   It does not ring a bell.
2    Q   Set up, does that word ring a bell?
3    A   It does not.
4        MR. SCHOCK:  Looks like I forgot to turn on
5  the camera for the last 15 minutes.  Could have paid
6  more to have somebody come and do it.
7        MR. HEIGELE:  Could have paid for a nicer
8  room, too.  No offense, Joel.
9        MR. BRUNTRAGER:  This is a lovely room.
10       MR. SCHOCK:  This is lovely office, and you're
11  a lovely man, Joel.
12       MR. BRETT:  Hope all this is going on the
13  record.
14       MR. SCHOCK:  Can we agree by consensus to back
15  up and take off the record to where the giggling and
16  remarks started that had nothing to do with what we're
17  talking about.
18       MR. HEIGELE:  That's fine.  We can edited it.
19       MR. SCHOCK:  Jane, redact from the record
20  those remarks, please.
21       MR. HEIGELE:  He's a powerful man, by the way.
22   Q   (By Mr. Schock)  How about recall of
23  statements from those first responders as to rigor
24  mortis?
25       Do you remember those -- What was said in the

Page 68

1  Major Case Squad briefings about rigor mortis?
2    A   I don't remember anything said about rigor
3  mortis.
4    Q   So we've gone over you don't remember anything
5  about temperature of the body; right?  Did we cover
6  that?
7    A   Yeah.  I said that I remembered someone said
8  that the body was cool to the touch.
9    Q   And when I said rigor mortis, I referred to
10  stiffness, is that how you took the word rigor mortis?
11   A   I took the word rigor mortise to be rigor
12  mortis.
13   Q   Which is stiffness of the body after death;
14  right?
15   A   Correct.  It's the stages.
16   Q   Right.  And in fact, after death the body does
17  become stiff; correct?
18   A   Correct.
19   Q   And if a person, for example, moves the arm of
20  a body that's been dead for an hour or two, the whole
21  body will move, instead of just the arm?
22   A   I don't know that.
23   Q   Do you remember anything about that being
24  said, that one of the first responders moved the arm and
25  the whole body moved?

Page 69

1     A   No.
2          MR. HEIGELE:  And you're talking about Major
3   Case Squad briefings?
4     Q   (By Mr. Schock)  Right.  In the briefings.
5     A   No, I don't, not in the briefings.
6     Q   Do you remember anything about how long any
7   first responders stated in any reports, or in meetings
8   with Major Case Squad members that they thought the body
9   had been deceased when they arrived at the house?
10    A   I don't remember there being a time discussed.
11    Q   You don't remember anything about an hour or
12  two?
13    A   No.
14    Q   I want to turn now to the release of Mr. Faria
15  on the 29th.
16         Do you recall that at roughly three or four
17  o'clock on the 29th that Mr. Faria was released from
18  custody of the police?
19    A   I recall that he was released.  But I don't
20  know what time, or anything like that.
21    Q   Do you -- Well, did you have anything to do
22  with his release?  Any influence on that decision?
23         MR. HEIGELE:  To the point it calls for
24  speculation.
25         MR. SCHOCK:  Well, I'm not asking about her

Page 70

1   speculation.  I'm asking about her involvement.  That's
2   not speculation.
3     A   I was not involved with telling him, I mean,
4   telling them to release him, if that's what you're
5   asking me.
6     Q   (By Mr. Schock)  I am asking you if you had
7   any involvement?
8          Did you discuss with the police, did you discuss
9   with the sheriff's department personnel, the Major Case
10  Squad, anybody, the fact that Russ Faria was going to be
11  released on the 29th?
12    A   I don't recall having a conversation
13  specifically about his release.
14         I recall that his 24-hour hold would have
15  extinguished at some point, and absent the filing of
16  charges, by law he would have been released.
17    Q   Sure.  There's no charges filed.  Now you
18  understand it's a disputed fact when we think the
19  custody, when he was formally in custody, but let's set
20  that aside, okay, that's not an issue in this
21  deposition.
22    A   Okay.
23    Q   Before his release, and I will submit to you
24  it was on the 29th in the afternoon, does that sound
25  right?

Page 71

1     A   Sure.  I don't know.  I don't know when it
2   was.  Actually, I don't know when it was.
3     Q   Do you recall that you had any discussions
4   with anyone in law enforcement that might be called a
5   presentation to you, or a suggestion to you that you
6   file a murder charge against Russ Faria?
7     A   Yes.
8     Q   Tell me about those conversations.
9     A   I don't recall if they were conversations, or
10  if they actually submitted a probable cause statement to
11  me.
12    Q   Do you agree that it was your decision whether
13  to issue a charge at that time?
14    A   Yes.
15    Q   So you don't remember whether they spoke to
16  you when they submitted a probable cause statement, but
17  it was one of those; is that a fair statement?
18    A   That's a fair statement.
19    Q   And do you know whether that was on the day of
20  his release, or the day before, or do you know when that
21  was?
22    A   It would have been towards the end of his
23  24-hour hold.
24    Q   Do you remember what evidence they presented
25  to you in support of a theory that Russell Faria was --

Page 72

1   there was probable cause to believe that Russell Faria
2   had murdered Betsy Faria?
3     A   I don't remember specifically.
4     Q   Now, do you still have -- it's kind of a crazy
5   question, I'm going to ask it, maybe you'll object:  Do
6   you have a copy of any probable cause statement that was
7   submitted to you during that time, when you declined to
8   file a charge?
9     A   No.
10    Q   Do you know where it would be?
11    A   I don't know that one was submitted.
12    Q   Right.  That's why.  You don't remember either
13  way.  It's kind of speculating?
14         MR. HEIGELE:  It's silly questions.
15         MR. SCHOCK:  There'll be plenty of silly
16  questions.
17    Q   (By Mr. Schock)  Do you remember weighing in
18  your mind the question of whether there was probable
19  cause based on the information you received, whether it
20  was oral, or in a probable cause statement?
21    A   I don't remember that specifically, but I'm
22  sure that I did.
23    Q   So you don't really remember what evidence
24  they presented to you, but you remember they presented
25  some evidence, and that you weighed it; right?

Page 73

1    A   Correct.
2    Q   That's your only memory of this part of the
3  process?
4    A   Correct.
5    Q   And you remembered that you decided there was
6  not enough; is that right?
7    A   Correct.
8    Q   And did you give any advice to law enforcement
9  that he needed to be released, or anything like that?
10    A   No.
11    Q   Do you remember making any statements to the
12  press after his release?
13    A   Yes.
14    Q   Okay.  And tell me what you said to the press?
15    A   I don't remember specifically what I said.
16  But I would have used one of my standard canned answers,
17  I'm sure.
18    Q   Okay.  Well, what were your standard canned
19  answers?
20    A   Something to the effect of, we're hopeful to
21  gather enough evidence at some point to provide justice
22  for the victim in our case.
23    Q   Okay.  Hang on one second.  I'm going to --
24  Okay.  I've got a document in front of me, and now we're
25  going to go to our first use of these books behind us.

Page 74

1  We've got to get to page 1445.
2        And that should be in book six, which would be
3  on the top right behind you.
4        See if that's -- The numbers are in the lower
5  right corner.
6        MR. HEIGELE:  What's your page?  What's your
7  lead?
8        MR. SCHOCK:  It's page 1445 of plaintiff's
9  disclosures.
10        MR. HEIGELE:  What's your tab?  Which tab?
11        MR. SCHOCK:  What tab?  Is that the pages?
12  It's page five.  I did my math wrong.
13        MR. SWANSON:  Thirty-three.
14        MR. BRUNTRAGER:  Fourteen forty-five is what
15  you're looking up?
16        MR. SCHOCK:  Yes, sir.  Would you open it up
17  to 1445.
18    Q   (By Mr. Schock)  Okay.  Have you seen that
19  document before, ma'am?
20    A   I don't know if I have, or not.
21    Q   Well, it's a report by KSD.com, and it's dated
22  December 30th at 7:16 p.m.; right?
23    A   Yes.
24        MR. HEIGELE:  Just as an over-reaching
25  objection, I would object as to hearsay, and that's my

Page 75

1  objection.
2    Q   (By Mr. Schock)  Okay.  Would you tell me --
3  Would you read that page and tell me when you're done
4  reading it, please.
5    A   Okay.
6    Q   It goes on the next page.  Just read through
7  the next page, too.
8    A   Okay.
9    Q   Okay.  Now, it says the writer of this
10  document says that you said that the Major Case Squad
11  was going to work into the weekend to try to charge
12  someone.
13        Do you recall telling that to the reporter?
14    A   No.
15        MR. HEIGELE:  Well, I'm saying to the extent
16  it misstates the actual words of the document, I object,
17  but --
18    Q   (By Mr. Schock)  Do you remember saying words
19  to that effect to the reporter, what is said there in
20  the first paragraph?
21    A   Absolutely not.
22    Q   Did you say any words along those lines to
23  that reporter?
24    A   Not that I recall.
25    Q   Go to the second, the right-hand column.

Page 76

1    A   Yes.
2    Q   And it's the first full paragraph.  Would you
3  read that slowly into the record, please?
4        MR. HEIGELE:  Same objections.
5    A   "The Lincoln County Prosecutor hopes it's only
6  a matter of time before she can charge him with murder.
7  The prosecutor is fast-tracking DNA and fingerprint
8  tests, as well as cell phone records."
9    Q   Okay.  So you're the Lincoln County
10  prosecutor; right?
11    A   I am.
12    Q   Did you say words to that effect to the
13  reporter?
14    A   No.
15    Q   Did you say words to that effect to anybody
16  from the press?
17    A   No.
18    Q   Did you say words to that effect to anybody
19  involved in law enforcement?
20    A   No.
21    Q   Did you say words to that effect to anybody?
22    A   No.
23    Q   Is it your belief that the reporter is making
24  up that story and completely misquoting you?
25    A   Yes.  Not mis -- It's not my belief that the

Page 77

1 reporter's making up the story. It's my belief that the
2 reporter is misquoting.
3     Q   What did you say?
4     A   I don't recall specifically what I said. But
5 I'm sure something like what I said to you a moment ago.
6     Q   So this remark that he says you said, that it
7 was only a matter of time before you can charge him, now
8 "him" is Russell Faria; right?
9     A   I don't know who "him" is with regard to what
10 Mike Rush thought. I have no idea.
11    Q   Well, the, the prior paragraphs indicate that
12 by context the "him" is the husband; right?
13        Do you agree with that?
14    A   It says investigators arrested a man
15 Wednesday. It doesn't say who.
16    Q   Well, the only one who had been arrested was
17 Russell Faria; right?
18        MR. HEIGELE: I think the thing says what the
19 things says. That was the objection made the first time
20 you looked at the document.
21    A   This document doesn't suggest that it's Russ
22 Faria at all.
23    Q   (By Mr. Schock) Okay. That's your
24 interpretation of that, and I accept it. I don't accept
25 it, but I understand that's your position.

Page 78

1        So as to this statement attributed to you by
2 Mr. Mike Rush of KSDK, that you hope it's only a matter of
3 time before she, that would be you, can charge him with
4 murder, you deny saying that?
5     A   Correct.
6     Q   And then it says, you're fast-tracking DNA and
7 fingerprint test as well as cell --
8        MR. HEIGELE: I was going to, after you finish
9 your question, I was going to object it again, that
10 the document is hearsay, does not specifically state
11 anything about Leah Askey, doesn't state specifically
12 anything about Russell Faria, doesn't make any statement
13 as to guilt, and that's my objection.
14        If I could have a continuing objection to this,
15 that's fine.
16        MR. SCHOCK: Of course.
17        MR. HEIGELE: Okay.
18    Q   (By Mr. Schock) So let's talk about this
19 statement in the article. The prosecutor is
20 fast-tracking DNA.
21        Did you make any statement to Mike Rush or any
22 member of the press about fast-tracking DNA?
23    A   No. I wish there were a way to do that. So I
24 never made that statement.
25    Q   Did you make any statements to the press,

Page 79

1 including Mike Rush, about fingerprint tests?
2     A   No.
3     Q   Did you make any such statements, any
4 statements to such people about cell phone records?
5     A   Not that I recall. They may have asked me a
6 question about it, and I may have said those have been
7 sent off, or something to that regard, but I would have
8 never said anything was getting fast-tracked, because
9 there isn't a possibility to fast-track, that I am aware
10 of.
11    Q   Okay. Was there a formal press conference or
12 anything that you participated in on that day, or the
13 next day? That day being the 29th.
14    A   I don't recall if in this case there was.
15        Ordinarily in a Major Case call-out there's a
16 press conference that the Major Case Squad calls, but I
17 don't remember specifically if there was one in this case,
18 or not.
19    Q   Do you remember even whether you made any
20 statements to the press, as you sit here now? You've
21 talked about a statement you might have made, which is
22 sort of what you always make; right?
23    A   Correct.
24    Q   Now slightly different question: Do you
25 remember whether you did make any statement to the press

Page 80

1 on the 29th or 30th of December, 2011, about Faria, the
2 Faria murder?
3     A   On the 29th?
4     Q   Or 30th.
5     A   I obviously spoke with Mike Rush at some
6 point. If there was a press conference, I would not
7 have spoken at that, that would have only been the
8 commander and possibly the sheriff.
9     Q   Okay. So you do think you spoke to Mike Rush?
10    A   I recall speaking to Mike Rush.
11    Q   Do you remember when it was, in terms of -- we
12 can put it in context maybe, before or after Russ
13 Faria's release, do you have any knowledge of that?
14    A   I recall that it was dark outside. That's
15 what I remember.
16    Q   It was wintertime, so it might have been early
17 on the evening of the December 29th, the day of his
18 release. Does that sound right?
19    A   I don't know specifically when it was, but I
20 remember that it was dark outside.
21    Q   Was there anybody else there for the
22 conversation?
23    A   I don't recall.
24    Q   Do you know, was it, was it, he sort of saw
25 you and said, hey, do you have a second to talk, or was

Page 81

1  it some kind of a formal event where you said I'll talk
2  to anybody?  What's the context?
3       How did you come about to talk to him?
4       A   He was in the parking lot when I walked out to
5  go to my car.
6       Q   And he said will you speak to me?
7       A   Yes.
8       Q   And you said?
9       A   I said sure.
10      Q   And you talked to him?
11      A   Yes.
12      Q   So did you talk to him any other time in those
13  couple of days?
14      A   I don't believe so.
15      Q   Do you believe this report, even though you
16  disagree with its contexts -- its contents, relates to
17  that conversation?
18      A   It doesn't appear to have anything in it that
19  was involved in that conversation, but I don't believe I
20  spoke with Mike Rush on any other time.
21      Q   Okay.  Fair enough.  Do you, as you sit here
22  now, believe you used the term fast-track with Mike Rush
23  in that conversation?
24      A   No.
25      Q   Do you believe that you used any words that

Page 82

1  could be interpreted to mean fast-track?
2       A   I don't believe so.
3       Q   Do you remember talking to the Major Case
4  Squad, anybody in the personnel of Major Case Squad
5  after Russ Faria's release about any attempt to gather
6  further evidence in the case?
7       MR. HEIGELE:  Could you restate that, please?
8       Q   (By Mr. Schock)  Sure.  After Russell
9  Faria's -- Let me start over.
10      After Russ Faria's release, did you talk to
11  anybody in the Major Case Squad about gathering further
12  evidence on the question of who had murdered Betsy Faria?
13      A   I don't recall speaking with them.
14      Q   You don't recall saying we need more evidence
15  to charge him or anybody else, to anybody on the Major
16  Case Squad?
17      MR. HEIGELE:  You mean other than the initial
18  discussions as to the first probable cause statement?
19      Q   (By Mr. Schock)  When you say the first
20  probable cause statement, are you talking about one that
21  might have been presented to her --
22      MR. HEIGELE:  Yeah.
23      Q   -- before his release?
24      MR. HEIGELE:  That's the conversations she's
25  already had.

Page 83

1       Q   (By Mr. Schock)  Right.  Now I'm going to a
2  new time frame, after his release, asking whether you
3  recall any conversations with anybody in the Major Case
4  Squad about trying to gather more evidence, and get
5  enough evidence to charge Russ Faria, or anybody else?
6       A   No.  I, I recall they were still running down
7  leads.
8       Q   Okay.  Anybody other than the Major Case Squad
9  and law enforcement you had such conversations with?
10      A   No.
11      Q   Are you aware that there was a probable cause
12  statement submitted on January 3rd?
13      A   I'm aware that one was submitted somewhere
14  around that time frame.
15      Q   And pursuant to that, with that probable cause
16  statement you charged Russ Faria with murder; right?
17      A   Correct.
18      Q   And he was arrested; right?
19      A   Correct.
20      Q   Well, did you issue the charge on the 3rd, do
21  you remember?  Did you actually file the charge on the
22  3rd, and maybe he was arrested the next day; does that
23  sound right?
24      A   I don't remember if I filed it the same day he
25  was arrested, or if I filed it the day before.

Page 84

1       Q   Do you know as you sit here now what
2  additional evidence was gathered by law enforcement
3  after Russell Faria's release on the 29th, which, in
4  your mind, was sufficient to issue the charge on
5  January 3rd or 4th, whatever day you actually filed it?
6       A   I don't remember specifically the -- how much
7  additional information was, was gathered, or was added
8  to the probable cause statement.
9       Q   At that time did you form a belief as to when
10  the murder occurred?
11      A   At what time?
12      Q   Between the time when Russ was released on the
13  29th and you issued the murder charge, did you form an
14  opinion as to when the murder occurred?
15      A   No.
16      Q   Would you say that at that point it was
17  between, say the earliest time it could have been was
18  that phone call, which was after 7:00, the phone call
19  between -- when Betsy left the message with Pam Hupp's
20  husband, and when first responders found her body dead,
21  we agreed with that; right?
22      A   I would agree that it occurred some time after
23  she spoke with her daughter on the phone, and when Russ
24  Faria called 9-1-1.
25      Q   In the course of issuing the charge, and

Page 85

1    thinking -- you didn't think a lot about the case and
2    the evidence, that's your job; right?
3        A   Correct.
4        Q   Did you form an opinion as to whether -- Did
5    you form an opinion based on the evidence as to whether
6    your, in your opinion, Russ Faria had been with Corbin
7    between roughly 6:00 and 9:00?
8        A   I didn't have an opinion at that point.
9        Q   Okay.  Did you have an opinion as to whether
10   the body had been dead for a substantial amount of time,
11   being at least half an hour, minimum half an hour,
12   before Russ Faria called 911?
13       A   I didn't have an opinion at that point.
14       Q   Is it a fair statement that you issued the
15   murder charge without having a theory of when Russ
16   Faria murdered Betsy Faria?
17       A   No.  That's not a fair statement.
18       Q   Okay.  Then help me reconcile those two
19   statements.  I thought you said you didn't --
20           MR. HEIGELE:  She just testified as to when
21   the murder had to have occurred.
22       Q   (By Mr. Schock)  Well, you put it between 7:00
23   and the time of the call, right, to the 911 call, after
24   the call to his daughter?
25       A   Which is about 7:20, I believe.

Page 86

1        Q   Okay.
2        A   And 9:41 when 911 was called.
3        Q   What I'm asking is, did you formulate an
4    opinion, more specific than that, or was it just your
5    opinion it occurred during that time?
6           MR. HEIGELE:  At the point of when?
7        Q   (By Mr. Schock)  When you filed the murder
8    charge.
9        A   When I filed the murder charge, I knew that
10   the murder had occurred between the times she spoke on
11   the phone, "she" being Betsy, with her daughter, and
12   when Russ Faria came home and called 911.
13       Q   And that was the extent of your opinion as to
14   the time at that time?
15       A   Sure.
16       Q   Not more specific than that?
17       A   Correct.
18       Q   Were you aware that those first responders,
19   police, excuse me, fire and ambulance, had indicated,
20   based on their observations, that the body had been dead
21   for an hour or so when Russ made the call?
22           MR. HEIGELE:  Asked and answered.
23       A   I wasn't aware of those specific statements.
24       Q   (By Mr. Schock)  Well, were you aware that
25   statements to that effect had been made by those people?

Page 87

1        A   Not with regard to timeline, no.
2        Q   Well, you were at those briefings when the
3    first responder's observation of stiffness, blood and
4    temperature had been stated; right?  I mean, you knew
5    about that; right?
6           MR. HEIGELE:  Misstates testimony.
7        A   I knew that they had -- someone had said
8    something about being cool to the touch, and someone had
9    said something about stiff.  It might have been the same
10   person, it might have been a different person.  I'm not
11   sure about that.
12       Q   (By Mr. Schock)  Did you think it was your
13   duty as a prosecutor to get into the details of when
14   the -- when this person you're charging had committed
15   the crime, other than that general time frame that we
16   spoke of?
17           I'll use the term general time frame as 7:15,
18   7:20, the call with the daughter and the 911 call.
19           MR. HEIGELE:  It's argumentative, and it's
20   asked and answered.
21       A   I don't understand the question.
22       Q   (By Mr. Schock)  Sure.  Let me go back.
23           Do you believe it was your duty as a prosecutor
24   in issuing a charge of murder to get specific about how
25   the crime had occurred, including the time?

Page 88

1        A   No.
2        Q   Did you believe these statements that you had
3    heard, or were aware of about coolness, stiffness, and
4    blood condition, that it was, first, as to the first
5    two, cool and stiff, and as the second two, that there
6    was some contradictory evidence; right?  Soppiness,
7    versus coagulant setup?
8           MR. HEIGELE:  It misstates the testimony as to
9    the time frame in which these discussions were had in
10   context of the filing of the charges, and the Major Case
11   Squad, so it's argumentative and it's vague, so, and I
12   believe it's been asked and answered.
13           But if you want to, I guess, rephrase it in
14   another way, or have her reread it, and she can try to
15   notice it, that's fine.
16       Q   (By Mr. Schock)  First of all, do you remember
17   the question I asked?
18       A   No.
19           MR. SCHOCK:  Okay.  Jane, would you please
20   reread the question.
21           MR. HEIGELE:  Sorry.
22           [Reporter read back the question on page 88,
23   line 2].
24       A   I didn't understand the question.
25       Q   (By Mr. Schock)  Okay.  I'll ask it again.

