

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

RUSSELL SCOTT FARIA,         )
                             )
        Plaintiff,           )
                             )
vs.                          ) Case No. 4:16-CV-01175-JAR
                             )
SERGEANT RYAN J. McCARRICK,  )
et al.,                      )
                             )
        Defendants.          )

DEPOSITION OF MICHAEL MERKEL

Taken on behalf of Plaintiff
September 28, 2017

COURT REPORTING ASSOCIATES
P.O. Box 440014
St. Louis, Missouri 63144
(314) 961-6306

1

---

INDEX OF QUESTIONERS

QUESTIONS BY:                        PAGE NO.

Mr. Schock                              5

Mr. Pleban                            126

Mr. Heigele                           127

2

---

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

RUSSELL SCOTT FARIA,         )
                             )
        Plaintiff,           )
                             )
vs.                          ) Case No. 4:16-CV-01175-JAR
                             )
SERGEANT RYAN J. McCARRICK,  )
et al.,                      )
                             )
        Defendants.          )

DEPOSITION OF MICHAEL MERKEL, produced,
sworn and examined on September 28, 2017, on behalf of
Plaintiff, between the hours of nine o'clock in the
forenoon and five o'clock in the afternoon of that day,
at the offices of Barklage, Brett & Hamill, P.C., 211
North Third Street, St. Charles, Missouri 63301, before
TAMI L. BRUDER-KSIOSZK, a Registered Professional
Reporter, Certified Court Reporter and a Notary Public
within and for the State of Missouri.

A P P E A R A N C E S

For the Plaintiff:

        W. Bevis Schock, Esquire
        7777 Bonhomme Avenue, Suite 1300
        Clayton, Missouri 63105

        Nathan T. Swanson, Esquire
        ROSENBLUM, SCHWARTZ & FRY
        120 South Central Avenue, Suite 130
        Clayton, Missouri 63105
For the Defendants McCarrick, Merkel and Harney:
        Jason S. Retter, Esquire
        KING, KREHBIEL & HELLMICH, LLC
        2000 South Hanley Road
        St. Louis, Missouri 63144

        (Appearances Continued)

3

---

APPEARANCES CONTINUED
For the Defendant Askey:
        Christopher L. Heigele, Esquire
        CORONADO, KATZ, LLC
        14 West Third Street, Suite 200
        Kansas City, Missouri 64105

For the Defendant Lincoln County:

        John Hamill, Esquire
        BARKLAGE, BRETT & HAMILL, P.C.
        211 North Third Street
        St. Charles, Missouri 63301
For the Defendant Michael Merkel:
        Chet Pleban, Esquire
        PLEBAN PETRUSKA LAW L.L.C.
        2010 South Big Bend Boulevard
        St. Louis, Missouri 63117

Also present:

        Plaintiff Russell Scott Faria
        Defendant Leah Askey

Exhibit
28

4

1    IT IS HEREBY STIPULATED AND AGREED, by and
2 between counsel for the Plaintiff and counsel for the
3 Defendants, that this deposition may be taken in
4 shorthand by Tami L. Bruder-Ksioszk, a Notary Public,
5 Registered Professional Reporter and Certified Court
6 Reporter, and afterwards transcribed into typewriting;
7 and the signature of the witness is expressly reserved.
8                * * * * *
9              MICHAEL MERKEL,
10 of lawful age, produced, sworn and examined on behalf of
11 the Plaintiff, deposes and says:
12             DIRECT EXAMINATION
13 QUESTIONS BY MR. SCHOCK:
14         MR. SCHOCK: Mr. Merkel, I'm Bevis Schock.
15 It's our custom to announce our appearances today, so --
16         MR. SWANSON: Nathan Swanson for Defendant
17 or Plaintiff.
18         THE PLAINTIFF: Russell Faria, Plaintiff.
19         MR. HAMILL: John -- John Hamill, Defendant
20 County.
21         MR. PLEBAN: Chet Pleban for Detective
22 Merkel.
23         MR. HEIGELE: Chris Heigele on behalf of
24 Defendant Askey, and Defendant Askey is also present.
25         MR. RETTER: Jason Retter for Defendant

5

1    A.    Yes.
2    Q.    Sir, I want to talk to you about obviously
3 the Faria murder, but I want to start with your training
4 and background --
5    A.    Okay.
6    Q.    -- and your current position.
7    A.    Okay.
8    Q.    So where do you work now?
9    A.    I work for the Lincoln County Sheriff's
10 Office in Troy, Missouri.
11    Q.    Your position?
12    A.    I'm a captain with the Sheriff's Office.
13 I'm a criminal investigations division commander.
14    Q.    How long have you been in that post?
15    A.    Oh, almost three years, I believe. Two or
16 three years.
17    Q.    So this murder was in 2011, so since the
18 promotion, significantly after that?
19    A.    Yes, sir.
20    Q.    What was your post, your position, your
21 title, you might say, at the time of the murder?
22    A.    I believe I was a general crimes detective.
23 If not, I was assigned to the Detective Bureau as either
24 a crime scene investigator and a general crimes
25 detective or one capacity or another.

7

1 Merkel.
2         THE WITNESS: Mike Merkel.
3    Q.    (By Mr. Schock) Thanks. Would you state
4 your full name?
5    A.    Michael Allen Merkel.
6    Q.    Thanks.
7    A.    Yes, sir.
8    Q.    Sir, you were at the depo about three weeks
9 ago of Mr. Faria, right?
10    A.    Yes, sir.
11    Q.    Have you ever been deposed before?
12    A.    Prior to that?
13    Q.    Yes.
14    A.    On occasion.
15    Q.    Okay. So I'm going to be real quick on the
16 rules, just three of them; one is, if you don't
17 understand me, will you let me know?
18    A.    Yes.
19    Q.    Will -- will you work with me to try to
20 take turns speaking?
21    A.    Yes, sir.
22    Q.    And will you let me know if you need to
23 take a break --
24    A.    Absolutely.
25    Q.    -- for any reason any time?

6

1    Q.    Okay. So you worked as a detective as
2 opposed to a patrol officer?
3    A.    Yes, sir.
4    Q.    How long had you been in that line of work
5 with that distinction?
6    A.    At that point, since about 2007, maybe
7 mid-2007.
8    Q.    So then roughly four years?
9    A.    Approximately. Sure.
10    Q.    How long had you been a police officer
11 before that, POST certified?
12    A.    My first -- I was POST certified in
13 December of 2002, and my first job wasn't until February
14 1st of 2013.
15    Q.    2013 can't --
16    A.    '13.
17    Q.    -- be right.
18    A.    Yes, because I was POST certified December
19 13th. Oh, I only remember that because it was Friday
20 the 13th of 2002. I'm sorry. 2003. So --
21    Q.    Okay.
22    A.    -- about three months -- two, three months.
23    Q.    Okay. No problem. I knew it was just one
24 of those. Sometimes --
25    A.    Just a number.

8

1    Q.    Sometimes in these things we make a
2 misstatement --
3    A.    Right.
4    Q.    -- and we just correct them.
5    A.    Okay.
6    Q.    When you were in your position at the time
7 of the Faria murder, what were your duties?
8    A.    My initial duties were to respond to the
9 scene, make an overall assessment.
10    Q.    Okay.  Hang -- hang on.  Are you talking
11 now about any crime that you were assigned to or this
12 crime, because I want any crime first?
13    A.    Oh, any crime?
14    Q.    Yeah.
15    A.    It was -- it would be a general crimes
16 detective.  So, I mean, we would do crimes against
17 persons, crimes against property, really anything that
18 is a felony complaint that is assigned to the Detective
19 Bureau.
20    Q.    Who would assign out the work, say, You're
21 going on this one, you're going on that one, to
22 different guys?
23    A.    I'm not sure who actually assigned it.  I
24 can't remember who would have been my supervisor at the
25 time.  I -- I don't -- I wouldn't -- I don't know.  I

9

1 was just a general crimes detective, and if I had a case
2 assigned to me, it would show up in my queue, and I
3 would work it, so --
4         THE REPORTER:  It would what?
5         THE WITNESS:  It would show up in my queue.
6 So --
7    Q.    (By Mr. Schock)  Oh, you had some kind of a
8 computer --
9    A.    Yeah, --
10    Q.    -- that tells you what to work on?
11    A.    -- like a program.
12    Q.    Okay.
13    A.    And if it was assigned out, it would just
14 come to me.
15    Q.    We -- we're gonna --
16         MR. RETTER:  Just one at a time.  Bevis is
17 going to tell you.
18         THE WITNESS:  Okay.
19         MR. SCHOCK:  Exactly.
20         MR. HEIGELE:  And it might be his fault.
21         MR. SCHOCK:  Absolutely.  I'll take all the
22 blame.  Just put it right on me.
23    Q.    (By Mr. Schock)  Sir, so you would get
24 assigned a job, I'm talking in general now, in your
25 queue?

10

1    A.    Yes, sir.
2    Q.    And then lay out a little bit how the
3 course of a routine investigation would go and what your
4 role would be.
5    A.    I think every investigation would -- I
6 mean, it -- it would be different.  You have to consider
7 every factor of it.  So you would take -- you would take
8 your report and you would contact your victim, and then,
9 I mean, from there, it -- it really varies.  If you got
10 a crime against property, you review the report and you
11 look at the details of it and follow-up on any leads you
12 may have.
13         You may have a different course of action if you
14 have a crime against persons, if you need to do a
15 forensic interview with a child, or, you know, obtain
16 records through subpoenas or anything like that.  I
17 mean, it -- really, it's case by case.
18    Q.    Fair enough.  Is the idea to try to
19 understand what crime occurred first?
20    A.    Yes.
21    Q.    Understand, if you can, who did it --
22    A.    Yes.
23    Q.    -- second?
24    A.    Yes.
25    Q.    Understand how to gather or actually engage

11

1 in gathering evidence that is relevant to this crime?
2    A.    Yes.
3    Q.    And at some point approach the prosecuting
4 attorney for a charge to be issued; is that --
5    A.    Present the information to them, yes, to
6 see -- I mean, I wouldn't decide what charges would be
7 issued, but I would present all the information that I
8 have, so --
9    Q.    Right.  I mean, that's a -- that's a very
10 routine process, right?
11    A.    Sure.
12    Q.    It would kind of happen at the end of the
13 investigation or at least the end of the beginning of
14 the investigation?
15    A.    Sure.
16    Q.    So let's talk about this situation.
17    A.    Okay.
18    Q.    How did it first come to your attention
19 that there was a crime on Sumac Drive?
20    A.    I -- I can't recall who specifically called
21 me, but I was notified that there was an incident at
22 that address, I don't know what the address is now, but
23 at Mr. Faria's home, and that the Patrol Division was
24 asking that someone from the Detective Bureau respond.
25    Q.    Was that still in the evening of the 27th

12

1 of December? And I will submit to you that -- I know
2 you probably don't have all these dates in your mind.
3 The murder happened on the 27th of December 2011. Do
4 you agree with that? Sound right?
5     A.    That sounds right. Sure.
6     Q.    Okay. So my question is, did -- did --
7 what time in terms of when Mr. Faria made his 911 call
8 around 9:40 --
9     A.    Okay.
10    Q.    -- did you get the word that you needed to
11 get to work on this?
12    A.    It -- it would have been a short time after
13 that. I'm -- I don't remember exactly what time it was,
14 but it -- I'll say it may have been within an hour.
15    Q.    And were you on your shift, on duty, or did
16 you have to come in to work on that?
17    A.    No. I -- I would have had to come in
18 because my hours were Monday through Friday like 8:30 to
19 4:30 or 8:30 to 5:00.
20    Q.    Okay. So did you get a call at home or
21 something?
22    A.    I -- I don't recall specifically. I -- I
23 don't have a home phone all the time, so I --
24    Q.    So wherever you were, you got a call, they
25 had your number, and you responded?
13

1     A.    Yes.
2     Q.    Did you -- were you non -- were you plain
3 clothes?
4     A.    I wasn't a uniformed patrol officer. I
5 would have had something with insignia on, so, I mean,
6 that's not really plain clothes to me.
7     Q.    I understand. Do you remember what you
8 were told in that call and any of the details?
9     A.    In the phone call? No. Not specifically.
10 No.
11    Q.    But the idea was that you were to go to
12 Sumac Drive directly?
13    A.    If -- if that's the address, yes, sir.
14    Q.    Okay. It is. And did you do that?
15    A.    Yes, sir.
16    Q.    Take some time to get dressed or whatever
17 if you weren't in -- in your insignia?
18    A.    More than likely, sure.
19    Q.    And do you know what time you got there?
20    A.    I do -- I do not.
21    Q.    Okay. When you got there, tell me what you
22 saw going on when you first drove up.
23    A.    There -- there would have been other
24 emergency services there. I don't recall who all was
25 there.
14

1     Q.    Okay. One -- one -- one second. You said
2 there would have been, and I am kind of interested --
3 and maybe you just said that as a form of speech, but I
4 want to know whether there were emergency vehicles
5 there.
6     A.    Okay. I don't recall exactly what -- what
7 emergency vehicles were there or -- or who they were
8 specifically.
9     Q.    But there were some?
10    A.    There were some there. Yeah.
11    Q.    Do you think there were any fire department
12 vehicles there?
13    A.    I -- I don't know.
14    Q.    And do you remember some of the -- the
15 identity of some of the people who were there?
16    A.    To the best of my recollection, I remember
17 a deputy, and I'm not sure if he was a sergeant at the
18 time, but -- so say two deputies.
19    Q.    Who are?
20    A.    Chris Hollingsworth and Michael Pirtle.
21    Q.    Were there others, but you just don't know
22 their names?
23    A.    There -- there were other people. I don't
24 know if they were deputies or firemen or EMS or --
25    Q.    Any -- any idea how many?
15

1     A.    No.
2     Q.    Okay. Would you say more than three or
3 four?
4     A.    Well, there would have been at least three
5 if there was two deputies, so sure.
6     Q.    Okay. More than ten?
7     A.    I don't know.
8     Q.    Okay. Fair enough. Do you know whether
9 you saw Mr. Faria there at that time when you first
10 arrived?
11    A.    I don't recall if he was outside or not,
12 but he was -- he was there. He was present. Yes, sir.
13    Q.    I know he was -- he -- he ended up in a
14 police car at some point. Did you ever see him in the
15 police car?
16    A.    Not that I recall. No, sir.
17    Q.    Okay. Did you ever talk to him that night?
18    A.    Yes, sir.
19    Q.    Okay. And that was at -- at the scene or
20 later?
21    A.    I don't recall if we talked to him at the
22 scene first. We may have let him know that we were
23 going to go to the Sheriff's Office. I don't remember
24 having a lot of conversation with him prior to going to
25 the Sheriff's Office.
16

1    Q.    Okay.  And what did you do there?  And you
2  did go to the Sheriff's Office.  Were you in that car
3  that drove him or in an accompanying car?
4    A.    I don't recall how we were arranged, but,
5  yes, I -- we went with him to the Sheriff's Office in
6  some fashion.
7    Q.    And I want to know what you did at the
8  scene before you went to the Sheriff's Office.  Can you
9  tell me that as best of your memory?
10    A.    I'm not sure exactly without reflecting on
11  some sort of report.  I'm not sure where exactly I would
12  have walked, but we would have done a general
13  walkthrough of the house and -- and been told about
14  anything of importance at the time.
15    Q.    Okay.  So do you remember any of the things
16  you were told?
17    A.    Just that there was -- obviously the nature
18  of -- of -- of Betsy Faria, which, I mean, that was
19  pretty plain.  I could see that.  And then that there
20  was some what appeared to be blood on a light switch,
21  and at that point, I mean, we didn't have much detail at
22  that point.
23    Q.    Were officers going in and out of the
24  house?
25    A.    I don't recall.

17

1    Q.    You went in -- in the house, right?
2    A.    I did.  Yes, sir.
3    Q.    Okay.  And did you have a search warrant at
4  that point?
5    A.    No, sir.
6    Q.    Okay.  What authority did you have to go
7  into the house at that point?
8    A.    We had a -- a suspicious death.  We didn't
9  -- we didn't know what was going on.
10    Q.    Sure.  You were there on an emergency
11  basis, right?
12    A.    Yes, sir.
13    Q.    Of course.  You can go into the house under
14  those circumstances, right?
15    A.    Sure.
16    Q.    Okay.  And you did, right?
17    A.    Yes, sir.
18    Q.    And was there talk that you would be
19  getting a search warrant maybe to -- for computers and
20  other things?
21    A.    At that point, no, sir.
22    Q.    Didn't hear that?
23    A.    We wouldn't have -- no.  I don't recall
24  that.
25    Q.    Did you just sort of glance at the body or

18

1  did you have a chance to observe the body somewhat
2  closely?
3    A.    Close as far as proximity?  No.  I didn't
4  -- I didn't get close to it.  I mean, you could stand a
5  reasonable distance away and still survey it a little
6  bit.
7    Q.    Did you do that?
8    A.    Yeah.  I -- I mean, I looked at her.  Sure.
9    Q.    Okay.  Let me ask you some questions about
10  investigations.  Do you agree that in any investigation
11  of a murder, time of death is an important fact to
12  determine?
13    A.    I know that that's something that is
14  determined.  I -- I haven't worked enough homicides to
15  tell you if it's, you know, one of the most important
16  facts out there.  That's -- that would be one of the
17  facts that we determine, yes.
18    Q.    Okay.  Well, maybe we ought to talk a
19  little bit more about your training.
20    A.    Okay.
21    Q.    Have you gone to school and received any
22  certificates or had seminars, things like that, on -- on
23  investigating crimes?
24    A.    Yes, sir.
25    Q.    And have you done some -- did you do some

19

1  of those before December 2011?
2    A.    Yes, sir.
3    Q.    Were some of those on how to properly
4  conduct an investigation?
5    A.    More than likely.  Sure.
6    Q.    Okay.  Did you go to quite a few hours of
7  that sort of thing?
8    A.    Prior to 2011, I'd -- I'd have to look at
9  my -- my certificates and everything of when I went to
10  which classes, because I have gone afterwards as well.
11    Q.    Sure.
12    A.    I just don't --
13    Q.    I understand.
14    A.    -- know when they -- when they were.
15    Q.    You had been a detective for about four
16  years at that point, right?
17    A.    Yes, sir.
18    Q.    And had you -- had you worked with some
19  more experienced detectives in that period?
20    A.    Yes, sir.
21    Q.    Would you say that you had learned some of
22  the principles of the trade at that point both from
23  experience, from mentoring of more experienced people
24  and from schools?
25    A.    Yes, sir.

20

1    Q.   Okay.  Did you think you were in a position
2  where you pretty well understood how to conduct an
3  investigation properly?
4    A.   Sure.
5    Q.   Okay.  And that's why I was asking about
6  this time of death issue.  So you would call it a --
7  something you would try to find out, but you didn't --
8  you're not sure whether you would call it one of the
9  most important things to find out, fair?  Is that what I
10  -- did I understand what you said?
11    A.   I mean, every -- every fact is important.
12  I mean, I wouldn't say that that's hands-down the most
13  important fact.
14    Q.   Absolutely.  Do you agree that in any
15  criminal investigation, that -- that one of your jobs is
16  to figure out which facts are more important than other
17  facts?
18    A.   And again, I -- I think all the facts are
19  important, and it's my job to gather all the facts and
20  give them to the prosecuting attorney.
21    Q.   Okay.  Well, let's back up on that.  So
22  there's some facts that -- let's say -- just take --
23  this house had a basement, right?
24    A.   I believe so.  Yes, sir.
25    Q.   Okay.  And there were some computers in the
                                21

1  basement, right?
2    A.   If I remember correctly, yes.  I believe
3  there was.
4    Q.   Do you agree that the fact that there were
5  computers in the basement was an important fact in the
6  sense that there's a murder, we might have some data on
7  these computers that are relevant, the fact that they're
8  there is an important fact?
9        MR. PLEBAN:  At -- at what point are we
10  talking about now?  When he gets there?
11        MR. SCHOCK:  Yeah.  Yeah.
12        MR. PLEBAN:  Later on or --
13        MR. SCHOCK:  Yeah.  Well, we're actually --
14  I'm asking in general terms now.
15    Q.   (By Mr. Schock)  Just about --
16    A.   So --
17    Q.   I'm talking about just --
18    A.   -- not in relation to this case?  Just in
19  general?
20    Q.   Yeah.  I'm kind of giving you a
21  hypothetical.
22    A.   Okay.  Hypothetically, I mean, if -- again,
23  it's case by case.  I mean, if --
24    Q.   Absolutely.
25    A.   -- if there's electronics that are
                                22

1  available and it's used in the commission of a crime,
2  sure, it would be -- it would be a fact that we would --
3    Q.   Yeah.
4    A.   -- look into, sure.
5    Q.   I guess what I'm trying to do is -- is just
6  -- you kind of seem to imply to me that all facts are
7  created equal, and I am trying to ask you whether in
8  fact in your job as an investigator, a detective, one of
9  the things you need to do is sift through all the facts
10  and determine which seem to be more important than
11  others?
12    A.   I don't think it's our job to weigh the --
13  the levity of the importance of the facts.  It's -- we
14  gather the facts.  We're information gatherers.  I think
15  the importance of -- of evidence or a fact would be an
16  opinion.
17    Q.   So you're telling me that you don't form
18  opinions as you do your job?
19    A.   We look for facts.  We look for evidence.
20    Q.   So were you on the Major Case Squad at the
21  time?
22    A.   I believe so.  Yes, sir.
23    Q.   And we had a long deposition of Detective
24  McCarrick.  Do you know him?
25    A.   McCarrick?  Yes, sir.
                                23

1    Q.   And he was working with you at the time?
2  He worked for Lincoln County at the time?
3    A.   Yes.  I believe he did.  Yes, sir.
4    Q.   He's a colleague of yours, right?
5    A.   Sure.
6    Q.   Sure.  And you have highest respect for
7  him?
8    A.   Sure.
9    Q.   Okay.
10    A.   Yeah.
11    Q.   You think he respected you?
12    A.   Yeah.  Absolutely.
13    Q.   Now, he said that -- that there was one
14  gentleman above him who was the commander and then he
15  was sort of the second guy and he had a lot to do with
16  assigning out leads, telling people where to go over the
17  four days that the Major Case Squad was there, which he
18  called the call-out.
19    A.   Okay.
20    Q.   Do you remember that there were such
21  meetings?
22    A.   Can you -- can you kind of drill that down?
23  Meetings like what?
24    Q.   Sure.  Sure.  He said that two or three
25  times a day, the officers on the Major Case Squad who
                                24

729

1 were working on the case would assemble and discuss the
2 case and what had been learned and decide what they
3 would do next, things like that. Do you remember those
4 meetings?
5     A.   Not with any specificity. It -- it -- we
6 would have had a -- a brief and a debrief, sure. I
7 mean, that would -- that seems to be more of a standard
8 practice --
9     Q.   Right.
10     A.   -- than any of it.
11     Q.   Was that -- maybe I misunderstood Mr.
12 McCarrick, but I understood him to say that really all
13 the members of the team would get together in these
14 meetings to discuss the status of the investigation.
15     A.   Yeah, and it -- it really depends on our
16 availability. I mean, we would try to assemble everyone
17 we could, sure.
18     Q.   Sure. And was one of the ideas during
19 those meetings to try to determine how to allocate
20 resources and who would do what next, right?
21     A.   That, I don't know, because I was never --
22 I was an investigator. I wasn't part of the -- the
23 hierarchy, the higher-ups of --
24     Q.   But you were at the meetings, right, --
25     A.   I can't say --

                              25

1     Q.   -- some of them anyway?
2     A.   -- I was at ever -- every one, --
3     Q.   I understand.
4     A.   -- sure, in 2000 --
5     Q.   You were at some of them?
6     A.   Sure.
7     Q.   And during those meetings, did it seem as
8 though there was a process of prioritizing facts that
9 needed to be gathered, So let's put some people on
10 looking at this and some people looking on that, and
11 we'll let this sit for a while, do that tomorrow, that
12 kind of thing? Was that what was done in those
13 meetings --
14     A.   I --
15     Q.   -- among other things?
16     A.   I don't know. I mean, we shared
17 information. I don't know if they were prioritizing the
18 information or anything. That would -- again, that
19 would be something that's done by the I think they call
20 it the deputy commander or the report writer. I mean,
21 that would be done above my --
22     Q.   Do you feel like all the people at your
23 level just sat quietly and waited for instructions as
24 opposed to participating in the discussion?
25     A.   They would have participated in the

                              26

1 discussion, sure.
2     Q.   And have opinions?
3     A.   I -- I can't speak for what other people
4 would have said.
5     Q.   Right. Did you express any opinions in the
6 course of those meetings?
7     A.   I can't recall specifically what I said.
8     Q.   That's not what I asked. Did you express
9 yourself on any opinions that you had about the
10 investigation in any of those meetings, if you remember,
11 not what you said yet, but did you do it?
12     A.   I don't know.
13     Q.   Okay. That's fine. And we're going to
14 have a deal, if we can, we made the same arrangement
15 with everybody else, sometimes when we're going through
16 one of these depositions, you don't remember something,
17 just as happened a moment ago, which is fine, but if you
18 do remember it between now and the trial of this case,
19 if -- would you be willing to let your attorney know so
20 that he can contact me and say, Oh, we have to update
21 this deposition?
22     A.   Sure.
23     Q.   That would be great. Otherwise, at trial,
24 if you start remembering things, I won't -- that'll --
25 I'll get surprised. That wouldn't be fair, --

                              27

1     A.   Okay.
2     Q.   -- right?
3     A.   Correct.
4     Q.   Okay. So you were at some of these
5 meetings. We have established that. That's -- that's
6 all I really want to go to there.
7         So that night, you saw the body, right?
8     A.   Yes, sir.
9     Q.   And did you see the blood?
10     A.   Yes, sir. Yes.
11     Q.   Do you remember the condition of the blood?
12 Can you tell us what the condition of the blood was?
13     A.   It would have been in various stages, wet,
14 dry. I mean, there -- there was a lot of it.
15     Q.   Was some of it wet?
16     A.   Appeared to be, sure.
17     Q.   Some of it -- now, do you agree that blood
18 sort of sets up, it coagulates? I mean, water, for
19 example, if you spill some water, it doesn't glob up.
20 It just sort of dissipates. And blood acts a little
21 differently than water. Do you agree with that?
22     A.   Sure. Blood does act differently than
23 water.
24     Q.   Okay.
25     A.   Right.