36

Page 89

1      Were you, when you issued the charge, aware that
2   the first responders had indicated that the body was stiff
3   when they arrived?
4      A   Yes.
5      Q   Were you aware that the first responders had
6   indicated that the body was cool when they arrived?
7      A   Yes.
8      Q   Were you aware that there was -- there were
9   statements from first responders and police officers
10   that were somewhat contradictory of the condition of the
11   blood when they arrived?
12      A   Yes.
13      Q   And the contradiction was that some said it
14   was soppy, whatever the right word is, and some said it
15   was setup, and/or coagulated; true?
16      A   I don't remember setup, and/or coagulated.  I
17   remember soppy, or something like that.
18      Q   Do you remember anybody saying that the blood
19   was settled?
20      A   No.  I remember there was contradiction in
21   their understanding of it.
22      Q   Okay.  Did that information about stiffness
23   and coolness lead you to any conclusion as to how long
24   the body had -- how long Betsy Faria had been dead when
25   the first responders arrived?

Page 90

1      A   No.
2      Q   Is that because you didn't consider it?
3      A   It's because I didn't trust it.
4      Q   Sounds like what McCarrick said.  Why didn't
5   you trust it?
6      A   For a variety of reasons.
7      Q   What were those reasons?
8      A   Well, it was cold outside, the doors were wide
9   open.  There was no indication -- There was indication
10   from the first responder that he touched the body for
11   less than a second with two fingers on her forearm.
12          He was wearing, they were all wearing big parka
13   coats and gloves, so I didn't trust that.
14          We knew that the body had, had to be alive at
15   7:20, and we knew that she was dead at 9:40, so the best
16   scenario, or the worst scenario is that she had been dead
17   just over two hours.
18          My limited knowledge of rigor mortis and how
19   long it takes would not have a body be completely stiff in
20   a two-hour window, so I didn't trust that.
21          Not to mention, one of the first responders
22   indicated that once they realized that this was not a
23   suicide, they directed everyone else to go outside, so
24   there wasn't a lot of firsthand information.
25          It was all kind of trickling through two or

Page 91

1   three individuals, and then back through law enforcement,
2   and then back to the Major Case Squad.
3      Q   Well, there were reports written, weren't
4   there?  About -- By the first responders?
5      A   I don't remember if they wrote reports, or if
6   law enforcement wrote reports after they spoke with
7   them.
8      Q   Did you review any reports about the condition
9   of the body before you issued the charge?
10      A   I don't -- I didn't review any reports,
11   because there weren't any written reports at that point
12   that I recall.
13      Q   So it was all oral?
14      A   As I recall, yes.  I didn't review anything
15   written until much later.
16      Q   All right.  I'd like now to turn to this
17   luminescence test issue.
18          Do you recall that there was something done
19   called a luminescence test?
20      A   Yes.
21      Q   What is your understanding of what was done in
22   that test?
23      A   Can you be more specific?
24      Q   Yeah.  What was the test?  What were they
25   testing?  What did they do?

Page 92

1      A   I don't know how the process works, but I know
2   the goal is to, to determine if there was any evidence
3   of a cleanup, or blood cleanup.
4      Q   Was there also a purpose to see if there was
5   some kind of a path to a certain part of the kitchen?
6      A   I don't believe -- I don't recall that there
7   was a specific purpose.  I wouldn't have known that.
8   That would have been outside my purview.
9      Q   Did you do anything to propose or encourage
10   law enforcement to do the luminescence test?
11          MR. HEIGELE:  Could you restate that, please?
12   It's vague.  I didn't understand it.
13      Q   (By Mr. Schock)  Sure.  Did you take any
14   action to encourage law enforcement to conduct a
15   luminescence test?
16      A   I signed off on the search warrant
17   application.
18      Q   Why did you sign off on the search warrant
19   application?
20      A   Because I believed that the four corners of
21   their affidavit met the requirements, so I signed off on
22   it, presented it to a judge
23      Q   Who agreed for the test; right?
24      A   Correct.
25      Q   Well, what about the document made you think

Page 93

1  that it was -- I mean, it was your decision to take it
2  to the judge; right?
3      I mean, you -- Let me restate.
4      They take it, but you got to sign it; right?
5      A   Correct.  And as I sit here today, I'm not 100
6  percent positive that I am the one that signed that
7  application, but it's likely that I did.
8      Q   Okay.  I think you did.
9      A   Okay.
10      Q   As you sit here today, do you remember
11  discussions with the law enforcement officers about that
12  search warrant application, which you had in connection
13  with your decision to affix your signature?
14      A   I don't remember specific discussions about
15  that application, no.
16      Q   Did they drop it off and you signed it, or did
17  you talk to them about it?
18      A   I don't recall.
19      Q   Did you, did you ever speak to anyone in law
20  enforcement and suggest that they do such a test?
21      A   No.
22      Q   Did you have any theory at that time about --
23  that, that Russ Faria had gone directly to a towel
24  drawer, and only he would know where the towel drawer
25  was?

Page 94

1      A   No.
2      Q   Have you ever heard anything in this case
3  about that theory?  Is that new today to you?
4      A   It's not new today.
5      Q   Okay.  Tell me how you heard about that theory
6  in the past.
7      A   I don't think I heard about it.  I think that
8  there was a drawer facing that luminesced, one of -- the
9  only one in the kitchen, and it happened to be the towel
10  drawer.  And it wasn't right next to the sink, it was a
11  few drawers over, as I recall, at least one or two
12  drawers over.
13      Q   So was it a theory of the prosecution that
14  Russ Faria went to that drawer, and only he would know
15  what was in that drawer, which is what we're trying to
16  show with the luminescence test; does that sound right?
17      MR. HEIGELE:  At what point are you talking?
18      Q   (By Mr. Schock)  When the decision was made to
19  make the test.
20      A   Not when the decision was made to make the
21  test, no.
22      Q   Tell me when that theory came up.
23      A   What theory?
24      Q   The theory that only Russ Faria would know
25  where the towel drawer was, and he had gone straight to

Page 95

1  the towel drawer to get something to cleanup?
2      A   I don't know that that was ever a theory.
3      Q   Was something like that a theory?
4      A   The theory was, there was a cleanup in the
5  kitchen, and it appeared that a towel, or something out
6  of that drawer, or that that drawer was accessed during
7  that time.
8      Q   After her death?
9      A   I don't know that that was -- Well, yeah,
10  sure, after her death.
11      Q   Because I mean, there's no blood before her
12  death; right?
13      A   Well, I mean, it isn't -- Yes.  Correct.
14      Q   Okay.  And who came up with that theory?
15      A   I don't recall.
16      Q   Was it before the issuance of the probable
17  cause statement which accompanied the murder charge,
18  that that theory became the subject of discussion?
19      A   No.
20      Q   It was after?
21      A   I believe so.
22      Q   Were you present for the luminescence test?
23      A   No.
24      Q   Did you know when it was happening?
25      A   Not specifically.

Page 96

1      Q   Did you know that the house had not been
2  secure in the interim since Russ Faria's release, and
3  the test?
4      A   Yes.
5      Q   Did you have concern that any evidence that
6  might be gathered of any kind of cleanup might have been
7  a cleanup that occurred after his release --
8      A   No.
9      Q   -- on the 29th?
10      A   No.
11      Q   Why not?
12      A   Because photographs were taken and video, I
13  think, if I -- if memory serves me correctly, I think
14  there was even a video taken of the scene, during the
15  time that the Major Case was called out, so that would
16  have captured blood, if you will, on the, on the floor
17  in a photograph.
18      Q   Well, there was blood near her body; right?
19      A   Sure.
20      Q   There was no blood on his clothes; right?
21      A   Correct.
22      Q   There was no -- Well, let me retract that.
23      Do you remember that some law enforcement
24  personnel in connection with the Major Case Squad had
25  concluded that there had been no cleanup?

Page 97

1    A   I didn't -- I did not know that.
2    Q   And when I say cleanup, I mean the Major Case
3   Squad had found no odor of cleaning materials; correct?
4        Does that ring a bell?
5    A   No.
6    Q   How about that there had been seen no swiping
7   motions on the floor, anything like that?
8    A   I don't remember anything about that.
9    Q   Do you remember, do you remember anything
10  about the condition of the floor, that it was dirty?
11       MR. HEIGELE:  Go ahead, if you know.
12   A   I don't remember anything about that, at the
13  time.
14   Q   (By Mr. Schock)  Right.  I'm only asking you
15  before the probable cause statement.  I'm asking you
16  about your decisions to issue the charge now.
17       This luminescence test occurred; right?  You
18  were aware it occurred?
19   A   Correct.
20   Q   And then did the officers come and talk to you
21  about it?
22   A   I'm sure they did.
23   Q   Who came and talked to you about it?
24   A   I don't recall.
25   Q   Does it sound like -- If I told you that

Page 98

1   Mr. Merkel, at the end of the table, was involved in the
2   tac test, would that ring a bell?
3    A   I knew that he was involved in the test, but I
4   don't remember if he came and spoke with me about it.
5    Q   And his wife, I think she might have had a
6   different name then; right?  Does that sound right?
7    A   Correct.
8    Q   But she was also involved in the test; right?
9    A   I didn't know who was involved in the test.
10   Q   And did they submit to you a report?
11   A   At some point they did.
12   Q   Do you remember what the contents of the
13  report was?
14   A   No.
15   Q   Did you use that report to -- Let me restate
16  that.  Did that report influence your decision to issue
17  the charge?
18   A   I wouldn't have had that report for some time
19  after the charge was made.
20   Q   So is it a fair statement that to the extent
21  that the luminescence test had anything to do with your
22  decision to charge Mr. Faria, it was based on oral
23  communications from the people who were involved?
24   A   That's correct.
25       MR. HEIGELE:  And a probable cause statement

Page 99

1   that was sworn out by the law enforcement officer?
2    A   That's correct.
3    Q   (By Mr. Schock)  Including what he said.
4    A   Correct.
5        MR. HEIGELE:  Just trying to keep you honest.
6        MR. SCHOCK:  I appreciate that.
7        MR. HEIGELE:  I know.
8    Q   (By Mr. Schock)  You were aware that the
9   officers used a camera during luminescence test; is that
10  correct?
11       At the time that it occurred, you knew that they
12  were going to use a camera; right?
13   A   I don't know if I knew that that was part of
14  it, or not, at the time.
15   Q   When they talked to you about it, did they say
16  anything about using a camera?
17   A   No.
18   Q   Were you aware that they took pictures?
19   A   I don't know if I was at the time.  I wouldn't
20  have -- When they do their investigation and they do
21  different things, I don't necessarily know the protocol
22  in which those things occur.
23       I don't know how they work.  I'm not trained in
24  that area, so I don't know -- when they say we want to go
25  and do -- apply Bluestar and see if we can get, you know,

Page 100

1   any information, or evidence, gather any evidence, then
2   okay, let's, you know, give me an affidavit and tell me
3   why.  But they don't say this is how we're going to do it.
4   I don't know any of those things.
5    Q   Okay.  Well, you are aware now that they took
6   pictures; right?
7    A   Correct.
8    Q   And you're aware now that the officers took
9   the position that the photographs showed absolutely
10  nothing; right?
11   A   That's incorrect.
12   Q   Okay.  What did they tell you that their
13  pictures showed, at any time in this case?
14   A   They told me that the camera did not capture
15  what their eyes saw.
16   Q   And in fact, in the time of the first trial,
17  there were no pictures given to the defense counsel
18  team; right?
19   A   Well, that's incorrect.
20   Q   Well, tell me about that.
21   A   On at least four separate occasions defense
22  counsel was given and provided in discovery, our
23  evidence logs, which included a log for each search
24  warrant that was conducted.
25       And on those logs it contained the reports and

Page 101

1  disks for photos. That was communicated to them, they
2  were given them. They elected not to go to the evidence
3  locker and look at them.
4      Q   When was the first time you saw the
5  photographs of the luminescence test?
6      A   I'm not certain.
7      Q   Was it between the two trials?
8      A   Yes.
9      Q   Okay. So you had not seen them before the
10 first trial?
11     A   Correct.
12     Q   Do you know how the photographs were delivered
13 to defense counsel's office?
14     A   I believe I hand-delivered them to Mr. Swanson
15 in my office.
16     Q   You elicited testimony in the first trial from
17 Mr. Merkel that the camera malfunctioned; is that
18 correct?
19     A   I don't remember the testimony I elicited from
20 him specifically, but I know that there was a
21 malfunction in the camera and it had to be sent off.
22     Q   And the malfunction was that, such a severe
23 one that there were no pictures; right?
24         MR. HEIGELE: That misstates his testimony,
25 but to that event, if you can testify as to that.

Page 102

1      A   I don't recall what his testimony was.
2      Q   (By Mr. Schock) Okay. Well, we'll look at
3  that later, and see what the -- the truth will be in the
4  transcript.
5          Have you looked at those pictures? Did you look
6  at those pictures between the two trials?
7      A   At some point I did.
8      Q   When?
9      A   I don't know specifically when.
10     Q   Before the trial, second trial started?
11     A   Yes.
12     Q   And do you believe that those were all the
13 pictures that were taken, the ones that were presented
14 to Mr. Swanson in your office?
15         I mean, were there any pictures that weren't
16 turned over? Let's put it that way.
17     A   I believe a disk was turned over, which was
18 the disk from evidence, because they decided they wanted
19 to see it at that point. So that's why I looked at it,
20 because then they were going to be looking at it.
21     Q   When you looked at it, did you ask Mr. -- Did
22 you, did you talk to Mr. Merkel or anybody else involved
23 in the test about it?
24     A   I'm sure I did.
25     Q   Did you ask the question in that conversation

Page 103

1  whether the pictures accurately showed, and were
2  representative of the luminescence test results?
3      A   Yes.
4      Q   What was the response?
5      A   No.
6      Q   Okay. How were they different?
7      A   Because the camera did not capture what their
8  eyes saw when they performed the test.
9      Q   So you think the pictures, when finally they
10 did show up, when you gave them to Mr. Swanson, or a
11 representative anyway, is that a fair statement of what
12 they'd seen?
13     A   They were not representative of what they had
14 seen while they were there performing the test live.
15     Q   And as you sit here now, you believe that?
16     A   Yes.
17     Q   Okay. The probable cause statement, which
18 accompanied the murder charge, was prepared by
19 Mr. McCarrick; is that right?
20     A   Probably.
21     Q   Who was in charge of that investigation before
22 you issued the murder charge?
23     A   At what point?
24         MR. HEIGELE: I was going to say, that's vague
25 as to what, quote, unquote, "the investigation at that

Page 104

1  point."
2      Q   (By Mr. Schock) I appreciate that. I am
3  going to rephrase to make this more clear. Let's break
4  it up into some time frames.
5          Based on the knowledge that you have right now
6  sitting here today, do you have an opinion as to who was
7  in charge of the investigation of the murder of Betsy
8  Faria in the 12 hours after that murder?
9      A   Yes.
10     Q   Who?
11     A   In the first four hours would have been the
12 sheriff, and thereafter, would have been the commander
13 of the Major Case Squad.
14     Q   Mr. Schimweg?
15     A   Correct.
16     Q   Now how long did he remain in charge of that
17 investigation?
18     A   Until the Major Case Squad disband.
19     Q   So he was the boss of the investigation, and I
20 think there was testimony that that ended on the 31st;
21 right?
22     A   Correct.
23     Q   Does that sound right?
24     A   Yes.
25     Q   That sounds like the right date to you?

Page 105

1    A   It believe it was New Year's Eve, yes.
2    Q   So he was in charge during that period. Who
3  was in charge of the investigation on the first,
4  second -- well, until you filed the charge, the murder
5  charge?
6    A   Well, inasmuch -- From like a hierarchy
7  position, it would go back to the sheriff.
8    Q   So the sheriff was in charge?
9    A   But the case would have been designated to an
10  individual.
11   Q   Do you know who that individual was?
12   A   I believe it was McCarrick.
13   Q   And he worked for Lincoln County; right?
14   A   Correct.
15   Q   Did he know about the luminescence test?
16   A   Yeah, I think he was present.
17   Q   Did you have any meetings with McCarrick over
18  the course of the time period after the Major Case Squad
19  call-out ended, and you received the probable cause
20  statement from him?
21      Did you speak to him at all?
22   A   I would have spoken with him when he applied
23  for a search warrant.
24   Q   And tell me the substance of that
25  conversation.

Page 106

1    A   I don't recall the substance, other than he
2  was applying for a search warrant.
3    Q   He presented you with written materials?
4    A   Correct.
5    Q   You reviewed them?
6    A   Correct.
7    Q   Do you remember now what those materials said?
8    A   No.
9    Q   I mean, we have a copy of it; right?
10   A   Right.
11   Q   The copies, you've seen the copy, you remember
12  signing it; right?
13   A   Yeah. I remember him applying, I remember
14  signing it, I remember a judge signing off, I remember
15  them going and doing that.
16   Q   Okay. Did you discuss the paw print on the
17  pos derriere of Betsy Faria with anybody in law
18  enforcement before you filed the charge against Russ for
19  murder?
20   A   I'm sure I did.
21   Q   Tell me the substance of those conversations,
22  who you had them with and what was said.
23   A   I don't remember specifically who I had them
24  with, but I remember asking if there were any other paw
25  prints in blood anywhere else in the house.

Page 107

1    Q   And the answer was?
2    A   No.
3    Q   So why was the, whether it was a paw print, or
4  not, relevant?
5    A   Well, because the dog was outside, according
6  to your client, the dog was outside when he got home.
7  And there appeared to be a paw print in blood on the
8  victim's body, and there wasn't any -- there weren't any
9  other paw prints throughout the house.
10      So unless the dog had wings and flew out, that
11  seemed unlikely.
12   Q   I mean, Russ Faria could have carried him out;
13  right? That was one theory; right?
14   A   I don't remember that being a theory.
15   Q   Okay. Could have been there wasn't a paw
16  print at all; right?
17   A   That was not my belief.
18   Q   Okay. How were you so sure it was a paw
19  print?
20   A   It looked like a paw print.
21   Q   There was -- Was there a test of that material
22  on the clothing? It was on her clothing; right?
23   A   Correct.
24   Q   Was there a test to see whether that was DNA,
25  blood, DNA?

Page 108

1    A   At what point?
2    Q   At any point. Well, before the probable cause
3  statement.
4    A   I mean, I wasn't aware that one had been
5  conducted at that point.
6    Q   Okay. Let me ask you a question: Do you
7  recall that the forensics on the cabinetry and the tiles
8  of the floor came back no blood in, say, roughly March
9  of 2012?
10   A   I don't remember what they specifically said,
11  but I know they tested negative for whatever it was we
12  were testing -- they sent them, or we sent them off to
13  be tested for.
14   Q   Do you believe that that negated the
15  luminescence test?
16   A   No.
17   Q   Why not?
18   A   Because the criminalist was able to explain
19  why that would happen, and how that could happen.
20   Q   Tell me what the criminalist said.
21   A   The criminalist said we are already working
22  with a surface that's -- I don't know if it was,
23  difficult's the right word, but the long and the short
24  of it is, the surface already appeared to be clean, so
25  there was already diluents that were used on that

Page 109

1   surface. And the test itself requires the use of more
2   diluents so that they --
3       Q   I'm sorry. What's that word you're using?
4           MR. HEIGELE: Diluents.
5       Q   Diluents.
6       A   We call it diluents.
7           MR. HEIGELE: Well, I mean, stupid attorney
8   talk. It's diluents.
9       A   Okay. In the medical world I think --
10  whatever. They use liquid to clean, if it were cleaned,
11  there would have been liquid used to clean.
12      Q   (By Mr. Schock) Okay. Let's, we got to way
13  back up here, because I don't know who "they" is. Let's
14  set our time frames, okay. I want to start over in this
15  conversation.
16      A   Okay.
17      Q   I got lost on your pronouns.
18      A   Okay. Sorry.
19      Q   There was a luminescence test done; right?
20      A   Correct.
21      Q   Mr. Merkel said it shows certain things, and
22  that appeared in Mr. McCarrick's probable cause
23  statement?
24      A   True. I believe Mr. McCarrick was present
25  during the luminescence test.

Page 110

1       Q   Okay.
2       A   So I'm not certain if his probable cause
3   statement indicated what, what Merkel said, or not, or
4   whether it was just his own observations.
5       Q   But the probable cause statement basically
6   included information about that luminescence test;
7   right?
8       A   That's correct.
9       Q   And in fact, wasn't that the only additional
10  evidence that was gathered between the release of
11  Russell Faria on the 29th, and the filing of the charge
12  on the 3rd?
13          MR. HEIGELE: Calls for speculation, but you
14  can answer.
15      Q   (By Mr. Schock) I need to rephrase then.
16          What evidence do you know of that was gathered,
17  between the release of Russell Faria on the 29th, and the
18  charge on the third of January, that was new during that
19  time period? What was gathered, what evidence was
20  gathered against Mr, Faria?
21          MR. RETTER: Other than the Bluestar?
22      Q   (By Mr. Schock) Other than the Bluestar.
23      A   I don't know.
24      Q   I mean, you issued the charge; right?
25      A   Correct.

Page 111

1       Q   I mean, you said no, we've established you
2   said no on the 29th; right?
3       A   I said no when the first P.C. was presented,
4   or discussed.
5       Q   Right. And then you said yes?
6       A   Correct.
7       Q   A few days later?
8       A   [Nodding].
9       Q   What evidence was gathered in the intervening
10  period that led you to change your mind?
11      A   I don't remember what specifically they had
12  gathered before, or after. I just, by the time the
13  charge was issued, I believed that they had met their
14  probable cause.
15      Q   Do you agree that the belief as to that they
16  had met probable cause had to be based on evidence?
17      A   Sure.
18      Q   And so is it a fair statement that there must
19  be -- there must have been new evidence, or you would
20  have had the same opinion you'd had a few days earlier;
21  right?
22      A   Or that they included it in their probable
23  cause.
24      Q   Oh, so there was information you didn't know
25  on the 29th that had already been gathered that you got

Page 112

1   in the interim?
2       A   Perhaps.
3       Q   Was there any such evidence?
4       A   I don't know.
5       Q   Well, on the 29th, didn't you make a strong
6   and diligent inquiry and try to examine all relevant
7   evidence to see if there was enough evidence to charge
8   Mr. Faria?
9           MR. HEIGELE: It's argumentative, misstates
10  testimony.
11      A   It's not -- I don't gather evidence.
12      Q   (By Mr. Schock) I know. You, you receive
13  evidence from law enforcement, and you make a decision
14  as to whether to charge; right?
15      A   I receive a statement. And if I believe that,
16  in the four corners of that statement, or what they are
17  giving me indicates that there's probable cause, then
18  I'll issue a charge. If, if it doesn't, then I won't.
19          But oftentimes they don't put all the
20  information that they have on the document, and there may
21  be extra information that they just haven't included at
22  that point.
23      Q   Well, do you think that law enforcement, when
24  they're getting ready to approach a prosecutor to issue
25  a charge, tries to include all the relevant information?