                              28

1    Q.    But -- but some of this -- you're saying
2 some of the blood was wet?
3    A.    Appeared to be, yes, sir.
4    Q.    How about the rug around where the --
5 wasn't there some blood on the rug near the body?
6    A.    I don't recall there being a rug.  I -- I
7 remember carpet.  I don't remember a rug.
8    Q.    Carpet.  That's what I'm talking about.
9    A.    Oh, okay.  Yeah.  There would have been
10 blood on the carpet.  Sure.
11    Q.    Do you remember the condition of that
12 blood?
13    A.    Not specifically.  No.
14    Q.    Okay.  When you looked at that body, did
15 you reach any sort of immediate conclusions about how
16 the crime might have occurred?
17    A.    Other than she was stabbed?  I mean, that
18 was pretty obvious, that she was stabbed.
19    Q.    She had a knife sticking out of her neck,
20 right?
21    A.    Yes.
22    Q.    No question on that one.
23    A.    Right.  Right.
24    Q.    And she had this awful, deep cut on her
25 arm, right?

29

1    A.    Yeah.  I mean, I can't remember which arm
2 it was, but, yeah, she would have had what appeared to
3 be a gash in her arm.
4    Q.    Did you reach any conclusions as to whether
5 that was a defensive wound or not?
6    A.    Not that I recall.  Again, that -- that may
7 be reflected in -- in a report or something.  The --
8 overall, I mean, it looked like there was a struggle.
9    Q.    You felt there were signs of a struggle?
10    A.    Sure.
11    Q.    Tell me what those signs were.
12    A.    The amount of blood, just -- just hers.  I
13 mean, just her there, it looked like -- that's not
14 something that somebody would do to themselves.
15    Q.    Right.  When you get to stab wound whatever
16 it is, eight and nine, you're -- pretty hard to go the
17 next 40, right?
18    A.    Well, yeah.  I mean -- yeah.  I don't -- I
19 don't see -- I don't see how somebody could just lay
20 there and be stabbed that many times and there not be a
21 struggle.
22    Q.    Right.  Okay.  Fair enough.  And, of
23 course, you didn't know how many times she had been
24 stabbed at that point?
25    A.    At that point, no, sir.

30

1    Q.    And her face was covered in blood and
2 everything, right?
3    A.    Yeah.  Yes.
4    Q.    I mean, it was pretty -- pretty awful,
5 wasn't it?
6    A.    Oh, yeah.  Absolutely.
7    Q.    Now, I don't mean to be macabre about this,
8 but your job sometimes involves seeing victims of crime
9 in that sort of condition, fair enough?
10    A.    And worse, yes, sir.
11    Q.    And worse.  Okay.
12         THE WITNESS:  Thank you.
13    Q.    (By Mr. Schock)  Did you go to any other
14 parts of the house?
15    A.    From what I remember, I just walked down
16 the hallway to the bedroom and -- and looked into the
17 bedroom real quick and kind of did a quick survey, and
18 then that was it.  I don't -- I don't remember walking
19 any other places in the house.
20    Q.    Was your survey for the purpose of clearing
21 the residence or for just looking around for evidence?
22    A.    My understanding is that it was already
23 cleared, so I would have -- I would have just been given
24 the call it the highlights, I mean given kind of a brief
25 overview of what the deputy had or sergeant for that

31

1 matter.
2    Q.    Explain that, please.
3    A.    The -- the deputy, the original responding
4 deputy --
5    Q.    Right.
6    A.    -- in clearing the house may have some
7 further information that I may need.  So if I remember
8 correctly, he was saying, Hey, look in this place, look
9 in this place, this is what I saw, and then that would
10 have been it.
11    Q.    Did he talk, for example, about the blood
12 on the light switch?
13    A.    The light switch, something to that effect.
14 Yes.
15    Q.    You looked at that?
16    A.    Yeah.
17    Q.    I mean, you were there in your capacity as
18 a detective?  You were trying to gather information,
19 right?
20    A.    Yes.
21    Q.    That's why you walked around?
22    A.    Yeah.
23    Q.    Okay.  What was the -- well, did you go
24 into the kitchen?
25    A.    I can't remember if I did or not.

32

1    Q.   Did you look in the kitchen?
2    A.   We would have been able to see the kitchen
3  from the foyer, at least part of it, not the whole
4  thing.
5    Q.   Do you remember the condition of the floor?
6    A.   In the kitchen?
7    Q.   Correct.
8    A.   No.  I do not.
9    Q.   Was it dirty?
10   A.   I -- I don't recall.
11   Q.   No recall.  Did you see any evidence of
12 wiping motion on the floor or anything?
13   A.   I don't recall.
14   Q.   You don't remember or you didn't see
15 anything, and I'm not trying to -- I just want to
16 clarify the record.
17   A.   I -- I don't know if there was or not.
18   Q.   As you sit here now?
19   A.   At that -- at the initial -- the onset,
20 when I was there the first time?
21   Q.   Yes.
22   A.   I don't remember seeing anything.
23   Q.   Do you agree that in your capacity as a
24 detective, that would have been something you would have
25 been looking for anywhere in the house, sign of a

33

1  cleanup?
2    A.   At that point?
3    Q.   Yes.
4    A.   Not necessarily.
5    Q.   Well, you knew you had a dead body, right?
6    A.   Yes.
7    Q.   Wouldn't sign of a cleanup be relevant?
8    A.   On the initial response?  Not necessarily.
9  I'm -- I'm gathering preliminary information at that
10 point, and the least I can disturb a crime scene,
11 sobeit.
12   Q.   Well, looking at something doesn't disturb
13 it unless it's the Heisenberg uncertainty principle,
14 right, which we don't have to get into too deeply?
15   A.   If I have to walk through the scene to get
16 there, there's an opportunity for disturbance.
17   Q.   Sure.  But didn't you say the kitchen was
18 visible?
19   A.   Part -- parts of it, sure.
20   Q.   Okay.  Did you look closely at the kitchen?
21   A.   I don't recall if I did or not.
22   Q.   Okay.
23   A.   I --
24   Q.   And there's kind of a -- a doorway out to
25 the back porch, right?

34

1    A.   I believe so.  Yes, sir.
2    Q.   When you say, for example, walked around,
3  you walked to the bedroom, you said?
4    A.   Yes.
5    Q.   Did you watch your steps to -- less there
6  be a pile of blood, then you would not step in that;
7  fair enough?
8    A.   Fair enough.
9    Q.   I mean, you watch yourself?  You didn't
10 want to disturb anything, right?
11   A.   Correct.
12   Q.   Okay.  Do -- when we're talking about -- as
13 you looked in the house, in the kitchen area and you
14 looked toward this back door, did you see any signs of
15 cleanup or a path marked with wiping motions or anything
16 like that?
17   A.   I don't -- I really don't recall.
18   Q.   Okay.  Do you agree that a prudent
19 detective under those circumstances would be looking for
20 such a sign?
21   A.   Again, at that point, not necessarily.
22   Q.   Would you be -- would it be a statement
23 that you would just be looking for anything that might
24 stand out as unusual?  Would that be your consistent --
25   A.   Anything, but not everything, sure.

35

1    Q.   Anything, but not everything.  Okay.
2    A.   Correct.
3    Q.   So if a guy had a -- had a big Statue of
4  Liberty in the corner, that might be kind of
5  interesting, but not very important, fair enough?
6    A.   Sure.
7    Q.   All right.  So you're trying to figure out
8  what would be relevant to the crime, right?
9    A.   Again, anything, but not everything.
10   Q.   That's a human process?  Would you call it
11 a sub -- would you agree it's kind of a subjective
12 process, to -- to use your mind and evaluate what you're
13 seeing and determine what's important and what isn't
14 important?
15   A.   I don't -- I don't think it's -- it's
16 subjective to say that I have to gather every single
17 important fact at that point.  I have what are facts.  I
18 mean, they're -- they're facts.  There -- there was a
19 red substance on the light switch, she was there with a
20 knife in her neck.  Those were the facts that I had.  I
21 mean, I -- I don't think it's fair to say that I should
22 have gathered every single pertinent fact at that point
23 in time.  I mean, that -- that would have been hasty in
24 my opinion.
25   Q.   Of course.  And also impossible, right?

36

1    A.   Correct.
2    Q.   What I'm trying to ask you is -- we've --
3 we've covered enough.  We'll -- we'll go on.
4    A.   Okay.
5    Q.   So you walked around the house a little
6 bit.  We have discussed that, right?
7    A.   Correct.
8    Q.   Do you remember anything else that you saw
9 that was a pertinent fact?
10   A.   I -- I don't recall at this point.  No.
11   Q.   Okay.  And, again, if you remember
12 something, you will let your lawyer know, right?
13   A.   Correct.
14   Q.   Okay.
15        MR. RETTER:  Even during the course of the
16 deposition.
17        MR. SCHOCK:  That would be great.
18        MR. RETTER:  Absolutely.
19        MR. SCHOCK:  We'll come back to it.
20   Q.   (By Mr. Schock)  What did you do after you
21 walked around?
22   A.   I -- I probably would have -- I don't know.
23 I don't remember exactly what I did minute by minute.  I
24 just -- we would have -- at some point, I know we took
25 Russ back to the police station and talked to him.
                            37

1    Q.   Okay.  How did it come about that you were
2 one of the officers involved in that process?
3    A.   Which process?  Of taking him back?
4    Q.   Taking him back.  Yes.
5    A.   We would have -- there would have been me
6 and another detective, it was Detective Harney, and we
7 were the only two detectives on scene, so we -- just
8 naturally, we would have taken him back.
9    Q.   Did you get an order to do that from
10 anybody who was a -- a superior of yours?
11   A.   I don't recall.
12   Q.   Did you have -- as part of your job, did
13 you feel the authority to say to Mr. Faria, Hey, we're
14 going to go to the station, sir, are you willing to go
15 with us, that kind of thing?
16   A.   Sure.
17   Q.   That's in your purview?
18   A.   Yeah.  I would have -- right.  I would have
19 gathered information from Mr. Faria.  Sure.
20   Q.   That's routine, right?
21   A.   Sure.
22   Q.   Would you agree with the statement that in
23 every homicide, the spouse is a suspect?
24   A.   A suspect?  No.
25   Q.   Would you agree that in every homicide,
                            38

1 that the spouse should be considered as a possible
2 person who committed -- well, if we -- for example, if
3 the spouse is in Europe and we absolutely know that and
4 the homicide happens in Troy, that spouse is probably
5 not a suspect, right?
6    A.   Yeah, but we would -- I mean, yeah.  We
7 would find that out.  Sure.
8    Q.   Sure.  But now in this case, you had Mr.
9 Faria as the person who was the reporting party and the
10 spouse, right?
11   A.   Yes.  Yes, sir.
12   Q.   Did that make him immediately in your mind
13 a suspect?
14   A.   No, sir.
15   Q.   Okay.  And did you take him to the station
16 to develop information to see if he was a suspect?
17   A.   I don't think we set out to see if he was a
18 suspect.  We set out to see if he had any -- any
19 information relevant to his -- his wife's homicide.
20   Q.   Okay.  Fair enough.  At that point, you
21 knew almost nothing except that there had been the
22 report of the death and you were there and saw a body,
23 right?
24   A.   Correct.
25   Q.   And did anybody say anything about the fact
                            39

1 that Mr. Faria had called it in as a suicide?
2    A.   I believe that was mentioned.  Yes, sir.
3    Q.   And as you looked at the body, as we have
4 already spoken about, you knew it wasn't a suicide,
5 right?
6    A.   I wouldn't have known that for a fact.  I
7 -- it didn't appear to be one, no, sir.
8    Q.   We -- we talked earlier about it?
9    A.   Correct.
10   Q.   I mean, it -- so did that make you a little
11 suspicious about Mr. Faria?
12   A.   I wouldn't say it made me suspicious.
13 Again -- again, we gather facts.  So one of my
14 fact-gathering missions would have been to talk to Mr.
15 Faria and, you know, understand -- I mean, Betsy is not
16 there to tell us what her -- her family dynamic is or
17 anything, and he would have been the next closest
18 person, so we would have talked to Mr. Faria.
19   Q.   Okay.  When you were looking at that body,
20 did you reach any -- did -- did you observe any facts
21 that would have led you to know how long the body had
22 been in the state of death as opposed to life?
23   A.   At that point, I don't -- I don't believe I
24 did.
25   Q.   Okay.  And we have said this is about an --
                            40

1  we -- we think 10:30 maybe, an hour after the call --
2     A.   I don't -- I don't recall the exact --
3     Q.   Okay.
4     A.   It -- it -- I would assume it would be
5  within an hour, and here's why, we have an hour to
6  respond to a scene.
7     Q.   Oh, --
8     A.   So --
9     Q.   -- okay.  okay.  So you -- the call at --
10  911 call came in, and at some point pretty soon
11  thereafter, you got a call to respond and you did?
12     A.   Sure.
13     Q.   Okay.
14     A.   Yes.
15     Q.   How long after you arrived -- how much time
16  passed until you had a chance to observe the body?
17     A.   I don't know.
18     Q.   I mean, was that one of the first things
19  you did or --
20     A.   I -- I don't know.  I don't know the order
21  in which things --
22     Q.   Okay.
23     A.   -- transpired.
24     Q.   Did you direct anybody else to do anything,
25  gather any facts?

41

1     A.   Not that I'm aware of.  No, sir.
2     Q.   Okay.  You went to the station.  You don't
3  remember whether you were in the car with Mr. Faria or
4  in a different car?
5     A.   Specifically, no.  Chances are I was in the
6  -- in a car with him.
7     Q.   Okay.  Remember anything that was said in
8  the car?
9     A.   Not specifically.  No, sir.
10     Q.   Did he seem shaken?
11     A.   Not that I recall.  I don't know.
12     Q.   Don't know.  Fair enough.
13     A.   No.
14     Q.   What happened when you got to the station?
15  And was this the -- is this the Lincoln County Sheriff's
16  Department?
17     A.   Yes, sir.  Again, I -- I -- I would have to
18  look at my report.  Chances are we took him to an
19  interview room and -- and either began talking to him or
20  -- I don't -- I don't know specifically what we did, you
21  know, in chronological order, but we would have gone
22  into an interview room and talked or gotten him a drink
23  or, you know, something to that effect.
24     Q.   Sure.  If he said he wanted a cigarette,
25  you got him a cigarette, right?

42

1     A.   More than likely, sure.
2     Q.   In fact, I was kind of curious about that.
3  Did -- you did get him a cigarette, right?  I mean, your
4  report says you did?
5     A.   Okay.  If my report says I did, --
6     Q.   Was it --
7     A.   -- I probably did.
8     Q.   Was it -- was it considered within the
9  rules to smoke in the Sheriff's Office?
10     A.   We would let people, considering the
11  circumstances.  We have let people, you know.
12     Q.   Would you call that no big deal?
13     A.   Yeah.  That's --
14     Q.   A guy wants a cig, let him have a cig?  His
15  wife just --
16     A.   Yeah.  I mean --
17     Q.   -- died, right?
18     A.   Yeah.  That's --
19     Q.   Okay.  Fair enough.
20     THE PLAINTIFF:  Can we take a quick break,
21  Bevis?  I got to go to the bathroom real quick.
22     MR. SCHOCK:  Okay.  Let's go off the
23  record.
24     (Break was taken.)
25     Q.   (By Mr. Schock)  Okay.  Let's go back on

43

1  the record.  I am going to ask two follow-up questions.
2  When you got to the scene, do you know if fire and
3  rescue and/or ambulances had -- were there?  Do you
4  remember that?
5     A.   I don't -- I don't remember if --
6     Q.   Do you know if they -- do you have
7  knowledge now as you sit here now whether they had come
8  and gone?
9     A.   I don't know who had -- who had come and
10  gone at that point.
11     Q.   When you got to the scene, was there a
12  person who was in charge of the scene?
13     A.   Not that I recall specifically.  I think
14  Deputy Hollingsworth was keeping the crime scene log.
15  We have an entry/exit/ingress/egress log, so they would
16  have -- they would have tracked that.
17     Q.   You remember somebody who was saying, I'm
18  in charge here?
19     A.   No.  I don't -- I don't recall anybody
20  saying that.
21     Q.   All right.  Let's go back to this interview
22  of Mr. Faria.
23     A.   Okay.
24     Q.   He told you a story of where he had been
25  that day and that evening, correct?

44

**Page 45**

1    A.   Correct.
2    Q.   And you then had something that you could
3 check on, fair?
4    A.   Fair.
5    Q.   And we'll put maybe those into two broad
6 categories.  One is things that could be checked on with
7 surveillance cameras like going to QT and things that
8 had to be checked on via human beings.
9    A.   Okay.
10   Q.   True?
11   A.   Sure.
12   Q.   And I want to ask you, did you do anything
13 to initiate the checking up on either of those two sets
14 of data points?
15   A.   If you consider asking for assistance
16 through Major Case Squad checking up on that, --
17   Q.   I sure do.
18   A.   -- sure.
19   Q.   So talk -- so let's go back to Major Case
20 Squad.  When did you find out that Major Case Squad was
21 on call-out?
22   A.   I -- it -- it would have been within the
23 parameters.  It would have been within four hours.  I
24 mean, they would have -- they would have been working on
25 resources within those four hours.

**Page 46**

1    Q.   Well, you were with Mr. Faria what I'm
2 kind of getting at?
3    A.   Mm-hm.
4    Q.   Did you -- were you coming out once in a
5 while and talking to other people in the law enforcement
6 where somebody said, Hey, Major Case Squad is coming;
7 Oh, okay; and that kind of a thing or --
8    A.   Yeah.  I knew they were coming and we would
9 have been preparing.  There's things we got to get out
10 and set up and make --
11   Q.   Yeah.
12   A.   -- available to them and stuff like that,
13 sure.
14   Q.   Well, Mr. Harney talked about that
15 yesterday.  Was -- wasn't -- didn't he do some of the
16 setup in the room and everything?
17   A.   Yeah.  Yeah.  He -- he handled some of that
18 and I handled some of that.  Sure.
19   Q.   Okay.  Routine?
20   A.   Yeah.
21   Q.   So how did it come about that the
22 information that Mr. Faria said he had been certain
23 places like the QT and the U-Gas was communicated to
24 Major Case Squad?  Did you have any function in that?
25   A.   I don't recall if I did or not.

**Page 47**

1    Q.   Okay.  You are aware that that information
2 was communicated to them?
3    A.   It would have been.  Sure.
4    Q.   You just don't -- but you were the one that
5 got that information with Mr. Harney, right?
6    A.   I wouldn't say I was the only person that
7 got that information.
8    Q.   Who was --
9    A.   I don't -- I don't know if another team of
10 detectives got that information or not.  I didn't see
11 their interview.
12   Q.   Who was with you interviewing Mr. Faria?
13   A.   I don't believe anybody was with me.  I
14 think it would have just been me and Mr. Faria.
15   Q.   There was a glass and people could observe,
16 right?
17   A.   Not necessarily.  There -- it's a -- it's a
18 four-walled room, but there's cameras, so you can
19 observe from a I'll call it a satellite room.
20   Q.   I understand.
21   A.   Okay.
22   Q.   Did -- you gathered this information that
23 he -- he said he had been various places that evening?
24   A.   Yes.
25   Q.   And then somehow that was communicated to

**Page 48**

1 the Major Case Squad.  Did you recommend or do you know
2 if someone recommended that, Hey, we ought to go get
3 this surveillance camera information and see if he's
4 telling the truth?
5    A.   I -- I don't know if it was or not.  They
6 came upon the information, I just don't remember how,
7 and they would have taken the steps to validate it, I'm
8 sure.
9    Q.   And as you sit here now, you know that that
10 happened?
11   A.   Yeah.  I know that happened.  Yeah.
12   Q.   Okay.  And you also know it checked out,
13 right, within -- pretty close?  He had one thing
14 backwards, right, --
15   A.   I -- I think so.
16   Q.   -- that day?
17   A.   I -- I don't -- I don't remember exactly.
18   Q.   But -- but his story of where he went as
19 far as being on camera was correct, right?
20   A.   I believe so.
21   Q.   In other words, this Arby's bag in his car,
22 right?
23   A.   If I remember correctly, sure.
24   Q.   Okay.  And that -- and it was determined
25 that in fact he was at Arby's, right?

1    A.    To the best of my knowledge. I --
2    Q.    Right.
3    A.    Like I said, these weren't my leads, so I
4 don't -- I don't know.
5    Q.    Well, you gathered -- you were the first
6 one to gather the information that he had been to those
7 places because he told you so, right?
8    A.    Correct.
9    Q.    And then what you're telling me is you
10 didn't go get --
11    A.    No. I didn't follow up.
12    Q.    -- the infor --
13    A.    Like I didn't go to Arby's or -- what was
14 the other place you said?
15    Q.    U-Gas, et cetera.
16    A.    Yeah. I didn't -- I didn't go to those
17 places.
18    Q.    I understand.
19    A.    Okay.
20    Q.    But you know -- I mean, you were involved
21 in this investigation for years going forward, right?
22    A.    Not necessarily. More -- I mean, I would
23 have had some duties in the initial part of it, but I
24 wasn't really as immersed in it as I am now until prior
25 to the second trial.

49

1    Q.    I understand. Okay. Now, let's go to this
2 second set of information, which is the part that had to
3 be verified by talking to people, and those --
4    A.    Okay.
5    Q.    -- would be the people who -- that he had
6 been at this game night with, right?
7    A.    Sure. Yes.
8    Q.    And he told you that he got together with
9 his pals on Tuesday nights and they played a board game,
10 right? You knew that from talking to him?
11    A.    Yeah. I believe that's what he said.
12    Q.    Okay. And so did -- do you remember that
13 you got their names?
14    A.    I -- I don't remember if I did. I mean, if
15 I did, I did.
16    Q.    Okay. Well, I mean --
17    A.    I don't remember if I asked specifically
18 who they were or anything.
19    Q.    Well, surely if -- if you're talking to a
20 guy whose wife just got murdered and he said during the
21 relevant time, I was with certain people, you would have
22 asked their names, wouldn't you have?
23    A.    Potentially, sure.
24    Q.    Just potentially?
25    A.    Yeah. No. I mean, knowing that Major Case

50

1 is coming to take over the investigation, I -- I might
2 not have wanted to, you know, talk to him as in detail
3 as the Major Case Squad would when they got there. They
4 essentially take over the investigation, so --
5    Q.    And --
6    A.    -- it's their decision if I stay in the
7 interview or not, and -- and at -- when they got there,
8 I didn't. I didn't stay in the interview.
9    Q.    Who took over the interviewing for you?
10    A.    There was -- there would have been two
11 detectives. I only know that Ray Floyd took it over,
12 him and somebody else. I don't know who the other
13 person was.
14    Q.    All right. Somehow the Major Case Squad
15 learned that there were four people he had been with,
16 right?
17    A.    I believe it was four. Yes, sir.
18    Q.    Okay. And somehow their names were
19 communicated to Major Case Squad, fair enough?
20    A.    Yeah. Yeah, or either they got them. I
21 mean --
22    Q.    And as you sit here now, you're aware that
23 those people were interviewed very early the next
24 morning, 6:00 or 7:00, on the 28th, correct?
25    A.    That's -- that sounds right. I know they

51

1 were interviewed. I'm not sure what time they were
2 interviewed.
3    Q.    Well, they were interviewed twice, right,
4 then and a couple days later?
5    A.    I'm not sure that all of them were. I -- I
6 think there was a follow-up interview done. I'm not --
7 I'm not sure. I -- like I said, I -- I didn't have any
8 involvement with that.
9    Q.    Okay. So at some point, you left Mr. Faria
10 and other people took over talking to him?
11    A.    Yes.
12    Q.    Okay. What was your next act that you
13 undertook in connection with this case?
14    A.    I -- I don't recall what order they were
15 in. There would be a lead sheet to say what I did next.
16 I -- I don't know exactly what --
17    Q.    Can you tell me some of the things you did?
18    A.    I believe I did I don't remember if it was
19 a search warrant for the phone itself or if it was for
20 electronic records from the service provider. It was
21 one of the two. I would -- I think I got call history
22 from the residence, then after that, I'm -- I would have
23 done the search warrant for the BLUESTAR.
24    Q.    Yeah. We're going to get to that in a
25 minute.

52

1     A.   Okay.

2     Q.   That's a few days later.

3     A.   Yeah.  Initially, I'm not sure exactly what
4  all I did.  I had a few tasks.  I think I had four or
5  five leads, not very many at all.

6     Q.   Do you think one of them might have related
7  to getting call history and all that, maybe --

8     A.   Yeah.

9     Q.   -- cell phone records or cell phone tower
10  history?

11     A.   Yeah.  Well, I don't -- that's the thing.
12  I don't remember what it was, if it was -- so we would
13  do a search warrant for what's physically on the phone
14  and then we would do a 2703 for the service provider
15  records.  I don't know which one I did.

16     Q.   Okay.  That's fair enough.

17     A.   Yeah.

18     Q.   Were you in communication with other
19  officers, the Maj -- this Major Case Squad, sort of
20  talking through this process of gathering information,
21  Oh, now we have information from his phone, now we've
22  got the cell tower records?  You knew as the -- did you
23  know in your role in this case what was going on in the
24  investigation?

25     A.   I -- I had a part in it.  I mean, I'm sure

53

1  I knew bits and pieces of it.  I didn't have everything
2  at my fingertips.  Oh, I did the autopsy, too.  I went
3  to the au -- I didn't do the autopsy.  I went to the
4  autopsy.  I attended it.

5     Q.   Okay.  So were you aware or did you have
6  any involvement in Mr. -- were you aware of or did you
7  have any involvement in Mr. Faria going to a polygraph
8  exam in Lake Saint Louis?

9     A.   I didn't know that occurred at the time.  I
10  didn't know that was occurring until after the fact.

11     Q.   Okay.  Did you suggest it or anything like
12  that?

13     A.   No.

14     Q.   Nothing to do with it?

15     A.   No.

16     Q.   As you sit here now, do you have any
17  knowledge of where the raw data from that polygraph is?

18     A.   No.

19     Q.   Have you ever heard any talk about where it
20  might be?

21     A.   No.

22     Q.   Have you ever heard any talk that it's
23  never been produced to the defense counsel at criminal
24  or to plaintiff's counsel in this case?

25     A.   No, sir.

54

1     Q.   Mr. McCarrick told us that he spoke to the
2  poly examiner and that Mr. Faria had flunked the poly.

3     A.   Okay.

4     Q.   Did you become aware of that on the 28th,
5  that day?

6     A.   Not that I recall.  No, sir.

7     Q.   Were you still devoting all your time to
8  this case?

9     A.   I would assume so.  Sure.  I mean, we would
10  be assigned to it until the Major Case Squad they call
11  it disbanded, they left, and then we'd go back to our
12  normal -- normal duties.