Page 113

1       MR. HEIGELE: Speculation, vague.
2    A   My job would be much easier if they did that,
3  yes.
4    Q   (By Mr. Schock) How often, in your
5  experience, have they not done that?
6       MR. HEIGELE: Again, same objection.
7  Argumentative.
8    A   How often in my experience have they not done
9  what?
10   Q   Not given you all the information that they
11 have in some sort of coherent form so you can make an
12 evaluation, that they just leave things out, how often
13 has that happened to you, as a prosecutor?
14      MR. HEIGELE: Same objection.
15   A   Often.
16   Q   (By Mr. Schock) Tell me about some times when
17 that's happened.
18      MR. HEIGELE: Same objection.
19   A   We want to do a search warrant on this house,
20 there was a rape that was committed in whatever year, we
21 believed that this person is the person that committed
22 the rape, and we believe that he resides in this house,
23 and went to go in and search the house for this person
24 and bring him out so that we can get his DNA.
25      There's an example.

Page 114

1    Q   (By Mr. Schock) Well --
2       MR. HEIGELE: Which is totally unrelated to
3  this case.
4    A   Correct.
5    Q   (By Mr. Schock) I understand that. It's not
6  exactly my question.
7       You told me a moment ago that it was a common
8  event that law enforcement, when coming to you seeking to
9  have a charge issued, which is different than getting a
10 search warrant, right, and sometimes they wouldn't present
11 all the relevant evidence in favor of issuing the charge;
12 is that what you meant to say to me a moment ago?
13      MR. HEIGELE: It misstates her testimony. Now
14 it's argumentative.
15   Q   (By Mr. Schock) But that's why I'm asking her
16 what her testimony was. I want to understand her
17 testimony.
18   A   My testimony is that oftentimes law
19 enforcement, when they come to me, they may talk to me
20 about a case, they may talk to me about the situation,
21 but when it comes down to the brass tacks of putting it
22 on the paper, they miss connecting elements that would
23 warrant probable cause.
24      They may have it in their mind, and they may
25 have articulated it verbally, but they haven't put it on

Page 115

1  the paper, in which case I can't issue.
2    Q   Now you might send them back and say, hey,
3  work harder on this; right?
4    A   Actually, I just refuse it.
5    Q   Okay. And in this case, you refused it;
6  right? On the 29th.
7    A   Correct.
8    Q   And we don't have a copy of what they
9  presented to you; right?
10   A   Correct. And I don't know if they presented,
11 or if they just verbally said, this is what we got. I
12 don't know.
13   Q   Have you ever written a probable cause
14 statement for the officer?
15   A   No.
16   Q   Did you do it in this case?
17   A   No.
18   Q   In this case, do you believe that what they
19 presented to you was somehow incomplete, and it included
20 information other than what was in the luminescence
21 test?
22      Let me restate that. Give me another chance
23 with that one, okay.
24      You've indicated that on the 29th they came to
25 you, either with a writing or orally, and said here's what

Page 116

1  we got against Russ Faria, and you refused it; right?
2    A   Correct.
3    Q   You've also indicated a few days later on the
4  3rd they approached you with a probable cause statement,
5  and you accepted it and issued the charge; right?
6    A   Some time thereafter, yes.
7    Q   What do you mean some time thereafter?
8    A   I don't know if it was 3rd or the 4th.
9    Q   Okay. Third or the 4th, whichever it is?
10   A   Correct.
11   Q   And they came to you with a probable cause
12 statement, and you said I will issue the charge; right?
13   A   I issued the charge.
14   Q   Right. And I'm asking you, what evidence did
15 they have that they hadn't had on the 29th?
16      MR. HEIGELE: Asked and answered.
17   Q   (By Mr. Schock) I'm asking it again. Please
18 provide me that information.
19   A   I don't remember.
20   Q   Okay. Well, we know the luminescence test;
21 right?
22   A   Well, the luminescence test was not performed
23 on the 29th.
24   Q   Right. So they had the luminescence test;
25 right?

Page 117

1    A   Correct.
2    Q   What else --
3    A   It was my understanding that a luminescence
4  test had been performed. I didn't know that it hadn't
5  been until they applied for a search warrant asking for
6  one.
7    Q   So on the 29th you thought it had already been
8  done?
9    A   Correct.
10   Q   Who told you that?
11   A   Nobody. I just assumed that that was part of
12 it.
13   Q   Well, when they showed up with the request for
14 the search warrant, you sure knew it hadn't been done;
15 correct?
16   A   Correct.
17   Q   As you sit here now, just -- I don't mean to
18 ask this question one more time, but I'm going to, you
19 don't know of any evidence, other than the luminescence
20 test, which was given to you on January 3rd or 4th that
21 hadn't been given to you on the 29th; is that true?
22   A   I don't know that that's true.
23   Q   Okay. Well, then try to help me with what
24 additional evidence you had, other than the luminescence
25 test on the 3rd.

Page 118

1      MR. HEIGELE: It's asked and answered.
2      MR. SCHOCK: Well, but she, she said there
3  might be more, so that's why I'm asking it again.
4      MR. HEIGELE: She doesn't know.
5    A   I don't remember.
6    Q   (By Mr. Schock) Let's let her testify. You
7  don't remember?
8    A   I said I didn't believe there was probable
9  cause on the 29th, and when I issued the charge I did
10 believe there was probable cause, so there was
11 additional information provided to me between those two
12 dates.
13     I don't remember what additional information,
14 but I remember that I believed it met the standard, and
15 therefore, I issued the charge.
16   Q   Fair enough.
17     MR. HEIGELE: You at a breaking point?
18     MR. SCHOCK: Sure.
19     MR. HEIGELE: I figured that was a --
20     MR. SCHOCK: Let's go off record.
21     [Whereupon, there was a short break].
22   Q   (By Mr. Schock) Back on the record.
23     So Miss Askey, now what I'm going to do is kind
24 of go through my notes and some of these questions will be
25 a little disjointed; okay?

Page 119

1    A   Okay.
2    Q   Do you remember directing CSI Investigator
3  Pratt to take an impression of the dog's paw?
4    A   No.
5    Q   Do you think you did that?
6    A   I know that I didn't do that.
7    Q   You know that you did not.
8        Did you speak to the sheriff about the
9  investigation after the conclusion of the Major Case Squad
10 call-out, and your filing of the probable cause statement
11 and the charge of murder?
12   A   I don't remember speaking to him.
13   Q   Why don't you look at that probable cause
14 statement.
15     And it's not in that book, it's in, it's in book
16 seven. Can we grab book seven?
17     We can put five back in the left column there.
18     Go to page 1968, if my math is right.
19     MR. BRUNTRAGER: Let the record reflect that I
20 got the book.
21     MR. HEIGELE: What's your tab?
22     MR. SCHOCK: Let me when you're at that page.
23     MR. HEIGELE: Hold on.
24     MR. SWANSON: Back to 54.
25     MR. HEIGELE: He's at 1968 starting, yeah.

Page 120

1    Q   (By Mr. Schock) As you examined the evidence
2  and the probable cause statement, and decided that there
3  was probable cause to issue the charge, did you consider
4  any of the details of his initial entry of the house,
5  into the house to be relevant, particularly, the putting
6  down of the dog food, where the jacket was, how long it
7  took to see the body, and this initial statement that he
8  thought it was suicide; was any of that relevant to you?
9    A   I didn't review any of the evidence. I only
10 reviewed the probable cause statement as it was
11 submitted to me.
12   Q   Okay. So your whole analysis, decision to
13 issue the charge was based on what was in the probable
14 cause statement?
15   A   That's always my decision when, when I file a
16 charge, is always based on what's in the probable cause
17 statement.
18   Q   Well, in this case you had additional
19 knowledge, because you'd been to several of those Major
20 Case Squad briefings; right?
21   A   I had been to several of the briefings. I
22 don't know if there was additional knowledge than what
23 was included in the P.C., or not.
24   Q   Okay. But anything that was said in the
25 briefings that you attended that isn't in the probable

44

30 (Pages 117 to 120)

Page 121

1    cause statement was in your mind; fair?
2        A   It's fair. But I wouldn't have considered it
3    with regard to issuing a charge.
4        Q   Okay. Now the -- In D, which is on 16 --
5    1969, it talks about this cap; right?
6            In the middle of D.
7        A   Uh-huh. Yes. I'm looking at it.
8        Q   And that was something that you think he
9    either had on at some point, or there it was and it was
10   found; right?
11           I mean, it says it was found there.
12       A   Correct.
13       Q   Did it seem odd to you that they were focusing
14   on this cap, but his clothes didn't have any blood?
15       A   No.
16       Q   Did you consider at all the concern that they
17   never found a fabric that matched the fabric mark on the
18   plate, the light plate?
19           MR. HEIGELE: It's argumentative. Assumes
20   facts not in evidence at this point.
21    ·A   What was the question?
22       Q   (By Mr. Schock) Do you remember there was
23   some fabric mark on the light plate?
24       A   I remember there was a pattern on the light
25   plate.

Page 122

1        Q   Yeah, as though a piece of fabric had touched,
2    wasn't that what the thought of the Major Case Squad and
3    others working on it?
4        A   I don't remember the Major Case Quad having
5    any thought as to what had touched the light switch.
6        Q   Do you remember that there was no evidence of
7    cleanup, such as towels? There were no dirty towels, or
8    anything like that?
9        A   I remember that there were not any towels with
10   blood on them.
11       Q   Right.
12       A   Visible blood.
13       Q   Right. And you remember that his clothing had
14   no blood; right?
15       A   That's correct.
16       Q   Okay. We sort of didn't finish talking
17   about -- just backup a second. In, in March or so when
18   the cabinets and the floor came back negative for blood,
19   did you think that probable cause had dissipated?
20       A   I don't remember what they came back negative
21   for, but I remember that they came back negative.
22           I don't -- That did not change my opinion as to
23   probable cause.
24       Q   Okay. All right. In E it says, Hupp said
25   Russell was not very nice to Elizabeth, "Elizabeth"

Page 123

1    being Betsy, and Elizabeth said she was thinking of the
2    leaving Russell. Do you see that?
3        A   Yes.
4        Q   Did you have any concern that Pamela Hupp was
5    framing Russell Faria?
6      . A   No.
7        Q   Why not?
8        A   Well, because it would have been a pretty bad
9    frame job, is the best -- if she were framing, or if
10   anybody were framing Russ Faria, I don't think they
11   would make it look like a suicide. I don't think they
12   would stab someone 55 times. I don't think they would
13   clean up the floor, I don't think they would do it with
14   the dog in the house. I don't think they would give a
15   hoot if there was blood on someone else's slippers.
16   They would just leave them there.
17           I think the only person that cares about those
18   things is your client, so it didn't concern me, or I never
19   thought that someone was framing him.
20       Q   As you sit here now, do you think Russ Faria
21   killed Betsy Faria?
22       A   My personal opinion?
23       Q   Yes.
24       A   Yes, I do.
25       Q   Does the fact that Pamela Hupp killed

Page 124

1    Gumpenberger affect that analysis at all?
2        A   No, it doesn't.
3        Q   In E it talks about the life insurance
4    policies; right? The bottom of E.
5        A   Yeah.
6        Q   Okay. And do you agree that in all criminal
7    investigations motive is relevant?
8        A   Sure.
9        Q   And was it your understanding at the time you
10   filed the charge that Pamela Hupp had made herself the
11   beneficiary of the life insurance policy?
12       A   No.
13       Q   You didn't know about that at that time?
14       A   It was my understanding that Betsy Faria had
15   made Pam Hupp the beneficiary of one of her policies.
16       Q   Right. One of her policies; right?
17       A   Correct.
18       Q   Right. I should have been more specific.
19   Thank you.
20           MR. HEIGELE: Yes, you should have.
21       Q   (By Mr. Schock) But you did know that?
22       A   I did.
23       Q   And that created a motive for Pamela Hupp to
24·  kill Betsy Faria, do you agree with that?
25       A   I disagree with that.

Page 125

1    Q   Why?
2    A   Because -- Well, because she was going to die
3  soon anyway. And because, if that was her motive, I
4  would have expected someone who was savvy in the
5  insurance business to have at least waited long enough
6  to make sure that change was complete before they killed
7  her.
8    Q   Okay. Now we go down to G.
9    A   On the following page?
10   Q   Yes.
11   A   Yes.
12   Q   And this talks about the illuminating
13  materials; right?
14       It goes into the dog. Why don't you read G and
15  tell me when you're done.
16   A   Okay.
17   Q   Okay. So there's all this stuff about the
18  luminescence, and the theory of the going to the towel
19  drawer in there; right?  Right?  Blood?
20   A   Correct.
21   Q   But the blood came up negative three months
22  later; right?  There was no blood?
23   A   The samples that were submitted tested, and
24  were tested, I'm not sure what they were tested for, but
25  the test came back negative.

Page 126

1        And I believe there was a presumptive -- I don't
2  remember exactly what they said.
3    Q   But I mean, once they came back negative,
4  didn't everything about G disappear?
5        MR. HEIGELE: Argumentative. Misstates her
6  past testimony, especially in regards to the diluents.
7    A   It's diluent, by the way.
8        MR. HEIGELE: It's diluent. Sorry. That
9  she's already testified to.
10   A   Does G go away?
11   Q   (By Mr. Schock) Yeah. That's my question.
12   A   No.
13   Q   Why not?
14   A   If I build a snowman in the morning and it's
15  gone when I get home, it doesn't mean the snowman never
16  existed.
17   Q   That's your best answer?
18   A   That's my answer.
19       MR. HEIGELE: That's my client.
20   Q   (By Mr. Schock) That's fine. Now in H
21  there's a poly; right? Reference to the poly?
22   A   Correct.
23   Q   You said it showed extreme deception; right?
24   A   Correct. That he, Russell Faria, showed
25  extreme deception.

Page 127

1    Q   And you believe it was fair and reasonable to
2  rely on that probable cause statement from McCarrick,
3  but I mean, it's based on hearsay, but that's how it
4  works; right?
5    A   I rely on officers' testimony all the time
6  when I --
7    Q   Of course. And McCarrick, you didn't think
8  that McCarrick was the poly examiner, did you?
9    A   I don't know that I knew.
10   Q   You, I think you've told us that he was the
11  report writer. He wasn't the guy going out and
12  interviewing people and doing the polygraph?
13   A   Right.
14   Q   You knew he wasn't the polygraph guy; right?
15   A   Based on the date, I would assume that he was
16  not the polygraph person.
17   Q   Right. So he relied on another person in law
18  enforcement's conclusion; right?
19   A   Correct.
20   Q   Do you think that it was fair that he was
21  ignoring other evidence, particularly, this first
22  responder evidence?
23       MR. HEIGELE: That's argumentative. It, it
24  assumes facts not in evidence. It misstates prior
25  testimony, and that's my objection.

Page 128

1    A   I think that when Detective Sergeant McCarrick
2  submitted me a probable cause statement, it was
3  sufficient to issue charges.
4        MR. SCHOCK: Okay. That's fine. I'm getting
5  near the end now.
6        MR. BRUNTRAGER: Of the depo now, or of things
7  generally?
8        MR. SCHOCK: We're just warming up on things
9  generally.
10       MR. SWANSON: Good times.
11   Q   (By Mr. Schock) Do you remember that there
12  was a -- Go ahead.
13       MR. SWANSON: No, I was joking with her.
14   Q   (By Mr. Schock) Okay. There's -- There was a
15  hearing before the first trial on the question of
16  whether the insurance policy beneficiary change would
17  come into evidence.
18       Do you remember that hearing?
19   A   I do.
20   Q   Okay. Did you take the position that it
21  should not come in? To evidence at the trial.
22   A   That what should not come in?
23   Q   The beneficiary change from -- of the policy,
24  the State Farm policy, from Russ to Pam Hupp?
25   A   As I recall, the assistant attorney general

46

32  (Pages 125 to 128)

Page 129

1   argued the state's position on that motion hearing, and
2   the position of the state was that a change of
3   beneficiary is hearsay, and that in the event the court
4   wanted to allow that in, they needed to allow in the
5   other evidence with regard to her life insurance
6   policies.
7        And the other hearsay evidence, which would be
8   statements from the deceased to other people regarding
9   changing of her policies, that if they were going to argue
10  that it's motive for Pam Hupp, then it had to also be
11  motive for Russ Faria, and that if that hearsay document
12  was allowed, the rest of the hearsay should be allowed.
13       That was the state's position, so I believe it
14  was argued by assistant attorney general.
15   Q   But you were responsible for the state's
16  position; right?
17   A   We were dually responsible.
18   Q   Were you leading the prosecution, or was Mr.
19  -- What was his name?  Hicks, Richard Hicks?
20   A   Hicks.
21   Q   Was he leading the prosecution, or were you?
22   A   I think it was a dual effort.  I mean,
23  obviously, the murder occurred in Lincoln County, but I
24  requested, through the governor's office, the assistance
25  of the attorney general.

Page 130

1   Q   And that's routine; right?  I mean, a lot of
2   prosecutors do that on a big case; right?
3   A   I don't know if they do, or they don't.  I
4   just knew that I needed someone with more experience
5   than I had --
6   Q   Right.
7   A   -- to assist in that case.  And so the
8   attorney general, the governor approved it and the
9   attorney general's office sent down several individuals
10  at different times to review it, and assign themselves
11  to the case, and then ultimately, they were with me
12  through every process throughout the case, including
13  trial.
14   Q   Okay.  Did you ever tell Mr. Schwartz that if
15  the judge rules that the beneficiary change was coming
16  in, you would drop the case against Faria and not to go
17  to trial?
18   A   No.
19   Q   Did you ever say to Joel Schwartz -- Well, did
20  you make such a statement to anybody?
21       I asked you about Joel Schwartz.  Did you make
22  the statement, like I just said, to anybody?
23       MR. HEIGELE:  Could you please restate the
24  statement that you're attributing?
25   Q   (By Mr. Schock)  Sure.  That if the judge

Page 131

1   ruled the insurance beneficiary change to Pam Hupp would
2   come into evidence, that you would drop the case; did
3   you ever say that?
4   A   No.
5   Q   Did you ever say to anybody that dropping the
6   case would present problems for you politically?
7   A   No.  I actually encouraged the family to drop
8   the case and allow me to drop the case, and be
9   supportive of that before the first trial.
10   Q   So let's go into that a little bit.  So you
11  asked the family to drop the case?
12   A   I told the family that I thought the case
13  would be stronger down the road when more technology
14  improved, and maybe there were more evidence gathered; I
15  thought it would be a stronger case later.
16       I didn't think it was a case that was winnable.
17   Q   So before the first trial you did not think
18  the case was winnable?
19   A   I thought that there -- that it would be
20  difficult, it would be a difficult swing.
21   Q   Who did you tell that to exactly?
22   A   I don't remember.
23   Q   The girls, Leah and Mariah?
24   A   I don't remember if it was Betsy's mom, or her
25  sisters, or maybe all of them.  I don't remember.

Page 132

1   Q   They all were convinced Russ had done it;
2   right?
3   A   Correct.  We all were, yes.  And I think they
4   asked me a question like, do you think you can win it,
5   do you think you're going to win it?
6       And I was honest with them.
7   Q   Let's go into this issue of the trust fund for
8   the insurance proceeds.
9       Do you remember that issue, first trial?
10   A   Specifically, what are you talking about?
11   Q   Let's go over the details.  So Pam Hupp
12  testified in the first trial; right?
13   A   I believe so, yes.
14   Q   And she testified that she had put the money
15  from the insurance, from State Farm, it was $150,000.00;
16  right?
17   A   I don't remember what she testified to,
18  frankly, but I know that at some point she said that she
19  put money into a trust.
20   Q   Okay.  Did you have any knowledge of officers
21  suggesting to Miss Hupp that she make that -- that she
22  put that money into a trust fund?
23   A   No.
24   Q   If you elicited testimony about whether it was
25  in a trust fund, how did you know that that was a fact?

47

33 (Pages 129 to 132)



Page 133

1     A   I believe Pam Hupp was Richard Hick's witness,
2   so he would have had any meetings with her prior to
3   trial.
4     Q   You didn't know before the trial anything
5   about the trust fund issue?
6     A   I'm sure he and I discussed it, but he would
7   have been the one meeting with her ahead of trial to
8   talk about his questions, and, you know, how to answer
9   questions, and where to go, and all those things.
10    Q   Yeah.  Did the second trial, do you believe
11  that her credibility as a witness had been destroyed
12  before the second trial, by her statements about him
13  seeing Russ Faria hiding in his car, and all that?
14    A   I don't know that I thought her credibility
15  had been destroyed.  I thought she had issues.
16    Q   What issues did she have?
17    A   A lot of them.  She was just kind of all over
18  the place.
19    Q   Right.
20    A   It was like she was hard to track.
21    Q   I mean, she said in reference in -- she told
22  law enforcement before the second trial that she had
23  some kind of a memory recovery, and that she'd seen Russ
24  Faria hiding in the Nissan at the location of the murder
25  when she got there with Betsy a little after 7:00 on the

Page 134

1   27th of December; right?
2     A   I remember that she said something about
3   seeing a car in the area with two men in it, but I don't
4   remember specifically who she said was in it.
5     Q   And she'd never said anything about that
6   before; right?
7     A   That's correct.  That's my understanding.
8     Q   Did you consider that to damage her
9   credibility?
10    A   Not to the point of -- not, not being able to
11  be rehabilitated.
12    Q   You said she was sort of all over the place,
13  if I remember your testimony correctly a moment ago?
14    A   Correct.
15    Q   Tell me what issues, on what issues she was
16  all over the place.
17    A   I don't remember specific issues.  I just
18  remember that she was the type of person that she would
19  only answer the question that was asked.  And so if you
20  didn't follow up the question, or ask for more detail,
21  she likely wouldn't give it to you.
22       So it didn't necessarily mean that she was
23  inconsistent, she just answered questions in a way that
24  was difficult for me, because you never really knew which
25  direction it was going to go.