13     Q.   That was on -- according to Mr. McCarrick,
14  that happened on the 31st, about -- it was about a
15  four-day call-out.  Does that sound right?

16     A.   Yeah.  They're usually four or five days.

17     Q.   And I can't remember if I asked you this.
18  Were you technically a member formally of the Major Case
19  Squad at that time?

20     A.   I believe I was.

21     Q.   Okay.

22     A.   I'm -- I'm not entirely sure.  There's -- I
23  mean, we fill out applications for them, but I may not
24  have been a member of the Major Case Squad, but I was a
25  member of the host agency, so the host agency always

55

1  helps out and the Major Case supplements it and --

2     Q.   I understand.

3     A.   -- coordinates the investigation.

4     Q.   You've been on the Major Case Squad at
5  various times in your career; --

6     A.   Yes.

7     Q.   -- is that true?

8     A.   Yeah, in different capacities.

9     Q.   So Mr. McCarrick told us that when he spoke
10  to the poly examiner, he said, I concluded that Mr.
11  Faria was our guy.

12      I think that's a pretty -- pretty accurate quote
13  to what he said in his deposition a couple days ago.

14     A.   Okay.

15     Q.   Did you get the information that Mr. Faria
16  was the prime suspect at any time that day, the 28th,
17  the day after the murder?

18     A.   I don't -- I don't think it was ever
19  delivered that he was a prime suspect.  I think he was
20  the -- the suspect that we had at the time.

21     Q.   Okay.  Did you ever have on that very first
22  day a -- any information that there were any other
23  suspects?

24     A.   No.

25     Q.   Anything about Pam Hupp being a suspect?

56

1    A.    No.
2    Q.    Did you have anything to do with
3 interviewing Pam Hupp that day?
4    A.    No.
5    Q.    I know you talked to her in 2014 or '15,
6 right?
7    A.    '15.   '15, I think it was.
8    Q.    2015?
9    A.    Yeah.   Yeah.   Much later on.   Yeah.
10   Q.    Had you ever talked to her before then?
11   A.    Before 2015?
12   Q.    Correct.
13   A.    Not that I'm aware of.
14   Q.    See, we covered whole sections of the
15 deposition in one question.
16   A.    Whatever works for you.
17   Q.    When did you become aware that Mr. Faria
18 was being taken as the person who had murdered his wife
19 by law enforcement?
20   A.    I -- I don't know.   I -- I mean, it would
21 have been within those few days, but I don't remember
22 when it was.
23   Q.    Do you remember anything about Mr. Faria
24 being released on the 29th?   Were you -- did you have
25 any involvement in that?

                         57

1    A.    More than likely, No.   I don't -- I don't
2 think I did.   No.
3    Q.    Did you have any knowledge of the
4 communications between law enforcement, Sheriff's
5 Department employees, which you call I guess the host
6 agency?   Was that the term you used?
7    A.    Okay.   Yeah.   Yeah.   We would -- we would
8 have been the host agency.   Sure.
9    Q.    And Major Case Squad with the prosecuting
10 attorney's office?
11   A.    No.   I mean, for lack of better words, I
12 was a grunt, so --
13   Q.    Okay.   Did you have yourself any
14 communication with Miss Askey during say the time of the
15 call-out, yourself?
16   A.    No.
17   Q.    Are you aware of who spoke to her during
18 that time period?
19   A.    No.
20   Q.    Okay.   You don't remember or you -- and you
21 might have known at one time, or you just don't know and
22 you never did know?
23   A.    No.   No.   I didn't know and I still don't
24 know.
25   Q.    Okay.   Do you remember anything about Miss

                         58

1 Askey saying to people in the host agency and the Major
2 Case Squad that she did not have enough information to
3 charge Mr. Faria?
4    A.    Firsthand, no.   That was something that was
5 relayed to us -- relayed, and not just to me, it wasn't
6 one-on-one, but relayed to us by McCarrick.   It would
7 have been McCarrick.
8    Q.    Was that in one of those meetings or
9 something when he told you all that?
10   A.    It -- it may have been.   Sure.   I mean,
11 that -- I remember that's -- that's where it came from.
12   Q.    That was kind of the purpose of those
13 meetings, was to update people on major information?
14 That would be major information, fair enough?
15   A.    Yeah, to collaborate a little bit.
16   Q.    Yeah.   Sure.
17   A.    Been a while.
18   Q.    Of course.   And then was there -- she
19 actually was on TV, right?   Did you know about that?
20   A.    Who's that?
21   Q.    Miss Askey.
22   A.    No.   I'm not aware of that.
23   Q.    Aware of a -- a news article about it
24 indicating that she hoped to have information to charge
25 somebody?   Anything about that did you know?

                         59

1    A.    No.
2    Q.    So then we get the -- okay.   Let me ask you
3 one more question.
4    A.    Okay.
5    Q.    Do you remember anything else specifically
6 that you did regarding the Faria case, the Faria murder,
7 during the call-out?
8    A.    If I'm missing something, it's on a lead.
9 I mean, just like with the autopsy, that clicked a
10 little bit later, so -
11   Q.    Okay.   Call-out ended on the 31st.   People
12 mostly just took the weekend off, right, the holiday?
13   A.    Yeah.   Sure.   That would seem -- seems
14 correct.
15   Q.    And then -- then there was some discussion
16 of doing a BLUESTAR test.   Do you remember that?
17   A.    I don't remember -- I didn't have that
18 discussion.   If it -- it was had, it was had by other
19 people.
20   Q.    Well, did you participate in a BLUESTAR
21 test?
22   A.    I would have performed it.   Sure.
23   Q.    Okay.
24   A.    Yeah.
25   Q.    What were the events that precipitated your

                         60

**Page 61**

1 being the person who performed it? How did it come
2 about that you were the guy that did that?
3     A.  So I wasn't the one that obtained the
4 search warrant, but a search warrant was being obtained,
5 and I was told that that was one of the things that we
6 would need to do, and that's part of my -- excuse me --
7 part of my background, so --
8     Q.  Okay.
9     A.  Again, You're -- you're the grunt, go do
10 your job, that sort of thing.
11     Q.  Did you have prior training in how to do a
12 BLUESTAR test?
13     A.  Yes.
14     Q.  And had you had -- you have some -- some
15 kind of certificate or something on how to do that?
16     A.  I took -- so my -- my associate's in
17 criminal justice has an emphasis on forensic science, so
18 the prac -- I remember the practical in college, right,
19 so we covered a classroom full of pig blood, just
20 covered it, had it all cleaned up professionally, and
21 went back and BLUESTARRED. Well, it would have been
22 Luminal at the time, but did the chemical luminescence
23 test, so --
24     Q.  And was --
25     A.  I've had training in -- in -- what do they

**Page 62**

1 call it -- like controlled experiments, so, yeah.
2     Q.  When you did the academic version, you got
3 the pig blood, cleaned it up, and then used BLUESTAR,
4 did -- did the blood show?
5     A.  Yeah.
6          MR. RETTER: Used Luminal, to be clear, was
7 his testimony, if it matters.
8          THE WITNESS: Yeah. That would have been
9 Luminal.
10     Q.  (By Mr. Schock) Okay. And this test in
11 the Faria house was not Luminal. What --
12     A.  It would have been BLUESTAR.
13     Q.  Is it --
14     A.  Just another reagent.
15     Q.  Is there any material difference in the
16 two?
17     A.  It's the same product, just compet --
18 competing products. That's all it is.
19     Q.  Yeah. Same -- works in the same manner?
20     A.  Yeah. Sure.
21     Q.  When you were learning about BLUESTAR --
22 this was BLUESTAR, right? This was --
23     A.  Which time?
24     Q.  The -- the Faria case.
25     A.  Yes.

**Page 63**

1     Q.  When you were learning about BLUESTAR and
2 Luminal, --
3     A.  Yes.
4     Q.  -- did you understand that just because
5 there was illumination, that didn't mean that there was
6 blood?
7     A.  Correct.
8     Q.  It could be from something else?
9     A.  Correct.
10     Q.  And so would it be a fair statement that a
11 positive was not firm evidence of blood, but it was an
12 evidence -- evidence only that something had reacted
13 which was on the list of things that would react and it
14 could be blood?
15     A.  Could be. Yeah. It could be blood. One
16 of the things it could be. Sure.
17     Q.  If there was no reaction, then there was no
18 blood, right?
19     A.  Yeah. That's fair to say.
20     Q.  Okay. When you did the academic version
21 when you were in class and you put the pig -- pig blood
22 around the room, then you cleaned it up, and then you
23 did the BLUESTAR or the Luminal, whichever it was, did
24 -- did it illuminate?
25     A.  In -- in -- at school?

**Page 64**

1     Q.  Yes.
2     A.  In my college?
3     Q.  Yes.
4     A.  Yes.
5     Q.  Okay. So is it a fair statement then that
6 the power of this Luminal or BLUESTAR is that when it's
7 not visible with the naked eye, you might be able to see
8 it with the BLUESTAR? I mean, that's the --
9     A.  Yeah. Absolutely. Yes.
10     Q.  -- that's the point, right?
11     A.  I had to think about your question. Yeah.
12 Absolutely.
13     Q.  Okay. And in this case, there was some
14 discussion of the need for a BLUESTAR as re -- as it
15 might relate to paths from the body or paths in the
16 house. Do you remember that?
17     A.  I remember just the need for BLUESTAR.
18     Q.  So nobody ever told you what it was for or
19 what you were looking for?
20     A.  Well, they would have had to. They would
21 have said, We're looking for, you know, presence --
22 presence of a cleanup or something. I mean, We're
23 looking for blood. That's what BLUESTAR does.
24     Q.  Okay. So you knew that, but there was sort
25 of a logic to it that -- that -- maybe that where Mr.

1 Faria had gone? I mean, he was your suspect, right?
2    A.  I believe at that point, yeah.
3    Q.  Absolutely, right?
4    A.  Yeah.
5    Q.  So you could maybe -- let me ask you this.
6 In --
7    A.  Okay.
8    Q.  -- is it a principle of investigations that
9 if you have a suspect and there are known facts about
10 the suspect --
11    A.  Okay.
12    Q.  -- and there are known facts about the
13 scene, --
14    A.  Okay.
15    Q.  -- that if it is impossible for someone to
16 have done the crime because of the known facts having a
17 contradiction, that person is cleared?
18    A.  So it's either one or the other?
19    Q.  No. I'm just talk --
20    A.  You know what I'm saying? Like I feel
21 like --
22    Q.  No.
23    A.  -- we're saying there's -- there's only one
24 answer to that, and, I mean, certainly we're going to
25 have facts that don't support it and we're going to have

65

1 facts that do support it. It doesn't mean that one set
2 of facts speaks to guilt or innocence altogether.
3    Q.  Well, okay. Let me try to get at this a
4 different way. I was kind of taking an extreme case and
5 I want -- I want to kind of work an extreme case.
6    A.  Okay.
7    Q.  So we'll go back to the example we had
8 earlier in the day. Let's say there's a murder and you
9 talk -- there's a husband and wife, and you talk to the
10 children, and they say, Last week, dad said he was going
11 to kill mom.
12    A.  Okay.
13    Q.  That puts dad right in the bullseye as
14 being a suspect, right?
15    A.  Yeah. I mean, it depends on how the -- the
16 child's statement was obtained, but sure.
17    Q.  But, I mean, it would make -- it doesn't
18 mean he did it, but it means there's definitely -- he's
19 a suspect --
20    A.  Yeah.
21    Q.  -- at that point?
22    A.  There's some -- there's something we have
23 to look up.
24    MR. PLEBAN: Bevis, where are we going with
25 all this? I mean, you know -- you know, I guess we can

66

1 go through hypotheticals all day long. If you want to
2 cite one, Shockley is -- is a prime example of some
3 police officer who said he was going to kill a guy and
4 it turned out that he didn't. So, I mean, you know, I'm
5 not sure where we're going with all this.
6    I mean, you have a lawsuit. I got that. I mean,
7 it's -- it's kind of fun, I guess, to hypothesize all
8 this stuff, but I'm not sure that this is reasonably
9 calculated to lead to the discovery of admissible
10 evidence in this case. I mean, I'm willing to sit here
11 and indulge you, but, I mean, I just -- where are we
12 going?
13    MR. SCHOCK: Well, and I --
14    MR. PLEBAN: I mean, we can --
15    MR. SCHOCK: -- first --
16    MR. PLEBAN: -- we can argue it back and
17 forth, too. I mean, I don't -- you know, I just don't
18 know where we're going.
19    MR. SCHOCK: I think it's very important to
20 understand the man's understanding of how can -- how
21 these investigations are conducted and how people are
22 excluded, because that's where I'm going, because that's
23 really important to the case. It's the heart of the
24 case.
25    MR. PLEBAN: But he had a role here. Okay?

67

1 And -- and his -- his role, you know, a military term is
2 I guess he was a grunt in this. All right? He -- he
3 wasn't in a command position, so he had a role, he
4 performed that role. Okay? You're claiming that he did
5 that somehow improperly, the role that he performed.
6    Now, all these hypotheticals I'm not sure get us
7 any place, you know. Whether he agrees, disagrees with
8 somebody else's is -- is -- is not relevant here. So, I
9 mean, why don't we get to what he did and -- and -- and
10 find out what he did and what he didn't do? I mean,
11 that's why we're here, aren't we?
12    MR. SCHOCK: Well, --
13    MR. HEIGELE: Join.
14    MR. SCHOCK: -- I would like to continue
15 this line of questioning.
16    MR. PLEBAN: You're free to do that.
17    MR. SCHOCK: Okay.
18    MR. PLEBAN: I'm just not sure we're
19 getting any place though.
20    MR. SCHOCK: And I -- I think we are and
21 it's where I want to get, so if you --
22    MR. PLEBAN: Okay.
23    MR. SCHOCK: -- don't mind, and I -- and I
24 will certainly respect your desire to keep it moving.
25 Fair enough?

68

1    MR. PLEBAN:  Yeah.  Just show my objection
2  to the hypothetical and show mine as a continuing
3  objection --
4         MR. SCHOCK:  Absolutely.
5         MR. PLEBAN:  -- to the hypothetical so I
6  don't have to keep interrupting.  I don't want to
7  interrupt the flow.
8         MR. HEIGELE:  Join.
9    Q.  (By Mr. Schock)  Let's get back to it.
10    A.  Okay.
11    Q.  You have been trained in how to conduct a
12  criminal investigation, true?
13    A.  Yes.
14    Q.  And I think you said earlier that you
15  considered yourself in 2011 to be accomplished in that
16  field due to experience, mentoring and formal training,
17  correct?
18    A.  Yes.
19    Q.  Okay.  And is it true that you should
20  always examine your known facts against the suspect to
21  see if there are inherent contradictions which would
22  exclude possibly a suspect from having had committed --
23  having committed the crime?
24    A.  Yeah.  I mean, again, it's every fact.
25    Q.  Okay.  Well, there are certain facts
                    69

1  sometimes called forensic facts, right?
2    A.  Yes.
3    Q.  So for --
4    A.  Scientific, sure.
5    Q.  So, for example, there was no question that
6  Betsy Faria had been stabbed?
7    A.  Well, I mean, yeah, you could see that, at
8  least once.
9    Q.  And that's a little different from the time
10  of death, which is not -- that's a fact you would like
11  to know, but that's not an absolute, firm fact in this
12  case, correct?
13    A.  Yeah.  It's just -- it's another fact.
14    Q.  But there's a difference between those two
15  facts?  One is an absolutely known fact and one is a
16  fact you would like to find out, right?
17    A.  Yeah.  That makes sense.
18    Q.  Okay.  And, in fact, in this case, it's
19  really hard to know the exact time of death, right?
20    A.  I -- I don't know that.  I'm not -- that's
21  usually done by a medical professional.  I don't -- I
22  don't usually have any -- I -- I've never had any
23  involvement in determining the time of death.
24    Q.  Okay.  When you were involved in this
25  BLUESTAR test, --
                    70

1    A.  Yes, sir.
2    Q.  -- did anybody explain to you what the
3  purpose of the test was in terms of fitting into a
4  theory of how Russ Faria might have committed this
5  murder?
6    A.  To see if there was any -- any blood
7  evidence in certain areas of the house, specifically the
8  kitchen -- kitchen/dining room, I think it was.
9    Q.  Did anybody tell you why that might be
10  relevant to the investigation?
11    A.  I don't recall if we had a conversation
12  about it.  I -- I get kind of in a mode when I -- like
13  the forensics thing, that's -- that's my bread and
14  butter.  I like it.  I enjoy it.  That's why I went to
15  school for it.  So maybe I get distracted and -- and
16  really focused on what I'm doing and not what people are
17  saying, so I don't recall a conversation being had
18  specifically about it or -- you know, it was, We need to
19  test this area with BLUESTAR.  Let's do that.  I like
20  BLUESTAR.
21    Q.  Okay.  Now, how many times had you done
22  BLUESTAR tests before this?
23    A.  Blue --
24    Q.  And I am not talking -- let me back up.
25    A.  Okay.
                    71

1    Q.  I'm not talking about training.  I'm
2  talking about actually doing it in a investigation.
3    A.  BLUESTAR, I don't know.
4    Q.  Luminal?
5    A.  Luminal, maybe half a dozen times.  Not
6  very many.  The situation doesn't present itself very
7  often.
8    Q.  Okay.  So -- but you have experience with
9  it?  You used it a half a dozen, approximately, times?
10  You knew how to do it?
11    A.  In -- in an investigation; --
12    Q.  Correct.
13    A.  -- is that what you're asking me?  Yeah.
14  Yes.
15    Q.  And you had done it in the -- in practice
16  in school, too?  You just described that.
17    A.  Yeah.  I done it -- I've done it more in
18  practice.  I mean, again, that's my bread and butter.  I
19  like it.
20    Q.  Okay.  Is there a function of filming in
21  connection with a BLUESTAR test?
22    A.  Typically, sure.
23    Q.  And what is that function?
24    A.  To attempt to capture the chemical
25  luminescence in a photograph.
                    72

1     Q.   And it gets back to that pig blood we were
2  talking about where you cleaned it up and couldn't see
3  it with your eyes?
4     A.   Mm-hm.
5     Q.   But you could see it with the illumination
6  agent?
7     A.   Correct.
8     Q.   And then you take a picture of that to
9  record that, right?
10    A.   I don't know that we did in the -- in
11  college. I don't -- I don't remember taking
12  photographs. We very well could have, but I just don't
13  recall.
14    Q.   In all of your prior six approximate times
15  you had done these BLUESTARS, had you taken photographs?
16    A.   I don't recall specifically, no.
17    Q.   Do you --
18    A.   What we -- what we usually do is -- is, I
19  mean, we've -- you've got the BLUESTAR. That's a
20  presumptive test. So maybe I'll make a correlation
21  here. It's no different than if you're doing a PBT on
22  the side of the road. That's a presumptive test,
23  agreed?
24    Q.   Yeah.
25    A.   So we do the presumptive test and then we
                        73

1  back it up with -- with a forensic test like you're
2  saying, a scientific test. So, I mean, that -- that's
3  -- that's a forethought. I know that I'm going to try
4  to document, I'm going to see if it's present, and then
5  I'm going to back it up with a forensic test, too. I am
6  going to take samples. I am going to have somebody tell
7  me that there is or is not blood present, --
8     Q.   And that --
9     A.   -- so --
10    Q.   -- that happened in this case, right?
11    A.   The -- the items were seized. I -- I have
12  never seen the forensic reports for it. I -- I don't
13  know if it -- what it tested for or if it was tested or
14  anything.
15    Q.   So as you sit here right now, you -- if I
16  tell you right now that, in fact, the test came back
17  that the cabinets and the tiles that were seized were
18  negative for blood, this would be the first time you
19  ever heard of that?
20    A.   To the best of my recollection, yeah. I
21  have never -- I have never seen those forensic reports.
22    Q.   Okay. Well, had you ever heard that that
23  was the situation?
24    A.   Not that I remember. No.
25    Q.   You were in the room and participated in
                        74

1  covering the windows, right?
2     A.   Yeah. I would have had some role in that.
3  Yes.
4     Q.   Who was there? Who was there?
5     A.   Oh, there -- there was a handful of -- it
6  -- it takes more than one person.
7     Q.   Hang -- hang on one second.
8     A.   Okay.
9     Q.   This thing has stopped.
10         MR. SCHOCK:  I may be out of memory. I
11  don't know how to make it work, so I'm -- we're not
12  going to video anymore unless I can -- it's not working,
13  guys, so the video is over.
14         MR. RETTER:  Okay. At 10:55 a.m.
15    Q.   (By Mr. Schock) I asked you who was with
16  you when you did the BLUESTAR test?
17    A.   If I remember correctly, I -- I know
18  McCarrick was there, I want to say at the time her name
19  was Becky Mueller, and Tabitha, at the time her name was
20  Markwardt. Other than that, I don't -- there -- I -- I
21  know there was at least one other person there, I just
22  don't remember who it was.
23    Q.   And -- and there was a --
24    A.   Or maybe a couple. I don't know.
25    Q.   There was a search warrant to do that test,
                        75

1  right?
2     A.   Yeah. To the best of my knowledge, yeah.
3     Q.   Did you ever see it?
4     A.   I'm sure I did. I don't recall
5  specifically when or anything, but, yeah, I'm sure I
6  did.
7     Q.   Did you have knowledge that the scene had
8  not been secure between the time of Mr. Faria's release
9  on the 29th through the day of the BLUESTAR test?
10    A.   I don't know that I knew that at the time.
11  I believe I found that out later.
12    Q.   When -- in your work as a forensic person,
13  you said this is an area that you like to do and you
14  know a lot about it, right?
15    A.   I enjoy it, yes.
16    Q.   Well, do you consider yourself an expert in
17  that area?
18    A.   Nope. Nope. That's an ever-changing
19  field.
20    Q.   Try to keep up with it?
21    A.   The best I can, --
22    Q.   Okay.
23    A.   -- and I don't have much room for indulging
24  in the things I like in the current role I'm in --
25    Q.   Is it a --
                        76

1   A.  -- unfortunately.

2   Q.  -- true statement that a BLUESTAR test is
3  compromised if there has been a period of time before
4  the test when the scene was not secure?

5   A.  I don't know that.  I don't know if there's
6  a time frame on it or not.

7   Q.  Well, I'll submit to you that in this case,
8  the -- the -- the scene --

9   A.  Mm-hm.

10  Q.  -- the house --

11  A.  Mm-hm.

12  Q.  -- was secure, and you know that, the night
13  of the murder, right?

14  A.  Yes.

15  Q.  And there was an investigation done?

16  A.  Yes.

17  Q.  All right.  And then on the 29th, Mr. Faria
18  got to his house after his release and there were no
19  police there, there were no yellow tapes or anything.
20  Were you aware of that?

21  A.  No.  I mean, if -- if they weren't there,
22  they weren't there.  I wasn't there.

23  Q.  Okay.  And then you did this BLUESTAR test
24  on the 4th, right, 3rd or 4th?

25  A.  It was one of those.  I want to say it was

77

1  the 3rd.

2   Q.  Okay.  The 3rd?

3   A.  Okay.  Yes.

4   Q.  Did you have any concern that -- that if
5  you're looking for evidence of clean-up, that somebody
6  could have cleaned up later?

7   A.  Well, I'm going to go right back to I was
8  asked to perform a test, not -- not develop hypotheses
9  about what had happened in between.  I was asked to
10  perform a test.

11  Q.  Well, in your training, --

12  A.  Mm-hm.

13  Q.  -- did they tell you in connection with
14  BLUESTAR and Luminal tests, illumination tests, that you
15  should do it on a scene that's been secure?

16  A.  Not that I recall.  No.

17  Q.  Never came up?

18  A.  Not that I recall.  No.

19  Q.  Did it make logical sense to you?

20  A.  Well, I -- let's talk about rules of best
21  evidence.  Yeah, if we can have it secured, absolutely,
22  but, I mean, you see cases -- I have watched I.D.  You
23  see cases where they do BLUESTAR, you know, 25 years
24  later by pulling up carpet and something has been
25  saturated and BLUESTAR still reacts with it, because

78

1  there's -- the chemicals are still present to react with
2  it.  So, I mean, it's -- is it safe to say at that point
3  that that hasn't been secured for 20 years?  You know --
4  you know what I mean?  So that's -- again, that's why
5  it's a presumptive test.

6   Q.  Well, but your -- is it a fair statement
7  that one of the things you were looking for was evidence
8  of clean-up?

9   A.  I was looking for blood.

10  Q.  That's all?

11  A.  I -- I was looking for the positive
12  presence and a chemical reaction from BLUESTAR with
13  blood.  That's what I was looking for.

14  Q.  I understand.

15  A.  Okay.

16  Q.  So you participated -- let me ask you one
17  more question.

18  A.  Okay.

19  Q.  Did you all have a meeting before you went
20  over there to discuss what you were going to do and how
21  you were going to do it?

22  A.  We -- we may have talked about it.  I don't
23  know if it was a meeting.  I mean, we're not in one
24  office.  We weren't at the time.  It would have been
25  discussed.  I don't -- it wasn't -- from the best of my

79

1  knowledge, wasn't a -- a meeting.  We didn't gather in
2  one particular area.

3   Q.  How did you all decide who was going to do
4  what during the test?

5   A.  That -- we would have done that on the fly.
6  I was -- if I remember right, I was the only one that --
7  that had ever had any experience with that, so they --
8  they would have -- it would have defaulted to me to do
9  the actual application.