Page 135

1     Q   Did you have help from the AG in the second
2   trial?
3     A   No.
4     Q   You had access to some conversations between
5   Mr. Faria and his counsel which were recorded by the
6   jail; is that right?
7     A   No, not the jail.
8     Q   Did you have access to any conversations
9   between Russ Faria and his defense counsel?
10    A   At what period?
11    Q   At any period, any recorded statements.
12    A   We had access to any of the call logs that
13  happened while he was in the department of corrections.
14    Q   Right.  And in fact, those calls were
15  recorded; right?
16    A   Sure.  I mean, they specifically say that over
17  and over.
18    Q   Right.  And you listened to those calls; is
19  that right?
20    A   Some of them I did.
21    Q   Did you think that was improper, legally, when
22  you were listening to the calls between a criminal
23  defendant and his counsel?
24    A   No.
25    Q   Because?

Page 136

1     A   Well, because there was -- It was said on the
2   calls, this is a recorded line, these calls are
3   recorded.  There wasn't any request, it wasn't on an
4   attorney line to have a private call, it was on the
5   public line in the department of corrections that puts
6   everyone on notice that if you think you have a
7   privilege, you really don't, because these calls are
8   being recorded.
9     Q   Are you familiar with what's called the
10  Third-Party Doctrine, which relates to a situation where
11  the party has no other choice but to talk to their
12  lawyer over a phone?
13    A   I'm familiar with that.
14    Q   Did you think that applied in this case?
15    A   No.
16    Q   Why not?
17    A   Because the department of corrections has the
18  ability for lawyers to call on a private line, and they
19  chose not to.
20    Q   Okay.  Did you tell defense counsel,
21  Mr. Swanson and Mr. Schwartz, that you were listening to
22  their client's phone calls with him?
23    A   I didn't listen to the calls until much later.
24    Q   When you did listen to the calls, did you tell
25  them that you were listening to the calls between

Page 137

1   defendant and their counsel?
2       A   We provided them with the calls.
3       Q   Did you tell them that you had listened to
4   them?
5           MR. HEIGELE:  Asked and answered.
6           MR. SCHOCK:  No, she hasn't answered it.
7       A   Did I call them up myself --
8       Q   Yes.
9       A   -- and say I've been listening to these calls?
10      Q   Yes.
11      A   No.  But that's because I didn't listen to
12  them until right before the trial.  My staff had been
13  listening, and I told them they needed to put them
14  together and send them out.
15          I didn't have time to listen to them.  I started
16  listening to them just before the second trial.
17      Q   Okay.  When you see the probable cause
18  statement, did you look at the pictures of the
19  luminescence test yourself?
20          MR. HEIGELE:  Objection.  She did not issue
21  the probable cause statement.  It's argumentative.
22      Q   (By Mr. Schock)  I'm sorry.  When you issued
23  the charge against Russ Faria for murder, did you look
24  at the pictures that were made at the luminescence test?
25      A   I didn't look at the pictures until before the

Page 138

1   second trial.
2       Q   Do you remember whether any officers told you
3   at the end -- In the course of the Major Case Squad
4   call-out that they were convinced that, that Russ Faria
5   killed Betsy after he got home from game night?
6           MR. HEIGELE:  To the extent it calls for
7   hearsay, I object.  But you can answer.
8       A   I don't remember that anyone during the
9   call-out specified when they thought he killed Betsy.
10      Q   (By Mr. Schock)  Okay.
11      A   I know that they, the consensus was that they
12  believed he killed Betsy, but I don't remember them
13  specifically saying when they thought it had occurred.
14      Q   When did you decide to argue to the jury in
15  the closing of the first trial that Russ Faria killed
16  Betsy earlier in the evening and the alibi witnesses
17  were lying?
18      A   After Mr. Schwartz made his closing argument.
19      Q   Do you remember a hearing on the alibi defense
20  and a bill of particulars?
21          So in other words, defense counsel gave an alibi
22  in response to discovery request, and then filed a bill of
23  particulars asking the state to state when the crime
24  occurred.  Do you remember that hearing?
25      A   I remember several of those hearings.

Page 139

1       Q   Okay.  And you argued that you should not have
2   to state when the crime occurred; is that right?
3       A   I argued that I shouldn't have to narrow the
4   time from between 7:20 and 9:41.
5       Q   Why did you take that position?
6       A   Because it would be impossible to know exactly
7   when it occurred.
8       Q   Don't you think defense counsel needed to know
9   your theory of the case under the rules?
10      A   Well, I think the judge didn't agree with
11  defense counsel on any of the times, whether it was in
12  the first trial, or the second, any of the times defense
13  counsel filed requests for a bill of particulars, the
14  judge denied the request.  So regardless of what I
15  thought, the judge agreed.
16      Q   Okay.  In the insurance case, you were present
17  for the testimony of Corbin a few days ago, yes or no?
18  I can't remember.
19      A   Oh, for the Argonaut case in this?
20      Q   Yes.
21      A   Yes, I was present.
22      Q   There was a document presented as an Exhibit
23  A, I don't remember what exhibit it was, that is related
24  to the -- a case, and let me -- Let's go off the record
25  for one second.

Page 140

1           [Whereupon, there was a discussion off the
2   record].
3       Q   (By Mr. Schock)  We're going back on the
4   record.
5           Ma'am, let me ask you about your law license.
6   Has your law license ever been disciplined?
7       A   Yes.
8       Q   Tell me about that, please.
9       A   I mean, by discipline, I've had bar
10  complaints.
11      Q   I don't care about the complaints.  I care
12  about the outcome of the complaints.
13      A   Okay.  Yes.  I'm not sure what -- I think it
14  was called a private admonishment.
15      Q   Okay.  And when did that occur?
16      A   I think in 2011.
17      Q   Did that relate to this case in any way?
18      A   No.
19      Q   Okay.  Have you ever had any discipline, not,
20  not complaints, but disciplines about this case?
21      A   No.
22      Q   Are there complaints against you pending at
23  this time regarding this case?
24      A   Complaints?
25      Q   Correct.

Page 141

1    A   Yes.
2    Q   Okay. Will you do me the favor, that if those
3   are resolved before trial, you'll tell your attorney, so
4   we can either reopen the depo, or get -- sometimes it
5   might be something private that we wouldn't know about,
6   but I think I have a right to know it.
7       MR. HEIGELE:  Joel Schwartz made it.
8       MR. SCHOCK:  I know he did, but he might not
9   know the outcome.
10      MR. HEIGELE:  Okay.
11   Q   (By Mr. Schock)  Do you agree to tell your
12  attorney if that is resolved before the trial of this
13  case?
14   A   Yes. One of them has been resolved.
15   Q   Okay. I'm only interested -- Did that result
16  in any discipline?
17   A   No.
18   Q   If any of them are, you will tell your
19  attorney?
20   A   Correct.
21   Q   Thank you. Let me ask you this: Have you had
22  any discussions with the U.S. Attorney, or any
23  representatives of the U.S. Attorney, or the FBI about
24  this case? Any aspect of it.
25   A   Yes.

Page 142

1    Q   Tell me about those conversations, when they
2   happened, who they were with, and what was said?
3    A   I spoke with the U.S. Attorney's Office in
4   January, I think it was January, of 2016, after he had
5   received a call from Joel Schwartz wanting to review the
6   file. And so I said, sure, come on out. And I gave him
7   my file.
8    Q   Did you have any follow-up conversation?
9    A   Yeah. I've talked to him whenever he's called
10  or needed more information, or needed my secretary to
11  send him something that maybe he didn't have initially,
12  or --
13   Q   Who is "he"?
14   A   Tom Dittmeier.
15   Q   And do you know if his investigation is
16  complete?
17   A   I do not know.
18   Q   Do you know whether he's reached a conclusion
19  whether to charge anybody with murder in this case?
20   A   I do not know.
21   Q   You agree that, due to double jeopardy, Russ
22  Faria can no longer be prosecuted for the murder of
23  Betsy Faria?
24   A   I agree that jeopardy has attached.
25       MR. SCHOCK:  All right. That concludes the

Page 143

1   first volume of the depo. It's all I have, unless you
2   all want to ask further questions, let's do that.
3       MR. RETTER:  I don't have any further questions.
4       MR. PLEBAN:  No questions.
5       MR. BRETT:  No questions.
6       MR. BRUNTRAGER:  I have no role, other than
7   personal counsel.
8       MR. SCHOCK:  You could ask a question, though.
9       MR. BRUNTRAGER:  Where is a good place for
10  lunch?
11      MR. HEIGELE:  There's a couple down the way.
12  I'll reserve questions. Then we go off?
13      MR. SCHOCK:  One second. When you say you
14  reserve questions, are you reserving questions because
15  they might be about what we're talking about next, or
16  because you don't want to ask her questions about what's
17  come before?
18      I think this is your shot on what we've talked
19  about up until now because we're going to do this other
20  part wholly separately.
21      MR. HEIGELE:  I don't have any follow-up with
22  her.
23      MR. SCHOCK:  Okay. As to what we've already
24  done?
25      MR. HEIGELE:  Yeah. I'll reserve it for

Page 144

1   trial.
2       MR. SCHOCK:  Oh, okay. That's what you mean.
3   I didn't understand what you meant. Okay.
4       Okay. Let's go off the record. Concluding
5   volume one.
6
7           o-0-o
8       COMES NOW THE WITNESS, LEAH L. ASKEY, and having
9   read the foregoing transcript of the deposition taken on
10  the 23rd day of October, 2017, acknowledges by signature
11  hereto that it is a true and accurate transcript of the
12  testimony given on the date hereinabove mentioned.
13
14          LEAH L. ASKEY
15      Subscribed and sworn to before me this ____ day
16  of _____, 201_.
17      My commission expires:_____.
18
19
20          Notary Public
21
22
23
24
25

Page 145

```
 1              CERTIFICATE
 2       I, JANE M. RICH, a Certified Court Reporter,
 3   within and for the State of Missouri, license #411, do
 4   hereby certify that pursuant to notice there came before
 5   me in the law offices of Barklage, Brett & Hamill, 211 N.
 6   Third, St. Charles, Missouri,
 7           LEAH L. ASKEY,
 8   who was first duly sworn to testify to the truth and
 9   nothing but the truth of all knowledge touching and
10   concerning the matters in controversy in this cause; that
11   the witness was thereupon examined, and said examination
12   was reduced to writing by me and signed by the witness,
13   and that this deposition is a true and accurate record of
14   the testimony given by the witness.
15       I further certify that I am not of counsel, nor
16   attorney for either of the parties to said suit, nor
17   related, nor interested in any of the parties or their
18   attorneys.
19       IN WITNESS WHEREOF, I have hereunto set my hand
20   this 2nd day of November, 2017.
21           _____.
22           Jane M. Rich, CCR No. 411.
23
24
25
```

### A

ability 53:13
136:18
able 31:16,23
108:18 134:10
absent 70:15
absolute 25:24
absolutely 56:9
75:21 100:9
abusive 42:3,11
accept 77:24,24
accepted 116:5
access 135:4,8,12
accessed 95:6
accompanied
95:17 103:18
accurate 64:11
144:11 145:13
accurately 103:1
acknowledges
144:10
action 92:14
actual 75:16
added 84:7
additional 84:2,7
110:9 117:24
118:11,13
120:18,22
address 18:11
administration
13:16
admitted 5:13
admonishment
140:14
advice 73:8
affect 124:1
affidavit 92:21
100:2
affix 93:13
afternoon 23:9
27:1 35:5 70:24
ag 135:1
age 4:3
agencies 11:12
agency 37:25 38:1
ago 29:1 51:23
77:5 114:7,12
134:13 139:17
agree 11:18 16:8

16:14 17:3
44:24 49:17
53:23 54:18
60:2,13 61:24
67:14 71:12
77:13 84:22
111:15 124:6,24
139:10 141:11
142:21,24
agreed 84:21
92:23 139:15
agreement 39:3
ahead 60:16 97:11
128:12 133:7
al 1:6 2:6
alibi 24:24 43:9
49:18 50:2,6
51:1,8 52:1 55:2
138:16,19,21
alive 47:23,24
48:10 52:22,23
90:14
allow 129:4,4
131:8
allowed 129:12,12
ambiguity 32:1
ambulance 62:5
64:14 66:3,9,17
86:19
amiss 17:17
amount 58:4
85:10
analysis 120:12
124:1
announcements
4:13
answer 12:11
107:1 110:14
126:17,18 133:8
134:19 138:7
answered 86:22
87:20 88:12
116:16 118:1
134:23 137:5,6
answers 73:16,19
anybody 8:21
25:25 26:8 28:2
45:11,19 61:3,9
65:15,17 70:10

76:15,18,21
80:21 81:2 82:4
82:11,15,15 83:3
83:5,8 89:18
102:22 106:17
123:10 130:20
130:22 131:5
142:19
anymore 25:22
54:14
anyway 43:8
103:11 125:3
apparently 24:10
appear 81:18
appeared 95:5
107:7 108:24
109:22
application 92:17
92:19 93:7,12,15
applied 105:22
117:5 136:14
applies 25:19
apply 99:25
applying 106:2,13
appointments
16:5
appreciate 12:9
99:6 104:2
approach 112:24
approached 116:4
approved 130:8
area 99:24 134:3
argonaut 139:19
argue 129:9
138:14
argued 129:1,14
139:1,3
argument 138:18
argumentative
87:19 88:11
112:9 113:7
114:14 121:19
126:5 127:23
137:21
arm 68:19,21,24
arrested 77:14,16
83:18,22,25
arrived 22:20,20
61:24,25 66:16

66:19 69:9 89:3
89:6,11,25
article 78:19
articulated
114:25
aside 70:20
asked 28:12,17
29:7 36:13
38:17 79:5
86:22 87:20
88:12,17 116:16
118:1 130:21
131:11 132:4
134:19 137:5
askey 1:13 2:9,25
3:3,4 4:2,8,12,22
4:23 58:24
78:11 118:23
144:8,14 145:7
asking 36:24
37:20 56:21
66:11 69:25
70:1,5,6 83:2
86:3 97:14,15
106:24 114:15
116:14,17 117:5
118:3 138:23
aspect 141:24
assemble 57:23
asserted 48:18,19
assign 130:10
assigned 62:10,17
assigning 14:24
assist 130:7
assistance 129:24
assistant 128:25
129:14
associates 1:23
association 9:12
9:12
assume 7:19 41:7
127:15
assumed 9:1,3
12:3 117:11
assumes 121:19
127:24
attached 142:24
attempt 82:5
attend 23:12

attended 27:6
120:25
attorney 2:19
8:21 10:15 11:3
12:6,16 13:4
14:10,11 37:20
109:7 128:25
129:14,25 130:8
130:9 136:4
141:3,12,19,22
141:23 145:16
attorneys 9:13
11:23 12:7
13:11 14:5,12
142:3 145:18
attributed 78:1
attributes 36:12
attributing
130:24
available 22:25
24:1
avenues 33:21
average 8:3
awakened 19:25
aware 16:23 20:8
48:18,24 49:1,2
79:9 83:11,13
86:18,23,24 88:3
89:1,5,8 97:18
99:8,18 100:5,8
108:4

### B

bach 50:21
back 12:19 16:2
38:2,3 40:3
41:23 51:21
55:25 59:14,15
62:17,20 64:8,10
67:14 87:22
88:22 91:1,2
105:7 108:8
109:13 115:2
118:22 119:17
119:24 122:18
122:20,21
125:25 126:3
140:3
backup 122:17
bad 32:2 123:8

bank 28:14
bar 5:14 140:9
barklage 2:13 3:6
145:5
based 11:1,2
32:11 47:6 61:4
72:19 85:5
86:20 98:22
104:5 111:16
120:13,16 127:3
127:15
basically 18:17
110:5
basis 14:22 16:7
beat 25:23
bed 19:22
began 29:2
beginning 8:8
39:2,3
behalf 1:15 2:10
4:5
belief 47:3,6
51:15 59:13
61:4 76:23,25
77:1 84:9
107:17 111:15
believe 10:20,22
14:6 15:11
16:19 20:7
33:13,20 38:15
38:17 45:12
46:4,5,7 53:12
53:18 54:21
63:23 65:6 72:1
81:14,15,19,22
81:25 82:2
85:25 87:23
88:2,12 92:6
95:21 101:14
102:12,17
103:15 105:1,12
108:14 109:24
112:15 113:22
115:18 118:8,10
126:1 127:1
129:13 132:13
133:1,10
believed 39:13
46:10 51:8 52:7

55:6 60:21
61:20 64:22,24
92:20 111:13
113:21 118:14
138:12
bell 33:16 40:15
47:13 66:25
67:1,2 97:4 98:2
bend 3:11
beneficiary
124:11,15
128:16,23 129:3
130:15 131:1
best 11:13,15
60:17 90:15
123:9 126:17
bet 20:15
betsy 29:14 32:9
33:25 34:7,23
41:12 47:11,14
52:18 58:2 72:2
82:12 84:19
85:16 86:11
89:24 104:7
106:17 123:1,21
124:14,24
133:25 138:5,9
138:12,16
142:23
betsys 131:24
bevis 2:18 4:8
big 3:11 90:12
130:2
bill 138:20,22
139:13
binders 43:2
bit 5:3 6:4,16 11:4
42:1 131:10
blood 30:1,6
32:23 36:6 65:5
65:9 66:13,16,20
87:3 88:4 89:11
89:18 92:3
95:11 96:16,18
96:20 106:25
107:7,25 108:8
121:14 122:10
122:12,14,18
123:15 125:19

125:21,22
bluestar 99:25
110:21,22
blvd 3:11
bodily 36:22
body 32:10 36:12
61:24 62:6
64:16 65:13,17
65:19,21 68:5,8
68:13,16,20,21
68:25 69:8
84:20 85:10
86:20 89:2,6,24
90:10,14,19 91:9
96:18 107:8
120:7
bodys 64:16
bonhomme 2:19
book 74:2 119:15
119:15,16,20
books 73:25
boss 14:15,19,21
104:19
bottom 124:4
box 1:23
boyfriend 33:13
brass 114:21
break 58:16,23
104:3 118:21
breaking 58:21
118:17
brentwood 1:24
brett 2:13 3:6,6
4:20,20 67:12
143:5 145:5
briefing 23:25
24:7 29:19
30:23 34:6,18
40:21 42:8
briefings 23:9,12
23:18 26:12,19
27:6,22 32:25
33:4,24 46:3
49:5 55:13,15
56:17,18,20 59:5
59:15,17 68:1
69:3,4,5 87:2
120:20,21,25
briefly 6:17

bring 113:24
brought 14:10
64:10
bruntrager 3:4
19:15 58:17
67:9 74:14
119:19 128:6
143:6,9
build 126:14
building 23:24
burdensome 16:6
business 125:5

─────── C ───────
c 2:13,17 3:7,10
4:18 111:3
120:23
cabinetry 108:7
cabinets 122:18
call 17:14 18:4,8
18:25 19:11,18
20:18 35:5
42:25 47:11
84:18,18 85:23
85:23,24 86:21
87:18,18 109:6
135:12 136:4,18
137:7 142:5
called 17:12 18:5
18:22 19:5 20:6
20:9,14 71:4
84:24 85:12
86:2,12 91:19
96:15 136:9
140:14 142:9
callout 25:20 26:1
29:6 30:15
32:20 35:16
39:12,13 40:12
42:23 45:15,23
46:1,19 49:2,24
52:12,14 56:17
64:2 79:15
105:19 119:10
138:4,9
calls 36:23 45:5
66:10 69:23
79:16 110:13
135:14,18,22
136:2,2,7,22,23

136:24,25 137:2
137:9 138:6
camera 67:5 99:9
99:12,16 100:14
101:17,21 103:7
campaign 8:7,15
canned 73:16,18
cant 7:22,24
30:15 37:22
45:14 48:3
49:16,17 50:21
53:6,10 115:1
139:18
cap 121:5,14
capture 100:14
103:7
captured 96:16
car 81:5 133:13
134:3
care 28:8,9 140:11
140:11
careful 34:16
cares 123:17
carried 107:12
case 6:14,15 9:15
15:7 20:8,11
21:9,19,23 22:23
23:8 24:18,23
25:20 26:1 29:6
29:11 30:4,15,22
32:13,20 33:1,5
33:23 34:6,19
37:5 39:12,12
40:12,22 42:8
43:14 44:16
45:23,25 46:19
50:2,14 51:11,14
52:12,17 53:2
55:3,13,20 56:16
58:25 60:3,14,20
62:4,20,21 63:21
64:1,8 66:4,7,15
68:1 69:3,8 70:9
73:22 75:10
79:14,15,16,17
82:3,4,6,11,16
83:3,8 85:1
88:10 91:2 94:2
96:15,24 97:2

100:13 104:13
104:18 105:9,18
114:3,20 115:1,5
115:16,18 119:9
120:18,20 122:2
122:4 130:2,7,11
130:12,16 131:2
131:6,8,8,11,12
131:15,16,18
136:14 138:3
139:9,16,19,24
140:17,20,23
141:13,24
142:19
cases 6:2,11 7:20
14:24 16:5
cause 1:4 2:4
53:11,17,21
71:10,16 72:1,6
72:19,20 82:18
82:20 83:11,15
84:8 95:17
97:15 98:25
103:17 105:19
108:2 109:22
110:2,5 111:14
111:16,23
112:17 114:23
115:13 116:4,11
118:9,10 119:10
119:13 120:2,3
120:10,14,16
121:1 122:19,23
127:2 128:2
137:17,21
145:10
ccr 1:22 2:15
145:22
cell 1:25 76:8 78:7
79:4
certain 25:11
36:19 92:5
101:6 109:21
110:2
certainly 49:11
60:17
certificate 145:1
certified 145:2
certify 145:4,15

chance 115:22
change 111:10
122:22 125:6
128:16,23 129:2
130:15 131:1
changes 9:15
changing 129:9
charge 16:17 53:6
53:10,18 71:6,13
72:8 75:11 76:6
77:7 78:3 82:15
83:5,20,21 84:4
84:13,25 85:15
86:8,9 87:24
89:1 91:9 95:17
97:16 98:17,19
98:22 103:18,21
103:22 104:7,16
105:2,3,4,5,8
106:18 110:11
110:18,24
111:13 112:7,14
112:18,25 114:9
114:11 116:5,12
116:13 118:9,15
119:11 120:3,13
120:16 121:3
124:10 137:23
142:19
charged 83:16
charges 70:16,17
88:10 128:3
charging 87:14
charles 2:14 3:7
145:6
check 36:6 38:1
45:7 54:4
checked 30:1,6
36:15,18 54:3,7
checking 32:22
45:3
checks 36:12
choice 136:11
chose 13:18
136:19
chris 4:21
christopher 3:1
cigarettes 45:21
circumstances