10  Q.  Now, the application consists of you got to
11  get the light out of the room, right?

12  A.  As best you can.

13  Q.  Which -- and you put up some cardboard on
14  the windows, things like that, correct?

15  A.  Yap.  Yap.

16  Q.  Did all that?

17  A.  Yap.  Yes.

18  Q.  You apply the illuminating material by some
19  kind of a spray or something; is that right?

20  A.  Yeah.  Well, it's -- it's really water that
21  you put a tablet in.  You know, you have to have
22  distilled water, and then you -- they -- depending on
23  the kit you're using.  So you can have a -- there's a
24  kit that comes in a box and it's what I'll call it
25  like a standard BLUESTAR application.  It comes with a

80

1 little spritzer. Or you have -- had at the time, I
2 don't -- I don't know what they've done now with it, but
3 you had a tube, looks like -- I can't think of it --
4 anyway, it's -- it's a tube and it has tablets in it, so
5 that's called -- that's a BLUESTAR magnum. That's a
6 higher concentrate. So you would mix that in a spray
7 bottle. So instead of a spritz -- I keep doing this,
8 but instead of a spritzer where you push down, it's a
9 spray bottle.
10    Q.   I understand.
11    A.   Okay.
12    Q.   And once the room is -- been darkened
13 by putting up cardboard and --
14    A.   Right.
15    Q.   -- closing all the curtains, it's ready to
16 go, right? You just go ahead and do it, fair enough?
17    A.   Yeah. I mean, you have to -- you have to
18 be mindful of what you're doing and where you're going
19 because you're in the dark, so --
20    Q.   Good point. Yeah.
21    A.   Yeah.
22    Q.   You have to know where the furniture -- in
23 fact, the pictures show the furniture kind of -- some of
24 the things were put up. Did you do that?
25    A.   I don't -- I don't think we did. No.
                           81

1    Q.   Okay. Maybe somebody else did that
2 earlier?
3    A.   Yeah. I don't know.
4    Q.   I mean, you don't want to bump into things.
5 Did -- fair enough? I mean, you don't want to get --
6 hit a table and get hurt or something, right?
7    A.   Yeah. I mean, it's dark, so you have to be
8 -- I mean, you have to be ready to -- to try to capture
9 it on film, too.
10    Q.   Would it be a fair statement that you don't
11 walk in the area where you are going to do your testing,
12 the relevant test area?
13    A.   Yeah.
14    Q.   Try to keep it pure?
15    A.   Sure, the best you can.
16    Q.   So once you do your -- you use that spray
17 bottle, right?
18    A.   Yeah. I believe I use the sprayed bottle.
19    Q.   And then how long does it take until this
20 thing starts to function?
21    A.   The -- the chemical luminescence is
22 actually a lot quicker. The -- the -- or is a lot
23 faster, but still slower than it -- than it fading. I
24 mean, it -- you have to -- it's a science experiment.
25 You -- you have to work with it. If you see some
                           82

1 luminescence, you have to watch what you're doing so you
2 don't overapply and make it runny. I mean -- I mean,
3 it's -- I can't give you bullet points of how you do --
4 like I say, you mix it up and you spray and you look for
5 chemical luminescence. That's what you do.
6    Q.   Okay.
7    A.   I mean, you just got to kind of play with
8 what -- what the scenario is that you're given.
9    Q.   Do -- do you spray it -- so here -- here we
10 are in this room, it's whatever it is, I don't know, ten
11 feet by fifteen feet.
12    A.   Okay.
13    Q.   Do you just kind of spray it around the
14 room or do you spray it on the areas you want to look
15 at?
16    A.   You -- you try to do like a swath, like an
17 overall, and you -- you follow your trail, follow your
18 trail if you have one. If you don't have one, I mean,
19 you're -- I mean, if you don't have anything to follow,
20 you're not following it, right? So you got an idea of
21 where something may have happened and you start there.
22    Q.   Okay.
23    A.   And I -- I always try -- I don't -- I mean,
24 there's no clear-cut way of how to do it, but I always
25 try to start at the furthest point from my egress so I
                           83

1 can work backwards. Does that make sense?
2    Q.   Toward the egress?
3    A.   Yeah. Like find a safe way in and then
4 work backwards, so --
5    Q.   Okay.
6    A.   I mean, we boot up and do all that stuff,
7 too.
8    Q.   Right. Did -- you did all that in this
9 case?
10    A.   Yeah.
11    Q.   Doesn't work on rugs, right?
12    A.   What doesn't?
13    Q.   The -- the illumination.
14    A.   No. It should.
15    Q.   Should? It works on the rug?
16    A.   Yeah.
17    Q.   Did you -- did the place where the body was
18 light up? Right?
19    A.   I don't know that we did -- I don't
20 think --
21    Q.   Did you spray there?
22    A.   Yeah, and I think there was some -- I think
23 the rug was -- the carpet was removed, --
24    Q.   Oh.
25    A.   -- if I remember right.
                           84

1    Q.   I see.  So you did this test, and I would
2  like you to tell me what you saw that illuminated.
3    A.   What areas of the kitchen?
4    Q.   Correct.  Well, anywhere in the house that
5  you saw illuminated, --
6    A.   There --
7    Q.   -- I want you to tell me.
8    A.   From what I remember, it -- it -- it was a
9  faint luminescence, and kind of patchy areas, and then
10  there was -- it looked like it was on a cabinet face, so
11  those would have been areas of interest that we would
12  have -- would and apparently did seize to do forensic
13  testing on.
14    Q.   Okay.  So you saw a cabinet area?
15    A.   A cabinet facing.
16    Q.   Yeah.
17    A.   And I want to say, I'm not 100 percent
18  sure, but I want to say it was to the -- like if you're
19  looking, it's a galley kitchen, so if you're looking
20  down the galley, it's to the right.  I'm pretty sure
21  that's where it was.
22    Q.   And in your training and experience, is one
23  of the things you're supposed to look for wiping
24  motions?
25    A.   You -- you can.  I mean, that's -- if
                          85

1  you're going to further assess the -- the scene, then,
2  yeah, I mean, you can see if there's wiping motions.
3  Sure.
4    Q.   And -- and sometimes those show up, right?
5    A.   Sometimes.  I mean, every case is
6  different.
7    Q.   Have you ever seen those show up?
8    A.   In any case?
9    Q.   Have you ever seen wipe -- yes.
10    A.   Yeah.  We -- I've staged that in -- in
11  practicals and stuff before.  Like we -- we -- I
12  remember we specifically did that in college.
13    Q.   And by that, you mean you would maybe wipe
14  some blood on a flat surface and then it would -- you
15  would see the place where the wiping had occurred?
16    A.   Yeah.
17    Q.   All right.  Did you see any wiping in this
18  case?
19    A.   Not that I recall.  I remember it just
20  being areas where it looked like the -- well, not looked
21  like -- where the chemical luminescence was present.  I
22  mean, there was just areas.
23    Q.   Did it show a pathway?  Sort of -- you
24  know, did you see luminescence in a line going in any
25  particular direction?
                          86

1    A.   I wouldn't say it was in a straight line,
2  but it was towards a general area, it seemed.  I mean,
3  it was -- again, we've got to act quick, we've got to be
4  fluid with this, so it was in a general direction, I'll
5  say.
6    Q.   Was there more than one path?
7    A.   I remember there being certain areas that
8  -- I mean, it would have -- it would have suggested that
9  there was two different directions that were traveled or
10  they could have all been traveled at once.  I don't
11  know.
12    Q.   Okay.  Did you take photos?
13    A.   Yes.
14    Q.   Is that part of the standard protocol?
15    A.   There -- we don't really have a standard
16  protocol for it, but that would be something that I
17  would attempt to do, sure.
18    Q.   Have you done photographs in every case you
19  have worked on that was -- what did you say -- it was
20  approximately six?
21    A.   I don't know.  I don't know if we had the
22  ability to take them early on.  We haven't had as
23  advanced -- as advanced of equipment as we do now.
24    Q.   Okay.
25    A.   So if I would have done one back in like
                          87

1  2004, I don't -- we would have had a 35 millimeter then.
2  You would have had to overexpose, so I -- I don't know
3  if I took photos on those or not.
4    Q.   There's some kind of a specialized camera
5  that's used, right?
6    A.   Not necessarily.  You can do it with a 35
7  millimeter.
8    Q.   Okay.  Some kind of a filter that's used?
9    A.   Hm-mm.
10    Q.   You just -- any old -- I mean, could you do
11  it on your iPhone?
12    A.   No, because you can't -- well, not that I
13  know of.  I can't control the -- the aperture and the
14  shutter speed on my iPhone, so you have to manipulate
15  the camera --
16    Q.   Okay.
17    A.   -- to be able to manipulate the camera.
18    Q.   Did you know how to do that?
19    A.   Yeah.
20    Q.   Okay.  That's part of your training and
21  experience?
22    A.   More my experience than anything, yeah.
23    Q.   Okay.  And you took those photos?  You took
24  a lot of photos, right?
25    A.   We -- we took a lot of photos.  It --
                          88

1 again, it's all hands on deck when you're doing
2 something like this, so more than one --
3     Q.   How many cameras were there?
4     A.   There would have just -- well, there -- we
5 probably would have had both our cameras out there.  I
6 don't recall if we had both of them or not.
7     Q.   Okay.  Who's we?  I mean, I didn't know
8 there were two cameras until right now.
9     A.   The people that I said were out there
10 before.  We would have had --
11     Q.   Okay.
12     A.   -- our cameras.
13     Q.   Did you operate a camera?
14     A.   I -- I'm sure I did at some point in time.
15 Yeah.
16     Q.   Do you know who else operated a camera?
17     A.   No.  It -- it would have been one of the
18 other crime scene -- crime scene people, so it would
19 have been Tabitha or Becky.
20     Q.   Did you have any knowledge at that time
21 that there were any problems with the camera?
22     A.   We knew -- we didn't know what -- how the
23 cameras were affected.  We knew that our equipment
24 wasn't the best.  So, again, that's -- that's why we try
25 to bolster things with forensic evidence, too.

                    89

1     Q.   You mean taking the cabinets in and sending
2 them to the lab?
3     A.   Mm-hm.
4     Q.   How many photos do you think you took?
5     A.   I don't know.
6     Q.   Do you know how many photos the other
7 person took?
8     A.   No.  Again, it's -- it's all hands on deck.
9 We're just trying to get the process done.
10     Q.   How long do you think you spent taking
11 photographs, if you can make an estimate?
12     A.   I -- I can't.  I don't know.
13     Q.   I mean, does this take an hour or does this
14 take five minutes or somewhere in between?
15     A.   Anywhere in between.  I mean, it -- I don't
16 -- I don't think it would have taken five minutes.  It's
17 -- again, you're working in the dark.  You're dealing
18 with all these variables, and there's no way to put a
19 specific time on it.
20     Q.   Okay.  Now, then, the photographs -- well,
21 after -- after you took the photographs, did you do
22 anything else?
23     A.   We -- you know, we would have tried to --
24 we try not to leave people's houses a mess, so, I mean,
25 we would have undone what we did.

                    90

1     Q.   Ah.  Right.
2     A.   So --
3     Q.   Take -- take the cardboard off?
4     A.   Yeah.  Yeah.  Yeah.
5     Q.   Okay.  And then you -- you left, fair
6 enough?
7     A.   Sure.
8     Q.   Write a report?
9     A.   Yeah.
10     Q.   And then when is the next time you saw the
11 photographs?
12     A.   I don't -- I don't remember exactly when I
13 saw them next.
14     Q.   What was your job once the photographs were
15 taken as far as getting the photographs developed?
16     A.   We don't develop our photographs typically.
17 We put them on a disc and put them into evidence.
18     Q.   Put them into evidence?
19     A.   Yeah.
20     Q.   Did you have anything to do with that
21 process?
22     A.   I don't know if I did or not.  That -- that
23 may have been handled by the evidence techs also.
24     Q.   So it's a digital camera?
25     A.   Yeah.  Those -- yeah.  That was a digital.

                    91

1 Those photographs were with a digital camera.
2     Q.   And did -- so did you -- and I'm sorry.
3 Maybe you said the answer.  I didn't get it.  Did you
4 put the photographs on the disc or did somebody else do
5 that?
6     A.   I don't recall.
7     Q.   Don't recall?
8     A.   I have done that 1,000 times.
9     Q.   Know how to do it?
10     A.   Yeah.  I mean, I have no problem --
11     Q.   Easy-peasy?
12     A.   Yeah.
13     Q.   And how long after the BLUESTAR -- BLUESTAR
14 test do you think you put it on the disc?
15     A.   Again, I don't know that I did, and I don't
16 -- I'm not sure.
17     Q.   Did you, in connection with the -- any part
18 of this case, come to look at those photographs again?
19     A.   Yeah.  I -- I would have looked at them at
20 some point.
21     Q.   When's the next time you looked at those
22 photographs?
23     A.   I don't know.
24     Q.   Were the photographs on one of these
25 cameras where you can kind of -- after you have taken

                    92

1 the photo, you can flip through and actually look at the
2 screen and see the photographs you have taken?
3    A.   I think so.  Yeah.
4    Q.   Okay.
5    A.   I think so.
6    Q.   Did you look at them --
7         MR. RETTER:  Just one point of contention,
8 if you don't mind, Bevis.  I'm not sure if we know even
9 the first time yet when he saw the photographs, if that
10 makes any sense to you.  You said the next, and I'm just
11 not sure when the first was.
12        MR. SCHOCK:  Fair enough.
13    Q.   (By Mr. Schock) I was -- just I was trying
14 to get to this idea of flipping.  Some of these cameras
15 I have seen, you take a picture and you can -- you can
16 actually look at a screen --
17    A.   Yeah.  It's -- it's got a --
18    Q.   -- and see it?
19    A.   -- like an LCD screen that like you can
20 preview.  Yeah.
21    Q.   And did you preview the photos you took
22 when you were at the scene?
23    A.   Not that I remember.  No.
24    Q.   Did you look at the photos as you were
25 putting them on the disc?

93

1    A.   I -- again, I don't know that I did put
2 them on the disc.  I -- I don't recall doing that or --
3 I could have, but I don't remember.
4    Q.   At some point, did you reach a conclusion
5 that there was a problem with the camera and/or the
6 development of the pictures?
7    A.   Yes, at some point, I mean, obviously.
8    Q.   What -- what was the problem?
9    A.   I -- I don't know exactly like technically
10 what the problem was, but there was -- there was a
11 problem according to Nikon with -- I mean, we would have
12 to look at the service records, but we had to send them
13 in to Nikon to fix them.  Yeah.  Nikon.
14    Q.   Okay.  Did you see the photographs before
15 the first trial, either on the screen of the camera or
16 as a result of pulling the data off the camera, looking
17 at it on a computer, or any other method?
18    A.   I -- I don't remember if I did or not.
19    Q.   Well, you testified at the first trial that
20 they showed absolutely nothing, right?
21    A.   Okay.
22    Q.   Does that sound right?
23    A.   That's -- that's what I testified to.  Yes.
24    Q.   Well, if you -- do you agree that if you
25 testified to that, you must have seen them?

94

1    A.   Yes.
2    Q.   And do you remember at the second trial,
3 the photographs were produced to you, right?
4    A.   Yes.
5    Q.   And they did show some luminescence, right?
6    A.   What's that?
7    Q.   The photographs.
8    A.   I -- I don't -- I don't remember.  That
9 wasn't asked of me in the second trial to the best of my
10 knowledge.  From -- from what I remember, that -- it
11 wasn't asked if -- if the photographs showed
12 luminescence, so I don't -- I don't remember looking for
13 that in the photographs.
14    Q.   Okay.
15    A.   And then I think that goes back to the
16 first trial also, is that there was -- there was a
17 mischaracterization of what I was saying, was -- like
18 you just asked me, was there luminescence in the photos,
19 so my answer to that in the first trial was, No, they
20 didn't show anything, they showed nothing.  So they
21 didn't show any luminescence.
22        Obviously, if you open a shutter on a camera,
23 you're going to get something.  That's a photograph --
24 it could look pitch black.  That's a photograph of
25 something.  There's just not enough light there to

95

1 expose what it is.
2    Q.   Yeah.
3    A.   So --
4    Q.   Let's -- let's look at a -- at a -- at a
5 page here.  Okay?
6    A.   Okay.
7    Q.   Okay.  So we're going to go to page
8 Plaintiff's 1863, and, sir, we have these books over
9 here, and I will show you a picture, which will not be
10 very good.
11    A.   Good Lord.
12        MR. HEIGELE:  Do you know which tab that
13 is, Bevis?
14        MR. SWANSON:  I want to say 52.
15    Q.   (By Mr. Schock) Okay.  Sir, I'm going to
16 hand you a book, and this is a binder with a bunch of
17 pages in it.
18    A.   Okay.
19    Q.   And what we are doing in this process is we
20 printed out all these endless pages of data, and that's
21 page, as I said, 1863, and, obviously, in front of you,
22 there's kind of a smudge, it's kind of hard to see
23 there, right?
24    A.   Yeah.
25    Q.   I have a better of that on my computer, and

96

7 4 7

1 let me show it to you, if I may.
2    A.   This is a -- like a black and white
3 photo --
4    Q.   Yeah.
5    A.   -- black and white copy of a photo.
6    Q.   And I'm going to -- now I'm going to show
7 you -- you guys can see it's the one that's -- it's 1763
8 -- 1863, and this is one of the photos you took, and
9 there's a smudge there, right?
10    A.   That looks like it.  Yeah.
11    Q.   Is that what luminescence looks like on a
12 photo?
13    A.   It could.  Sure.
14    Q.   Okay.  So, at least for that photo, there
15 was some luminescence, right?
16    A.   Yes.
17    Q.   And there's some other smudges on some
18 other photos.  Do you agree with that?
19    A.   I -- I would have to see them.
20    Q.   Okay.
21    A.   I mean, I would have to look at them.
22         MR. SCHOCK:  Can you find me one?
23    Q.   (By Mr. Schock)  He'll find one of those.
24    A.   Okay.
25    Q.   Now, this is about as small as you're going

97

1 to get.  Let's go to page 1850, please.
2    A.   Mm-hm.
3    Q.   I know it's hard to see, and the numbers
4 are on the side.  Do you see there?
5         MR. RETTER:  Yeah.  There's page PLT 1850.
6    A.   1850, you said?
7    Q.   (By Mr. Schock)  Yeah.
8    A.   Okay.
9         MR. SCHOCK:  And -- and here's a -- here --
10 here it is on the computer, guys, like this?
11         MR. HEIGELE:  Mm-hm.  I got it.
12    Q.   (By Mr. Schock)  And there's -- at the top,
13 there's -- in the -- in the colored one, there's a red
14 on the right and a green on the upper left.  Do you know
15 what those things are?
16    A.   Not off the top of my head.  No, sir.
17    Q.   Okay.  And if you look down, you almost
18 have to be Sherlock Holmes, but --
19    A.   I'm getting a little glare.
20    Q.   -- there is -- there is a little blue mark
21 on there, right?
22    A.   Yap.
23    Q.   Okay.  Now, are you trained to look for
24 very small mark -- small evidence of luminescence like
25 that?

98

1    A.   We're just look -- we're supposed to look
2 for the presence of it, so any presence of it.
3    Q.   Okay.  So --
4    A.   Not specifically trained to say, Hey, find
5 the small marks.
6    Q.   Right.
7    A.   Just find it.
8    Q.   Find all the marks, right?
9    A.   Use it and find it.  Yeah.
10    Q.   Okay.  So the fact that a mark is small
11 doesn't mean it would be ignored?  I mean, in fact,
12 you're supposed to see the small ones and the big ones,
13 fair enough?
14    A.   Yeah.  That's fair.
15    Q.   Okay.  All right.  All right.  Do you know
16 as you sit here today how the photographs ended up in
17 the hands of defense counsel?
18    A.   No.  I do not.
19    Q.   You were presented with the photographs in
20 the second trial, right?
21    A.   Yes.  Not all of them.  Some of them, yes.
22    Q.   Okay.  And did you make any representations
23 after the BLUESTAR test to any person that you had seen
24 a path to any particular part of the kitchen?
25    A.   I -- I don't recall if I did or not.

99

1    Q.   Okay.  Did anybody ask you if you had seen
2 a path to any part of the kitchen or any other part of
3 the house?
4    A.   I don't recall if I -- I don't recall if
5 they did or not.
6    Q.   Okay.
7         MR. SCHOCK:  It's 11:20.  I'm at -- I'm at
8 a logical break time for me.  Are -- are you guys
9 comfortable with it?
10         MR. PLEBAN:  I need a potty break.
11         MR. SCHOCK:  Okay.  Let's go ahead and
12 break.
13         (Break was taken.)
14    Q.   (By Mr. Schock)  So let's go back on the
15 record.
16    A.   Okay.
17    Q.   Mr. Merkel, --
18    A.   Sure.
19    Q.   -- you said that you turned those photos
20 into evidence and put them -- you had them on some kind
21 of a disc and you turned the disc into evidence?
22         MR. RETTER:  I think that mischaracterizes
23 his testimony, Bevis.
24         MR. SCHOCK:  That's why I was asking, to
25 get that straight.

100

1    A.   Yeah.  It -- it would have been done.  That
2  would have been the process.
3    Q.   (By Mr. Schock)  Okay.
4    A.   Whether or not I did it, we do that so
5  much, each one of us do that so much, so I can't say
6  that I did it in this specific case.
7    Q.   Okay.  You don't remember doing it?
8    A.   No.  I don't.
9    Q.   But you understand it was done.  When that
10 is done by you, do you always have a look at the photos
11 before you put them on the disc?
12   A.   Not always.  No.
13   Q.   Did you do that in this case?
14   A.   I don't recall.  I don't know if I did or
15 not.
16   Q.   Okay.  Do you know anything about what
17 happened to that disc after it went into the evidence?
18   A.   No.
19   Q.   Have you received -- and I am just going to
20 fire these because I have them on my list.
21   A.   Okay.
22   Q.   Not in order.  Have you received any
23 information from Lincoln County as to whether they're
24 going to indemnify you in this case by either providing
25 a defense for you, paying any settlement or paying any

101

1  judgment?
2    A.   No.  I'm not even sure what you're talking
3  about, so I can --
4    Q.   Okay.
5    A.   -- say no.
6    Q.   Well, let's say that -- I have a right to
7  know about insurance coverage and --
8    A.   Okay.
9    Q.   -- sources of payment, so has -- has
10 Lincoln -- has anybody from Lincoln County told you
11 anything about that subject?
12   A.   No.
13   Q.   Okay.  You understand that there's a
14 lawsuit pending?
15        MR. PLEBAN:  You are talking about other
16 than the lawsuit?
17        MR. SCHOCK:  That's what I'm -- that's what
18 I'm getting at.
19        MR. PLEBAN:  Yeah.  All right.
20   Q.   (By Mr. Schock)  You understand there's a
21 lawsuit pending, right?
22   A.   The -- in addition?  What do -- what do we
23 call it, the underlining suit?
24   Q.   This is the underlining suit.
25        MR. PLEBAN:  Yeah.

102

1    Q.   (By Mr. Schock)  That's the insurance
2  coverage suit.
3    A.   Okay.
4    Q.   You got served in that case?
5    A.   Yes.
6    Q.   You're represented in that case?
7    A.   Yes.
8    Q.   And I am asking if there's any information
9  that anybody has provided you other than that?
10   A.   No.
11   Q.   Okay.
12   A.   I haven't had much, if any, information on
13 that one.
14   Q.   Sir, you had an interview with Miss Hupp in
15 June of 2015; is that right?
16   A.   Sounds right.
17   Q.   Okay.
18   A.   Would have been '15.  Yeah.
19   Q.   Okay.  And how did it come about that that
20 interview occurred?
21   A.   I think that was the one where she -- she
22 either just showed up or called.  I don't know how she
23 ended up there, but we -- we interviewed her.  She
24 wanted to talk to us, so we talked to her.
25   Q.   Okay.  Did -- do you recall who was we?