17:23,24
city 3:2 9:10
civil 6:15
class 10:14
classes 8:21
clayton 2:20
clean 108:24
109:10,11
123:13
cleaned 109:10
cleaning 97:3
cleanup 92:3,3
95:1,4 96:6,7,25
97:2 122:7
clear 25:24 31:2
31:25 32:1
104:3
cleared 31:10,16
31:23
clearing 32:5,6
client 107:6
123:18 126:19
clients 136:22
close 52:24 62:1
closely 43:16
closing 138:15,18
clothes 96:20
121:14
clothing 107:22
107:22 122:13
coagulant 88:7
coagulated 66:24
89:15,16
coats 90:13
cocounsel 2:21
coherent 113:11
cold 65:18 90:8
colder 65:19
collection 6:20
collective 58:25
college 5:4
column 75:25
119:17
com 74:21
come 22:25 24:2
30:18 43:4
55:25 67:6 81:3
97:20 114:19
128:17,21,22

131:2 142:6
143:17
comes 14:22
114:21 144:8
coming 57:16
114:8 130:15
commander 23:8
31:6 56:21 80:8
104:12
comments 29:21
29:24 41:12
commission 11:13
144:17
commit 54:20,22
58:13 63:24
committed 33:24
39:15 53:3,17,18
54:9 63:12
87:14 113:20,21
common 114:7
communicated
101:1
communicating
27:24
communications
98:23
community 11:6
11:10
compared 64:22
comparing 65:20
competently
64:10
complaints
140:10,11,12,20
140:22,24
complete 125:6
142:16
completely 28:22
28:23 76:24
90:19
complicated
54:25
computer 38:7,7,8
38:14
computers 38:21
45:5
concensus 55:12
concern 96:5
121:16 123:4,18

concerning
145:10
concluded 35:19
96:25
concludes 142:25
concluding 144:4
conclusion 16:16
51:10 63:12
89:23 119:9
127:18 142:18
conclusions 58:8
64:6
condition 61:23
62:5 64:16
66:13,15 88:4
89:10 91:8
97:10
conduct 25:16
92:14
conducted 100:24
108:5
conducting 31:20
conference 2:12
79:11,16 80:6
conferences 9:13
confident 24:12
conflicting 64:20
64:25
confusion 65:8
connecting
114:22
connection 21:4
93:12 96:24
consensus 24:13
51:11,14 67:14
138:11
consider 15:12
90:2 120:3
121:16 134:8
considered 121:2
considering 33:5
33:8
consistent 23:7
24:19 53:8,14
contact 18:3 20:2
contained 100:25
contaminate 32:7
contents 81:16
98:12

contested 12:4,20
  12:24
context 57:1
  77:12 80:12
  81:2 88:10
contexts 81:16
continue 57:11
continuing 78:14
contract 16:7
contradiction
  89:13,20
contradictory
  88:6 89:10
controversy
  145:10
conversation
  37:15,18 39:16
  41:1 70:12
  80:22 81:17,19
  81:23 102:25
  105:25 109:15
  142:8
conversations
  71:8,9 82:24
  83:3,9 106:21
  135:4,8 142:1
convictions 16:13
convinced 132:1
  138:4
cool 65:22,24 68:8
  87:8 88:5 89:6
coolness 88:3
  89:23
cooperating 34:24
cooperative 41:2
  41:24 43:7
copies 106:11
copy 72:6 106:9
  106:11 115:8
corbin 50:20 55:7
  59:21 85:6
  139:17
corbins 51:9 52:2
  52:11 55:8 59:5
  59:18,20 60:21
  61:6
corner 74:5
corners 92:20
  112:16

coronado 3:1
correct 5:9 6:25
  7:3,12,21 8:14
  10:6 12:12,15
  13:8 15:3 17:4
  17:21 19:6 20:1
  20:9,10,24 21:3
  21:18,23,24
  23:17 24:5,16
  26:21 27:8 32:5
  39:8,10 40:19
  41:19 44:21
  45:6 47:9 48:6,9
  48:12,17 49:3,4
  50:4 51:17
  52:19 53:1,5,15
  53:15 54:6,13,15
  54:17 55:21
  56:2,5,11 57:18
  57:21,23 59:13
  60:5,12 63:10
  64:11,12 66:4,5
  68:15,17,18 73:1
  73:4,7 78:5
  79:23 83:17,19
  85:3 86:17
  92:24 93:5
  95:13 96:21
  97:3,19 98:7,24
  99:2,4,10 100:7
  101:11,18
  104:15,22
  105:14 106:4,6
  107:23 109:20
  110:8,25 111:6
  114:4 115:7,10
  116:2,10 117:1,9
  117:15,16
  121:12 122:15
  124:17 125:20
  126:22,24
  127:19 132:3
  134:7,14 140:25
  141:20
corrected 12:11
correcting 12:9
correction 17:9
corrections
  135:13 136:5,17

correctly 20:18
  96:13 134:13
couldnt 31:21
  49:14
counsel 3:4 39:4
  100:17,22 135:5
  135:9,23 136:20
  137:1 138:21
  139:8,11,13
  143:7 145:15
counsels 101:13
counted 10:3
county 3:5 4:20
  11:12,13,15 16:7
  16:24 63:9 76:5
  76:9 105:13
  129:23
couple 6:10 10:2
  81:13 143:11
course 18:10
  34:22 48:20
  53:23 78:16
  84:25 105:18
  127:7 138:3
court 1:1,23 2:1
  11:19 24:1
  30:22 39:6
  129:3 145:2
cover 68:5
covered 27:3
crazy 72:4
created 124:23
credibility 59:24
  60:1,15 133:11
  133:14 134:9
crime 7:19 30:11
  30:19,23,24 31:9
  31:10,16,22
  46:21 53:16,18
  53:19,25 87:15
  87:25 138:23
  139:2
criminal 6:5 7:20
  124:6 135:22
criminalist 108:18
  108:20,21
csi 119:2
curious 10:8
currently 11:25

12:7
custody 34:10,13
  69:18 70:19,19
customary 56:6

——————

D

d 3:6 121:4,6
daily 14:22
damage 134:8
dark 80:14,20
data 35:23 36:4,5
  38:22,24,24
  39:19,23
date 16:25 17:3
  104:25 127:15
  144:12
dated 74:21
dates 118:12
daughter 33:12
  84:23 85:24
  86:11 87:18
daughters 33:11
day 2:10,12 21:16
  22:23 23:1,18,23
  24:6 25:4,11,12
  25:13,14 26:22
  30:13,16 34:11
  34:14 43:10,17
  44:22 45:2,17
  51:1 71:19,20
  79:12,13,13
  80:17 83:22,24
  83:25 84:5
  144:10,15
  145:20
days 9:22,24 10:2
  10:3 25:20 26:9
  44:8 52:15
  81:13 111:7,20
  116:3 139:17
daytime 27:2
dead 52:24 64:17
  68:20 84:20
  85:10 86:20
  89:24 90:15,16
death 17:8,9,13
  17:16,18,22 24:9
  68:13,16 95:8,10
  95:12
debt 6:20

deceased 69:9
  129:8
december 17:2
  44:6,7,17 61:17
  74:22 80:1,17
  134:1
deception 126:23
  126:25
decide 57:11
  138:14
decided 8:12 73:5
  102:18 120:2
decision 30:24
  35:10 69:22
  71:12 93:1,13
  94:18,20 98:16
  98:22 112:13
  120:12,15
decisions 97:16
declined 72:7
defendant 2:22,25
  3:5,9 4:21 16:16
  135:23 137:1
defendants 1:7
  2:7 4:16
defense 37:20
  39:4 100:17,21
  101:13 135:9
  136:20 138:19
  138:21 139:8,11
  139:12
definitely 52:7
delivered 101:12
democrat 12:25
democrats 13:1,2
denied 139:14
deny 78:4
department 70:9
  135:13 136:5,17
depending 15:6,7
  44:1
depo 24:15 65:2
  128:6 141:4
  143:1
deposes 4:5
deposition 1:13
  2:9 12:15 23:3
  51:7,23 59:9,10
  59:12 70:21

144:9 145:13
deputies 62:16
deputy 19:12
derriere 29:13
    106:17
designated 105:9
destroyed 133:11
    133:15
detail 134:20
details 41:11
    87:13 120:4
    132:11
detective 51:15
    128:1
determine 57:4
    58:2,6 92:2
determined 58:1
didnt 6:22 13:21
    13:24 23:23
    24:8 25:12
    27:24 31:21
    34:11,13 35:9
    38:11 54:20,22
    55:18 58:13
    60:25 85:1,8,13
    85:19 88:24
    90:2,3,4,13,20
    91:10,14 92:12
    97:1 98:9
    111:24 112:5
    117:4 118:8
    119:6 120:9
    121:14 122:16
    123:18 124:13
    126:4 127:7
    131:16 133:4
    134:20,22
    136:23 137:11
    137:15,25
    139:10 142:11
    144:3
die 125:2
diego 5:5
dies 17:19 18:9
different 16:5
    26:5 28:13
    33:21 37:24,25
    57:12 66:14
    79:24 87:10

98:6 99:21
    103:6 114:9
    130:10
difficult 131:20
    131:20 134:24
difficults 108:23
diligent 112:6
diluent 126:7,8
diluents 108:25
    109:2,4,5,6,8
    126:6
direct 4:6 26:2
directed 90:23
directing 119:2
direction 57:12
    61:13 134:25
directives 25:15
    25:17,25 26:7
directly 93:23
dirty 97:10 122:7
disagree 81:16
    124:25
disappear 126:4
disband 104:18
discipline 140:9
    140:19 141:16
disciplined 140:6
disciplines 140:20
disclosures 74:9
discovery 100:22
    138:22
discuss 57:6 60:14
    60:17 70:8,8
    106:16
discussed 37:10
    37:12 49:11
    69:10 111:4
    133:6
discussing 58:25
discussion 29:12
    33:23 34:5,8
    43:11 49:8
    50:13 52:10
    56:25 57:13,14
    59:19,21,24,25
    61:12 95:18
    140:1
discussions 32:19
    32:22 34:21

46:20 50:25
    51:3 52:12
    56:16,19 57:22
    59:16 61:16,18
    61:22 62:3 71:3
    82:18 88:9
    93:11,14 141:22
disjointed 118:25
disk 102:17,18
disks 101:1
dismissed 16:17
dispatch 17:14
    19:8,13
dispositive 39:14
disputed 70:18
dissipated 122:19
distinction 16:12
district 1:1,1 2:1,1
dittmeier 142:14
division 1:2 2:2
dna 76:7 78:6,20
    78:22 107:24,25
    113:24
docket 21:15
doctrine 136:10
document 73:24
    74:19 75:10,16
    77:20,21 78:10
    92:25 112:20
    129:11 139:22
doesnt 32:7 77:15
    77:21 78:11,12
    81:18 112:18
    118:4 124:2
    126:15
dog 29:13 45:21
    48:15 107:5,6,10
    120:6 123:14
    125:14
dogs 30:1,5 119:3
doing 16:13 24:1
    31:24 56:12
    106:15 127:12
dollar 11:7,14
domestic 6:7
dont 7:15 9:23
    10:2,10,13 12:2
    13:24,25 14:16
    17:12 18:2,18

19:1,5,11,11,12
    20:4,5,7,14 21:7
    21:13,15,16 22:3
    22:6,12,19,21,21
    23:22 24:8 25:8
    25:11,13,22
    26:15,17,18,24
    27:1,3,6,13,16
    27:16,21 28:6,8
    28:11,23 29:5,6
    29:23 30:9,20
    31:1,5,5,13
    32:17 33:3,17
    34:8,14,14 35:3
    35:15 36:9,18
    37:1,23 38:10,23
    39:1,16,24 40:11
    41:21 42:7,10,19
    43:13 44:12,14
    45:1,18,18 46:7
    46:14,18 49:21
    50:11,17,25 51:3
    51:5 52:5,13
    55:14,17 57:8
    58:9,9,11,15
    59:25 60:24
    61:1,9,15 62:15
    65:3,14,20 66:12
    66:18,22 68:2,4
    68:22 69:5,10,11
    69:19 70:12
    71:1,1,2,9,15
    72:3,11,12,21,23
    73:15 74:20
    77:4,9,24 79:14
    79:17 80:19,23
    81:14,19 82:2,13
    82:14 83:24
    84:6 87:21
    89:16 91:5,10
    92:1,6,6 93:14
    93:18 94:7 95:2
    95:9,15 97:8,12
    97:24 98:4
    99:13,19,21,23
    99:24 100:3,4
    101:19 102:1,9
    106:1,23 107:14
    108:10,22

109:13 110:23
    111:11 112:4,11
    112:19 115:8,10
    115:12 116:8,19
    117:17,19,22
    118:5,7,13
    119:12,13
    120:22 122:4,20
    122:22 123:10
    123:11,12,13,14
    125:14 126:1
    127:9 130:3,3
    131:22,24,25
    132:17 133:14
    134:3,17 136:7
    138:8,12 139:8
    139:23 140:11
    143:3,16,21
doors 90:8
double 142:21
doubt 38:16 44:12
draw 16:12 58:8
drawer 93:24,24
    94:8,10,14,15,25
    95:1,6,6 125:19
drawers 94:11,12
drive 16:24
drop 21:1 93:16
    130:1 131:2,7,8
    131:11
dropping 131:5
dry 66:23
dual 129:22
dually 129:17
due 142:21
duly 4:3 145:8
duties 10:22,23
    21:17
duty 10:21 87:13
    87:23

—————————————
        E
e 2:17,17 122:24
    124:3,4
earlier 111:20
    138:16
earliest 84:17
early 15:4 24:18
    40:5 80:16
easier 113:2

eastern 1:1,2 2:1 2:2
edited 67:18
educate 11:9
effect 37:22 73:20 75:19 76:12,15 76:18,21 86:25
effort 129:22
eight 2:11 48:5
either 8:6 17:13 30:14 38:24 60:24 61:15 66:6 72:12 115:25 121:9 141:4 145:16
elected 6:1 7:1 8:5 9:8,21 101:2
election 8:8,20,25 12:4,19,20
elective 9:9
electives 9:20
elements 114:22
eleven 7:5
elicited 101:16,19 132:24
elizabeth 122:25 122:25 123:1
elses 123:15
employer 45:4,5
encourage 92:9 92:14
encouraged 131:7
ended 104:20 105:19
enforcement 11:11 17:14 22:10 24:13 25:15,18 26:1,9 27:15 34:21 46:21 64:23 71:4 73:8 76:19 83:9 84:2 91:1,6 92:10,14 93:11 93:20 96:23 99:1 106:18 112:13,23 114:8 114:19 133:22
enforcements 127:18

engaged 45:8
ensure 11:9
entered 19:15
entry 120:4
especially 126:6
essence 56:12
essentially 18:18 20:22
established 43:18 49:23 59:3 111:1
et 1:6 2:6
evaluation 113:12
eve 105:1
evening 2:12 17:1 17:10 18:19 20:11 27:1 59:22 80:17 138:16
event 48:22 81:1 101:25 114:8 129:3
evidence 47:4 53:9,14,15 71:24 72:23,25 73:21 82:6,12,14 83:4 83:5 84:2 85:2,5 88:6 92:2 96:5 100:1,1,23 101:2 102:18 110:10 110:16,19 111:9 111:16,19 112:3 112:7,7,11,13 114:11 116:14 117:19,24 120:1 120:9 121:20 122:6 127:21,22 127:24 128:17 128:21 129:5,7 131:2,14
evolved 17:25
evolving 15:6
ex 33:15
exact 14:7 26:18
exactly 17:12 19:13 23:20 37:23 66:22 114:6 126:2 131:21 139:6

examination 4:6 145:11
examine 112:6
examined 37:5 120:1 145:11
examiner 36:3,21 37:5,16 127:8
example 14:25 27:14 50:25 68:19 113:25
exclude 58:13
excuse 26:4,4 86:19
exhibit 139:22,23
exhusband 33:13 54:5 58:14
exist 38:13
existed 126:16
expected 16:9 125:4
experience 11:3,3 15:17 113:5,8 130:4
expires 144:17
explain 108:18
explaining 36:9
explanation 38:20
extensively 65:1
extent 26:13 43:7 75:15 86:13 98:20 138:6
extinguished 70:15
extra 112:21
extreme 126:23 126:25
eyes 100:15 103:8

—————— F ——————
fabric 121:17,17 121:23 122:1
facing 94:8
fact 18:6 45:8,15 45:18 46:25 47:2,16,19,20,22 47:24 48:11 51:8 52:11 56:6 61:6 63:24 64:5 68:16 70:10,18 100:16 110:9

123:25 132:25 135:14
facts 121:20 127:24
failed 38:21,23 39:1
fair 12:17,18 20:15 26:18,19 28:19 33:22 39:25 41:8 43:9 44:15 46:15 47:22 49:12 71:17,18 81:21 85:14,17 98:20 103:11 111:18 118:16 121:1,2 127:1,20
false 5:2
familiar 55:19 64:2,5 136:9,13
family 131:7,11 131:12
far 10:25 13:15
faria 1:3 2:3 4:14 25:4,10 28:19 29:13,14 33:25 34:7,10,20 35:6 35:20 37:6 41:12 42:3 44:11 48:14,18 49:13,22 51:8 52:2,4,11,18,20 53:3 55:7 58:2 59:5,17 60:21 61:6 69:14,17 70:10 71:6,25 72:1,2 77:8,17 77:22 78:12 80:1,2 82:12 83:5,16 84:24 85:6,12,16,16 86:12 89:24 93:23 94:14,24 98:22 104:8 106:17 107:12 110:11,17,20 112:8 116:1 123:5,10,20,21 124:14,24

126:24 129:11 130:16 133:13 133:24 135:5,9 137:23 138:4,15 142:22,23
farias 32:9 34:23 35:2 43:11 44:16 59:1 61:16 80:13 82:5,9,10 84:3 96:2
farm 128:24 132:15
fasttrack 79:9 81:22 82:1
fasttracked 79:8
fasttracking 76:7 78:6,20,22
favor 114:11 141:2
fbi 141:23
feel 14:8
field 5:16
figure 60:9
figured 12:10 118:19
file 71:6 72:8 83:21 120:15 142:6,7
filed 70:17 83:24 83:25 84:5 86:7 86:9 105:4 106:18 124:10 138:22 139:13
filing 70:15 88:10 110:11 119:10
finally 103:9
find 24:9 57:23
fine 19:4 22:22 67:18 78:15 88:15 126:20 128:4
fingerprint 76:7 78:7 79:1
fingers 90:11
finish 78:8 122:16
finished 32:3 57:9
fire 62:5 64:14 66:8,16 86:19

firemen 66:3
firm 2:23 3:1,6,10
first 4:3 7:14,17
　9:4,7,17 10:21
　12:1,3,4 16:23
　17:6,7,8 21:15
　24:6 25:10,12,14
　26:9 30:10,16
　34:11,14,24
　37:14,17 38:25
　40:3,9 43:10
　44:8 50:25
　61:23 62:4,16
　63:5,7 64:2,14
　65:13 66:8,16,19
　67:23 68:24
　69:7 73:25
　75:20 76:2
　77:19 82:18,19
　84:20 86:18
　87:3 88:4,4,16
　89:2,5,9,25
　90:10,21 91:4
　100:16 101:4,10
　101:16 104:11
　105:3 111:3
　127:21 128:15
　131:9,17 132:9
　132:12 138:15
　139:12 143:1
　145:8
firsthand 90:24
fit 57:1
five 8:3 11:25
　12:8 13:23
　44:25 45:2,9,17
　62:2 63:1 74:12
　119:17
flew 107:10
floor 96:16 97:7
　97:10 108:8
　122:18 123:13
florida 33:14
　53:25 54:1
　58:14
focusing 121:13
follow 11:19
　16:20 55:18
　134:20

followed 51:4
following 125:9
follows 4:5
followup 142:8
　143:21
food 45:21 48:15
　120:6
footage 46:8
forearm 90:11
foregoing 144:9
forenoon 2:11
forensic 53:8
forensics 108:7
forget 12:14
forgot 67:4
form 84:9,13 85:4
　85:5 113:11
formal 36:21
　79:11 81:1
formally 70:19
formulate 86:3
fortyfive 74:14
found 56:1 57:4
　63:23 84:20
　97:3 121:10,11
　121:17
four 12:6,7 25:19
　26:9 44:8 52:15
　69:16 92:20
　100:21 104:11
　112:16
fourday 42:23,24
fourteen 74:14
frame 83:2,14
　87:15,17 88:9
　123:9
frames 104:4
　109:14
framing 123:5,9
　123:10,19
franchise 6:19
frankly 132:18
friends 48:22
　49:14,24
front 73:24
full 76:2
function 8:9
fund 132:7,22,25
　133:5

further 20:16
　82:6,11 143:2,3
　145:15

_____ G _____

g 13:10 125:8,14
　126:4,10
gain 22:8
gained 42:20
game 48:22 49:13
　60:11 138:5
gas 28:13 45:22
　46:13 48:15
gather 58:3,7 60:3
　73:21 82:5 83:4
　100:1 112:11
gathered 61:5
　84:2,7 96:6
　110:10,16,19,20
　111:9,12,25
　131:14
gathering 60:8
　82:11
general 8:21
　12:22 87:15,17
　128:25 129:14
　129:25 130:8
generally 128:7,9
generals 130:9
geographically
　28:16
george 15:22
getting 5:10 16:13
　20:18,21 22:20
　79:8 112:24
　114:9 128:4
giggling 67:15
girls 131:23
give 9:25 16:25
　26:7,8 62:2 73:8
　100:2 115:22
　123:14 134:21
given 8:21 57:12
　100:17,22 101:2
　113:10 117:20
　117:21 144:12
　145:14
giving 18:19,20
　112:17
gloves 32:9,15,17