103

1  Who -- who interviewed her?
2    A.   I just -- I really just remember Harney and
3  I being there, Pat and I being there.
4    Q.   Okay.  Right.  Pat Harney, right?
5    A.   Yeah.
6    Q.   We talked to him yesterday about it?
7    A.   Yeah.
8    Q.   And do you remember him saying anything
9  about a theory he had of the case?
10   A.   Yeah.  I mean, we throw around the ideas
11 that we have sometimes.  Yeah.
12   Q.   To witnesses?
13   A.   Oh, yeah.  We -- yeah.  I mean, it's -- I
14 mean, it's -- it's a volley.  It's a dialogue.  We just
15 make conversation.
16   Q.   Okay.  And you recall that Mr. Harney maybe
17 told her that he thought Russ had come home and that was
18 why Pam Hupp had left?  Does that ring a bell?
19   A.   I remember that being part of it.  I mean,
20 I don't know at what lengths they talked about that.
21   Q.   Do you remember why that was -- I mean, I
22 think he -- I think Mr. Harney said, Merkel and I think,
23 and sort of described something like that?
24   A.   Okay.  If -- if he said that, it will be in
25 a -- I think it's transcribed or --

104

1    Q.   Yeah.  It's transcribed.
2    A.   Okay.
3    Q.   I mean, I'm just giving you a quick, just
4 kind of --
5    A.   Okay.
6    Q.   -- getting to the point here.  But did you
7 in fact think that was so?
8    A.   I don't know if I did or not.  I don't
9 recall having that conversation.
10    Q.   Do you -- do you agree with the statement
11 that sometimes police officers will throw something out
12 like that to a witness just to see their reaction?
13    A.   Yeah.  I mean, I can't speak for every
14 police officer.  I mean, some may do it, some may not.
15    Q.   Do you do that sometimes?
16    A.   It depends on the case.  I mean, I -- I
17 could.
18    Q.   Do you -- is that an ethical problem if you
19 -- if you state something that you would say, Hey, I
20 think this happened, if it's -- if it's in fact not what
21 you thought happened?
22        MR. HEIGELE:  I'll object as to a legal
23 conclusion, but --
24        MR. PLEBAN:  As a matter of fact, the
25 courts have held that police officers have the right to
                        105

1 lie to suspects, but independently of that.
2        MR. RETTER:  You can answer as to whether
3 or not it's an ethical problem to you or not.
4        Fair enough, Bevis?
5    A.   I would -- I would consider it, I guess, I
6 mean.
7    Q.   (By Mr. Schock)  To be what?
8    A.   If we're lying to somebody?  Yeah.  I
9 don't --
10    Q.   That's not good?
11    A.   I -- I wouldn't practice it.
12    Q.   Okay.  Let me ask about some other
13 principles.  Do you agree that in -- in investigations
14 of homicides, that the officers working on the case
15 should keep an open mind as to who committed the crime?
16    A.   Well, that's with every case.  Yeah.
17    Q.   Okay.
18    A.   I mean, not just homicides.  Sure.
19    Q.   Right.  And consider all facts?
20    A.   Yeah.  That's -- again, right back to the
21 beginning, we're fact gatherers.
22    Q.   Not ignore facts?
23    A.   No.
24    Q.   Okay.  I mean, you have called yourself a
25 grunt as though you had no --
                        106

1        MR. PLEBAN:  Actually, I did, but --
2        MR. SCHOCK:  No.  He did, too.
3        MR. PLEBAN:  Oh, okay.
4        MR. SCHOCK:  That was his word.  He -- he
5 put it in your mind.
6        MR. PLEBAN:  Okay.
7    Q.   (By Mr. Schock)  But were you a grunt
8 throughout this investigation, or did you have some
9 processes of actual analysis and thought in which you
10 considered the facts as against the question of who
11 might have committed the crime?
12    A.   I mean, everything that I developed and --
13 and cultivated, I -- I -- I knew it was part of a bigger
14 picture, so, I mean, I would take the facts that I have
15 and I would give them to somebody and say, Here's your
16 facts, run with it, and if you have any questions about
17 it, come back and ask me if it needs clarification.
18    Q.   And you were in some of those meetings we
19 have already talked about during the four-day call-out,
20 right?
21    A.   Yeah.  I -- I can't say I was in every one,
22 but, --
23    Q.   Right.
24    A.   -- yeah.
25    Q.   We covered that.  Was Miss Askey in some of
                        107

1 those meetings?
2    A.   I don't recall.
3    Q.   Did you have any conversations with Miss
4 Askey about theories of the case as to how Mr. Faria
5 might have committed the crime at any time?
6    A.   Not that I recall.  No.  I mean --
7    Q.   Did you have any discussions with Miss
8 Askey about whether Mr. Faria committed the crime?
9    A.   Yeah.  I -- I have maintained I still
10 believe Russ did it.
11    Q.   Okay.  To this day right now based on all
12 facts and everything you know?
13    A.   Yap.
14    Q.   Now, you're aware that -- well, maybe
15 you're not aware.  Let me tell you something Mr.
16 McCarrick said.
17    A.   Okay.
18    Q.   He said that all of the police officers in
19 that call-out, by the end of the call-out, believed that
20 Russ Faria committed that crime after he came -- he had
21 driven home after game night, so roughly 9:30 until the
22 phone call at 9:40 --
23        MR. PLEBAN:  Well, hold on.  Who wants to
24 go first?
25        MR. RETTER:  I -- I have to at least object
                        108

1 to the extent that mischaracterizes Mr. McCarrick's
2 testimony.
3          MR. PLEBAN:  It absolutely does.
4          MR. HEIGELE:  And I join.
5          MR. SCHOCK:  Which I don't think it does.
6          MR. PLEBAN:  Oh, okay.
7          MR. RETTER:  And you can answer.
8          THE WITNESS:  Okay.
9          MR. PLEBAN:  We can disagree.
10    A.    Can you start over, please?
11    Q.    (By Mr. Schock)  Sure.
12    A.    Okay.
13    Q.    I'll ask it a different way to try to --
14    A.    Okay.
15    Q.    -- soften up these objections.  Mr.
16 McCarrick stated that the officers had reached the
17 conclusion, based on all the evidence that they
18 considered, that Mr. Faria committed this murder after
19 he returned from game night, and he had left the area to
20 the south about 9:10 or so, gotten there around 9:30,
21 roughly.
22          MR. RETTER:  Same objection.
23          MR. PLEBAN:  Same objection.
24          MR. RETTER:  Do answer the question.
25          MR. PLEBAN:  I don't think you softened it.
                                                     109

1          MR. RETTER:  There wasn't a question, I
2 don't think, but same objection.
3          MR. SCHOCK:  Okay.  Can we let that be
4 continuing while I finish the question?
5          MR. RETTER:  We sure can.  Absolutely.
6          MR. HEIGELE:  Sure.
7    Q.    (By Mr. Schock)  Did you reach that
8 conclusion?
9    A.    I didn't have all the facts at the time.  I
10 wasn't -- I didn't have the amount of exposure McCarrick
11 did at that time, --
12    Q.    Right now, --
13    A.    -- so I wouldn't have --
14    Q.    -- do you have an opinion about when Mr.
15 Faria committed this murder that you said you just
16 believe he did commit?
17          MR. PLEBAN:  I'll object on the basis of
18 relevancy.  It's not reasonably calculated to lead to
19 the discovery of admissible evidence, and it calls for
20 conclusion, speculation and conjecture, but subject to
21 that, have at it.
22          MR. HEIGELE:  Join.
23          MR. RETTER:  I'll join, but do answer the
24 question.
25    A.    Okay.  Can you repeat it?
                                                     110

1          MR. SCHOCK:  Please repeat the question,
2 Tami.
3          (Reporter read back from the record.)
4    A.    Based on what I know, based on the
5 information that I have, which I'm not even sure if it's
6 everything, yeah, I -- I still believe that.
7    Q.    (By Mr. Schock)  You believe that he did it
8 at 9:30 as opposed to earlier in the night?
9    A.    Oh, no.  I don't have a timeline.  I don't
10 -- I don't have enough information to determine that.
11    Q.    So you don't have an opinion as to when he
12 committed that murder?
13    A.    Not -- not a rock solid opinion, no.
14    Q.    What are the factors that you do know that
15 go into -- that might go into forming an opinion as to
16 when he committed the murder?
17    A.    Just the things that I have encountered
18 during the investigation.  I mean, I could -- I would
19 really have to sit down and think about everything.  I
20 just know that that's the opinion that I have
21 maintained, you know.
22    Q.    Well, do you agree with the statement that
23 if a guy committed a murder, that the prosecution has
24 got to figure out roughly when he did it?  If -- if
25 there -- if there are vastly different scenarios of when
                                                     111

1 it could have been done, there ought to be evidence for
2 one or the other; does that make sense?
3          MR. HEIGELE:  Objection to the point that
4 it's vague and calls for speculation and conjecture, and
5 there's no foundation for this witness, but you can go
6 ahead and answer.
7    A.    Yeah.  I think -- I feel like what you keep
8 asking me is to give one solid answer for every type of
9 case.  I -- I can't -- I can't generalize an answer to
10 that.  I -- I mean -- and I will give this example.  So
11 we've got -- if we have a child abuse case, that -- that
12 child may only be able to tell us that the leaves on the
13 tree were brown.  So now we've got not a specific date
14 or even an incremental hour block.  We've -- we've got a
15 season.  So, yeah.  Yeah.  I mean, to have the best
16 timeline again, I'll go back to Rules of Evidence, I
17 would prefer to have the best timeline, and if I don't
18 have enough to develop that, --
19    Q.    (By Mr. Schock)  Were you aware that --
20    A.    -- I work with what I've got.
21    Q.    Are you aware that Mr. Faria has been
22 placed pretty strongly in -- 20, 25 miles south of Sumac
23 Drive around 9:00?
24    A.    No.  I --
25    Q.    First you have heard of that?
                                                     112

1    A.    Well, I don't know where he was actually
2 placed.  I --
3    Q.    Well, I mean --
4    A.    Just like we discussed before, I know he's
5 got his -- his witnesses.
6          MR. PLEBAN:  Again, Bevis, where are we
7 going with this?
8          THE WITNESS:  I don't know.
9          MR. PLEBAN:  I mean, we can -- again, we
10 can talk about theories all day long, but where -- where
11 are we going with this -- with this line of questioning?
12         MR. SCHOCK:  Are you going to direct him
13 not to answer?
14         MR. PLEBAN:  No.  Of course not, but I just
15 -- man, --
16         THE WITNESS:  I don't know.
17         MR. PLEBAN:  -- I just don't know where
18 we're going with it.  That's all.
19         MR. RETTER:  Well, just -- I -- if I --
20 just listen to his questions carefully.
21         THE WITNESS:  Yeah.
22         MR. RETTER:  We may object, but unless
23 someone tells you not to answer, you think about his
24 question and answer it.  Fair enough?
25         THE WITNESS:  Okay.  I can do that.

                        113

1          MR. RETTER:  Fair enough, Mr. Schock,
2 Bevis?
3          MR. SCHOCK:  Sure.
4          MR. RETTER:  Perfect.
5    Q.    (By Mr. Schock)  Mr. Merkel, you
6 interviewed Mr. Faria.  He said he went -- he went to
7 Arby's, right, --
8    A.    At --
9    Q.    -- after game night?
10   A.    That was one of the places, I believe.
11 Yes.
12   Q.    After game night, right?
13   A.    I believe -- I believe it was -- I believe
14 that was the one that was after game night.  I'd have --
15 yeah.
16   Q.    And that's about 20, 25 miles south of
17 where this murder occurred, right?
18   A.    I don't know exactly where it would be, no.
19   Q.    Okay.  Well, do you know where Mr. Corbin's
20 house was?
21   A.    No.
22   Q.    You just don't have any idea?
23   A.    No.  I -- I don't know if it was -- it was
24 south of where I am, I mean south of Troy, --
25   Q.    Okay.

                        114

1    A.    -- or, yeah, south.
2    Q.    Do you agree with the statement that he
3 couldn't have committed the murder when he was at
4 Arby's?
5    A.    Well, yeah.  If he's standing in Arby's,
6 yeah, he's not going to kill somebody in a house.
7    Q.    So he had to do it either before he went to
8 Arby's or after; is that true?
9    A.    Yeah.  That's fair.
10   Q.    Okay.  Did you ever develop a theory based
11 on the facts that you know as to whether Mr. Faria
12 committed the murder before or after he went to Arby's?
13         MR. HEIGELE:  Asked and answered.
14   A.    No.
15   Q.    (By Mr. Schock)  No?
16   A.    No.
17   Q.    Okay.  Did you wear any special glasses
18 during the luminescence test?
19   A.    Special glasses?
20   Q.    Yeah.  Do you wear glasses on that, any
21 kind of special --
22   A.    Like -- like seeing glasses, like these?
23   Q.    Not -- not the glasses you normally wear
24 day to day just to see better, because they're your
25 prescription glasses, but special glasses that are used

                        115

1 for that test like --
2    A.    No.  That would -- that would be -- if it's
3 what I'm thinking you're saying, that would be a
4 BlueMax.  There's a difference.  So we have a light,
5 it's -- it's like a big Maglite, but it's got a -- a --
6 like a filter, I'm going to call it a filter, and then
7 you have to view that through special glasses.  Is that
8 kind of what you're asking me?
9    Q.    Well, yeah.  Was that -- was this that kind
10 of test or a different --
11   A.    No.
12   Q.    -- kind of test?
13   A.    That's a totally different kind of test.
14   Q.    Okay.
15   A.    Yeah.
16   Q.    Did you ever use the phrase in -- with
17 reference to the BLUESTAR test results that there was a
18 trail like a trail of bread crumbs?  Did you ever say
19 that?
20   A.    Yeah.  I think that's in one of my reports.
21 Yeah.
22   Q.    And was it in fact like a trail of bread
23 crumbs?
24   A.    Well, I think we kind of looked at it with
25 those little spots on the -- the photos.  I mean, it

                        116

1 looked like little spots.
2    Q.   Okay.  You -- okay.  That's fine.  Did you
3 ever check the sink trap?
4    A.   I didn't.
5    Q.   Do you know of anybody who did?
6    A.   I don't know if they were ever checked.  I
7 know they were seized on that -- that same day, that
8 same search warrant.  Well, I'm pretty sure they were
9 seized.
10   Q.   Did you have --
11   A.   I believe they were.
12   Q.   -- anything to do with it?
13   A.   What's that?
14   Q.   The sink trap at all.
15   A.   No.
16   Q.   Okay.
17   A.   Not that I remember.
18   Q.   You wrote a report about the luminescence
19 test, right?
20   A.   Yes.
21   Q.   When did you write that?
22   A.   That's -- it was well after the fact.  I
23 think it was -- the -- the date is on the actual report.
24   Q.   So is the date on the report the date you
25 wrote it?
                        117

1    A.   I don't know.
2    Q.   I mean, April, I think it's --
3    A.   I would have to look at it.  I don't know.
4    Q.   April 9th, 2013, it was approved by Ryan
5 McCarrick?
6    A.   Right.
7    Q.   We -- we can look at that.  This is Bates
8 stamped 1967.  We might even have the correct book in
9 front of us.  Is this 7?
10        MR. SWANSON:  We do.
11   Q.   (By Mr. Schock)  Yeah.  Go to 1967, please.
12        MR. RETTER:  Sure.
13        MR. HEIGELE:  Did you say 1967?
14        MR. SCHOCK:  Yes.
15        MR. PLEBAN:  Yes.
16        MR. HEIGELE:  I'm looking -- I'm looking at
17 a different --
18        MR. PLEBAN:  Yeah.  I think he said --
19        MR. HEIGELE:  I think I'm looking at a
20 different copy from with the other Bates stamp range on
21 it.
22        MR. RETTER:  Oh.
23        MR. HEIGELE:  Yeah.
24        MR. RETTER:  Supplementary BLUESTAR
25 forensics PLT 1967.
                        118

1    Q.   (By Mr. Schock)  Okay.
2    A.   Okay.
3    Q.   Is that a report that you wrote?
4    A.   Looks to be one.  Yes.
5    Q.   Okay.  Now, at the very bottom, --
6    A.   Mm-hm.
7    Q.   -- it says, Entered by Michael Merkel,
8 Lincoln County SO.  Sheriff's Office or something?
9 What's SO stand for?
10   A.   Yeah.  That would be Sheriff's Office.
11 Yeah.
12   Q.   Okay.  On 4/3/2013, 8:46 a.m., --
13   A.   Yes.
14   Q.   -- right?
15   A.   Yes.
16   Q.   Is that when you wrote it?
17   A.   I don't remember.
18   Q.   Okay.  Did you -- what does the word
19 entered mean?
20   A.   It was put in that system somehow, like
21 whether it was typed or cut and pasted from a Word
22 document or something to that effect.
23   Q.   I notice at the top, date and time is
24 blank?
25   A.   Okay.  Yeah.
                        119

1    Q.   Do you know why that is?
2    A.   No.  I have no idea.
3    Q.   I'm asking you, sir, when you wrote that
4 report?
5    A.   I don't remember.
6    Q.   You said you wrote -- I think you said a
7 little earlier you wrote it substantially later?
8    A.   Yeah.  Some --
9    Q.   Was that what you --
10   A.   Sometime af -- I mean obviously sometime
11 afterwards.
12   Q.   After you did it.  Yeah.
13   A.   Yeah.
14   Q.   Do you think you wrote it within a week of
15 the actual test?
16   A.   I don't know.
17   Q.   Do you know why you would or would not have
18 written the report promptly after the event?
19   A.   No, I don't, other than I just didn't do
20 it.
21   Q.   It says that Mr. McCarrick approved it on
22 9th of April '13, so a few days later, six days later,
23 right?
24   A.   A week later.  Yeah.
25   Q.   Did -- did you discuss that report with Mr.
                        120

1 McCarrick?
2    A.   I may have.  I mean, this -- this wasn't
3 the only report that we had.  I could have discussed
4 this one with him.  I probably just discussed a lot of
5 cases with him.  I don't have any independent
6 recollection of discussing this one.
7    Q.   When you normally submit a report, it has
8 to be approved by an officer, right, a superior?  That's
9 pretty standard?
10   A.   I don't -- I don't remember how this system
11 worked, so I don't -- I don't know about this particular
12 system.  I could tell you how ours works now and --
13 yeah, that's --
14   Q.   I'm not interested in now.  I'm interested
15 in then.
16   A.   Yeah.  I don't remember how that worked.
17   Q.   Okay.  Did you -- do you know how it came
18 about that on this particular April date, as opposed to
19 any other date, that you did enter this report?
20   A.   No.  I don't recall.
21   Q.   Don't recall anybody asking you to do it?
22   A.   No.  I sure don't.
23   Q.   You don't -- do you remember whether you
24 wrote it because somebody asked you around that time?
25   A.   No.  I don't remember, and, I mean, I very

                        121

1 well could have had -- already had it typed in a Word
2 document and cut and pasted it over.  We do that all the
3 time.
4    Q.   Would your computer show that, when it was
5 made?
6    A.   Now?
7    Q.   Yeah.
8    A.   I don't have the same computer.  I mean,
9 that -- this is how long ago?  This was four years ago,
10 so I know I don't have the same computer.
11   Q.   Did you work on the swabs of Mr. Faria's
12 hands?
13   A.   I don't -- I don't remember if I did or
14 not.
15   Q.   Did you seize his clothes?
16   A.   I did read a report where I did that, so
17 that would be one of the things that I didn't remember.
18 Yeah.  I did.
19   Q.   And --
20   A.   And nail clippings.
21   Q.   And nail clippings?  You did do that?
22   A.   I think that was -- the clothes and the
23 nail clippings were all -- it's -- well, at the same
24 time under the same lead that I wrote.
25   Q.   Right.  And that's a standard thing to do

                        122

1 on someone who's a murder suspect when it's a violent
2 situation?
3    A.   It could -- it could be.  It could be one
4 of the things we do.  Sure.
5    Q.   Okay.  Do you know who Leah Day and Mariah
6 Day are?
7    A.   I -- you know what, I'm still kind of
8 confused as if they're Russ' biological children or not,
9 but they are -- my understanding is that they're Leah's
10 children or Betsy's children.
11   Q.   Yeah.  Did you speak to them at all after
12 the -- well, did you -- when -- when was the first time
13 -- let me ask the correct question.
14   A.   Okay.
15   Q.   Have you ever spoken to them?
16   A.   Nope.  If they fell out of the ceiling
17 right now, I wouldn't know who they were.
18   Q.   Okay.  That's what I want to know.  All
19 right.  Let me look at some notes here.  I think we may
20 be done.
21        Not quite.
22        Did -- after December 29th, and I may have asked
23 this, I just want to make sure, did Miss Askey ever tell
24 you that she needed additional evidence in order to
25 charge Mr. Faria?

                        123

1    A.   No.
2    Q.   Did you ever talk to Miss Askey after you
3 had done that BLUESTAR test in the immediate say that
4 day or the next day about the test?
5    A.   Not that I remember.  No.
6    Q.   But do you think -- this report you
7 prepared on it, did you -- did you give a copy of that
8 to Miss Askey?
9    A.   I don't know that I -- I would have.  That
10 would have been part of a larger report that the case
11 agent would have taken over there.
12   Q.   Do you have any idea if Miss Askey ever
13 learned on January 3rd or 4th about the results of the
14 BLUESTAR test?
15   A.   No idea.
16   Q.   But you didn't -- you didn't tell her,
17 weren't involved in telling her?
18   A.   Nope.
19   Q.   Your report there that we just looked
20 at, --
21   A.   Mm-hm.
22   Q.   -- it doesn't say anything about the house
23 not having been secure, right?
24   A.   I didn't have any knowledge of that, so no.
25 It doesn't.

                        124

1    Q.   You Mirandized Mr. Faria that night, right?
2    A.   I don't specifically recall that. I may
3 have.
4    Q.   Okay. Why would you have Mirandized him?
5         MR. PLEBAN: Well, he said he doesn't
6 recall it, Bevis. Now you're asking him why he did
7 something that he doesn't recall?
8         MR. SCHOCK: Well, he didn't totally --
9         MR. PLEBAN: Show the report.
10        MR. SCHOCK: I think he didn't -- I know.
11 I am asking him about it. I don't think he said he for
12 sure didn't know. I'm asking a follow-up question.
13   A.   I -- yeah. I don't recall --
14   Q.   (By Mr. Schock) Either way?
15   A.   -- specifically doing that. Yeah.
16   Q.   Okay. Do you remember about Mr. Faria
17 asking to call his mother during that night?
18   A.   Hm-mm. Not specifically. No, sir.
19   Q.   Remember telling him he couldn't call his
20 mother?
21   A.   No.
22   Q.   That's all -- that's all my questions, sir.
23 Thank you very much.
24   A.   No problem.
25   Q.   There may be questions from other people
                                                    125

1 here.
2         MR. RETTER: Not here.
3         MR. HEIGELE: I'm looking. That's why I'm
4 not --
5         MR. SCHOCK: Take all the time you need.
6         MR. HEIGELE: I don't have any questions.
7         CROSS-EXAMINATION
8 QUESTIONS BY MR. PLEBAN:
9    Q.   Yeah. Just a few, Mike.
10   A.   Okay.
11   Q.   For the last several days, we have talked
12 about theories, hypotheticals, et cetera, but let me get
13 down to the nuts and bolts of this thing. During the
14 time that you were involved in this case, limited as it
15 is, did you have occasion to fabricate any evidence at
16 any time?
17   A.   No.
18   Q.   Did you have occasion to conspire with
19 anyone to fabricate any evidence?
20   A.   No, sir.
21   Q.   With respect to -- to the role that you
22 played in this matter, limited as it was, did you act
23 maliciously in any -- in any regard --
24   A.   No, sir.
25   Q.   -- in connection with anything that you
                                                    126

1 did?
2    A.   No, sir.
3    Q.   Did you -- did you engage in the
4 preparation of any false statements?
5    A.   No, sir.
6    Q.   Did you make any false statements?
7    A.   No, sir.
8    Q.   Did you do anything other than act in good
9 faith with respect to your -- the role, limited as it
10 was, that you played in this case?
11   A.   I did not.
12        MR. PLEBAN: That's all.
13        MR. RETTER: That's all I got.
14        MR. SCHOCK: No follow-up from me.
15        CROSS-EXAMINATION
16 QUESTIONS BY MR. HEIGELE:
17   Q.   And, sir, as far as you're concerned, would
18 those -- as far as your knowledge goes, would all of
19 those denials of -- of the questions that your counsel
20 asked, would that apply to all the witnesses that you're
21 aware of and parties in this case?
22   A.   Yes, sir.
23   Q.   Okay.
24        MR. RETTER: We'll read and sign.
25
                                                    127

                COURT REPORTING ASSOCIATES
                     P.O. Box 440014
                St. Louis, Missouri 63144
                     (314) 961-6306

October 5, 2017

Jason S. Retter, Esquire
KING, KREHBIEL & HELLMICH, LLC
2000 South Hanley Road
St. Louis, Missouri 63144

In Re: Russell Scott Faria -v- Sergeant Ryan J.
        McCarrick, et al. Case No. 4:16-CV-01175-JAR.
Dear Mr. Retter:
Please find in your email inbox the deposition
transcript of Michael Merkel taken 9/28/17.

Please make arrangements with your client for reviewing
his testimony, indicating all corrections on a
correction sheet, and signing the signature page before
a Notary Public.
Please forward corrections, if any, to all counsel of
record and forward the duly executed signature page to
Attorney W. Bevis Schock at your earliest convenience.
Thank you for your attention to this matter.
Yours truly,

Tami L. Bruder-Ksioszk, RPR, CCR
enclosures
cc: W. Bevis Schock, Esquire
        Christopher L. Heigele, Esquire
        Joel D. Brett, Esquire
        Steven R. Kratky, Esquire

                                                    128

1   Name of Witness:
2       DEPOSITION CORRECTION SHEET
3   In re:  Russell Scott Faria -v- Sergeant Ryan J.
      McCarrick, et al.  Case No. 4:16-CV-01175-JAR.
4
  Upon reading the deposition and before subscribing
5 thereto, the deponent indicated the following changes
  should be made:
6
  Page    Line    Should read:
7
8   Reason assigned for change:
9
  Page    Line    Should read:
10
11   Reason assigned for change:
12
  Page    Line    Should read:
13
14   Reason assigned for change:
15
  Page    Line    Should read:
16
17   Reason assigned for change:
18
  Page    Line    Should read:
19
20   Reason assigned for change:
21
22
23
      Deponent:
24
  Page_____of_____
25

129

1       o-O-o
2   COMES NOW THE WITNESS, MICHAEL MERKEL, and having
3 read the foregoing transcript of the deposition taken on
4 the 28th day of September, 2017, acknowledges by
5 signature testimony given on the date hereinabove
6 mentioned.
7
8 _____
     MICHAEL MERKEL
9
10 Subscribed and sworn to this_____day of
11 _____, 20_____.
12
13 My commission expires:_____
14
15 _____
     Notary Public
16
17
18
19
20
21
22
23
24
25

130

1      NOTARIAL CERTIFICATE
2 STATE OF MISSOURI  )
             )
3 COUNTY OF ST. LOUIS  )
4     I, TAMI L. BRUDER-KSIOSZK, a Registered
  Professional Reporter, a Certified Court Reporter and a
5 duly commissioned Notary Public within and for the State
  of Missouri, do hereby certify that on September 28,
6 2017, there came before me, at the offices of Barklage,
  Brett & Hamill, P.C., 211 North Third Street,
7 St. Charles, Missouri 63301,
8     MICHAEL MERKEL,
9 who was by me first duly sworn to testify to the truth
  and nothing but the truth of all knowledge touching and
10 concerning the matters in controversy in this cause;
  that the witness was there upon carefully examined under
11 oath and said examination was reduced to writing by me;
  and that the signature of the witness is reserved by
12 agreement of all parties, and that this deposition is a
  true and correct record of the testimony given by the
13 witness.
14     I further certify that I am neither attorney
  nor counsel for nor related nor employed by any of the
15 parties to the action in which this deposition is taken;
  further, that I am not a relative or employee of any
16 attorney or counsel employed by the parties hereto or
  financially interested in this action.
17
    IN WITNESS WHEREOF, I have hereunto set my
18 hand and seal on this 5th day of October, 2017.
19     My commission expires June 27, 2019.
20
21
22
      NOTARY PUBLIC
23   TAMI L. BRUDER-KSIOSZK, C.C.R. No. 1030
24
25

131

**- ' -**

'13 8:16 120:22
'15 57:5,7,7 103:18

**- 1 -**

1,000 92:8
100 85:17
1030 131:23
10:30 41:1
10:55 75:14
11:20 100:7
127 2:4
1300 3:17
13th 8:19,20
14 4:4
1763 97:7
1850 98:1,5,6
1863 96:8,21 97:8
1967 118:8,11,13,25
1st 8:14

**- 2 -**

20 79:3 112:22 114:16
 130:11
200 4:4
2000 3:23 26:4 128:7
2002 8:13,20
2003 8:20
2004 88:1
2007 8:6
2010 4:11
2011 7:17 13:3 20:1,8
 69:15
2013 8:14,15 118:4
2014 57:5
2015 57:8,11 103:15
2017 1:17 3:10 128:4
 130:4 131:6,18
2019 131:19
25 78:23 112:22 114:16
27 131:19
2703 53:14
27th 12:25 13:3
28 1:17 3:10
28th 51:24 55:4 56:16
 130:4
29th 57:24 76:9 77:17
 123:22

**- 3 -**

314 1:25
31st 55:14 60:11
35 88:1,6
3rd 77:24 78:1,2 124:13

**- 4 -**

4/3/2013 119:12
40 30:17
440014 1:24
4:16-CV-01175-JAR 1:8
 128:9

4:30 13:19
4th 77:24,24 124:13

**- 5 -**

5 2:3 128:4
52 96:14
5:00 13:19
5th 131:18

**- 6 -**

63105 3:20
63144 128:2
63301 3:12 4:8 131:7
6:00 51:24

**- 7 -**

7 118:9
7777 3:17
7:00 51:24

**- 8 -**

8:30 13:18,19
8:46 119:12

**- 9 -**

911 13:7 41:10
961-6306 1:25
9:00 112:23
9:10 109:20
9:30 108:21 109:20 111:8
9:40 13:8 108:22
9th 118:4 120:22