32:20,23 90:13
go 4:24 8:20 11:17
　12:19 16:2,22
　17:9 19:22
　20:20 24:7
　29:10 30:24
　31:2,3,4,7,9,10
　31:15,21,23 40:2
　43:9 48:15
　51:21 53:20,22
　55:24 56:7
　57:12 58:18,22
　59:14,15 60:16
　73:25 75:25
　81:5 87:22
　90:23 97:11
　99:24 101:2
　105:7 113:23
　118:20,24
　119:18 125:8
　126:10 128:12
　130:16 131:10
　132:7,11 133:9
　134:25 139:24
　143:12 144:4
goal 58:10,10 92:2
goes 75:6 125:14
going 5:1 18:5
　20:12 23:25
　24:4 27:4 30:23
　33:10 46:20
　54:8 57:19
　58:20 67:12
　70:10 72:5
　73:23,25 75:11
　78:8,9 83:1
　99:12 100:3
　102:20 103:24
　104:3 106:15
　117:18 118:23
　125:2,18 127:11
　129:9 132:5
　134:25 140:3
　143:19
good 11:6,14 17:9
　43:15 128:10
　143:9
gosh 61:13
gotten 38:24 43:2

47:1,12
governor 130:8
governors 129:24
grab 119:16
grew 28:15
group 57:1
guess 27:18 38:9
　59:3 60:6 88:13
guessing 8:3
guilt 78:13
guilty 16:16 63:24
gumpenberger
　124:1
gundy 15:22
guy 6:18 21:22
　35:20 54:11
　127:11,14
guys 32:2

_____ H _____

h 126:20
hadnt 116:15
　117:4,14,21
half 85:11,11
hamill 2:13 3:7
　145:5
hand 145:19
handdelivered
　101:14
handle 16:6 57:25
handled 6:2
hang 73:23
hanley 2:24
happen 22:15
　23:1 108:19,19
happened 7:10
　13:15 17:1 21:4
　56:7 60:8 63:6
　63:17 94:9
　113:13,17
　135:13 142:2
happening 95:24
hard 133:20
harder 115:3
harney 4:17
hasnt 137:6
havent 112:21
　114:25
head 21:22
headed 17:15

headquarters 34:19
headsup 18:19,20
hear 24:2
heard 15:8 41:20 41:21 88:3 94:2 94:5,7
hearing 42:7 128:15,18 129:1 138:19,24
hearings 138:25
hearsay 74:25 78:10 127:3 129:3,7,11,12 138:7
heart 36:6
hed 43:17,18 45:17 48:21 49:24
heigele 3:1 4:21 4:21 10:25 26:4 26:13 36:23 37:3 40:1 42:4 50:15 51:13,19 54:4 58:20 59:8 59:15 60:16 65:6 66:10 67:7 67:18,21 69:2,23 72:14 74:6,10,24 75:15 76:4 77:18 78:8,17 82:7,17,22,24 85:20 86:6,22 87:6,19 88:8,21 92:11 94:17 97:11 98:25 99:5,7 101:24 103:24 109:4,7 110:13 112:9 113:1,6,14,18 114:2,13 116:16 118:1,4,17,19 119:21,23,25 121:19 124:20 126:5,8,19 127:23 130:23 137:5,20 138:6 141:7,10 143:11 143:21,25

held 10:15
hell 12:16
hellmich 2:24
help 16:25 51:20 85:18 117:23 135:1
hereinabove 144:12
heres 115:25
hereto 144:11
hereunto 145:19
hes 26:14 67:21 119:25 142:9,18
hey 80:25 115:2
hicks 129:19,19 129:20 133:1
hiding 32:2 133:13,24
hierarchy 105:6
higher 31:15,18
hire 15:9,14 16:9
hired 14:3,4,10 15:8,16,25
hold 34:15 70:14 71:23 119:23
holian 50:21
home 43:18 46:24 47:1 48:14 49:14 86:12 107:6 126:15 138:5
honest 99:5 132:6
hoot 123:15
hope 60:10 67:12 78:2
hopeful 73:20
hopes 76:5
horse 25:24
hospital 17:19
hotel 10:1
hour 64:17 68:20 69:11 85:11,11 86:21
hours 2:11 10:3 90:17 104:8,11
house 32:2 51:9 52:2,11 55:8 59:5,18,20 60:21 61:7 69:9 96:1

106:25 107:9 113:19,22,23 120:4,5 123:14
hundred 25:23
hundreds 33:9
hupp 24:23 33:24 34:1,6 40:5,10 41:11,18 42:13 42:18 43:7 47:8 47:11 122:24 123:4,25 124:10 124:15,23 128:24 129:10 131:1 132:11,21 133:1
hupps 47:14 84:19
husband 34:23 47:11,15 77:12 84:20
husbands 47:18

I
id 28:8 91:16
idea 27:13 77:10
ideas 33:21
identified 33:1
ignoring 127:21
ill 36:11 42:1 51:16 81:1 87:17 88:25 112:18 143:12 143:25
illuminating 125:12
im 12:5 14:7,8,8 18:23 21:9,10,10 21:13 22:16 23:20 25:23 27:5 28:1,12,22 29:3,4 36:24 38:9 41:7,10,10 43:13,25 44:1 49:1 51:3,19 62:14 66:11 69:25 70:1 72:5 72:21 73:17,23 75:15 77:5 83:1 83:13 86:3 87:10 93:5

97:14,15,22 99:23 101:6 102:24 106:20 109:3 110:2 114:15 116:14 116:17 117:18 118:3,23 121:7 125:24 128:4 133:6 136:13 137:22 140:13 141:15
important 44:19 55:3
impossible 139:6
impression 119:3
improper 135:21
improved 131:14
inaccurate 14:23
inadmissible 39:6
inasmuch 105:6
inclination 66:6
include 112:25
included 53:2 100:23 110:6 111:22 112:21 115:19 120:23
including 47:8,10 79:1 87:25 99:3 130:12
incomplete 115:19
inconsistent 134:23
incorrect 100:11 100:19
indicate 77:11
indicated 64:16 86:19 89:2,6 90:22 110:3 115:24 116:3
indicates 112:17
indication 90:9,9
individual 105:10 105:11
individuals 64:21 91:1 130:9
influence 35:10 69:22 98:16
information

57:10,23 58:4,6 58:7 60:4,9 61:4 62:17 72:19 84:7 89:22 90:20,24 100:1 110:6 111:24 112:20,21,25 113:10 115:20 116:18 118:11 118:13 142:10
informations 56:3
initial 82:17 120:4 120:7
initially 142:11
injury 6:9
inquiry 112:6
insurance 124:3 124:11 125:5 128:16 129:5 131:1 132:8,15 139:16
interested 29:3 43:25 44:1,16 141:15 145:17
interfere 31:21
interim 96:2 112:1
interpretation 77:24
interpreted 82:1
intervening 111:9
interview 14:1 40:9,15,21 41:17 42:18 43:24 44:1,3
interviewed 14:2 40:5 50:6 51:1
interviewing 127:12
interviews 24:23 25:2 48:20
investigate 52:18 55:25 56:8
investigated 46:21
investigating 57:19
investigation 25:16 26:2 28:5

31:20,22 48:11
53:2 57:2 63:12
99:20 103:21,25
104:7,17,19
105:3 119:9
142:15
investigations
62:22 124:7
investigator 119:2
investigators
47:17 77:14
involved 20:12
32:25 33:4
56:20 57:13
62:22 70:3
76:19 81:19
98:1,3,8,9,23
102:22
involvement
20:16 21:5 35:2
70:1,7
isnt 12:7 54:21
79:9 95:13
120:25
issuance 95:16
issue 30:4,8 46:16
46:20,23 70:20
71:13 83:20
84:4 91:17
97:16 98:16
112:18,24 115:1
116:12 120:3,13
128:3 132:7,9
133:5 137:20
issued 84:13
85:14 89:1 91:9
103:22 110:24
111:13 114:9
116:5,13 118:9
118:15 137:22
issues 6:20 133:15
133:16 134:15
134:15,17
issuing 84:25
87:24 114:11
121:3
ive 42:16,20 43:23
73:24 137:9
140:9 142:9

**J**

j 1:6 2:6 3:9 4:18
jacket 120:6
jail 44:11 135:6,7
jane 1:22 2:14
67:19 88:19
145:2,22
january 7:7,8,17
9:7,18 44:10
83:12 84:5
110:18 117:20
142:4,4
jason 2:23 4:16
jefferson 9:9
jeopardy 142:21
142:24
job 11:2,5,6,7,13
11:17 12:6 45:8
55:15 85:2
113:2 123:9
jobs 11:18
joel 3:6 4:20 67:8
67:11 130:19,21
141:7 142:5
john 13:10
join 51:16
joking 128:13
judge 15:19 92:22
93:2 106:14
130:15,25
139:10,14,15
jury 6:11,24 7:2
7:13 138:14
justice 8:10,23
10:12,21 11:7
16:10,13,14
73:21

**K**

kaiser 40:14,16
40:20 41:3,16
42:14,18 43:6
kansas 3:2
katz 3:2
keep 17:16 99:5
kept 19:24
kids 20:21 21:1
kill 124:24
killed 48:14 58:2

123:21,25 125:6
138:5,9,12,15
kind 5:2 6:2,14
17:25 28:16
41:25 43:5
46:25 47:10
72:4,13 81:1
90:25 92:5 96:6
118:23 133:17
133:23
kinds 29:8
king 2:23
kitchen 92:5 94:9
95:5
knew 19:10 23:24
31:15 34:10,11
34:15 49:23
50:5,8,9 56:18
86:9 87:4,7
90:14,15 98:3
99:11,13 117:14
127:9,14 130:4
134:24
know 4:8 7:15
10:1 11:15
12:16,16 13:24
13:24,25 17:15
18:6,9,18 19:11
19:12,13 20:11
20:22 21:13,16
21:25 22:1,14,21
23:22 26:24,25
27:1 28:11,12,14
28:16 29:8,18
31:1,9,14 32:14
32:16 33:20
34:1,14,15 35:8
35:9 36:1,3,9,18
36:18,25 37:1,23
38:10,23 39:1,22
40:7 42:9,19
43:13,21,22,24
44:22 45:1,1,18
45:22 46:14
50:11 58:11,15
59:3 62:15
66:12 68:22
69:20 71:1,1,2
71:19,20 72:10

72:11 74:20
77:9 80:19,24
84:1 92:1,1
93:24 94:14,24
95:2,9,24 96:1
97:1,11 98:9
99:7,13,19,21,23
99:24,25 100:2,4
101:12,20 102:9
105:11,15
108:11,22
109:13 110:16
110:23 111:24
112:4,12 115:10
115:12 116:8,20
117:4,19,22
118:4 119:6,7
120:22 124:13
124:21 127:9
130:3 132:18,25
133:4,8,14
138:11 139:6,8
141:5,6,8,9
142:15,17,18,20
knowledge 11:2
22:8 28:15
32:13 39:19
42:17,20 80:13
90:18 104:5
120:19,22
132:20 145:9
known 22:9 24:24
45:15,18 46:25
47:2,16,19,20
48:11 53:8 92:7
knows 36:24
66:11
krehbiel 2:23
ksd 74:21
ksdk 78:2

**L**

l 1:13 2:9 3:1 4:2
144:8,14 145:7
lady 52:22
lake 35:6
larger 57:1
late 7:10 18:19
19:20
law 2:13,19,23 3:1

3:6,10,10 5:7
9:15,15 11:11
15:15 17:14
22:9 24:13
25:15,17 26:1,9
27:14 34:21
46:20 64:22
70:16 71:4 73:8
76:19 83:9 84:2
91:1,6 92:10,14
93:11,19 96:23
99:1 106:17
112:13,23 114:8
114:18 127:17
133:22 140:5,6
145:5
lawful 4:3
lawn 4:24
lawyer 15:18,19
136:12
lawyers 136:18
lead 23:10 26:8
51:5 55:25 56:8
57:5,7,10,12
64:7,10 74:7
89:23
leading 129:18,21
leads 33:9,10
55:18 56:22
57:16,25 60:15
60:17 83:7
leah 1:13 2:9 3:3
4:2,12 78:11
131:23 144:8,14
145:7
learn 17:11 25:4
25:10,12 34:19
35:13,16 40:9
45:25
learned 17:6,7,8
25:7,13 34:23,24
35:1 50:11,17
56:22
learning 25:1
leave 27:18
113:12 123:16
leaving 123:2
led 30:24 31:1
57:5 111:10

left 47:14,19,21
   47:25 48:14
   84:19 119:17
legal 5:16
legally 135:21
lenay 4:12
liaison 11:11
license 2:15 15:16
   140:5,6 145:3
lieutenant 22:19
life 5:4 11:3 124:3
   124:11 129:5
light 121:18,23,24
   122:5
limited 90:18
lincoln 3:5 4:20
   16:24 63:9 76:5
   76:9 105:13
   129:23
line 88:23 136:2,4
   136:5,18
lines 65:4 75:22
liquid 109:10,11
listen 24:2 136:23
   136:24 137:11
   137:15
listened 135:18
   137:3
listening 135:22
   136:21,25 137:9
   137:13,16
little 5:3 6:4,16
   41:25 47:23
   118:25 131:10
   133:25
live 11:10 65:18
   65:20 103:14
llc 3:2,10
load 15:7
located 33:17
location 37:24
   133:24
locations 28:13
locker 101:3
log 100:23
logical 54:24
logs 100:23,25
   135:12
long 5:25 9:25

44:5 69:6 89:23
   89:24 90:19
   104:16 108:23
   120:6 125:5
longer 142:22
look 101:3 102:2
   102:5 119:13
   123:11 137:18
   137:23,25
looked 47:17,17
   77:20 102:5,19
   102:21 107:20
looking 27:15
   34:1 43:16
   74:15 102:20
   121:7
looks 67:4
lost 38:25 109:17
lot 11:16,16 48:13
   53:20 81:4 85:1
   90:24 130:1
   133:17
lots 57:16
louis 2:24 3:11 5:7
   5:10 35:6
lovely 67:9,10,11
lower 74:4
luminesced 94:8
luminescence
   91:17,19 92:10
   92:15 94:16
   95:22 97:17
   98:21 99:9
   101:5 103:2
   105:15 108:15
   109:19,25 110:6
   115:20 116:20
   116:22,24 117:3
   117:19,24
   125:18 137:19
   137:24
lunch 143:10
lying 138:17

_____ M _____
m 2:14 45:22
   74:22 145:2,22
maam 5:3 74:19
   140:5
major 10:8 20:8

20:11 21:9,19,23
   22:23 23:8
   24:18,23 25:20
   26:1 29:6 30:15
   30:22 32:19
   33:1,5,23 34:6
   34:19 39:12,12
   40:11,22 42:7
   44:16 45:23,25
   46:19 49:8
   50:13,13,16
   51:11,14 52:11
   52:17 55:13,20
   56:16 58:25
   60:3,14,20 62:4
   62:20,21 64:1,8
   66:4,7,15 68:1
   69:2,8 70:9
   75:10 79:15,16
   82:3,4,11,15
   83:3,8 88:10
   91:2 96:15,24
   97:2 104:13,18
   105:18 119:9
   120:19 122:2,4
   138:3
making 29:23
   40:20 73:11
   76:23 77:1
malfunction
   101:21,22
malfunctioned
   101:17
man 67:11,21
   77:14
manage 57:24
manpower 57:25
march 108:8
   122:17
mariah 131:23
mark 121:17,23
matched 121:17
material 27:4
   107:21
materials 97:3
   106:3,7 125:13
math 74:12
   119:18
matter 19:14

46:16 53:16
   61:21 76:6 77:7
   78:2
matters 145:10
mccarrick 1:6 2:6
   2:22 4:17 22:5,5
   22:16,22 23:15
   24:12 31:12,14
   33:18 35:18
   39:13,17 51:7,15
   55:6,9,14 59:4
   60:20 61:1 65:1
   90:4 103:19
   105:12,17
   109:24 127:2,7,8
   128:1
mccarricks 51:22
   55:11 109:22
mean 8:2 9:24,24
   14:14,16,18 21:7
   27:3,16,23,24
   28:6 30:14
   31:18,20 33:9
   34:11 36:5
   38:15 45:7
   46:11 47:4
   48:20 53:6 60:2
   70:3 82:1,17
   87:4 93:1,3
   95:11,13 97:2
   102:15 106:9
   107:12 108:4
   109:7 110:24
   111:1 116:7
   117:17 121:11
   126:3,15 127:3
   129:22 130:1
   133:21 134:22
   135:16 140:9
   144:2
meaning 57:6
means 16:14 32:1
   32:3 53:12
meant 114:12
   144:3
measurements
   32:3
mechanical 38:14
   38:21

medical 109:9
meeting 9:8 35:21
   42:13 133:7
meetings 22:23,25
   24:18 27:10
   28:7 35:21
   55:10 60:20
   61:2,10 62:4
   66:15 69:7
   105:17 133:2
member 78:22
members 69:8
memories 42:1
memory 20:17
   23:7 24:17
   29:11 43:7 73:2
   96:13 133:23
men 134:3
mention 90:21
mentioned 36:16
   144:12
merkel 3:9,12
   4:17,18,19,19
   98:1 101:17
   102:22 109:21
   110:3
message 47:14,19
   47:21,25 84:19
met 92:2 111:13
   111:16 118:14
michael 55:7
middle 121:6
mike 3:12 4:19
   77:10 78:2,21
   79:1 80:5,9,10
   81:20,22
mind 72:18 84:4
   111:10 114:24
   121:1
minimum 85:11
minute 30:23
minutes 48:2 62:2
   67:5
mis 76:25
misquoting 76:24
   77:2
missouri 1:1 2:1
   2:14,15,20,24
   3:3,8,11 8:10,23

9:12 11:19 145:3,6
misstates 50:15 51:13 59:8 75:16 87:6 88:8 101:24 112:9 114:13 126:5 127:24
mix 56:3 57:11
mo 1:24
mom 131:24
moment 29:1 30:21 77:5 114:7,12 134:13
monday 1:16
money 132:14,19 132:22
month 8:1
months 43:3 125:21
morning 9:25 20:15,18 21:6 23:9 24:22 27:1 40:5,6 42:14 50:9 126:14
mortis 65:13 67:24 68:1,3,9 68:10,12 90:18
mortise 68:11
motion 129:1
motions 97:7
motive 124:7,23 125:3 129:10,11
move 68:21
moved 68:24,25
moves 68:19
mower 4:24
murder 7:10 16:22,23 17:1,7 21:23 22:11 24:10,14,19 30:13 33:24 34:7 35:2 39:15 43:12 44:8 48:21 50:10 52:18 53:3,7,10 53:14 54:9,19,20 54:22,23 55:2 58:13 63:3,8,11

63:13,24,24 71:6 76:6 78:4 80:2 83:16 84:10,13 84:14 85:15,21 86:7,9,10 87:24 95:17 103:18,22 104:7,8 105:4 106:19 119:11 129:23 133:24 137:23 142:19 142:22
murdered 54:19 72:2 82:12 85:16
murderer 58:6

_____ N _____

n 2:17 145:5
name 4:11,12 18:13 98:6 129:19
named 21:22 40:14,14 41:4
names 4:8
narrow 139:3
nathan 2:20 4:15
near 32:9 96:18 128:5
necessarily 28:21 99:21 134:22
need 82:14 110:15
needed 73:9 129:4 130:4 137:13 139:8 142:10,10
needs 12:11
negated 108:14
negative 108:11 122:18,20,21 125:21,25 126:3
neil 3:4 19:15
never 25:17 39:2 78:24 79:8 121:17 123:18 126:15 134:5,24
new 14:4 15:9 83:2 94:3,4 105:1 110:18 111:19
newly 9:9,21
nextdoor 21:8,10

nice 122:25
nicer 67:7
night 19:20 20:6,9 20:14 28:19 34:22 43:12 46:17 48:21,22 49:13 50:19 60:22 138:5
nissan 133:24
nodding 111:8
normal 39:9
normally 18:7 36:21 66:7
north 2:14,24 3:7
notary 144:20
notes 118:24
notice 88:15 136:6 145:4
november 145:20
number 14:7 26:17,18
numbers 74:4

_____ O _____

o 1:23
o0o 4:1 144:7
object 26:14 60:11 72:5 74:25 75:16 78:9 138:7
objection 37:3 74:25 75:1 77:19 78:13,14 113:6,14,18 127:25 137:20
objections 76:4
objective 58:14
objectives 58:12
observation 87:3
observations 66:8 66:20 86:20 110:4
observer 26:11
obtain 39:19 60:7
obtained 36:4 42:17
obviously 15:15 80:5 129:23
occasions 100:21
occur 99:22

140:15
occurred 56:16 60:9 84:10,14,22 85:21 86:5,10 87:25 96:7 97:17,18 99:11 129:23 138:13 138:24 139:2,7
occurs 37:1
oclock 2:11,12 35:6 43:19 44:25 45:2,9,17 69:17
october 1:16 2:10 5:15 144:10
odd 121:13
odor 97:3
offense 67:8
offered 12:6
offering 55:14,17
office 8:8 9:1,3 10:15 11:23 12:3 13:7 14:8 14:13,20,20,21 16:6 19:8,9,12 20:23 21:8,15 30:21 42:15 43:18 50:5 67:10 101:13,15 102:14 129:24 130:9 142:3
officer 40:13 41:4 64:7,9 99:1 115:14
officers 40:4 50:6 51:1 55:22 56:7 64:23 89:9 93:11 97:20 99:9 100:8 127:5 132:20 138:2
offices 2:13 145:5
oftentimes 112:19 114:18
oh 44:7 61:13 111:24 139:19 144:2
okay 5:1 7:22 8:19 9:6 12:3,12

15:8 16:3 17:18 19:4 22:22 24:17 27:12 28:25 29:10,25 33:8,22 34:16 36:11,20 37:2,14 40:13 41:9,25 42:22 43:1,15 44:5 45:3,20 46:15,25 47:4 49:12 50:5,24 52:10,24 54:6,24 55:6 56:15 61:3 62:3,21 63:5 66:1,21 70:20,22 73:14,18,23,24 74:18 75:2,5,8,9 76:9 77:23 78:17 79:11 80:9 81:21 83:8 85:9,18 86:1 88:19,25 89:22 93:8,9 94:5 95:14 100:2,5,12 101:9 102:2 103:6,17 106:16 107:15,18 108:6 109:9,12,14,16 109:18 110:1 115:5,23 116:9 116:20 117:23 118:25 119:1 120:12,24 121:4 122:16,24 124:6 125:8,16,17 128:4,14,20 130:14 132:20 136:20 137:17 138:10 139:1,16 140:13,15,19 141:2,10,15 143:23 144:2,3,4
old 17:19
once 31:23 35:18 49:16,17 90:22 126:3
ones 14:2 102:13
open 74:16 90:9
opinion 10:25