**- A -**

a.m 75:14 119:12
ability 87:22
able 33:2 64:7 88:17
 112:12
about 6:8 7:2 8:6,22 9:11
 12:16 17:13 19:9,19
 20:15 21:5 22:10,15,17
 27:9 29:4,8,15 31:7
 32:11 35:12 38:1 39:25
 40:4,8,11,25 43:2 46:14,
 21 54:19 55:14,14 56:25
 57:23 58:25 59:19,23,25
 61:2 62:21 63:1 64:11
 65:9,12 71:12,18 72:1,2
 73:2 76:14 78:9,20 79:22
 97:25 101:16 102:3,7,11,
 15 103:19 104:6,9,20
 106:12 107:16,19 108:4,8
 109:20 110:14 111:19
 113:10,23 114:16 117:18
 121:11,18 124:4,13,22
 125:11,16 126:12
above 24:14 26:21
absolute 70:11
Absolutely 6:24 10:21
 21:14 22:24 24:12 31:6
 37:18 39:3 64:9,12 65:3

69:4 70:15 78:21 94:20
 109:3 110:5
abuse 112:11
academic 62:2 63:20
accompanying 17:3
accomplished 69:15
according 55:13 94:11
accurate 56:12
acknowledges 130:4
act 28:22 52:12 87:3
 126:22 127:8
action 11:13 131:15
acts 28:20
actual 80:9 107:9 117:23
 120:15
actually 9:23 11:25 22:13
 59:19 72:2 82:22 93:1,16
 107:1 113:1
addition 102:22
additional 123:24
address 12:22,22 14:13
admissible 67:9 110:19
advanced 87:23,23
af 120:10
affected 89:23
after 7:18 13:12 37:20
 41:1,15 52:22 54:10
 56:17 77:18 90:21,21
 92:13,25 99:23 101:17
 108:20,21 109:18 114:9,
 12,14 115:8,12 117:22
 120:12,18 123:11,22
 124:2
afternoon 3:11
afterwards 5:6 20:10
 120:11
against 9:16,17 11:10,14
 69:20 107:10
age 5:10
agency 55:25,25 58:6,8
 59:1
agent 73:6 124:11
ago 6:9 27:17 56:13
 122:9,9
agree 13:4 19:10 21:14
 22:4 28:17,21 33:23
 35:18 36:11 38:22,25
 94:24 97:18 105:10
 106:13 111:22 115:2
AGREED 5:1 73:23
agreement 131:12
agrees 68:7
Ah 91:1
ahead 81:16 100:11 112:6
al 3:7 128:9
all 10:21 12:7 13:2,23
 14:24 21:18,19 23:6,9
 25:12 26:22 28:6 36:7
 44:21 51:14 52:5 53:4,5,
 7 55:7 59:9 61:20 62:18
 66:25 67:1,5,7 68:2,6
 73:14 77:17 79:10,19
 80:3,16 81:15 84:6,8
 86:17 87:10 89:1 90:8,18
 96:20 99:8,15,15,21
 102:19 106:19 108:11,18
 109:17 110:9 113:10,18

117:14 122:2,23 123:11,
 18 125:22,22 126:5
 127:12,13,18,20 128:13,
 15 131:12
Allen 6:5
allocate 25:19
almost 7:15 39:21 98:17
already 31:22 40:4 107:19
 122:1
also 5:24 36:25 48:12
 91:23 95:16
altogether 66:2
always 55:25 69:20 83:23,
 24 101:10,12
ambulances 44:3
among 26:15
amount 30:12 110:10
an 9:9 12:21 13:14 17:3
 18:10 19:11 20:4 21:2
 22:5,8 23:8,15 25:22
 34:16 38:9 40:25 41:1,5,
 5 42:18,22 44:15 61:17
 63:11 66:4,5 70:11,15
 72:11 76:13,16,18 77:15
 83:16,20 90:11,13 93:19
 103:14 105:18 106:3,15
 110:14 111:11,15 112:9,
 14 121:8
analysis 107:9
and/or 44:3 94:5
announce 5:15
another 7:25 38:6 47:9
 62:14 70:13
answer 65:24 92:3 95:19
 106:2 109:7,24 110:23
 112:6,8,9 113:13,23,24
answered 115:13
any 6:25,25 9:11,12,13
 11:11 14:8 15:11,25,25
 17:15 19:10,21 21:14
 25:5,10 27:5,9,10 29:15
 30:4 31:13,19 33:11
 35:14 39:18,18 40:20,20
 41:25 46:24 52:7 54:6,7,
 16,19,22 56:16,22,22
 57:25 58:3,13 62:15
 68:7,19 70:22,22 71:6,6
 78:4 80:7 86:8,17,24
 88:10 89:20,21 92:17
 93:10 94:17 95:21 99:2,
 22,23,24 100:2,2 101:22,
 25,25 103:8,12 107:16
 108:3,5,7 114:22 115:17,
 20 121:5,19 124:12,24
 126:6,15,16,19,23,23
 127:4,6 128:15
anybody 38:10 39:25
 41:24 44:19 47:13 71:2,9
 100:1 102:10 103:9
 117:5 121:21
anymore 75:12
anyone 126:19
anything 9:17 11:16 17:14
 26:18 33:12,15,22 35:10,
 15,23,25 36:1,9 37:8
 39:25 40:17 41:24 42:7
 45:12 50:18 54:11 56:25

**- A -**

57:2,23 58:25 59:25 60:5
74:14 76:5 77:19 83:19
88:22 90:22 91:20 95:20
101:16 102:11 104:8
117:12 124:22 126:25
127:8
anyway 26:1 81:4
anywhere 33:25 85:4 90:15
aperture 88:13
apparently 85:12
appear 40:7
Appearances 3:25 4:1 5:15
appeared 17:20 28:16 29:3
30:2
application 80:9,10,25
applications 55:23
apply 80:18 127:20
approach 12:3
approved 118:4 120:21
121:8
approximate 73:14
Approximately 8:9 72:9
87:20
April 118:2,4 120:22
121:18
Arby's 48:21,25 49:13
114:7 115:4,5,8,12
area 35:13 71:19 76:13,17
80:2 82:11,12 85:14 87:2
109:19
areas 71:7 83:14 85:3,9,11
86:20,22 87:7
aren't 68:11
argue 67:16
arm 29:25 30:1,3
around 13:8 29:4 31:21
32:21 35:2 37:5,21 63:22
83:13 104:10 109:20
112:23 121:24
arranged 17:4
arrangement 27:14
arrived 16:10 41:15
article 59:23
ask 19:9 23:7 37:2 44:1
45:12 60:2 65:5 79:16
100:1 106:12 107:17
109:13 123:13
asked 27:8 50:17,22 55:17
75:15 78:8,9 95:9,11,18
115:13 121:24 123:22
127:20
Askey 4:2,14 5:24,24
58:14 59:1,21 107:25
108:4,8 123:23 124:2,8,
12
asking 12:24 21:5 22:14
45:15 72:13 100:24
103:8 112:8 116:8 120:3
121:21 125:6,11,12,17
assemble 25:1,16
assess 86:1
assessment 9:9
assign 9:20
assigned 7:23 9:11,18,23
10:2,13,24 55:10 129:8,
11,14,17,20
assigning 24:16

assistance 45:15
associate's 61:16
ASSOCIATES 128:1
assume 41:4 55:9
attempt 72:24 87:17
attended 54:4
attention 12:18 128:17
attorney 12:4 21:20 27:19
128:16 131:14,16
attorney's 58:10
au 54:3
authority 18:6 38:13
autopsy 54:2,3,4 60:9
availability 25:16
available 23:1 46:12
Avenue 3:17
aware 42:1 47:1 51:22
54:5,6 55:4 57:13,17
58:17 59:22,23 77:20
108:14,15 112:19,21
127:21
away 19:5
awful 29:24 31:4

**- B -**

back 21:21 34:25 35:14
37:19,25 38:3,4,8 43:25
44:21 45:19 55:11 61:21
66:7 67:16 69:9 71:24
73:1 74:1,5,16 78:7
87:25 95:15 100:14
106:20 107:17 111:3
112:16
background 7:4 61:7
backwards 48:14 84:1,4
bag 48:21
BARKLAGE 4:7 131:6
based 108:11 109:17
111:4,4 115:10
basement 21:23 22:1,5
basis 18:11 110:17
Bates 118:7,20
bathroom 43:21
because 8:18,19 9:12 13:18
20:10 25:21 49:7 63:4
65:16 67:22,22 78:25
81:19 88:12 101:20
115:24 121:24
Becky 75:19 89:19
become 55:4 57:17
bedroom 31:16,17 35:3
began 42:19
beginning 12:13 106:21
behalf 3:10 5:10,23
beings 45:8
believed 108:19
bell 104:18
Bend 4:11
best 15:16 17:9 49:1 74:20
76:2,21 78:20 79:25
80:12 82:15 89:24 95:9
112:15,17
Betsy 17:18 40:15 70:6
Betsy's 123:10
better 58:11 96:25 115:24
Bevis 5:14 10:16 43:21

66:24 93:8 96:13 100:23
106:4 113:6 114:2 125:6
128:16,22
Big 4:11 36:3 43:12 99:12
116:5
bigger 107:13
binder 96:16
biological 123:8
bit 11:2 19:6,19 37:6
59:15 60:10
bits 54:1
black 95:24 97:2,5
blame 10:22
blank 119:24
block 112:14
blood 17:20 28:9,11,12,17,
20,22 29:2,5,10,12 30:12
31:1 32:11 35:6 61:19
62:3,4 63:6,11,14,15,18,
21 64:23 71:6 73:1 74:7,
18 79:9,13 86:14
Blue 71:23 98:20
BlueMax 116:4
BLUESTAR 52:23 60:16,
20 61:12 62:3,12,21,22
63:1,23 64:6,8,14,17,23
70:25 71:19,20,22 72:3,
21 73:19 75:16 76:9
77:2,23 78:14,23,25
79:12 80:25 81:5 92:13
99:23 116:17 118:24
124:3,14
BLUESTARRED 61:21
BLUESTARS 73:15
BLUETAR 92:13
board 50:9
body 18:25 19:1 28:7
29:5,14 34:5 39:22 40:3,
19,21 41:16 64:15 84:17
bolster 89:25
bolts 126:13
Bonhomme 3:17
book 96:16 118:8
books 96:8
boot 84:6
bottle 81:7,9 82:17,18
bottom 119:5
Boulevard 4:11
Box 1:24 80:21
bread 71:13 72:18 116:18,
22
break 6:23 43:20,24 100:8,
10,12,13
BRETT 4:7 128:23
brief 25:6 31:24
broad 45:5
brown 112:13
Bruder-Ksioszk 5:4 128:20
131:4,23
bullet 83:3
bullseye 66:13
bump 82:4
bunch 96:16
Bureau 7:23 9:19 12:24
butter 71:14 72:18

**- C -**

C.C.R 131:23
cabinet 85:10,14,15
cabinets 74:17 90:1
calculated 67:9 110:18
call 13:7,20,24 14:8,9
21:6,8 26:19 31:24 36:10
41:1,9,10,11 43:12 47:19
52:21 53:7 55:10 58:5
62:1 80:24 102:23
108:22 116:6 125:17,19
call-out 24:18 45:21 55:15
58:15 60:7,11 107:19
108:19,19
called 12:20 24:18 40:1
70:1 81:5 103:22 106:24
calls 110:19 112:4
came 41:10 48:6 59:11
74:16 78:17 108:20
121:17 131:6
camera 48:3,19 88:4,15,17
89:13,16,21 91:24 92:1
94:5,15,16 95:22
cameras 45:7 47:18 89:3,
5,8,12,23 92:25 93:14
capacities 56:8
capacity 7:25 32:17 33:23
captain 7:12
capture 72:24 82:8
car 16:14,15 17:2,3 42:3,
4,6,8 48:21
cardboard 80:13 81:13
91:3
career 56:5
carefully 113:20
carpet 29:7,8,10 78:24
84:23
Case 1:8 10:1 11:17,17
22:18,23,23 23:20 24:17,
25 25:1,2 27:18 39:8
45:16,19,20 46:6,24 48:1
50:25 51:3,14,19 52:13
53:19,23 54:24 55:8,10,
18,24 56:1,4 58:9 59:2
60:6 62:24 64:13 66:4,5
67:10,23,24 70:12,18
74:10 77:7 84:9 86:5,8,
18 87:18 92:18 101:6,13,
24 103:4,6 104:9 105:16
106:14,16 108:4 112:9,11
124:10 126:14 127:10,21
128:9
cases 78:22,23 121:5
categories 45:6
cause 131:10
cc 128:22
CCR 128:20
ceiling 123:16
cell 53:9,9,22
certain 46:22 50:21 69:25
71:7 87:7
certainly 65:24 68:24
certificate 61:15 131:1
certificates 19:22 20:9
Certified 3:13 5:5 8:11,12,

18
certify 131:14
cetera 49:15 126:12
chance 19:1 41:16
Chances 42:5,18
change 129:8,11,14,17,20
changes 129:5
charge 12:4 44:12,18 59:3,
   24 123:25
charges 12:6
Charles 3:12 4:8 131:7
check 45:3 117:3
checked 45:6,8 48:12
   117:6
checking 45:13,16
chemical 61:22 72:24
   79:12 82:21 83:5 86:21
chemicals 79:1
Chet 4:10 5:21
child 11:15 112:11,12
child's 66:16
children 66:10 123:8,10,10
Chris 5:23 15:20
Christopher 4:3
chronological 42:21
cig 43:14,14
cigarette 42:24,25 43:3
circumstances 18:14 35:19
   43:11
cite 67:2
claiming 68:4
clarification 107:17
clarify 33:16
class 63:21
classes 20:10
classroom 61:19
Clayton 3:20
clean-up 78:5 79:8
cleaned 61:20 62:3 63:22
   73:2 78:6
cleanup 34:1,7 35:15 64:22
clear 62:6
clear-cut 83:24
cleared 31:23 65:17
clearing 31:20 32:6
clicked 60:9
clippings 122:20,21,23
Close 19:3,4 48:13
closely 19:2 34:20
closest 40:17
closing 81:15
clothes 14:3,6 122:15,22
coagulates 28:18
collaborate 59:15
colleague 24:4
college 61:18 64:2 73:11
   86:12
colored 98:13
come 10:14 12:18 13:16,17
   37:19 38:1 44:7,9 46:21
   61:1 92:18 103:19
   104:17 107:17
comes 80:24,25 130:2
comfortable 100:9
coming 46:4,6,8 51:1
command 68:3
commander 7:13 24:14

26:20
commission 23:1 130:13
   131:19
commissioned 131:5
commit 110:16
committed 39:2 69:22,23
   71:4 106:15 107:11
   108:5,8,20 109:18 110:15
   111:12,16,23 115:3,12
communicated 46:23 47:2,
   25 51:19
communication 53:18 58:14
communications 58:4
compet 62:17
competing 62:18
complaint 9:18
compromised 77:3
computer 10:8 94:17 96:25
   98:10 122:4,8,10
computers 18:19 21:25
   22:5,7
concentrate 81:6
concern 78:4
concerned 127:17
concerning 131:10
concluded 56:10
conclusion 94:4 105:23
   109:17 110:8,20
conclusions 29:15 30:4
condition 28:11,12 29:11
   31:9 33:5
conduct 20:4 21:2 69:11
conducted 67:21
confused 123:8
conjecture 110:20 112:4
connection 52:13 72:21
   78:13 92:17 126:25
consider 11:6 45:15 76:16
   106:5,19
considered 39:1 43:8 69:15
   107:10 109:18
considering 24:24
consistent 35:24
consists 80:10
conspire 126:18
contact 11:8 27:20
contention 93:7
continue 68:14
Continued 3:25 4:1
continuing 69:2 110:4
contradiction 65:17
contradictions 69:21
control 88:13
controlled 62:1
controversy 131:10
convenience 128:16
conversation 16:24 71:11,
   17 104:15 105:9
conversations 108:3
coordinates 56:3
copy 97:5 118:20 124:7
Corbin's 114:19
corner 36:4
CORRECTION 129:2
corrections 128:13,15
correctly 22:2 32:8 48:23
   75:17

correlation 73:20
counsel 5:2,2 54:23,24
   99:17 127:19 128:15
   131:16
County 5:20 7:9 24:2
   42:15 101:23 102:10
   119:8 131:3
couple 52:4 56:13 75:24
course 11:3,13 18:13 27:6
   30:23 36:25 37:15 59:18
   113:14
COURT 1:1 3:1,13 5:5
   128:1
courts 105:25
coverage 102:7 103:2
covered 31:1 37:3 57:14
   61:19,20 107:25
covering 75:1
created 23:7
crime 7:24 9:11,12,12,13
   11:10,14,19 12:1,19 23:1
   29:16 31:8 34:10 36:8
   44:14 45:16 69:23 89:18,
   18 106:15 107:11 108:5,
   8,20
crimes 7:22,24 9:15,16,17
   10:1 19:23
criminal 7:13 21:15 54:23
   61:17 69:12
CROSS-EXAMINATION
   126:7 127:15
crumbs 116:18,23
cultivated 107:13
curious 43:2
current 7:6 76:24
curtains 81:15
custom 5:15
cut 29:24 119:21 122:2

- D -

dad 66:10,13
dark 81:19 82:7 90:17
darkened 81:12
data 22:6 45:14 54:17
   94:16 96:20
date 112:13 117:23,24,24
   119:23 121:18,19 130:5
dates 13:2
day 3:11 24:25 44:25
   48:16 55:5 56:16,17,22
   57:3 66:8 67:1 76:9
   108:11 113:10 115:24,24
   117:7 123:5,6 124:4,4
   130:4 131:18
days 24:17 52:4 53:2
   55:16 56:13 57:21
   120:22,22 126:11
dead 34:5
deal 27:14 43:12
dealing 90:17
Dear 128:10
death 18:8 19:11 21:6
   39:22 40:22 70:10,19,23
debrief 25:6
December 8:13,18 13:1,3
   20:1 123:22

decide 12:6 25:2 80:3
decision 51:6
deck 89:1 90:8
deep 29:24
deeply 34:14
defaulted 80:8
Defendant 4:2,9,14 5:16,
   19,24,24,25
Defendants 3:8,21 5:3
defense 54:23 99:17 101:25
defensive 30:5
definitely 66:18
delivered 56:19
denials 127:19
department 15:11 42:16
   58:5
depending 80:22
depends 25:15 66:15
   105:16
depo 6:8
deponent 129:5
deposed 6:11
deposes 5:11
deposition 5:3 23:23 27:21
   37:16 56:13 57:15
   128:11 129:2 130:3
   131:12,15
depositions 21:16
deputies 15:18,24 16:5
deputy 15:17 26:20 31:25
   32:3,4 44:14
described 72:16 104:23
desire 68:24
detail 17:21 51:2
details 11:11 14:8
Detective 5:21 7:22,23,25
   8:1 9:16,18 10:1 12:24
   20:15 23:8,23 32:18
   33:24 35:19 38:6,6
detectives 20:19 38:7 47:10
   51:11
determine 19:12,17 23:10
   25:19 36:13 111:10
determined 19:14 48:24
determining 70:23
develop 39:16 78:8 91:16
   112:18 115:10
developed 91:15 107:12
development 94:6
devoting 55:7
dialogue 104:14
died 43:17
difference 62:15 70:14
   116:4
different 9:22 11:6,13 42:4
   56:8 66:4 70:9 73:21
   86:6 87:9 109:13 111:25
   116:10,13 118:17,20
differently 28:21,22
digital 91:24,25 92:1
DIRECT 5:12 41:24
   113:12
direction 86:25 87:4
directions 87:9
directly 14:12
dirty 33:9
disagree 109:9

disagrees 68:7
disbanded 55:11
disc 91:17 92:4,14 93:25
94:2 100:21,21 101:11,17
discovery 67:9 110:19
discuss 25:1,14 79:20
120:25
discussed 37:6 79:25 113:4
121:3,4
discussing 121:6
discussion 26:24 27:1
60:15,18 64:14
discussions 108:7
dissipates 28:20
distance 19:5
distilled 80:22
distinction 8:5
distracted 71:15
DISTRICT 1:1 3:1
disturb 34:10,12 35:10
disturbance 34:16
DIVISION 1:2 3:2 7:13
12:23
document 74:4 119:22
122:2
door 35:14
doorway 34:24
dozen 72:5,9
dressed 14:16
drill 24:22
drink 42:22
Drive 12:19 14:12 112:23
driven 108:21
drove 14:22 17:3
dry 28:14
due 69:16
duly 131:5,9
duties 9:7,8 49:23 55:12
duty 13:15
dynamic 40:16

- E -

each 101:5
earlier 40:8 66:8 69:14
82:2 111:8 120:7
earliest 128:16
early 51:23 87:22
EASTERN 1:2 3:2
Easy-peasy 92:11
effect 32:13 42:23 119:22
egress 83:25 84:2
eight 30:16
either 7:23 42:19 45:13
51:20 65:18 94:15
101:24 103:22 115:7
125:14
electronic 52:20
electronics 22:25
else 27:15 37:8 41:24
51:12 60:5 63:8 82:1
89:16 90:22 92:4
else's 68:8
email 128:11
emergency 14:24 15:4,7
18:10
emphasis 61:17

employed 131:16
employees 58:5
EMS 15:24
enclosures 128:21
encountered 111:17
ended 16:13 60:11 99:16
103:23
endless 96:20
enforcement 46:5 57:19
58:4
engage 11:25 127:3
enjoy 71:14 76:15
enough 11:18 16:8 19:14
30:22 31:9 35:7,8 36:5
37:3 39:20 42:12 43:19
51:19 53:16 59:2,14
68:25 81:16 82:5 91:6
93:12 95:25 99:13 106:4
111:10 112:18 113:24
114:1
enter 121:19
Entered 119:7,19
entirely 55:22
entry/exit/ingress/egress
44:15
equal 23:7
equipment 87:23 89:23
Esquire 3:22 4:3,10 128:6,
22,23
essentially 51:4
established 28:5
estimate 90:11
ethical 105:18 106:3
Europe 39:3
evaluate 36:12
Even 37:15 93:8 102:2
111:5 112:14 118:8
evening 12:25 44:25 47:23
event 120:18
events 60:25
ever-changing 76:18
every 11:5,7 21:11,11 26:2
36:16,22 38:23,25 69:24
86:5 87:18 105:13
106:16 107:21 112:8
everybody 27:15
everyone 25:16
everything 20:9 31:2 35:25
36:1,9 46:16 54:1 107:12
108:12 111:6,19
evidence 12:1 23:15,19
31:21 33:11 63:11,21,12
67:10 71:7 78:5,21 79:7
89:25 91:17,18,23 98:24
100:20,21 101:17 109:17
110:19 112:1,16 123:24
126:15,19
exact 41:2 70:19
Exactly 10:19 13:13 15:6
17:10,11 37:23 48:17
52:16 53:3 91:12 94:9
114:18
exam 54:8
EXAMINATION 5:12
131:11
examine 69:20
examined 3:10 5:10

examiner 55:2 56:10
example 28:19 32:11 35:2
39:2 66:7 67:2 70:5
112:10
except 39:21
exclude 69:22
excluded 67:22
excuse 61:6
experience 20:23 69:16
72:8 80:7 85:22 88:21,22
experienced 20:19,23
experiment 82:24
experiments 62:1
expert 76:16
expires 130:13 131:19
Explain 32:2 71:2
expose 96:1
exposure 110:10
express 27:5,8
expressly 5:7
extent 109:1
extreme 66:4,5
eye 64:7
eyes 73:3

- F -

fabricate 126:15,19
face 31:1 85:10
facing 85:15
fact 19:11 21:11,13 22:4,5,
7,8 23:2,8,15 36:17,22
37:9 39:25 40:6 43:2
48:25 54:10 69:24 70:10,
11,13,15,16,18 74:16
81:23 99:10,11 105:7,20,
24 106:21 116:22 117:22
fact-gathering 40:14
factor 11:7
factors 111:14
facts 19:16,17 21:16,17,18,
19,22 23:6,9,13,14,19
26:8 36:17,18,20 40:13,
20 41:25 65:9,12,16,25
66:1,2 69:20,25 70:1,15
106:19,22 107:10,14,16
108:12 110:9 115:11
fading 82:23
faint 85:9
Fair 11:18 16:8 21:9
27:25 30:22 31:9 35:7,8
36:5,21 39:20 42:12
43:19 45:3,4 51:19 53:16
59:14 63:10,19 64:5
68:25 79:6 81:16 82:5,10
91:5 93:12 99:13,14
106:4 113:24 114:1
115:9
faith 127:9
false 127:4,6
family 40:16
far 39:8 48:19 91:15
127:17,18
FARIA 1:6 5:18 6:9 7:3
9:7 13:7 16:9 17:18
38:13,19 39:9 40:1,11,15,
18 42:3 44:22 46:1,22

47:12,14 52:9 54:7 55:2
56:11,15 57:17,23 59:3
60:6,6 62:11,24 65:1
70:6 71:4 77:17 108:4,8,
20 109:18 110:15 112:21
114:6 115:11 123:25
125:1,16 129:3
Faria's 12:23 76:8 122:11
fashion 17:6
faster 82:23
fault 10:20
February 8:13
feel 26:22 38:13 65:20
112:7
feet 83:11,11
fell 123:16
felony 9:18
felt 30:9
few 20:6 53:2,4 57:21
120:22 126:9
field 69:16 76:19
fifteen 83:11
figure 21:16 36:7 111:24
fill 55:23
film 82:9
filming 72:20
filter 88:8 116:6,6
find 21:7,9 39:7 45:20
68:10 70:16 84:3 97:22,
23 99:4,7,8,9 128:11
fine 27:13,17 117:2
fingertips 54:2
finish 110:4
fire 15:11 44:2 101:20
firemen 15:24
firm 63:11 70:11
first 8:12,13 9:12 11:19
12:18 14:22 16:9,22
33:20 41:18 49:5 56:21
67:15 74:18 93:9,11
94:15,19 95:16,19 108:24
112:25 123:12 131:9
Firsthand 59:4
fitting 71:3
five 3:11 53:5 55:16
90:14,16
fix 94:13
flat 86:14
flip 93:1
flipping 93:14
floor 33:5,12
flow 69:7
Floyd 51:11
fluid 87:4
flunked 55:2
fly 80:5
focused 71:16
follow-up 11:11 44:1 52:6
125:12 127:14
following 83:20 129:5
foregoing 130:3
forenoon 3:11
forensic 11:15 61:17 70:1
74:1,5,12,21 76:12 85:12
89:25
forensics 71:13 118:25
forethought 74:3

form 15:3 23:17
formal 69:16
formally 55:18
forming 111:15
forth 67:17
forward 49:21 128:15
found 76:11
foundation 112:5
four 8:8 16:3 20:15 24:17
  45:23,25 51:15,17 53:4
  55:16 122:9
four-day 55:15 107:19
four-walled 47:18
foyer 33:3
frame 77:6
free 68:16
Friday 8:19 13:18
front 96:21 118:9
FRY 3:19
full 6:4 61:19
fun 67:7
function 46:24 72:20,23
  82:20
furniture 81:22,23
further 32:7 86:1 131:14
furthest 83:25