51:25 55:11,12
55:15,17 59:4
84:14 85:4,5,6,8
85:9,13 86:4,5
86:13 104:6
111:20 122:22
123:22
opportunity 14:1
opposed 26:12
60:8
oral 40:20 41:17
42:4,6 43:5,8
53:15 72:20
91:13 98:22
orally 115:25
ordinarily 79:15
outcome 140:12
141:9
outside 80:14,20
90:8,23 92:8
107:5,6
overly 16:6
overreaching
74:24
overriding 58:1,3

_____ P _____
p 1:23 2:13,17,17
3:7 45:22 74:22
111:3 120:23
page 74:1,6,8,12
75:3,6,7 88:22
119:18,22 125:9
pages 74:11
paid 67:5,7
pals 48:23
pam 24:23 33:24
34:1,6 40:5 43:7
47:8,11,14 84:19
124:15 128:24
129:10 131:1
132:11 133:1
pamela 123:4,25
124:10,23
paper 114:22
115:1
paragraph 75:20
76:2
paragraphs 77:11
parka 90:12

parking 81:4
part 11:5,6,7,8,10
11:12 32:13
50:16 73:2 92:5
99:13 117:11
143:20
participant 26:12
participated
79:12
particularly
120:5 127:21
particulars
138:20,23
139:13
parties 145:16,17
party 136:11
path 92:5
pattern 121:24
pause 4:25
paw 29:12,15,16
29:21 106:16,24
107:3,7,9,15,18
107:20 119:3
paws 30:1,5
pay 6:22
pending 140:22
people 13:15 14:4
14:12 15:25
16:19 22:25
24:24 32:6
33:10 40:17
50:18 51:5,11
55:12 56:24
57:19 58:13
60:14 64:8 66:7
66:14 79:4
86:25 98:23
127:12 129:8
percent 93:6
perfect 12:13
56:23
performed 103:8
116:22 117:4
performing
103:14
period 37:8 44:5
45:8 105:2,18
110:19 111:10
135:10,11

person 6:21 13:3
13:9 14:19
15:13,16 16:9
17:19 36:12
53:18,24 54:2,2
54:19,21 63:15
63:23 68:19
87:10,10,14
113:21,21,23
123:17 127:16
127:17 134:18
personal 3:4 6:9
16:15 28:15
123:22 143:7
personally 18:21
54:22
personnel 22:24
70:9 82:4 96:24
persons 53:13,21
perspectives
64:21
petruska 3:10
phone 19:17,24
45:5 47:10,12,18
76:8 79:4 84:18
84:18,23 86:11
136:12,22
phones 18:17
photograph 32:17
96:17
photographs
32:16 96:12
100:9 101:5,12
photos 32:4 101:1
physical 53:8,14
pictures 99:18
100:6,13,17
101:23 102:5,6
102:13,15 103:1
103:9 137:18,24
137:25
piece 122:1
pillow 41:13,22
place 15:2,4 18:24
19:1 25:2
133:18 134:12
134:16 143:9
placed 34:15
places 45:21 46:6

49:16,17
plaintiff 1:4,15
2:4,10,18 4:5,14
4:15
plaintiffs 74:8
plate 121:18,18
121:23,25
played 30:9
plea 63:19
please 4:11 67:20
75:4 76:3 82:7
88:19 92:11
116:17 130:23
140:8
pleban 3:10,10
4:18,18 143:4
plenty 72:15
point 8:13 21:13
22:9 37:25
49:11 50:8
52:21 55:24
57:3,22 61:5
69:23 70:15
73:21 80:6
84:16 85:8,13
86:6 91:11
94:17 98:11
102:7,19 103:23
104:1 108:1,2,5
112:22 118:17
121:9,20 132:18
134:10
pointed 47:4
police 34:20 66:16
69:18 70:8
86:19 89:9
policies 124:4,15
124:16 129:6,9
policy 14:19
124:11 128:16
128:23,24
politically 131:6
poly 126:21,21
127:8
polygraph 35:7,8
35:11,14,19,24
36:3,5,12,20
37:5,7,10,10,13
37:15 39:5,14,17

39:20 127:12,14
127:16
polygraphs 36:10
39:6
pos 29:13 106:17
position 14:2
19:24 25:25
77:25 100:9
105:7 128:20
129:1,2,13,16
139:5
positive 93:6
possibility 79:9
possible 27:15
58:4
possibly 80:8
posted 17:16
powerful 67:21
practice 5:21 6:3
6:12
pratt 119:3
prepared 43:1
103:18
present 2:20 3:3
3:12 23:3 51:22
56:20 95:22
105:16 109:24
114:10 131:6
139:16,21
presentation 71:5
presented 71:24
72:24,24 82:21
92:22 102:13
106:3 111:3
115:9,10,19
139:22
press 73:12,14
76:16 78:22,25
79:11,16,20,25
80:6
pressure 36:6
presumed 64:9
presumption 19:7
presumptive
126:1
pretty 15:4 20:25
24:12 41:10
43:17 44:19
47:2,22 54:24

62:1 123:8
prevailed 63:18
primary 10:23
    12:22,23,24 33:2
print 29:12,15,17
    29:22 106:16
    107:3,7,16,19,20
prints 106:25
    107:9
prior 22:20 34:22
    77:11 127:24
    133:2
private 6:3,12
    136:4,18 140:14
    141:5
privilege 136:7
probable 53:11,17
    53:21 71:10,16
    72:1,6,18,20
    82:18,20 83:11
    83:15 84:8
    95:16 97:15
    98:25 103:17
    105:19 108:2
    109:22 110:2,5
    111:14,16,22
    112:17 114:23
    115:13 116:4,11
    118:8,10 119:10
    119:13 120:2,3
    120:10,13,16,25
    122:19,23 127:2
    128:2 137:17,21
probably 8:2,3
    19:2,20 22:17
    31:6 43:3
    103:20
probe 41:25
problems 131:6
procedure 18:24
    19:1
procedures 64:3
proceeds 132:8
process 66:2 73:3
    92:1 130:12
pronouns 109:17
propose 92:9
prosecuted 63:15
    142:22

prosecuting 9:13
    10:15 13:4
prosecution 9:14
    16:15 63:17,18
    94:13 129:18,21
prosecutions
    11:21
prosecutor 6:1
    7:1 8:6,9,22
    10:24 13:13
    15:5,13,18,19
    18:23 31:8
    62:23 76:5,7,10
    78:19 87:13,23
    112:24 113:13
prosecutors 7:4
    9:8,12 10:20
    130:2
protected 11:8
protocol 99:21
provide 11:9
    73:21 116:18
provided 46:8
    100:22 118:11
    137:2
public 136:5
    144:20
pumping 46:13
purchased 6:21
purpose 52:17
    57:24 58:1,3,5
    60:3 92:4,7
purposes 32:6
pursuant 83:15
    145:4
pursue 57:11
pursued 64:7,9
purview 92:8
put 15:2,4 42:15
    56:3 57:10
    80:12 85:22
    102:16 112:19
    114:25 119:17
    132:14,19,22
    137:13
puts 136:5
putting 114:21
    120:5

────────
Q
────────

quad 122:4
qualifications
    15:12
question 25:9
    26:5 27:19 30:3
    30:5,7,20 34:3
    44:24 49:21
    52:13 57:8
    59:17 72:5,18
    78:9 79:6,24
    82:12 87:21
    88:17,20,22,24
    102:25 108:6
    114:6 117:18
    121:21 126:11
    128:15 132:4
    134:19,20 143:8
questions 4:7
    25:22 28:12,17
    28:18 29:7,8
    36:13 72:14,16
    118:24 133:8,9
    134:23 143:2,3,4
    143:5,12,14,14
    143:16
quickly 24:14
quote 50:16
    103:25

────────
R
────────

r 2:17
rainbow 6:22
ran 8:7,15 12:25
    13:3 33:9
range 23:21
rank 31:15,18
rape 113:20,22
rate 36:7 38:8
raw 35:23 36:4,5
    39:19,23
reach 16:15 63:12
reached 142:18
read 42:16,24
    75:3,6 76:3
    88:22 125:14
    144:9
reading 42:22
    75:4
ready 20:19,21
    112:24

realized 90:22
really 7:22 18:2
    26:15 43:25
    48:13 54:14
    61:9 72:23
    134:24 136:7
reason 38:16
    39:10
reasonable 127:1
reasons 90:6,7
recall 20:17 25:8
    28:6 29:2 31:5
    32:8,18,19,22
    33:3,12 35:3
    41:15 43:10,13
    43:15 45:14
    46:15,18,23
    47:15 57:15
    64:18,19,20,24
    65:14 67:22
    69:16,19 70:12
    70:14 71:3,9
    75:13,24 77:4
    79:5,14 80:10,14
    80:23 82:13,14
    83:3,6 91:12,14
    91:18 92:6
    93:18 94:11
    95:15 97:24
    102:1 106:1
    108:7 128:25
recalling 29:4
receive 112:12,15
received 72:19
    105:19 142:5
recollection 32:11
reconcile 85:18
record 36:21
    58:19,22 67:13
    67:15,19 76:3
    118:20,22
    119:19 139:24
    140:2,4 144:4
    145:13
recorded 135:5,11
    135:15 136:2,3,8
records 38:6,9,13
    45:4 76:8 79:4
recovery 133:23

redact 67:19
reduced 145:12
reference 17:5
    39:4 126:21
    133:21
referred 68:9
reflect 119:19
refuse 115:4
refused 115:5
    116:1
regard 18:3 19:2
    28:13 30:8
    66:18 77:9 79:7
    87:1 121:3
    129:5
regarding 10:14
    20:2 32:20
    59:25 129:8
    140:23
regardless 139:14
regards 126:6
register 36:19
regular 21:17
    48:22
rehabilitated
    134:11
relate 28:18
    140:17
related 139:23
    145:17
relates 30:5 81:16
    136:10
relative 33:14
    53:25 54:2,5
release 40:2 69:14
    69:22 70:4,13,23
    71:20 73:12
    80:13,18 82:5,10
    82:23 83:2 84:3
    96:2,7 110:10,17
released 69:17,19
    70:11,16 73:9
    84:12
relevant 107:4
    112:6,25 114:11
    120:5,8 124:7
relied 64:6 66:8
    127:17
rely 55:22 56:6

127:2,5
**relying** 66:2
**remain** 104:16
**remark** 28:3 77:6
**remarks** 61:23
  67:16,20
**remember** 9:23
  10:2,10,13 12:2
  12:15 17:12
  18:2,4 19:5 20:4
  20:5,14 21:7,15
  21:20 22:3,6,12
  22:19 23:2,5
  24:8,15 25:1,11
  25:13,14 26:18
  27:7,16,22 28:2
  28:9,11 29:5,6
  29:15,16,20,23
  29:25 30:2,7,9
  30:15 31:13
  32:17 33:17,22
  34:5,8,14 35:15
  35:21 39:16
  40:11,13,16,20
  40:23,25 41:3,11
  41:14,21,22 42:2
  42:7,10,19,22
  43:4,6,23 44:14
  44:15 46:7
  50:17,21,25 51:3
  51:6,10 52:3,4,5
  52:10 55:14,17
  56:15 59:7,16,19
  59:20,23,25
  60:19,24,25 61:1
  61:3,9,12,15,18
  61:22 62:3,8,9,9
  62:14,19 64:15
  65:3,9,10,12,15
  65:17,20,22,24
  66:6,14,18,19,22
  67:25 68:2,4,23
  69:6,10,11 71:15
  71:24 72:3,12,17
  72:21,23,24
  73:11,15 75:18
  79:17,19,25
  80:11,15,20 82:3
  83:21,24 84:6

88:16 89:16,17
89:18,20 91:5
93:10,14 96:23
97:8,9,9,12 98:4
98:12 101:19
106:7,11,13,13
106:14,14,23,24
107:14 108:10
111:11 116:19
118:5,7,13,14
119:2,12 121:22
121:24 122:4,6,9
122:13,20,21
126:2 128:11,18
131:22,24,25
132:9,17 134:2,4
134:13,17,18
138:2,8,12,19,24
138:25 139:18
139:23
**remembered** 68:7
  73:5
**reopen** 141:4
**rephrase** 8:11
  30:3 41:14
  88:13 104:3
  110:15
**report** 14:13,14
  14:17,18 22:17
  40:21 41:16,17
  41:21,23 42:3,4
  42:6,22 43:5,8
  55:15,25 57:4,10
  57:15 64:11
  74:21 81:15
  98:10,13,15,16
  98:18 127:11
**reported** 1:22
  46:2 64:8,15
**reporter** 75:13,19
  75:23 76:13,23
  77:2 88:22
  145:2
**reporters** 77:1
**reporting** 1:23
**reports** 14:22
  37:19 62:13
  69:7 91:3,5,6,8
  91:10,11 100:25

**represent** 4:14
  11:14
**representative**
  103:2,11,13
**representatives**
  141:23
**represented** 2:18
  2:22,25 3:5,9
  6:18,23
**request** 39:3
  117:13 136:3
  138:22 139:14
**requested** 39:2
  129:24
**requests** 139:13
**requirements**
  92:21
**requires** 109:1
**reread** 88:14,20
**reserve** 143:12,14
  143:25
**reserving** 143:14
**residence** 18:5
  32:5
**resides** 113:22
**resolve** 31:25
**resolved** 141:3,12
  141:14
**respiration** 36:6
**responded** 28:3
**responder** 90:10
  127:22
**responders** 61:23
  62:5 64:14
  65:13 66:8,16,19
  67:23 68:24
  69:7 84:20
  86:18 87:3 89:2
  89:5,9,25 90:21
  91:4
**response** 19:17
  103:4 138:22
**responses** 36:22
**responsible** 14:24
  129:15,17
**rest** 129:12
**restate** 51:18 82:7
  92:11 93:3
  98:15 115:22

130:23
**result** 141:15
**results** 35:13,19
  35:23 39:14
  103:2
**retain** 38:21,23
  39:1,10
**retained** 15:10
  38:8,10,11
**retention** 13:16
**rethinking** 12:5
**retired** 15:24 16:4
**retract** 96:22
**retter** 2:23 4:16
  4:16 51:16
  110:21 143:3
**returned** 23:10
**review** 91:8,10,14
  120:9 130:10
  142:5
**reviewed** 106:5
  120:10
**rich** 1:22 2:15
  145:2,22
**richard** 129:19
  133:1
**richards** 13:10,11
**rid** 38:24
**right** 5:5,16 7:2
  7:11 8:13 9:19
  10:16 11:21
  14:5,9,13,20
  15:9,10 16:22
  17:3,20 18:1,10
  19:9 21:1 23:15
  23:19,21 26:23
  27:7 32:4,8
  33:11,14,19
  34:12 36:7,13,16
  39:7,9,18 40:18
  41:5,7,10,18,20
  42:9,13,14 43:19
  43:20 44:13,15
  44:23 45:5
  46:14 47:1,5,8
  47:12,16,23 48:8
  48:11,16 49:5,9
  49:14,16,20,25
  50:3,7,10,22

51:20,22 52:7,8
52:18,20,22,25
53:4 54:1,3,3,9
54:14,16,24 55:8
55:20,22 56:1,4
56:8,10,13 57:7
57:13,17,20 58:2
59:11 60:11,11
62:11 64:3,6
65:2 68:5,14,16
69:4 70:25
72:12,25 73:6
74:3,5,22 76:10
77:8,12,17 79:22
80:18 83:1,16,18
83:23 84:21
85:2,23 87:4,5
88:6 89:14
91:16 92:23
93:2,4 94:10,16
95:12 96:18,20
97:14,17 98:6,6
98:8 99:12
100:6,10,18
101:23 103:19
104:5,21,23,25
105:13 106:9,10
106:12 107:13
107:13,16,22
108:23 109:19
110:7,24 111:2,5
111:21 112:14
114:10 115:3,6,9
116:1,5,12,14,21
116:24,25
119:18 120:20
121:5,10 122:11
122:13,14,24
124:4,16,16,18
125:13,19,19,22
126:21,23 127:4
127:13,14,17,18
129:16 130:1,2,6
132:2,12,16
133:19 134:1,6
135:6,14,15,18
135:19 137:12
139:2 141:6
142:25

righthand 75:25
rigor 65:13 67:23
   68:1,2,9,10,11
   68:11 90:18
ring 33:15 40:15
   47:13 66:24
   67:1,2 97:4 98:2
road 131:13
role 27:5 29:4
   30:8,9 62:22
   143:6
rookies 9:18
room 2:12 19:16
   22:7 67:8,9
roughly 23:18
   26:22 35:5 40:6
   49:19 61:24,25
   69:16 85:7
   108:8
routine 130:1
rrainbow 6:19
ruled 131:1
rules 11:19
   130:15 139:9
run 8:12 14:20
running 83:6
rush 77:10 78:2
   78:21 79:1 80:5
   80:9,10 81:20,22
russ 25:4,10 28:19
   34:10,20 35:1,19
   37:6 41:12 42:3
   43:11 48:14,18
   49:22 50:18
   52:1,20 53:3
   55:7 59:5 60:21
   61:6 70:10 71:6
   77:21 80:12
   82:5,10 83:5,16
   84:12,23 85:6,12
   85:15 86:12,21
   93:23 94:14,24
   96:2 106:18
   107:12 116:1
   123:10,20
   128:24 129:11
   132:1 133:13,23
   135:9 137:23
   138:4,15 142:21

russell 1:3 2:3
   4:14 49:13 59:1
   59:17 71:25
   72:1 77:8,17
   78:12 82:8 84:3
   110:11,17
   122:25 123:2,5
   126:24
ryan 1:6 2:6

S

s 2:17 3:11 141:22
   141:23 142:3
safety 11:9,9,10
   32:5
samples 125:23
san 5:4
savvy 125:4
saw 46:9,14 80:24
   100:15 101:4
   103:8
saying 23:20
   26:14 28:2
   42:10 43:6
   56:18 61:9
   65:14,15,17
   75:15,18 78:4
   82:14 89:18
   138:13
says 4:5 45:2 75:9
   75:10 77:6,14,18
   77:19 78:6
   121:11 122:24
scenario 90:16,16
scene 17:15 30:11
   30:19,24,25 31:9
   31:10,16,22 32:7
   32:9,12 62:16
   64:23 96:14
schimweg 21:22
   22:19 31:11,13
   104:14
schock 2:19 4:7,9
   4:13,23 5:1 11:1
   26:5,16 36:24
   37:4 40:2 42:5
   50:20 51:17,20
   51:21 54:6
   58:16,18,22,24
   59:10 60:19

65:7 66:11 67:4
   67:10,14,19,22
   69:4,25 70:6
   72:15,17 74:8,11
   74:16,18 75:2,18
   77:23 78:16,18
   82:8,19 83:1
   85:22 86:7,24
   87:12,22 88:16
   88:19,25 92:13
   94:18 97:14
   99:3,6,8 102:2
   104:2 109:12
   110:15,22
   112:12 113:4,16
   114:1,5,15
   116:17 118:2,6
   118:18,20,22
   119:22 120:1
   121:22 124:21
   126:11,20 128:4
   128:8,11,14
   130:25 137:6,22
   138:10 140:3
   141:8,11 142:25
   143:8,13,23
   144:2
school 5:7
schwartz 130:14
   130:19,21
   136:21 138:18
   141:7 142:5
schwartzs 42:15
scott 1:3 2:3
scrupulously
   11:19
search 92:16,18
   93:12 100:23
   105:23 106:2
   113:19,23
   114:10 117:5,14
second 30:16
   37:17 63:4
   73:23 75:25
   80:25 88:5
   90:11 102:10
   105:4 122:17
   133:10,12,22
   135:1 137:16

138:1 139:12,25
   143:13
secretary 142:10
secure 96:2
see 11:7 29:11
   30:6 44:6,10
   45:7 74:4 92:4
   99:25 102:3,19
   107:24 112:7
   120:7 123:2
   137:17
seeing 32:18
   133:13 134:3
seeking 114:8
seen 35:23 74:18
   97:6 101:9
   103:12,14
   106:11 133:23
semantics 34:17
   53:16
seminars 10:4
send 115:2 137:14
   142:11
sense 9:25 55:11
sent 79:7 101:21
   108:12,12 130:9
separate 100:21
separately 143:20
sergeant 1:6 2:6
   128:1
serve 11:5,11
   15:13
served 11:8
serves 20:17
   96:13
set 14:19 21:9
   67:2 70:19
   109:14 145:19
setting 42:8
settled 89:19
setup 88:7 89:15
   89:16
seven 10:16,17,18
   48:2,3 119:16,16
severe 101:22
shed 133:23 134:5
sheriff 19:11
   22:16 31:14
   80:8 104:12

105:7,8 119:8
sheriffs 19:8,9,12
   21:8 70:9
shes 82:24 126:9
shop 21:9
short 4:25 58:4,23
   108:23 118:21
shortly 30:17
shot 143:18
shouldnt 139:3
show 94:16
   103:10
showed 100:9,13
   103:1 117:13
   126:23,24
shows 109:21
sift 58:5
sign 92:18 93:4
signature 93:13
   144:10
signed 92:16,21
   93:6,16 145:12
signing 106:12,14
   106:14
silently 27:25
silly 72:14,15
sink 94:10
sir 74:16
sisters 131:25
sit 23:23 27:24
   32:14 35:4
   38:12 39:18
   50:24 64:13,15
   79:20 81:21
   84:1 93:5,10
   103:15 117:17
   123:20
sitting 13:4 27:21
   104:6
situation 18:3,16
   20:3,16 21:5
   29:5 114:20
   136:10
six 2:11 8:3 10:16
   74:2
sleep 18:9,18
slightly 26:5
   79:24
slippers 123:15

slowly 76:3
smith 40:14 41:4
  41:16 42:14,18
smothering 41:13
snowman 126:14
  126:15
sofa 32:9,15,17
solid 47:22,24
solo 5:21
somebody 19:8,10
  28:3 33:14,15,18
  46:2 51:4 53:6
  54:8 67:6
somebodys 38:8
somewhat 64:4
  89:10
soon 20:25 21:1
  21:14 125:3
soppiness 88:6
sopping 65:6,7
soppy 89:14,17
sorry 12:8 13:2
  88:21 109:3,18
  126:8 137:22
sort 10:4 28:3
  32:4 38:13
  41:16 55:12
  79:22 80:24
  113:11 122:16
  134:12
sound 18:18 19:9
  23:15,21 36:13
  36:16 41:5
  43:20 48:8
  70:24 80:18
  83:23 94:16
  97:25 98:6
  104:23
sounds 23:17 48:9
  90:4 104:25
speak 31:23 34:9
  62:18 81:6
  93:19 105:21
  119:8
speakers 10:4
speaking 22:12
  61:1 80:10
  82:13 119:12
special 8:6,20