- G -

galley 85:19,20
game 50:6,9 108:21 109:19
  114:9,12,14
gash 30:3
gather 11:25 21:19 23:14
  32:18 36:16 40:13 41:25
  49:6 80:1
gathered 26:9 36:22 38:19
  47:22 49:5
gatherers 23:14 106:21
gathering 12:1 34:9 53:20
general 7:22,24 9:15 10:1,
  24 17:12 22:14,19 87:2,4
generalize 112:9
gentleman 24:14
gets 22:10 73:1
getting 18:19 46:2 53:7
  68:19 91:15 98:19
  102:18 105:6
give 21:20 83:3 107:15
  112:8,10 124:7
given 31:23,24 83:8 130:5
giving 22:20 105:3
glance 18:25
glare 98:19
glass 47:15
glasses 115:17,19,20,22,23,
  25,25 116:7
glob 28:19
goes 95:15 127:18
gone 19:21 20:10 42:21
  44:8,10 65:1
gonna 10:15
Good 81:20 96:10,11
  106:10 127:8
gotten 42:22 109:20
great 27:23 37:17
green 98:14

grunt 58:12 61:9 68:2
  106:25 107:7
guess 23:5 58:5 66:25
  67:7 68:2 106:5
guilt 66:2
guy 24:15 36:3 43:14
  50:20 56:11 61:2 67:3
  111:23
guys 9:22 75:13 97:7
  98:10 100:8

- H -

half 72:5,9
hallway 31:16
HAMILL 4:7 5:19,19
hand 96:16 131:18
handful 75:5
handled 46:17,18 91:23
hands 89:1 90:8 99:17
  122:12
hands-down 21:12
hang 9:10,10 75:7,7
Hanley 3:23 128:7
happen 12:12
happened 13:3 27:17 42:14
  48:10,11 55:14 74:10
  78:9 83:21 101:17
  105:20,21
happens 39:4
hard 30:16 70:19 96:22
  98:3
Harney 3:21 38:6 46:14
  47:5 104:2,4,16,22
has 61:17 75:9 77:3 78:24
  81:4,12 102:9,9,10 103:9
  111:23 112:21 121:7
hasn't 79:3
hasty 36:23
haven't 19:14 87:22
  103:12
having 16:24 65:16 69:22,
  23 105:9 124:23 130:2
He'll 97:23
head 98:16
hear 18:22
heard 54:19,22 74:19,22
  112:25
heart 67:23
Heigele 2:4 4:3 5:23,23
  10:20 68:13 69:8 96:12
  98:11 105:22 109:4
  110:6,22 112:3 115:13
  118:13,16,19,23 126:3,6
  127:16
Heisenberg 34:13
held 105:25
helps 56:1
here's 41:5 98:9 107:15
HEREBY 5:1
hereinabove 130:5
hereto 131:16
Hey 32:8 38:13 46:6 48:2
  99:4 105:19
hierarchy 25:23
higher 81:6
higher-ups 25:23

highest 24:6
highlights 31:24
history 52:21 53:7,10
hit 82:6
Hm-mm 88:9 125:18
hold 108:23
holiday 60:12
Hollingsworth 15:20 44:14
Holmes 98:18
home 12:23 13:20,23
  104:17 108:21
homicide 38:23,25 39:4,19
homicides 19:14 106:14,18
hoped 59:24
host 55:25,25 58:5,8 59:1
hour 13:14 41:1,5,5 90:13
  112:14
hours 13:18 20:6 45:23,25
house 17:13,24 18:1,7,13
  21:23 31:14,19 32:6
  33:25 35:13 37:5 62:11
  64:16 71:7 77:10,18 85:4
  100:3 114:20 115:6
  124:22
houses 90:24
human 36:10 45:8
Hupp 56:25 57:3 103:14
  104:18
hurt 82:6
husband 66:9
hypotheses 78:8
hypothesize 67:7
hypothetical 22:21 69:2,5
Hypothetically 22:22
hypotheticals 67:1 68:6
  126:12

- I -

I.D 78:22
idea 11:18 14:11 15:25
  83:20 93:14 114:22
  120:2 124:12,15
ideas 25:18 104:10
identity 15:15
ignore 106:22
ignored 99:11
illuminate 63:24
illuminated 85:2,5
illuminating 80:18
illumination 63:5 73:5
  78:14 84:13
immediate 29:15 124:3
immediately 39:12
immersed 49:24
imply 23:6
importance 17:14 23:13,15
important 19:11,15 21:9,
  11,13,16,19 22:5,8 23:10
  36:5,13,14,17 67:19,23
impossible 36:25 65:15
improperly 68:5
inbox 128:11
incident 12:21
incremental 112:14
indemnify 101:24
independent 121:5

independently 106:1
INDEX 2:1
indicated 129:5
indicating 59:24 128:13
indulge 67:11
indulging 76:23
infor 49:12
information 12:5,7 23:14
  26:17,18 32:7,18 34:9
  38:19 39:16,19 46:22
  47:1,5,7,10,22 48:3,6
  49:6 50:2 53:20,21
  56:15,22 59:2,13,14,24
  101:23 103:8,12 111:5,10
inherent 69:21
initial 9:8 33:19 34:8
  49:23
Initially 53:3
initiate 45:13
innocence 66:2
insignia 14:5,17
instead 81:7,8
instructions 26:23
insurance 102:7 103:1
interest 85:11
interested 15:2 121:14,14
interesting 36:5
interrupt 69:7
interrupting 69:6
interview 11:15 42:19,22
  44:21 47:11 51:7,8 52:6
  103:14,20
interviewed 51:23 52:1,2,3
  103:23 104:1 114:6
interviewing 47:12 51:9
  57:3
into 5:6 18:7,13 23:4
  31:16 32:24 34:14 42:22
  45:5 71:3 82:4 91:17,18
  100:20,21 101:17 111:15,
  15
investigating 19:23
investigation 11:3,5 12:13,
  14 19:10 20:4 21:3,15
  25:14 27:10 49:21 51:1,4
  53:24 56:3 69:12 71:10
  72:2,11 77:15 107:8
  111:18
investigations 7:13 19:10
  65:8 67:21 106:13
investigator 7:24 23:8
  25:22
involved 38:2 49:20 70:24
  124:17 126:14
involvement 52:8 54:6,7
  57:25 70:23
involves 31:8
iPhone 88:11,14
isn't 36:13
issue 21:6
issued 12:4,7
items 74:11
itself 52:19 72:6

- J -

January 124:13

**Jason** 3:22 5:25 128:6
**job** 8:13 10:24 21:19 23:8,
  12,18 31:8 38:12 61:10
  91:14
**jobs** 21:15
**Joel** 128:23
**John** 5:19,19
**Join** 68:13 69:8 109:4
  110:22,23
**judgment** 102:1
**June** 103:15 131:19
**justice** 61:17

**- K -**

**keep** 68:24 69:6 76:20
  81:7 82:14 106:15 112:7
**keeping** 44:14
**kill** 66:11 67:3 115:6
**kind** 10:7 12:12 15:2
  22:20 23:6 24:22 26:12
  31:17,24 34:24 36:4,11
  38:15 43:2 46:2,7 59:12
  61:15 66:4,5 67:7 71:12
  80:19 81:23 83:7,13 85:9
  88:4,8 92:25 96:22,22
  100:20 105:4 115:21
  116:8,9,12,13,24 123:7
**kit** 80:23,24
**kitchen** 32:24 33:1,2,6
  34:17,20 35:13 71:8
  85:3,19 99:24 100:2
**kitchen/dining** 71:8
**knew** 8:23 34:5 39:21
  40:4 46:8 50:10 53:22
  54:1 64:24 72:10 76:10
  89:22,23 107:13
**knife** 29:19 36:20
**knowing** 50:25
**knowledge** 44:7 49:1 54:17
  58:3 76:2,7 80:1 89:20
  95:10 124:24 127:18
**known** 40:6 58:21 65:9,12,
  16 69:20 70:15

**- L -**

**lab** 90:2
**lack** 58:11
**Lake** 54:8
**larger** 124:10
**Last** 66:10 126:11
**later** 16:20 22:12 52:4
  53:2 57:9 60:10 76:11
  78:6,24 120:7,22,22,24
**law** 46:5 57:19 58:4
**lawful** 5:10
**lawsuit** 67:6 102:14,16,21
**lawyer** 37:12
**lay** 11:2 30:19
**LCD** 93:19
**lead** 52:15 60:8 67:9
  110:18 122:24
**leads** 11:11 24:16 49:3
  53:5
**Leah** 4:14 123:5
**Leah's** 123:9

**learned** 20:21 25:2 51:15
  124:13
**learning** 62:21 63:1
**least** 12:13 16:4 33:3
  34:10 70:8 75:21 97:14
  108:25
**leave** 90:24
**leaves** 112:12
**led** 40:21
**left** 52:9 55:11 91:5 98:14
  104:18 109:19
**legal** 105:22
**lengths** 104:20
**less** 35:5
**level** 26:23
**levity** 23:13
**Liberty** 36:4
**lie** 106:1
**life** 40:22
**light** 17:20 32:12,13 36:19
  80:11 84:18 95:25 116:4
**like** 10:11 11:16 13:18
  19:22 24:23 25:3 26:22
  30:8,13 35:16 45:7
  46:12,23 49:3,13 52:7
  54:11 60:9 62:1 65:20,21
  68:14 70:10,16 71:12,14,
  19 72:19 74:1 76:13,24
  80:14,25 81:3 83:4,16,16
  84:3 85:2,10,18 86:11,20,
  21 87:25 89:2 93:19,19
  94:9 95:17 97:2,10,11
  98:10,24 104:23 105:12
  112:7 113:4 115:22,22,22
  116:1,5,6,18,22 117:1
  119:20
**likely** 14:18 20:5 43:1
  58:1
**limited** 126:14,22 127:9
**Lincoln** 7:9 24:2 42:15
  101:23 102:10,10 119:8
**line** 8:4 68:15 86:24 87:1
  113:11
**list** 63:13 101:20
**listen** 113:20
**little** 11:2 19:5,19 28:20
  37:5 40:10 59:15 60:10
  70:9 81:1 98:19,20
  116:25 117:1 120:7
**log** 44:14,15
**logic** 64:25
**logical** 78:19 100:8
**long** 7:14 8:4,10 23:23
  40:21 41:15 67:1 82:19
  90:10 92:13 113:10
  122:9
**look** 11:11 20:8 23:4,19,19
  32:8,8 33:1 34:20 42:18
  66:23 83:4,14 85:23
  92:18 93:1,6,16,24 94:12
  95:24 96:4 97:21 98:17,
  23 99:1,1 101:10 118:3,7
  123:19
**looked** 19:8 29:14 30:8,13
  31:16 32:15 35:13,14
  40:3 85:10 86:20,20
  92:19,21 116:24 117:1

124:19
**looking** 26:10,10 31:21
  33:25 34:12 35:19,23
  40:19 64:19,21,23 78:5
  79:7,9,11,13 85:19,19
  94:16 95:12 118:16,16,19
  126:3
**looks** 81:3 97:10,11 119:4
**Lord** 96:11
**lot** 16:24 24:15 28:14
  76:14 82:22,22 88:24,25
  121:4
**Louis** 54:8 128:2 131:3
**Luminal** 61:22 62:6,9,11
  63:2,23 64:6 72:4,5
  78:14
**luminescence** 61:22 72:25
  82:21 83:1,5 85:9 86:21,
  24 95:5,12,18,21 97:11,
  15 98:24 115:18 117:18
**lying** 106:8

**- M -**

**macabre** 31:7
**Maglite** 116:5
**magnum** 81:5
**maintained** 108:9 111:21
**Maj** 53:19
**Major** 23:20 24:17,25
  45:16,19,20 46:6,24 48:1
  50:25 51:3,14,19 53:19
  55:10,18,24 56:1,4 58:9
  59:1,13,14
**makes** 70:17 93:10
**maliciously** 126:23
**man** 113:15
**man's** 67:20
**manipulate** 88:14,17
**manner** 62:19
**many** 15:25 30:20,23 53:5
  71:21 72:6 89:3 90:4,6
**Mariah** 123:5
**mark** 98:20,24 99:10
**marked** 35:15
**marks** 99:5,8
**Markwardt** 75:20
**material** 62:15 80:18
**matter** 32:1 105:24 126:22
  128:17
**matters** 62:7 131:10
**may** 5:3 11:12,13 13:14
  16:22 30:6 32:6,7 55:23
  59:10 75:10 79:22 83:21
  91:23 97:1 105:14,14
  112:12 113:22 121:2
  123:19,22 125:2,25
**maybe** 8:6 15:3 18:19
  19:18 25:11 41:1 45:5
  53:7 64:25 65:5 71:15
  72:5 73:20 75:24 82:1
  86:13 92:3 104:16
  108:14
**McCARRICK** 1:9 3:21
  23:24,25 25:12 55:1,13
  56:9 59:6,7 75:18 108:16
  109:16 110:10 118:5

120:21 121:1 128:9
**McCarrick's** 109:1
**mean** 9:16 11:6,9,17 12:6,
  9 14:5 17:18,21 19:4,8
  21:11,12 22:22,23 25:7,
  16 26:16,20 28:14,18
  29:17 30:1,8,13,18 31:4,
  7,24 32:17 35:9 36:18,
  21,23 39:6 40:10,15
  41:18 43:3,16 45:24
  49:20,22 50:14,16,25
  51:21 53:25 55:9,23
  57:20 58:11 59:10 60:9
  63:5 64:8,22 65:1,24
  66:1,15,17,18,25 67:4,6,
  6,10,11,14,17 68:9,10
  69:24 70:7 72:18 73:19
  74:2 77:21 78:22 79:2,4,
  23 81:17 82:4,5,7,8,24
  83:2,2,7,18,19,23 84:6
  85:25 86:2,5,13,22 87:2,8
  88:10 89:7 90:1,13,15,24
  92:10 94:7,11 97:21
  99:11,11 104:10,13,14,19,
  21 105:3,13,14,16 106:6,
  18,24 107:12,14 108:6
  111:18 112:10,15 113:3,9
  114:24 116:25 118:2
  119:19 120:10 121:2,25
  122:8
**means** 66:18
**medical** 70:21
**meeting** 79:19,23 80:1
**meetings** 24:21,23 25:4,14,
  19,24 26:7,13 27:6,10
  28:5 59:8,13 107:18
  108:1
**member** 55:18,24,25
**members** 25:13
**memory** 17:9 75:10
**mentioned** 40:2 130:6
**mentoring** 20:23 69:16
**Merkel** 3:21 4:9 5:9,14,22
  6:1,2,5 100:17 104:22
  114:5 119:7 130:2 131:8
**mess** 90:24
**method** 94:17
**Michael** 4:9 5:9 6:5 15:20
  119:7 130:2 131:8
**mid-2007** 8:7
**might** 7:21 10:20 22:6
  29:16 35:23 36:4 51:1
  53:6 54:20 58:21 64:7,15
  71:4,9 107:11 108:5
  111:15 118:8
**Mike** 6:2 126:9
**miles** 112:22 114:16
**military** 68:1
**millimeter** 81:1,7
**mind** 13:2 36:12 39:12
  68:23 93:8 106:15 107:5
**mindful** 81:18
**mine** 69:2
**minute** 37:23,23 52:25
**minutes** 90:14,16
**Mirandized** 125:1,4
**mischaracterization** 95:17

mischaracterizes 100:22
109:1
Miss 58:14,25 59:21
103:14 107:25 108:3,7
123:23 124:2,8,12
missing 60:8
missions 40:14
Missouri 3:12,20 4:8 7:10
128:2 131:2,7
misstatement 9:2
misunderstood 25:11
mix 81:6 83:4
mode 71:12
mom 66:11
moment 27:17
Monday 13:18
months 8:22,22
morning 51:24
mostly 60:12
mother 125:17,20
motion 33:12
motions 35:15 85:24 86:2
moving 68:24
Mueller 75:19
murder 7:3,17,21 9:7 13:3
19:11 22:6 56:17 60:6
66:8 71:5 77:13 109:18
110:15 111:12,16,23
114:17 115:3,12 123:1
murdered 50:20 57:18
must 94:25

- N -

nail 122:20,21,23
naked 64:7
name 6:4 75:18,19 129:1
names 15:22 50:13,22
51:18
Nathan 5:16
naturally 38:8
nature 17:17
near 29:5
necessarily 34:4,8 35:21
47:17 49:22 88:6
neck 29:19 36:20
need 6:22 11:14 23:9 32:7
61:6 64:14,17 71:18
100:10 126:5
needed 13:10 26:9 123:24
needs 107:17
negative 74:18
neither 131:14
never 25:21 54:23 58:22
70:22 74:12,21,21 78:17
news 59:23
next 25:3,20 30:17 40:17
51:23 52:12,15 91:10,13
92:21 93:10 124:4
night 16:17 28:7 50:6
77:12 108:21 109:19
111:8 114:9,12,14 125:1,
17
nights 50:9
Nikon 94:11,13,13
nine 30:16
nobody 64:18

non 14:2
Nope 76:18,18 123:16
124:18
normal 55:12,12
normally 115:23 121:7
North 3:12
NOTARIAL 131:1
Notary 3:13 5:4 128:14
131:5
notes 123:19
nothing 39:21 54:14 94:20
95:20
notice 119:23
notified 12:21
number 8:25 13:25
numbers 98:3
nuts 126:13

- O -

o'clock 3:11
oath 131:11
object 105:22 108:25
110:17 113:22
objection 69:1,3 109:22,23
110:2 112:3
objections 109:15
observe 19:1 40:20 41:16
47:15,19
obtain 11:15
obtained 61:3,4 66:16
obvious 29:18
obviously 7:2 17:17 94:7
95:22 96:21 120:10
occasion 6:14 126:15,18
occurred 11:19 29:16 54:9
86:15 103:20 114:17
occurring 54:10
October 128:4 131:18
off 43:22 60:12 91:3 94:16
98:16
Office 7:10,12 16:23,25
17:2,5,8 43:9 58:10
79:24 119:8,10
officer 8:2,10 14:4 67:3
105:14 121:8
officers 17:23 24:25 38:2
53:19 105:11,25 106:14
108:18 109:16
offices 131:6
often 72:7
old 88:10
once 46:4 70:8 81:12
82:16 87:10 91:14
one 6:16 7:25 8:23 9:21,
21 10:16 15:1,1,1 19:15,
16 21:8,15 23:8 24:13
25:18 26:2 27:16 29:22
38:2 40:7,13 41:18 45:6
47:4 48:13 49:6 52:21
53:6,15 57:15 58:21 59:8
60:3 61:3,5 63:15 65:18,
23 66:1 67:2 70:15,15
75:6,7,21 77:25 79:7,16,
23 80:2,6 83:18,18 85:22
87:6,25 89:2,17 92:24
93:7 97:7,8,22,23 98:13

101:5 103:13,21 107:21
112:2,8 114:10,14 116:20
119:4 121:4,6 122:17
123:3
one-on-one 59:6
ones 99:12,12
only 8:19 38:7 47:6 51:11
63:12 65:23 80:6 112:12
121:3
onset 33:19
open 95:22 106:15
operate 89:13
operated 89:16
opinion 23:16 36:24
110:14 111:11,13,15,20
opinions 23:18 27:2,5,9
opportunity 34:16
opposed 8:2 26:24 40:22
111:8 121:18
order 38:9 41:20 42:21
52:14 101:22 123:24
original 32:3
others 15:21 23:11
Otherwise 27:23
ought 19:18 48:2 112:1
our 5:15,15 23:12 25:15
55:11 56:11 89:5,12,23
91:16
ours 121:12
outside 16:11
overall 9:9 30:8 83:17
overapply 83:2
overexpose 88:2
overview 31:25

- P -

P.C 4:7
P.O 1:24
PAGE 2:2 96:5,7,21 98:1,
5
pages 96:17,20
pals 50:9
Pam 56:25 57:3 104:18
parameters 45:23
part 25:22 33:3 34:19
38:12 49:23 50:2 53:25
61:6,7 87:14 88:20 92:17
99:24 100:2,2 104:19
107:13 124:10
participate 60:20
participated 26:25 74:25
79:16
participating 26:24
particular 80:2 86:25
99:24 121:11,18
parties 127:21 131:12,15,
16
parts 31:14 34:19
party 39:9
passed 41:16
pasted 119:21 122:2
Pat 104:3,4
patchy 85:9
path 35:15 87:6 99:24
100:2
paths 64:15,15

pathway 86:23
patrol 8:2 12:23 14:4
paying 101:25,25
payment 102:9
PBT 73:21
pending 102:14,21
people 15:15,23 20:23
24:16 26:9,10,22 27:3
43:10,11 46:5 47:15
50:3,5,21 51:15,23 52:10
59:1,13 60:11,19 67:21
71:16 89:9,18 125:25
people's 90:24
percent 85:17
Perfect 114:4
perform 78:8,10
performed 60:22 61:1
68:4,5
period 20:19 58:18 77:3
person 39:2,9 40:18 44:12
47:6 51:13 57:18 61:1
65:17 75:6,21 76:12 90:7
99:23
persons 9:17 11:14
pertinent 36:22 37:9
phone 13:23 14:9 52:19
53:9,9,13,21 108:22
photo 93:1 97:3,5,12,14
photograph 72:25 95:23,24
photographs 73:12,15
87:18 90:11,20,21 91:11,
14,15,16 92:1,4,18,22,24
93:2,9 94:14 95:3,7,11,13
99:16,19
photos 87:12 88:3,23,24,25
90:4,6 93:21,24 95:18
97:8,18 100:19 101:10
116:25
phrase 116:16
physically 53:13
picture 73:8 93:15 96:9
107:14
pictures 81:23 94:6
pieces 54:1
pig 61:19 62:3 63:21,21
73:1
pile 35:6
Pirtle 15:20
pitch 95:24
place 32:8,9 49:14 68:7,19
84:17 86:15
placed 112:22 113:2
places 31:19 46:23 47:23
49:7,17 114:10
plain 14:2,6 17:19
Plaintiff 1:7 5:2,11,17,18,
18 43:20
plaintiff's 54:24 96:8
play 83:7
played 50:9 126:22 127:10
Pleban 4:10 5:21,21 22:9,
12 66:24 67:14,16,25
68:16,18,22 69:1,5
100:10 102:15,19,25
105:24 107:1,3,6 108:23
109:3,6,9,23,25 110:17
113:6,9,14,17 118:15,18

125:5,9  126:8  127:12
**PLT** 98:5  118:25
**point** 8:6  12:3  16:14
  17:21,22  18:4,7,21  20:16,
  22  22:9  30:24,25  34:2,10
  35:21  36:17,22  37:10,24
  39:20  40:23  41:10  44:10
  52:9  64:10  65:2  66:21
  79:2  81:20  83:25  89:14
  92:20  93:7  94:4,7  105:6
  112:3
**points** 45:14  83:3
**police** 8:10  16:14,15  37:25
  67:3  77:19  105:11,14,25
  108:18
**poly** 55:2,2  56:10
**polygraph** 54:7,17
**porch** 34:25
**position** 7:6,11,20  9:6  21:1
  68:3
**positive** 63:11  79:11
**possible** 39:1
**possibly** 69:22
**post** 7:14,20  8:11,12,18
**Potentially** 50:23,24
**potty** 100:10
**power** 64:6
**prac** 61:18
**practical** 61:18
**practicals** 86:11
**practice** 25:8  72:15,18
  106:11
**precipitated** 60:25
**prefer** 112:17
**preliminary** 34:9
**preparation** 127:4
**prepared** 124:7
**preparing** 46:9
**prescription** 115:25
**presence** 64:21,22  79:12
  99:2,2
**present** 5:24  12:5,7  16:12
  72:6  74:4,7  79:1  86:21
**presented** 99:19
**presumptive** 73:20,22,25
  79:5
**pretty** 17:19  21:2  29:18
  30:16  31:4,4  41:10  48:13
  56:12,12  85:20  112:22
  117:8  121:9
**preview** 93:20,21
**prime** 56:16,19  67:2
**principle** 34:13  65:8
**principles** 20:22  106:13
**printed** 96:20
**Prior** 6:12  16:24  20:8
  49:24  61:11  73:14
**prioritizing** 26:8,17
**probably** 13:2  37:22  39:4
  43:7  89:5  121:4
**problem** 8:23  92:10  94:5,
  8,10,11  105:18  106:3
  125:24
**problems** 89:21
**process** 12:10  26:8  36:10,
  12  38:2,3  53:20  90:9
  91:21  96:19  101:2

**processes** 107:9
**produced** 5:10  54:23  95:3
**product** 62:17
**products** 62:18
**Professional** 5:5  70:21
**professionally** 61:20
**program** 10:11
**promotion** 7:18
**promptly** 120:18
**properly** 20:3  21:3
**property** 9:17  11:10
**prosecuting** 12:3  21:20
  58:9
**prosecution** 111:23
**protocol** 87:14,16
**provided** 103:9
**provider** 52:20  53:14
**providing** 101:24
**proximity** 19:3
**prudent** 35:18
**Public** 3:13  5:4  128:14
  131:5
**pulling** 78:24  94:16
**pure** 82:14
**purpose** 31:20  59:12  71:3
**purview** 38:17
**push** 81:8
**put** 10:22  26:9  45:5  63:21
  80:13,21  81:24  90:18
  91:17,17,18  92:4,14  94:1
  100:20  101:11  107:5
  119:20
**puts** 66:13
**putting** 81:13  93:25