16:4
specialize 9:14
specific 10:7,14
  22:13 23:25
  27:23 29:6
  37:23 51:3,6
  56:22 86:4,16,23
  87:24 91:23
  92:7 93:14
  124:18 134:17
specifically 10:10
  10:13 20:4,5
  22:6,12 27:17
  28:5,11 29:5
  31:5 34:4 41:23
  42:19 57:14
  62:18 70:13
  72:3,21 73:15
  77:4 78:10,11
  79:17 80:19
  84:6 95:25
  101:20 102:9
  106:23 108:10
  111:11 132:10
  134:4 135:16
  138:13
specifics 21:7
  29:10 41:1
specified 138:9
speculate 28:24
speculating 19:3
  22:15 28:22
  38:9 58:10
  72:13
speculation 36:23
  36:25 66:10
  69:24 70:1,2
  110:13 113:1
spoke 27:9 28:4
  33:18 71:15
  80:5,9 81:20
  84:23 86:10
  87:16 91:6 98:4
  142:3
spoken 37:4,12
  80:7 105:22
spot 58:21
squad 20:8,12
  21:9,19,23 22:24

23:8 24:18,23
  25:20 26:1
  30:22 32:20
  33:1,5,23 34:6
  34:19 39:13
  40:22 44:16
  45:23 46:1,19
  50:14 51:11,14
  52:12,17 55:13
  55:20 56:16
  58:25 60:3,14,20
  62:4,20,21 64:1
  64:9 66:4,7,15
  68:1 69:3,8
  70:10 75:10
  79:16 82:4,4,11
  82:16 83:4,8
  88:11 91:2
  96:24 97:3
  104:13,18
  105:18 119:9
  120:20 122:2
  138:3
squads 53:2
st 2:14,24 3:7,11
  5:7,10 35:6
  145:6
stab 123:12
staff 137:12
stages 68:15
standard 73:16,18
  118:14
standing 56:18
start 4:23 5:2 82:9
  109:14
started 5:21 7:4
  12:1 60:6 67:16
  102:10 137:15
starting 42:5
  119:25
state 4:11 8:22
  54:12 78:10,11
  128:24 129:2
  132:15 138:23
  138:23 139:2
  145:3
stated 35:18 52:9
  59:4 69:7 87:4
statement 16:8

28:20 49:12
  53:23 55:4
  60:13 61:6
  65:22,24 71:10
  71:16,17,18 72:6
  72:20 78:1,12,19
  78:21,24 79:21
  79:25 82:18,20
  83:12,16 84:8
  85:14,17 95:17
  97:15 98:20,25
  103:11,17
  105:20 108:3
  109:23 110:3,5
  111:18 112:15
  112:16 115:14
  116:4,12 119:10
  119:14 120:2,7
  120:10,14,17
  121:1 127:2
  128:2 130:20,22
  130:24 137:18
  137:21
statements 26:8
  41:11 47:7
  49:23 59:24
  62:15,20 67:23
  73:11 78:25
  79:3,4,20 85:19
  86:23,25 88:2
  89:9 129:8
  133:12 135:11
states 1:1 2:1
  129:1,13,15
stating 61:3
station 28:14
  34:20
stay 13:21,25
stayed 10:1 13:17
  13:19 14:6
stephanie 40:16
  43:6
steward 11:6,14
stiff 68:17 87:9
  88:5 89:2 90:19
stiffness 68:10,13
  87:3 88:3 89:22
stop 12:11
stopped 60:7

stopping 4:24
story 76:24 77:1
straight 94:25
street 2:14 3:2,7
strong 112:5
stronger 131:13
  131:15
stuff 125:17
stupid 109:7
subject 49:8 63:7
  95:18
submit 36:11 41:4
  70:23 98:10
submitted 71:10
  71:16 72:7,11
  83:12,13 120:11
  125:23 128:2
subscribed
  144:15
substance 37:18
  105:24 106:1,21
substantial 85:10
sued 6:19,21
sufficient 84:4
  128:3
suggest 77:21
  93:20
suggesting 132:21
suggestion 71:5
suggestions 29:21
  29:23 30:1
suicide 18:6,7
  24:14,20 90:23
  120:8 123:11
suit 145:16
suite 2:19 3:2
sumac 16:23
support 71:25
supportive 131:9
supposed 8:9
  10:11
sure 8:12 11:20
  11:22 16:11
  18:17 21:13
  22:16 23:20
  26:16 27:11,20
  28:12 30:4,21
  38:19 39:22
  41:10,15 43:13

Column 1:

46:10,11 47:8 49:22 51:4 52:14 59:11 60:10 62:14 70:17 71:1 72:22 73:17 77:5 81:9 82:8 86:15 87:11,22 92:13 95:10 96:19 97:22 102:24 106:20 107:18 111:17 117:14 118:18 124:8 125:6,24 130:25 133:6 135:16 140:13 142:6

**surely** 58:13
**surface** 108:22,24 109:1
**suspect** 25:5,10 33:2,6 34:7,9 52:20 53:24 54:2,14 55:3
**suspects** 27:15 33:8
**suspicious** 17:22 17:24
**swanson** 2:21 4:15,15 74:13 101:14 102:14 103:10 119:24 128:10,13 136:21
**swearing** 8:8
**sweating** 36:7
**sweeney** 50:21
**swing** 131:20
**swiping** 97:6
**switch** 122:5
**sworn** 4:3 99:1 144:15 145:8
**system** 8:10,23 15:2,6
**systems** 38:21

___
**T**

**tab** 74:10,10,11 119:21
**table** 56:21 98:1

Column 2:

**tac** 98:2
**tacks** 114:21
**take** 8:20 9:17 53:25,25 58:16 62:2 67:15 92:13 93:1,4 119:3 128:20 139:5
**takeaways** 10:8
**taken** 1:15 2:9 25:2 35:11 96:12,14 102:13 144:9
**takes** 90:19
**talk** 17:18 22:11 24:6 50:18 62:10 66:1 78:18 80:25 81:1,3,12 82:10 93:17 97:20 102:22 109:8 114:19,20 133:8 136:11
**talked** 51:5 65:1 79:21 81:10 97:23 99:15 142:9 143:18
**talking** 17:20 18:1 29:1 31:11 40:23 41:22 50:20 59:9 64:13 67:17 69:2 82:3,20 94:17 122:16 132:10 143:15
**talks** 121:5 124:3 125:12
**tax** 11:7,14
**team** 100:18
**technology** 131:13
**tell** 5:13 6:2,16 7:22 9:6 15:25 17:5 27:12 28:6 37:14 42:17 48:3 63:5 71:8 73:14 75:2,3 94:5,22 100:2,12 100:20 105:24

Column 3:

106:21 108:20 113:16 119:22 125:15 130:14 131:21 134:15 136:20,24 137:3 140:8 141:3,11 141:18 142:1
**telling** 49:18 52:1 52:6 70:3,4 75:13
**temperature** 65:18 68:5 87:4
**term** 35:20 81:22 87:17
**terms** 80:11
**test** 78:7 91:17,19 91:22,24 92:10 92:15,23 93:20 94:16,19,21 95:22 96:3 97:17 98:2,3,8,9 98:21 99:9 101:5 102:23 103:2,8,14 105:15 107:21 107:24 108:15 109:1,19,25 110:6 115:21 116:20,22,24 117:4,20,25 125:25 137:19 137:24
**tested** 108:11,13 125:23,24,24
**testified** 85:20 126:9 132:12,14 132:17
**testify** 4:3 101:25 118:6 145:8
**testimony** 50:15 51:13,22 55:2 59:8 87:6 88:8 101:16,19,24 102:1 104:20 112:10 114:13 114:16,17,18 126:6 127:5,25 132:24 134:13 139:17 144:12

Column 4:

145:14
**testing** 91:25 108:12
**tests** 76:8 79:1
**thank** 51:18 59:14 124:19 141:21
**thats** 7:3 10:22 17:19 18:8 19:4 22:22 24:16 29:3 30:2 31:8,8 34:24 36:25,25 38:17 42:9 43:7 43:15,21,22 47:6 50:2,2,23 51:14 51:17,19 52:9,9 54:24 55:1,2,9 56:2,5,11,12 60:6,11 62:16 64:18 67:18 68:20 70:1,4,20 71:18 72:12 73:2 74:4,25 77:23,25 78:13 78:15 80:14 82:24 85:2,17 88:15 98:24 99:2 100:11,19 102:19 103:24 108:22 110:8 113:17 114:15 117:22 118:3 120:15 122:15 126:11,17,18,19 126:20 127:3,23 127:25 128:4 130:1 134:7,7 137:11 144:2
**theory** 71:25 85:15 93:22 94:3,5,13,22,23 94:24 95:2,3,4 95:14,18 107:13 107:14 125:18 139:9
**therell** 72:15
**theres** 10:7 12:24 18:7 29:12 30:4 30:10 32:1 42:12,12 55:3

Column 5:

62:13 70:17 79:15 95:11 112:17 113:25 125:17 126:21 128:14 143:11
**theyll** 17:16
**theyre** 17:9 17:15 26:22 32:3 56:12 60:18 112:24
**theyve** 39:1
**thing** 10:5 32:4 35:1 41:22 53:22 77:18
**things** 11:16 15:20 22:21 27:12 28:7,13,16 29:2 31:24 36:6 36:7,15,16,19 53:20 57:20 60:15 77:19 99:21,22 100:4 109:21 113:12 123:18 128:6,8 133:9
**think** 6:10,20 7:17 7:25 10:2 11:5 11:16 14:10 15:17 18:21 19:1,2,5 20:6 21:25 22:17,24 25:7,9 27:9 28:8 28:9 30:12 34:13 35:20 37:24 41:15 44:12 46:2,8 48:5 51:17 53:16,25 54:4 58:9,9,12 63:1 70:18 77:18 80:9 85:1 87:12 92:25 93:8 94:7 94:7 96:13,13 98:5 103:9 104:20 105:16 109:9 112:23 119:5 121:8 122:19 123:10 123:11,12,13,14

123:17,20 127:7
127:10,20 128:1
129:22 131:16
131:17 132:3,4,5
135:21 136:6,14
139:8,10 140:13
140:16 141:6
142:4 143:18
thinking 85:1
123:1
third 2:14 3:2,7
30:16 110:18
116:9 145:6
thirdparty 136:10
thirtythree 74:13
thought 29:1
39:17 46:8
48:13 52:4,6
58:25 59:1 69:8
77:10 85:19
117:7 120:8
122:2,5 123:19
131:12,15,19
133:14,15 138:9
138:13 139:15
thoughts 64:6
thousand 7:4
three 9:24 13:20
14:5 23:1 59:21
69:16 91:1
125:21
tiles 108:7
time 8:19 12:4,10
17:5 23:25 24:3
24:11 27:19
30:10,15,17 37:8
37:9 40:11 44:5
45:9 46:7 47:25
48:4,7 52:23
54:19,22 57:17
58:4 62:1 63:2
64:1,2 69:10,20
71:13 72:7 76:6
77:7,19 78:3
81:12,20 83:2,14
84:9,11,12,17,22
85:10,23 86:5,14
86:14 87:15,17
87:25 88:9

93:22 95:7
96:15 97:13
98:18 99:11,14
99:19 100:13,16
101:4 104:4
105:18 109:14
110:19 111:12
116:6,7 117:18
124:9,13 127:5
137:15 139:4
140:23
timeline 87:1
times 23:1 86:10
113:16 123:12
128:10 130:10
139:11,12
today 11:2,24
12:10 27:21
36:1 38:12
62:25 93:5,10
94:3,4 104:6
told 18:15 31:6,13
31:13,14 60:18
61:18 97:25
100:14 114:7
117:10 127:10
131:12 133:21
137:13 138:2
tom 142:14
top 74:3
total 12:8
totally 114:2
touch 65:23,25
68:8 87:8
touched 90:10
122:1,5
touching 145:9
towel 93:23,24
94:9,25 95:1,5
125:18
towels 122:7,7,9
town 33:18
track 133:20
trained 99:23
training 5:4 8:6
8:20 9:7,8,15
11:4
transcript 42:12
102:4 144:9,11

treat 14:19
trial 7:2,17 37:17
38:25 44:4
63:19,20 100:16
101:10,16
102:10,10
128:15,21
130:13,17 131:9
131:17 132:9,12
133:3,4,7,10,12
133:22 135:2
137:12,16 138:1
138:15 139:12
141:3,12 144:1
trials 7:13 44:5
101:7 102:6
trickled 62:17
trickling 90:25
tries 112:25
trigger 42:1
triggers 29:11
troy 5:24
true 51:2 53:9
54:20 55:1,4,5
89:15 109:24
117:21,22
144:11 145:13
trust 56:10 90:3,5
90:13,20 132:7
132:19,22,25
133:5
truth 4:4,4,4
49:19 52:1,6
57:23 60:7
102:3 145:8,9
truthful 61:21,21
try 6:11 7:13,16
26:8 34:3 57:22
57:24 63:21
75:11 88:14
112:6 117:23
trying 14:8,9
25:23 27:5 28:1
83:4 94:15 99:5
turn 67:4 69:14
91:16
turned 54:11
102:16,17
turns 24:22

two 7:4,25 9:13,24
10:8 13:22,24
23:1,18 26:22
35:5 40:4 49:16
49:17 64:17
68:20 69:12
85:18 88:5,5
90:11,17,25
94:11 101:7
102:6 118:11
134:3
twohour 90:20
type 9:14 134:18
types 16:5
typical 31:8
typically 17:13
22:15 26:25
29:4,8 37:1 57:3

U
u 141:22,23 142:3
uhhuh 7:9 20:21
121:7
ultimate 60:10
ultimately 130:11
understand 8:5
9:22 14:17
18:10 26:14,15
28:1 30:20 35:4
36:8,20 39:12
40:4 49:21
52:13 57:8 66:2
70:18 77:25
87:21 88:24
92:12 114:5,16
144:3
understanding
11:1 38:12 48:1
89:21 91:21
117:3 124:9,14
134:7
understood 39:11
unfair 6:20
united 1:1 2:1
university 5:8,11
unquote 50:16
103:25
unrelated 114:2
unseated 13:6
updates 9:15

use 73:25 87:17
98:15 99:12
109:1,10
usually 23:9

V
vacuum 6:19,22
vague 26:13 60:16
88:11 92:12
103:24 113:1
vaguely 62:7
variety 90:6
various 10:4
33:10 45:20
56:15
verbally 114:25
115:11
verdict 6:11,24
verify 60:18
versus 88:7
victim 29:13
54:21 73:22
victims 107:8
video 1:13 2:9
46:8 96:12,14
visible 122:12
visited 30:11
volume 1:14
143:1 144:5
vs 1:5 2:5

W
w 2:18
wait 30:2
waited 125:5
waiting 4:24
walk 31:17 32:6
walked 81:4
want 4:23 5:3
12:15 16:12
25:24 28:23
31:2,21 41:25
51:18 58:16
59:3 69:14
88:13 99:24
109:14 113:19
114:16 143:2,16
wanted 14:2 31:7
31:15 102:18
129:4

wanting 142:5
warming 128:8
warrant 92:16,18
 93:12 100:24
 105:23 106:2
 113:19 114:10
 114:23 117:5,14
wasnt 23:20,23
 44:20 45:19
 48:13 50:14
 54:14,16 57:14
 61:13 64:2
 66:23 86:23
 90:24 94:10
 107:8,15 108:4
 110:9 122:2
 127:11,14 136:3
 136:3
watch 44:3
watched 43:24
 44:2
way 11:15 18:15
 39:19,22 53:7,12
 60:24 61:15
 66:7 67:21
 72:13 78:23
 88:14 102:16
 109:12 126:7
 134:23 140:17
 143:11
wearing 90:12,12
wednesday 77:15
weekend 75:11
weeks 51:23
weigh 60:15
weighed 72:25
weighing 72:17
went 5:4,7 6:24
 9:9 21:2,14,19
 22:8 23:14
 26:17,20 28:19
 28:21 30:18
 33:21 35:6,8,9
 40:4 45:20 49:5
 51:4 52:14
 56:22 64:7,9
 94:14 113:23
west 3:2
wet 65:9

weve 19:4 27:3
 49:23 59:3 68:4
 74:1 111:1
 143:18,23
whats 35:1 36:18
 74:6,6,10 81:2
 109:3 119:21
 120:16 136:9
 143:16
whereabouts
 43:11,16 44:17
 46:16,22 53:13
 53:21 59:1
 61:16
whereof 145:19
whichever 116:9
wholly 143:20
whos 15:7
wide 90:8
wife 42:3 46:24
 48:14 98:5
win 132:4,5
window 90:20
wings 107:10
winnable 131:16
 131:18
wintertime 80:16
wish 78:23
witness 34:24
 47:7 51:9 133:1
 133:11 144:8
 145:11,12,14,19
witnessed 64:21
 64:22,23,24
witnesses 11:8
 24:25 43:10
 49:18 50:6 51:2
 52:1 60:15
 138:16
womack 4:12
won 8:17
wont 112:18
word 24:3 31:25
 32:1 65:8,8
 66:22,24 67:2
 68:10,11 89:14
 108:23 109:3
words 16:12
 75:16,18,22

76:12,15,18,21
 81:25 138:21
work 5:16,19
 11:12,13,23
 14:12 15:23
 20:20 21:5
 36:10 43:18
 44:22 56:13
 75:11 99:23
 115:3
worked 13:17
 45:4,17 105:13
working 12:7
 13:12 15:7
 51:11 108:21
 122:3
works 8:22 55:20
 92:1 127:4
world 109:9
worried 14:7
worst 90:16
wouldnt 17:24
 42:24 43:2 92:7
 98:18 99:19
 114:10 121:2
 134:21 141:5
writer 22:17
 55:16 75:9
 127:11
writing 115:25
 145:12
written 36:21
 91:3,11,15 106:3
 115:13
wrong 74:12
wrote 42:23 91:5
 91:6

———— X ————

———— Y ————

yeah 6:10 10:17
 10:19 14:10
 18:17 20:17,21
 23:22 33:11
 42:5 43:2 68:7
 82:22 91:24
 95:9 105:16
 106:13 119:25
 122:1 124:5

126:11 133:10
 142:9 143:25
year 7:14 8:4 9:4
 9:13 113:20
years 10:16 15:16
 42:20 105:1
youd 111:20
 120:19
youll 72:5 141:3
youre 9:18 10:11
 14:15 16:15
 20:8 25:11
 26:15 27:21
 30:7,22,22,23
 31:11 36:9
 50:24 55:19
 59:9 67:10 69:2
 70:4 74:15 75:3
 76:9 78:6 87:14
 100:8 109:3
 119:22 125:15
 130:24 132:5
youve 7:25 10:15
 12:10 41:15
 79:20 106:11
 115:24 116:3
 127:10

———— Z ————

———— 0 ————

00 40:6 45:22,22
 46:17,17,22,22
 47:1,23 48:10,19
 48:19 49:13,13
 49:20,25,25 51:9
 51:9 52:2,2,23
 55:8,8 59:1,2,5,6
 59:18,18,20,20
 61:16,17 84:18
 85:7,7,22 132:15
 133:25
000 132:15

———— 1 ————

10 58:18 62:2
100 93:5
11 58:18
12 104:8
13 9:18

1300 2:19
13th 9:7
14 3:2
1445 74:1,8,17
15 47:1,12 49:14
 52:22 67:5
 87:17
150 132:15
16 74:22 121:4
16cv01175jar 1:4
 2:4
1968 119:18,25
1969 121:5
1st 7:7

———— 2 ————

2 88:23
20 85:25 87:18
 90:15 139:4
200 3:2
2000 2:24
2006 5:12,15
201 144:16
2010 3:11 13:12
2011 7:10,18 9:4,7
 12:1,20 15:8
 17:2 18:1,2 44:6
 44:17 61:17
 80:1 140:16
2012 108:9
2016 142:4
2017 1:16 2:10
 144:10 145:20
211 2:13 3:7 145:5
23 1:16
23rd 2:10 144:10
24hour 34:15
 70:14 71:23
25 15:16
2654602 1:25
27th 17:1,10
 44:17 45:22
 61:17,25 134:1
28th 23:14 24:7
 24:11,18 25:1
 30:12,14 35:5
 37:6 40:5 42:14
29th 23:14 69:15
 69:17 70:11,24
 79:13 80:1,3,17

84:3,13 96:9
110:11,17 111:2
111:25 112:5
115:6,24 116:15
116:23 117:7,21
118:9
**2nd** 145:20

**3**

**30** 40:6 48:7,10
49:20
**30th** 23:14 74:22
80:1,4
**314** 1:25
**31st** 23:15 104:20
**3rd** 83:12,20,22
84:5 110:12
116:4,8 117:20
117:25

**4**

**4** 1:4 2:4
**40** 52:25 90:15
**41** 86:2 139:4
**411** 1:22 2:15
145:3,22
**440014** 1:23
**4th** 44:10 84:5
116:8,9 117:20

**5**

**5** 45:22
**50** 61:25
**54** 119:24
**55** 123:12

**6**

**6** 40:6,6 45:22
46:17,22 48:19
49:13,25 51:9
52:2 55:8 59:1,5
59:18,20 61:16
85:7
**63105** 2:20
**63117** 3:11
**63144** 1:24 2:24
**63301** 3:8
**64105** 3:3

**7**

**7** 47:1,1,12,23
48:7,10,10 49:14
49:20,20 52:22
52:23 74:22
84:18 85:22,25
87:17,18 90:15
133:25 139:4
**7777** 2:19

**8**

**88** 88:22

**9**

**9** 46:17,22 48:19
49:13,25 51:9
52:2,25 55:8
59:2,6,18,20
61:17,25 85:7
86:2 90:15
139:4
**911** 84:24 85:12
85:23 86:2,12
87:18
**9616306** 1:25