- Q -

**QT** 45:7  46:23
**question** 13:6  29:22  57:15
  60:3  64:11  70:5  79:17
  107:10  109:24  110:1,4,24
  111:1  113:24  123:13
  125:12
**QUESTIONERS** 2:1
**questioning** 68:15  113:11
**QUESTIONS** 2:2  5:13
  19:9  44:1  107:16  113:20
  125:22,25  126:6,8
  127:16,19
**queue** 10:2,5,25
**quick** 6:15  31:17,17  43:20,
  21  87:3  105:3
**quicker** 82:22
**quietly** 26:23
**quite** 20:6  123:21
**quote** 56:12

- R -

**range** 118:20
**raw** 54:17
**Ray** 51:11
**re** 64:14  129:3
**reach** 29:15  30:4  40:20
  94:4  110:7
**reached** 109:16
**react** 63:13  79:1

**reacted** 63:12
**reaction** 63:17  79:12
  105:12
**reacts** 78:25
**read** 111:3  122:16  127:24
  130:3
**ready** 81:15  82:8
**reagent** 62:14
**real** 6:15  31:17  43:21
**reason** 6:25  129:8,11,14,
  17,20
**reasonable** 19:5
**reasonably** 67:8  110:18
**recall** 12:20  13:22  14:24
  15:6  16:11,16,21  17:4,25
  18:23  27:7  29:6  30:6
  33:10,11,13  34:21  35:17
  37:10  38:11  41:2  42:11
  44:13,19  46:25  52:14
  55:6  71:11,17  73:13,16
  76:4  78:16,18  86:19  89:6
  92:6,7  94:2  99:25  100:4,
  4  101:14  103:25  104:16
  105:9  108:2,6  121:20,21
  125:2,6,7,13
**received** 19:21  101:19,22
**recollection** 15:16  74:20
  121:6
**recommend** 48:1
**recommended** 48:2
**record** 33:16  43:23  44:1
  73:9  100:15  111:3
**records** 11:16  52:20  53:9,
  15,22  94:12
**red** 36:19  98:13
**reduced** 131:11
**reference** 116:17
**reflected** 30:7
**reflecting** 17:10
**regard** 126:23
**regarding** 60:6
**Registered** 5:5  131:4
**relate** 64:15
**related** 53:6
**relation** 22:18
**relayed** 59:5,5,6
**release** 76:8  77:18
**released** 57:24
**relevancy** 110:18
**relevant** 12:1  22:7  34:7
  36:8  39:19  50:21  68:8
  71:10  82:12
**remember** 8:19  9:24  13:13
  14:7  15:14,16  16:23
  17:15  22:2  24:20  25:3
  27:10,16,18  28:11  29:7,7,
  11  30:1  31:15,18  32:7,25
  33:5,14,22  37:8,11,23
  42:3,7  44:4,5,17  48:6,17,
  23  50:12,14,17  52:18
  53:12  55:17  57:21,23
  58:20,25  59:11  60:5,16,
  17  61:18  64:16,17  73:11
  74:24  75:17,22  80:6
  84:25  85:8  86:12,19  87:7
  91:12  93:23  94:3,18
  95:2,8,10,12  101:7  104:2,

8,19,21  117:17  119:17
  120:5  121:10,16,23,25
  122:13,17  124:5  125:16,
  19
**remembering** 27:24
**removed** 84:23
**repeat** 110:25  111:1
**report** 11:8,10  17:11  26:20
  30:7  39:22  42:18  43:4,5
  91:8  117:18,23,24  119:3
  120:4,18,25  121:3,7,19
  122:16  124:6,10,19  125:9
**Reporter** 3:13,13  5:5,6
  10:4  111:3
**reporting** 39:9  128:1
**reports** 74:12,21  116:20
**representations** 99:22
**represented** 103:6
**rescue** 44:3
**reserved** 5:7
**residence** 31:21  52:22
**resources** 25:20  45:25
**respect** 24:6  68:24  126:21
  127:9
**respected** 24:11
**respond** 9:8  12:24  41:6,11
**responded** 13:25
**responding** 32:3
**response** 34:8
**result** 94:16
**results** 116:17  124:13
**Retter** 3:22  5:25,25  10:16
  37:15,18  62:6  75:14  93:7
  98:5  100:22  106:2
  108:25  109:7,22,24
  110:1,5,23  113:19,22
  114:1,4  118:12,22,24
  126:2  127:13,24  128:6,10
**returned** 109:19
**review** 11:10
**ring** 104:18
**Road** 3:23  73:22  128:7
**rock** 111:13
**role** 11:4  53:23  67:25
  68:1,3,4,5  75:2  76:24
  126:21  127:9
**room** 42:19,22  46:16
  47:18,19  63:22  71:8
  74:25  76:23  80:11  81:12
  83:10,14
**ROSENBLUM** 3:19
**roughly** 8:8  108:21  109:21
  111:24
**routine** 11:3  12:10  38:20
  46:19
**RPR** 128:20
**rug** 29:4,5,6,7  84:15,23
**rugs** 84:11
**rules** 6:16  43:9  78:20
  112:16
**run** 107:16
**runny** 83:2
**Russ** 37:25  71:4  104:17
  108:10,20
**Russ'** 123:8
**RUSSELL** 1:6  5:18  129:3
**RYAN** 1:9  118:4  129:3

**- S -**

safe 79:2 84:3
said 15:1,3 21:10 24:13,24
27:4,7,11 35:3 40:25
42:7,24 46:6,22 47:23
49:3,14 50:11,20 52:7
56:10,13 64:21 66:10
67:3 69:14 76:13 89:9
92:3 93:10 96:21 98:6
100:19 104:22,24 108:16,
18 110:15 114:6 118:18
120:6,6 125:5,11 131:11
Saint 54:8
same 27:14 62:17,19,19
109:22,23 110:2 117:7,8
122:8,10,23,24
samples 74:6
sat 26:23
satellite 47:19
saturated 78:25
saw 14:22 16:9 28:7 32:9
37:8 39:22 85:2,5,14
91:10,13 93:9
saying 29:1 32:8 44:17,20
59:1 65:20,23 71:17 74:2
95:17 104:8 116:3
scenario 83:8
scenarios 111:25
scene 7:24 9:9 16:19,22
17:8 34:10,15 38:7 41:6
44:2,11,12,14 65:13 76:7
77:4,8 78:15 86:1 89:18,
18 93:22
Schock 2:3 5:13,14,14 6:3
10:7,19,21,23 22:11,13,15
31:13 37:17,19,20 43:22,
25 62:10 67:13,15,19
68:12,14,17,20,23 69:4,9
75:10,15 93:12,13 96:15
97:22,23 98:7,9,12 100:7,
11,14,24 101:3 102:17,20
103:1 106:7 107:2,4,7
109:5,11 110:3,7 111:1,7
112:19 113:12 114:1,3,5
115:15 118:11,14 119:1
125:8,10,14 126:5 127:14
128:16,22
school 19:21 63:25 71:15
72:16
schools 20:24
SCHWARTZ 3:19
science 61:17 82:24
Scientific 70:4 74:2
SCOTT 1:6 129:3
screen 93:2,16,19 94:15
seal 131:18
search 18:3,19 52:19,23
53:13 61:4,4 75:25 117:8
season 112:15
second 11:23 15:1 24:15
49:25 50:2 75:7 95:2,9
99:20
sections 57:14
secure 76:8 77:4,12 78:15
124:23

secured 78:21 79:3
seeing 31:8 33:22 36:13
115:22
seem 23:6,10 26:7 42:10
60:13
seemed 87:2
seems 25:7 60:13
seen 74:12,21 86:7,9 93:15
94:25 99:23 100:1
seize 85:12 122:15
seized 74:11,17 117:7,9
seminars 19:22
send 94:12
sending 90:1
sense 22:6 70:17 78:19
84:1 93:10 112:2
September 1:17 3:10 130:4
SERGEANT 1:9 15:17
31:25 129:3
served 103:4
service 52:20 53:14 94:12
services 14:24
set 39:17,18 46:10 50:2
66:1
sets 28:18 45:13
settlement 101:25
setup 46:16
several 126:11
shaken 42:10
shared 26:16
sheet 52:15 129:2
Sheriff's 7:9,12 16:23,25
17:2,5,8 42:15 43:9 58:4
119:8,10
Sherlock 98:18
shift 13:15
Shockley 67:2
short 13:12
shorthand 5:4
should 36:21 39:1 69:19
78:15 84:14,15 106:15
show 10:2,5 62:4 69:1,2
81:23 86:4,7,23 95:5,20,
21 96:9 97:1,6 122:4
125:9
showed 94:20 95:11,20
103:22
shutter 88:14 95:22
side 73:22 98:4
sift 23:9
sign 33:25 34:7 35:20
127:24
signature 5:7 130:5
significantly 7:18
signs 30:9,11 35:14
since 7:17 8:6
single 36:16,22
sink 117:3,14
sit 26:11 33:18 44:7 48:9
51:22 54:16 67:10 74:15
99:16 111:19
situation 12:16 72:6 74:23
123:2
six 73:14 87:20 120:22
slower 82:23
small 97:25 98:24,24 99:5,
10,12

smoke 43:9
smudge 96:22 97:9
smudges 97:17
sobeit 34:11
soften 109:15
softened 109:25
solid 111:13 112:8
some 10:7 12:3 14:16
15:9,10,14,15 16:14 17:6,
11,20 19:9,25,25 20:3,18,
21 21:22,25 22:6 26:1,5,
9,10 28:4,15,17,19 29:1,
2,5 32:6 37:24 41:10
46:15,17,18 49:23 52:9,
17 60:15 61:14,14 64:13
66:22 67:2 75:2 80:13,18
81:23 82:25 84:22 86:14
88:4,8 89:14 92:20 93:14
94:4,7 95:5 97:15,17,17
99:21 100:20 105:14,14
106:12 107:8,18,25 120:8
123:19
somebody 30:14,19 44:17
46:6 51:12 59:25 68:8
74:6 78:5 82:1 92:4
106:8 107:15 115:6
121:24
somehow 47:25 51:14,18
68:5 119:20
someone 12:24 48:2 65:15
113:23 123:1
something 13:21 14:5
19:13 21:7 26:19 27:16
30:7,14 32:13 33:24
34:12 37:12 42:23 45:2
59:4,9 60:8 61:15 63:8,
12 64:22 66:22 78:24
80:19 82:6 83:21 87:16
89:2 95:23,25 104:23
105:11,19 108:15 119:8,
22 125:7
Sometime 120:10,10
Sometimes 8:24 9:1 27:15
31:8 70:1 86:4,5 104:11
105:11,15
somewhat 19:1
somewhere 90:14
soon 41:10
sorry 8:20 92:2
sort 17:11 18:25 20:7
24:15 28:18,20 29:15
31:9 53:19 61:10 64:24
86:23 104:23
Sound 13:4 55:15 94:22
sounds 13:5 51:25 103:16
sources 102:9
South 3:23 4:11 109:20
112:22 114:16,24,24
115:1 128:7
speak 27:3 105:13 123:11
speaking 6:20
speaks 66:2
special 115:17,19,21,25
116:7
specialized 88:4
specific 90:19 101:6 112:13
specifically 12:20 13:22

14:9 15:8 27:7 29:13
42:5,9,20 44:13 50:17
60:5 71:7,18 73:16 76:5
86:12 99:4 125:2,15,18
specificity 25:5
speculation 110:20 112:4
speech 15:3
speed 88:14
spent 90:10
spill 28:19
spoke 55:1 56:9 58:17
spoken 40:4 123:15
spots 116:25 117:1
spouse 38:23 39:1,3,4,10
spray 80:19 81:6,9 82:16
83:4,9,13,14 84:21
sprayed 82:18
spritz 81:7
spritzer 81:1,8
Squad 23:20 24:17,25
45:16,20,20 46:6,24 48:1
51:3,14,19 53:19 55:10,
19,24 56:4 58:9 59:2
St 3:12 4:8 128:2 131:3,7
stab 30:15
stabbed 29:17,18 30:20,24
70:6
staged 86:10
stages 28:13
stamp 118:20
stamped 118:8
stand 19:4 35:24 119:9
standard 25:7 80:25 87:14,
15 121:9 122:5
standing 115:5
start 7:3 27:24 83:21,25
109:10
starts 82:20
stated 109:16
statement 35:22 38:22
63:10 64:5 66:16 77:2
79:6 82:10 105:10
111:22 115:2
statements 127:4,6
STATES 1:1 3:1
station 37:25 38:14 39:15
42:2,14
Statue 36:3
status 25:14
stay 51:6,8
step 35:6
steps 35:5 48:7
sticking 29:19
still 12:25 19:5 55:7 58:23
78:25 79:1 82:23 108:9
111:6 123:7
STIPULATED 5:1
stopped 75:9
story 44:24 48:18
straight 87:1 100:25
Street 3:12 4:4
strongly 112:22
struggle 30:8,9,21
stuff 46:12 67:8 84:6
86:11
sub 36:11
subject 102:11 110:20

subjective 36:11,16
submit 13:1 77:7 121:7
subpoenas 11:16
Subscribed 130:10
substance 36:19
substantially 120:7
such 24:20 35:20
suggest 54:11
suggested 87:8
suicide 40:1,4
suit 102:23,24 103:2
Suite 3:17 4:4
Sumac 12:19 14:12 112:22
superior 38:10 121:8
supervisor 9:24
Supplementary 118:24
supplements 56:1
support 65:25 66:1
supposed 85:23 99:1,12
Sure 8:9 9:23 12:11,15
  13:5 14:18 15:17 16:5
  17:10,11 18:10,15 19:8
  20:5,11 21:4,8 23:2,4
  24:5,6,8,24,24 25:6,17,18
  26:4,6 27:1,22 28:16,22
  29:10 30:10 34:17,19
  35:25 36:6 38:16,19,21
  39:7,8 41:12 42:24 43:1
  45:11,17,18 46:13,18
  47:3 48:8,23 50:7,23
  52:1,5,7 53:3,25 55:9,22
  58:8 59:10,16 60:13,22
  62:20 63:16 66:16 67:5,8
  68:6,18 70:4 72:22 76:4,
  5 82:15 85:18,20 86:3
  87:17 89:14 91:7 92:16
  93:8,11 97:13 100:18
  102:2 106:18 109:11
  110:5,6 111:5 114:3
  117:8 118:12 121:22
  123:4,23 125:12
surely 50:19
surface 86:14
surprised 27:25
surveillance 45:7 48:3
survey 19:5 31:17,20
suspect 38:23,24 39:5,13,
  16,18 56:16,19,20,25
  65:1,9,10 66:14,19 69:20,
  22 123:1
suspects 56:23 106:1
suspicious 18:8 40:11,12
swabs 122:11
SWANSON 5:16,16 96:14
  118:10
swath 83:16
switch 17:20 32:12,13
  36:19
sworn 3:10 5:10 130:10
  131:9
system 119:20 121:10,12

- T -

tab 96:12
Tabitha 75:19 89:19
table 82:6
tablet 80:21
tablets 81:4
take 6:20,23 10:21 11:7,7
  14:16 21:22 39:15 43:20
  51:1,4 73:8 74:6 82:19
  87:12,22 90:13,14 91:3,3
  93:15 107:14 126:5
taken 5:3 38:8 43:24 48:7
  57:18 73:15 90:16 91:15
  92:25 93:2 100:13
  124:11 130:3 131:15
takes 75:6
taking 38:3,4 66:4 73:11
  90:1,10
talk 7:2 12:16 16:17 18:18
  19:18 32:11 40:14 45:19
  51:2 54:19,22 65:19
  66:9,9 78:20 103:24
  113:10 124:2
talked 16:21 37:25 40:8,18
  42:22 46:14 57:5,10
  79:22 103:24 104:6,20
  107:19 126:11
talking 9:10 10:24 22:10,
  17 29:8 35:12 42:19
  46:5 50:3,10,19 52:10
  53:20 71:24 72:1,2 73:2
  102:2,15
Tami 5:4 111:2 128:20
  131:4,23
tapes 77:19
tasks 53:4
team 25:13 47:9
technically 55:18 94:9
techs 91:23
telling 23:17 24:16 48:4
  49:9 124:17 125:19
ten 16:6 83:10
term 58:6 68:1
terms 13:7 22:14 71:3
  62:10 70:25 71:3,19
  72:21 73:20,22,25 74:1,2,
  5,16 75:16,25 76:9 77:2,
  4,23 78:8,10 79:5 80:4
  82:12 85:1 92:14 99:23
  115:18 116:1,10,12,13,17
  117:19 120:15 124:3,4,14
tested 74:13,13
testified 94:19,23,25
testify 131:9
testimony 62:7 100:23
  109:2 128:13 130:5
testing 82:11 85:13
tests 71:22 78:14,14
Thank 31:12 125:23
  128:17
Thanks 6:3,6
that'll 27:24
themselves 30:14
theories 108:4 113:10
  126:12
theory 71:4 104:9 115:10
thereafter 41:11
thereto 129:5
they're 22:7 36:18,18
  55:16 101:23 115:24
123:8,9
they've 81:2
thing 20:7 26:12 33:4
  38:15 46:7 48:13 53:11
  61:10 71:13 75:9 82:20
  122:25 126:13
things 9:1 17:15 18:20
  19:22 21:9 23:9 25:3
  26:15 27:24 41:18,21
  45:6,7 46:9 52:17 61:5
  63:13,16 76:24 79:7
  80:14 81:24 82:4 85:23
  89:25 98:15 111:17
  122:17 123:4
thinking 116:3
Third 3:12 4:4
this_____day 130:10
though 26:8 82:19 106:25
thought 104:17 105:21
  107:9
three 6:8,16 7:15,16 8:22,
  22 16:2,4 24:24
through 11:16 13:18 23:9
  27:15 34:15 45:16 53:20
  67:1 76:9 93:1 116:7
throughout 107:8
throw 104:10 105:11
tiles 74:17
timeline 111:9 112:16,17
title 7:21
today 5:15 99:16
together 25:13 50:8
told 14:8 17:13,16 44:24
  49:7 50:8 55:1 56:9 59:9
  61:5 64:18 102:10
  104:17
tomorrow 26:11
took 37:24 42:18 51:9,11
  52:10 60:12 61:16 88:3,
  23,23,25 90:4,7,21 93:21
  97:8
top 98:12,16 119:23
totally 116:13 125:8
toward 35:14 84:2
towards 87:2
tower 53:9,22
tracked 44:16
trade 20:22
trail 83:17,18 116:18,18,22
trained 69:11 98:23 99:4
training 7:3 19:19 61:11,
  25 69:16 72:1 78:11
  85:22 88:20
transcribed 5:6 104:25
  105:1
transcript 130:3
transpired 41:23
trap 117:3,14
traveled 87:9,10
tree 112:13
trial 27:18,23 49:25 94:15,
  19 95:2,9,16,19 99:20
tried 90:23
Troy 7:10 39:4 114:24
True 45:10 56:7 69:12,19
  77:2 115:8
truly 128:18
truth 48:4 131:9
try 6:19 11:18 21:7 25:16,
  19 66:3 74:3 76:20 82:8,
  14 83:16,23,25 89:24
  90:24 109:13
trying 23:5,7 32:18 33:15
  36:7 37:2 90:9 93:13
tube 81:3,4
Tuesday 50:9
turned 67:4 100:19,21
turns 6:20
TV 59:19
twice 52:3
Two 7:15 8:22 15:18 16:5
  24:24 38:7 44:1 45:5,13
  51:10 52:21 62:16 70:14
  87:9 89:8
type 112:8
typed 119:21 122:1
typewriting 5:6
Typically 72:22 91:16

- U -

U-Gas 46:23 49:15
uncertainty 34:13
underlining 102:23,24
understand 6:17 11:19,21,
  25 14:7 20:13 21:10
  26:3 40:15 47:20 49:18
  50:1 56:2 63:4 67:20
  79:14 81:10 101:9
  102:13,20
understanding 31:22 67:20
  123:9
understood 21:2 25:12
undertook 52:13
undone 90:25
unfortunately 77:1
uniformed 14:4
UNITED 1:1 3:1
until 8:13 41:16 49:24
  54:10 55:10 82:19 89:8
  108:21
unusual 35:24
update 27:20 59:13
upper 98:14
use 36:12 82:16,18 99:9
  116:16
used 23:1 58:6 62:3,6
  72:9 88:5,8 115:25
using 80:23
usually 55:16 70:21,22
  73:18

- V -

vague 112:4
validate 48:7
variables 90:18
varies 11:9
various 28:13 47:23 56:5
vastly 111:25
vehicles 15:4,7,12
verified 50:3
version 62:2 63:20
very 12:9 36:5 51:23 53:5

56:21 67:19 72:6,6 73:12
96:10 98:24 119:5
121:25 125:23
**via** 45:8
**victim** 11:8
**victims** 31:8
**video** 75:12,13
**view** 116:7
**violent** 123:1
**visible** 34:18 64:7
**volley** 104:14

## - W -

**waited** 26:23
**walk** 34:15 82:11
**walked** 17:12 31:15 32:21
35:2,3 37:5,21
**walking** 31:18
**walkthrough** 17:13
**want** 7:2,3 9:12 15:4 17:7
28:6 33:15 35:10 45:12
66:5,5 67:1 68:21 69:6
75:18 77:25 82:4,5 83:14
85:7,17,18 96:14 123:18,
23
**wanted** 42:24 51:2 103:24
**wants** 43:14 108:23
**warrant** 18:3,19 52:19,23
53:13 61:4,4 75:25 117:8
**watch** 35:5,9 83:1
**watched** 78:22
**water** 28:18,19,21,23
80:20,22
**way** 66:4 83:24 84:3 90:18
109:13 125:14
**we'd** 55:11
**we've** 37:2,3 53:21 73:19
87:3,3 112:11,13,14,14
**wear** 115:17,20,23
**week** 66:10 120:14,24
**weekend** 60:12
**weeks** 6:8
**weigh** 23:12
**went** 17:5,8 18:1 20:9
42:2 48:18 54:2,3 61:21
71:14 79:19 101:17
114:6,6 115:7,12
**weren't** 14:17 49:3 77:21,
22 79:24 124:17
**West** 4:4
**wet** 28:13,15 29:2
**what's** 36:13 53:13 95:6
117:13 119:9
**When's** 92:21
**where** 7:8 17:11 21:2
24:16 29:4 44:24 46:6
48:18 54:17,19 59:11
64:25 66:24 67:5,11,18,
22 68:21 73:2 78:23
81:8,18,22 82:11 83:21
84:17 85:21 86:15,20,21
92:25 103:21 113:1,6,10,
10,17 114:17,18,19,24
122:16
**wherever** 13:24
**which** 17:18 20:10 21:16

23:10 24:17 27:17 30:1
34:14 38:3 41:21 50:2
53:15 58:5 62:23 63:13
69:21 70:10 80:13 96:9,
12 107:9 109:5 111:5
131:15
**whichever** 63:23
**while** 26:11 46:5 59:17
110:4
**white** 97:2,5
**Who's** 59:20 89:7 123:1
**whole** 33:3 57:14
**whose** 50:20
**wife** 43:15 50:20 57:18
66:9
**wife's** 39:19
**willing** 27:19 38:14 67:10
**windows** 75:1 80:14
**wipe** 86:9,13
**wiping** 33:12 35:15 85:23
86:2,15,17
**with** 6:19 7:3,12 8:5 11:15
13:4 14:5 16:24 17:5
20:18 24:1,15 25:5 27:15
28:21 35:15 36:19 38:15,
22 42:3,6 45:6 46:1
47:5,12,13 50:6,8,21
51:15 52:8,13 53:18
54:14 57:2 58:9,14 60:9
64:7,8 66:24 67:5 68:7
71:19 72:8,21 73:3,5
74:1,1,5 75:15 76:20
78:13,25 79:1,12 80:7,25
81:2 82:25 83:7 87:4
88:6 89:21,25 90:18
91:20 92:1,17 94:5,11
96:16 97:18 99:19 100:9
103:14 105:10 106:16
107:16 108:3,7 111:22
112:20 113:7,11,11,18
115:2 116:16,24 117:12
118:20 120:25 121:4,5
126:18,21,25 127:9
**within** 13:14 14:15 43:8
45:22,23,25 48:13 57:21
120:14 131:5
**without** 17:10
**witness** 5:7 6:2 10:5,18
31:12 62:8 105:12 109:8
112:5 113:8,16,21,25
129:1 130:2 131:13
**witnesses** 104:12 113:5
127:20
**word** 13:10 107:4 119:18,
21 122:1
**words** 48:21 58:11
**work** 6:19 7:8,9 8:4 9:20
10:3,10 13:11,16 66:5
75:11 76:12 82:25 84:1,
4,11 112:20 122:11
**worked** 8:1 19:14 20:18
24:2 87:19 121:11,16
**working** 24:1 25:1 45:24
75:12 90:17 106:14
**works** 57:16 62:19 84:15
121:12
**worse** 31:10,11

**wound** 30:5,15
**Write** 91:8 117:21
**writer** 26:20
**writing** 131:11
**written** 120:18
**wrote** 117:18,25 119:3,16
120:3,6,7,14 121:24
122:24

## - Y -

**Yap** 80:15,15,17 98:22
108:13
**Yeah** 9:14 10:9 15:10 19:8
22:11,11,13,20 23:3
24:10,12 25:15 29:9
30:1,2,18,18 31:3,6
32:16,22 38:18 39:6,6
43:13,16,18 46:8,11,17,
17,20 48:11,11 49:16
50:11,25 51:20,20 52:24
53:3,8,11,17 55:16 56:8
57:9,9,9 58:7,7 59:15,16
60:13,24 62:1,5,8,19,20
63:15,19 64:9,11 65:2,4
66:15,20 69:1,24 70:7,13,
17 72:13,17 73:24 74:20
75:2 76:2,2,5 78:21
80:20 81:17,20,21 82:3,7,
13,18 84:3,10,16,22
85:16 86:2,10,16 88:19,
22 89:15 91:4,4,4,9,19,
25,25 92:10,12,19 93:3,
17,20 94:13 96:2,24
97:4,10 98:5,7 99:9,14
101:1 102:19,25 103:18
104:5,7,10,11,13,13
105:1,13 106:8,16,20
107:21,24 108:9 111:6
112:7,15,15 113:21
114:15 115:1,5,6,9,20
116:9,15,20,21 118:11,18,
23 119:10,11,25 120:8,
12,13,24 121:13,16
122:7,18 123:11 125:13,
15 126:9
**years** 7:15,16 8:8 20:16
49:21 78:23 79:3 122:9
**yellow** 77:19
**yesterday** 46:15 104:6
**yet** 27:11 93:9
**You've** 56:4 73:19
**yours** 24:4 38:10 128:18
**yourself** 27:9 35:9 58:13,
15 69:15 76:16 106:24