# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

RUSSELL SCOTT FARIA,      )
                                   )
         Plaintiff,       )
       vs.                  )       Case No. 4:16-cv-01175-JAR
                                   )
RYAN J. McCARRICK, et al.,   )
                                   )
       Defendants.     )
                                   )

## MEMORANDUM AND ORDER

This matter is before the Court on Motions for Summary Judgment filed by Defendants Lincoln County Prosecuting Attorney Leah Askey-Chaney ("Chaney"[1]) (Doc. 78), Lincoln County, Missouri (Doc. 82), and Lincoln County Sheriff's Department Sergeant Ryan McCarrick, Detective Michael Merkel, and Detective Patrick Harney (collectively, "the Police Defendants") (Doc. 84). All three motions have been extensively briefed. (Docs. 79, 83, 85, 87, 105-107, 108-110, 127-131, 133, 139, 140, 143.) Because all of these motions involve similar legal issues and intertwined facts, the Court will address them together.

Also before the Court are Defendants' Joint Motions to Exclude the Expert Testimony of Judge Glenn Norton, (Doc. 80), and Jeffrey J. Noble (Doc. 88). Plaintiff has responded in opposition to both motions (Docs. 104, 112), and Defendants have replied (Docs. 126, 142).

### Background[2]

---

[1] On July 6, 2018, the Court granted Plaintiff's consent motion to change Leah Askey-Chaney's name for purposes of the record to her married name, Leah Wommack Chaney. (Docs. 71, 72.)
[2] Facts are taken from the parties' statements of material fact, responses and supplements thereto. The Court will cite specific filings where appropriate.

On Tuesday, December 27, 2011, Elizabeth "Betsy" Faria was stabbed approximately fifty-five times and left to die on the floor of her home, the knife still lodged in her neck.  At the time, Betsy was receiving regular chemotherapy.  Throughout that day, Betsy and her husband, Plaintiff Russell "Russ" Faria, traded messages and phone calls regarding their evening plans. Russ, who worked from home, told Betsy that he intended to go to his friend Michael Corbin's house, where Corbin had for many years hosted a regular Tuesday game night for Russ and four others.  Betsy and Russ decided that Betsy would leave her afternoon chemotherapy appointment and head to her mother's house, which was near Corbin's, and that Russ would pick her up on his way home from game night.

Russ finished work and left the Faria home around 5:00 p.m.  On his way to Corbin's, he made four stops:  from 5:16 to 5:20, he stopped to get gas at a Conoco station in Troy, Missouri; from 5:31 to 5:32, he stopped to buy cigarettes at a U-Gas in Wentzville; at 5:52 he bought a bag of dog food at Green's Country Store in Lake St. Louis; and from 5:56 to 5:58 he was in an O'Fallon, Missouri Quicktrip buying two bottles of iced tea.  His first, second, and fourth stops were recorded on camera and he had a timestamped receipt from Green's.

Russ got to Corbin's around 6:00 p.m.  Regular game night participant Richard May was stuck at work, leaving the group without the six players necessary for their usual game. Nevertheless, the other five met, smoked marijuana, and watched movies.

At around 9:00 p.m., part-way through their second film, the group split up.  At some point during the day, Betsy had told Russ that her friend Pamela "Pam" Hupp would be picking her up from her mother's house, so Russ headed home.  On the way, he stopped at the Arby's on Raymond Drive in Lake St. Louis.  His receipt shows that he ordered two junior cheddar melts at 9:09 p.m.  Russ then made the twenty-five-mile trip home—which officers would later clock at twenty-six minutes and thirty seconds—grabbed the dog food from the back seat of his car, and

2

walked inside.  He set the dog food down just inside the door, took off his coat, and saw Betsy lying on the floor.

At 9:40:10 p.m., he was connected with a 911 operator.  Throughout the call, Russ was sobbing.  He told the dispatcher that he believed his wife had followed through on her previously stated intention to commit suicide and mentioned that he could see the knife sticking out of her neck.  The call lasted exactly ten minutes; shortly before Russ hung up, Lincoln County Sheriff's Deputy Christopher Hollingsworth arrived on the scene.  Recognizing that Betsy's wounds were inconsistent with a suicide, Hollingsworth took Russ out of the house.  The house was cleared and medical and fire personnel went inside.  The family dog was in the back yard on a chain and a second knife was found under the pillow Betsy had been using on the couch.

Fire Captain Robert Shramek noted that Betsy's body was cold and so stiff that her entire body moved when he tried to manipulate her arm and shoulder.  Based on his significant experience with dead bodies, Shramek concluded that Betsy had been dead for at least two hours.  Fire Lieutenant Martin Czarnecki believed Betsy had been dead for at least 30 minutes.  Ambulance team supervisor Michael Quatrocchi entered the Faria home shortly after the fire fighters.  He noted that that the skin on Betsy's arm was not pliable and concluded that she had rigor mortis consistent with someone who had been dead for some time.  Paramedic Kevin Altman was also at the scene and described the blood around Betsy's body in his written report as dark, consistent with having sat for a significant period of time.

While first responders were at the scene, the Lincoln County Sheriff initiated a "Major Case Squad ("MCS") call-out," which is designed to pool the resources of local law enforcement organizations to respond to cases of serious crimes.  St. Peters Police Lieutenant Mark Shimweg was placed in charge and McCarrick was assigned to be the "report writer" and second in command.

Around 11:00 p.m., Hollingsworth drove Russ to the Lincoln County Sheriff's Office. Over the next ten and one half hours, Merkel and City of Troy Police Major Raymond Floyd interrogated Russ.  Russ told a consistent story about his whereabouts that night, including the multiple stops to and from Corbin's house.  Russ's clothes were clean and fingernail clippings taken during the interrogation contained no relevant evidence.  Later analysis would confirm that there was no DNA from Betsy on Russ's clothes, feet, or hands.

Other MCS officers were simultaneously verifying Russ's alibi, and all of those present at game night confirmed Russ's timeline and admitted that they had smoked marijuana.  At some point, the MCS obtained a warrant to search the Faria house.  At the Faria house, there were no bloody footprints, no bloody or wet towels, no indications of wiping in the blood, and dust and dog treats on the floor, leading crime scene investigators ("CSIs") to conclude that there had been no clean up.  The only visible instances of blood found during the search were on a light switch plate in the bedroom and on a pair of Russ's slippers in the bedroom closet.  Russ's car was swabbed and eventually determined to be negative for blood.

While assessing the scene, CSIs noticed a dark mark on Betsy's pants that resembled a paw print.  It was thought that this might be relevant because the dog was unfriendly to most people and only someone she knew would have been able to get her from the murder scene to the backyard chain.  CSI Tiffany Fischer asked Defendant Detective Patrick Harney, the MCS officer working with the CSIs, for authorization to swab the Farias' dog's paw for DNA analysis. According to fellow CSI Amy Buettner, Harney spoke to Chaney, who by then was routinely participating in MCS briefings, and was told to forego the swab and instead take a print of the dog's paw.  No forensic conclusion as to whether the print matched the mark was ever reached.

4

At approximately 2 p.m. the day after the murder, Russ was taken to the Lake St. Louis Police Department for a polygraph.[3]  The test indicated deception when he was asked whether he killed Betsy or knew who did.  Following the polygraph, Russ was handcuffed and placed under arrest for the murder of his wife.

Meanwhile, two MCS officers were sent to interview Pam Hupp.  They arrived at her home at 6:40 a.m., the morning after Betsy was killed.  Hupp answered the door with wet hair and informed the officers that she had just finished showering.  She also told the officers that she had showered the night before, after returning home from dropping off Betsy.  Throughout her interview, Hupp said a number of suspicious things.  For instance, she initially told the officers that she had not gone into the Faria home when she dropped off Betsy but later stated twice that she had.  Likewise, she told the officers that she and Betsy were very close friends who saw each other on a near-daily basis but that she was not sure about the route to or from Betsy's home.  The officers asked Hupp about the fact that Betsy had recently named Hupp as beneficiary on a $150,000 life insurance policy, replacing Russ.  Hupp told officers that Betsy wanted her daughters to have the money but did not trust them to manage it responsibly, and that she didn't trust Russ.  Hupp also told the officers that the Farias' marriage was on the rocks and that Russ had been physically abusive, on one occasion holding a pillow over Betsy's face when she was sleeping, though none of those allegations could be corroborated by Betsy's other friends or family.  Hupp also told officers about a document on Betsy's computer that indicated that Betsy was afraid of Russ.  Despite stating that she had never seen the document, Hupp described the substance of the document in detail.

---

[3]  There is some dispute as to whether the officers conducted a "faux polygraph" as an investigative technique but there is no record evidence to support that claim.

The officers also examined Hupp's phone.  There were numerous text messages between Hupp and Betsy on the day of the murder, including several in which Hupp insisted on picking up Betsy from her chemotherapy appointment and taking her home, despite the fact that Betsy's mother's house was an hour-long round trip for Hupp compared to a short detour for Russ on the way home from game night.  When officers asked Hupp about a missed 7:27 p.m. call from Hupp's phone to Betsy's, she told them that she was calling to inform Betsey that she had reached the part of the drive where she knew the rest of the way home.  She later offered two slightly different reasons for calling.

On the afternoon of December 29, as Russ was approaching twenty-four hours in custody following his arrest at the Lake St. Louis Police Department, McCarrick submitted to Chaney a probable cause statement, seeking an arrest warrant and formal charge against Russ.  Chaney refused, and Russ was released.  As she was leaving the building that evening, Chaney was asked for comment by a local news reporter.  The reporter later wrote that Chaney was hopeful that they could find sufficient evidence to charge Russ with Betsy's murder.

The MCS continued to investigate after Russ was released.  On Thursday, December 29, two days after Betsy's murder, MCS officers re-interviewed Pam and Mark Hupp.  Meanwhile, officers were discussing the propriety of conducting a luminescence test at the Faria home to identify any invisible traces of blood at the scene.  Ultimately, the MCS started releasing officers and, on December 31, 2014, it formally disbanded.

Medical Examiner Kamal Sabharwal, M.D., performed an autopsy with McCarrick and Officer Brett Mitchell present.  Dr. Sabharwal later testified that the first responders' descriptions of Betsy's body at 9:50 p.m. on the night of her death were consistent with rigor mortis two to four hours after death.  However, evidence showed that Betsy died sometime after 7:00 p.m.  Around 7:00, Betsy had called her friend Laurel Moran to cancel a scheduled tennis

6

game due to Betsy's blood results.  In addition, Betsy's daughter, Leah Day, told police that she also spoke to her mother on the phone around 7:00 p.m. on the night of her murder.  Day was headed to the cell phone store to get a new phone and needed Betsy to speak to the store representative as the account holder to authorize the upgrade.  Betsy assured Day that she would be sitting on the couch with her phone next to her, awaiting Day's call, but when Day called from the store at 7:21, Betsy didn't answer.  Betsy failed to pick up Day's subsequent calls at 7:26 and 7:30.  Betsy also had a missed call from Hupp at 7:27 p.m.

The last evidence that Betsy was alive was her participation in a 7:04 p.m. voicemail made from Hupp's phone to Hupp's husband Mark.  Russ called 911 at 9:40 p.m., creating a time-of-death window of 7:04 p.m. to 9:40 p.m.  When asked by investigators whether Betsy could have been killed shortly before Russ called 911, Dr. Sabharwal admitted that there was a controversial medical theory that, in extraordinarily rare instances, a body could exhibit the signs of advanced rigor mortis immediately after death.

On Tuesday, January 3, 2018, one week after Betsy was murdered, McCarrick and Chaney presented a signed affidavit in support of a search warrant to conduct a "BlueStar" luminescence test of the Faria home to look for invisible blood residue that might indicate a clean-up.  The warrant was issued and Merkel, McCarrick, Evidence Technician Tabitha Rene Wilson, and Lincoln County Sheriff's Department employee Rebecca Mueller[4] were present for the test.

The home had been released some days prior, such that the investigators could not be certain that any evidence they found was present on the night of the murder.  Nevertheless, the investigators sprayed the living room and kitchen.  Luminescence was observed on the handle of

---

[4] Rebecca Mueller married Defendant Michael Merkel and now goes by Rebecca Merkel. However, the Court will use her maiden name (and use "Merkel" solely for Defendant Michael Merkel) to avoid confusion.

the towel drawer in the kitchen but nowhere else, suggesting that the drawer had been used by someone with bloody hands who knew where to find towels in the Faria home.  In addition, the investigators reported luminescence on the vinyl floor between where Betsy was found and the back door.  Together with the supposedly bloody paw print, it was surmised that the test was reacting to drops of blood left by someone while putting the dog in the back yard.

Whether the test was reacting to evidence of the murder was not universally agreed upon.  Mueller testified that she saw luminescence but did not see any pattern that might suggest blood splatter.  Similarly, Wilson remembered no pattern.  Merkel, however, testified that he remembered a path of luminescence leading in a "general direction."  Some of the photographs of the luminescence were of extremely poor quality owing to an improper setting or camera malfunction, but others were clear and showed no path or pattern.  In any event, McCarrick presented Chaney with a new probable cause statement that added the results of the BlueStar test and Cheney submitted charges against Russ for first-degree murder and armed criminal action and a grand jury indicted him.

During the BlueStar test, investigators had removed parts of tile and cabinetry that showed luminescence and transported them to a forensic lab for testing; while a BlueStar test illuminates the presence of human blood, it also illuminates other substances and therefore any positive result must be tested to determine whether human DNA is present.  Lab tests conducted after Russ had been charged later revealed that the tile and cabinetry were negative for human blood.  A report detailing the results of the BlueStar test was signed by Merkel fifteen months after the test was done.  The investigating officers eventually concluded that the negative result must have been due to dilution or other corruption of the samples.

In November 2013, a jury convicted Russ and he was sentenced to life in prison.  On direct appeal, the Missouri Court of Appeals found that the trial court had erred by granting the

prosecution's motion to exclude evidence of an alternative suspect—Pamela Hupp—and remanded the case for a new trial.  In November 2015, Russ waived his right to a jury and was found not guilty following a bench trial.

## I.   Defendant's Motions for Summary Judgment

On July 19, 2016, Russ filed this suit under 28 U.S.C. § 1983, naming McCarrick, Merkel, Harney, Chaney, and Lincoln County, Missouri as defendants and advancing the following counts:

> Counts I and II – Unconstitutional seizure (McCarrick);
>
> Count III – Unconstitutional seizure (Chaney);
>
> Count IV – Conspiracy to violate constitutional rights;
>
> Count V – Malicious prosecution (McCarrick and Merkel); and
>
> Count VI - Liability under *Monell v. Dep't of Soc. Servs. of City of New York* (Lincoln County);

(Doc. 7.)  Since then, Count I was voluntarily dismissed with prejudice (Doc. 95), and Count V was voluntarily dismissed without prejudice (Doc. 39).  Defendants now move for summary judgment on the remaining counts, arguing that they did not violate Russ's constitutional rights and that they are entitled to immunity.

## Legal Standards

### *Summary Judgment*

Pursuant to Federal Rule of Civil Procedure 56(a), a court may grant a motion for summary judgment only if "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The burden is on the moving party.  *City of Mt. Pleasant, Iowa v. Associated Elec. Co-op. Inc.*, 838 F.2d 268, 273 (8th Cir. 1988).  In ruling on a motion for summary judgment, all reasonable inferences must be drawn in a light most favorable to the non-moving party.  *Woods*

*v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005).  The evidence is not weighed and no credibility determinations are made.  *Jenkins v. Winter*, 540 F.3d 742, 750 (8th Cir. 2008).

Once the moving party demonstrates that there is no genuine issue of material fact, the nonmovant must do more than show there is some doubt as to the facts.  *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Instead, the nonmoving party bears the burden of setting forth affirmative evidence and specific facts by affidavit and other evidence showing a genuine factual dispute that must be resolved at trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Celotex*, 477 U.S. at 324.  "A dispute about a material fact is 'genuine' only 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Herring v. Canada Life Assur. Co.*, 207 F.3d 1026, 1030 (8th Cir. 2000) (quoting *Anderson*, 477 U.S. at 248).  On the other hand, judgment as a matter of law is appropriate only when there is no legally sufficient evidentiary basis on which a reasonable jury could find for the nonmoving party.  Fed. R. Civ. P. 50(a).

### § 1983 Claims

"The essential elements of a § 1983 claim are (1) that the defendant(s) acted under color of state law, and (2) that the alleged wrongful conduct deprived the plaintiff of a constitutionally protected federal right."  *Schmidt v. City of Bella Villa*, 557 F.3d 564, 571 (8th Cir. 2009) (citing *DuBose v. Kelly*, 187 F.3d 999, 1002 (8th Cir. 1999)).  "A public official 'acts under color of law when he misuses power possessed by virtue of . . . law and made possible only because he was clothed with the authority of . . . law.'"  *Ramirez-Peyro v. Holder*, 574 F.3d 893, 900 (8th Cir. 2009) (quoting *United States v. Colbert*, 172 F.3d 594, 596 (8th Cir. 1999)).  "[A] public official acts under color of law when that official 'abuses the position given to him by the State.'"  *Id*. (quoting *West v. Atkins*, 487 U.S. 42, 49-50 (1988)).

## Discussion

### *Count II – Seizure without probable cause (McCarrick)*

In his second count, Faria[5] argues that he was arrested and ultimately incarcerated based on false and fabricated statements included in McCarrick's probable cause statement, in violation of the Fourth Amendment.  (Doc. 7 at 63-68.)  In addition, he argues that McCarrick omitted evidence exculpating Faria and evidence implicating Hupp ("the Hupp Evidence").  (*Id.*)

"The Fourth Amendment prohibits government officials from detaining a person in the absence of probable cause."  *Manuel v. City of Joliet, Ill.*, 137 S. Ct. 911, 918 (2017).  Probable cause exists when the facts and circumstances are "sufficient to warrant a prudent man in believing that the (suspect) had committed or was committing an offense."  *Gerstein v. Pugh*, 420 U.S. 103, 111-12 (1975) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)).  "To challenge probable cause, a plaintiff must show (1) police deliberately or recklessly included a false statement, or omitted a truthful statement from the affidavit; and (2) 'the affidavit would not establish probable cause if the allegedly false information is ignored or the omitted information is supplemented.'"  *Dowell v. Lincoln Cty., Mo.*, 762 F.3d 770, 777 (8th Cir. 2014) (quoting *United States v. Mashek*, 606 F.3d 922, 928 (8th Cir. 2010)).

In applying the *Dowell* standard, the Court first asks whether the probable cause statement included false information or omitted true information.  Paragraph G of McCarrick's statement reads:

> On 01/03/2012, Detectives from the Criminal Investigations Division of the Lincoln County Sheriff's Office obtained a second search warrant for [Faria's house].  This search warrant was obtained to find any additional blood evidence, through the use of illuminating materials, which may have been cleaned away from the crime scene prior to the first responding Deputies.  It should be noted, Russell said the dog was outside when he arrived at the residence to find Betsy, and the dog was outside when Deputies responded to the scene at approximately

---

[5] For the remainder of the order, the Court will use "Faria" to refer to Plaintiff.

2149 hours.  After extensive review of the original crime scene, and the crime scene photographs, it was determined that a blood pattern found on Betsy's pants matched that of the family dog's paw.  Lincoln County Crime Scene personnel illuminated blood evidence, which had been cleaned from the crime scene, on the vinyl floor between the area Betsy was found, and the patio door used by Betsy and Russell Faria to let the dog outside. In addition, blood evidence, which had been cleaned from the crime scene, was also illuminated on the vinyl floor in the galley area of the kitchen and on the kitchen sink.  Furthermore, blood evidence, which had been cleaned from the crime scene, was illuminated on the handle of the kitchen drawer used by Betsy and Russ Faria to hold towels.  It should be noted, the remaining drawers in the kitchen did not illuminate blood evidence, suggesting prior knowledge of the towel's location, without the need for a search. These items, along with the kitchen sink trap and a mop head found in the laundry room, were seized by Lincoln County Sheriff's Office personnel for DNA matching.

(*See* Doc. 105 at 47.)

Faria argues that Paragraph G is false because there was no clean-up.  In addition, he argues that the reference to blood evidence between where Betsy was found, and the back door falsely suggested the existence of a "path" between the locations when the photographs of the test results show random illumination with no apparent pattern or direction. Finally, he notes that the lab tests proved the luminescence was not due to human blood.

The Court notes that much of Paragraph G is not supported by the evidence and its inclusion suggests that McCarrick prepared the statement in reckless disregard for the facts available to him at the time.  Of particular note, there was no forensic finding that the dark mark on Betsy's pants "matched" the dog's paw and the presence of luminescence is not, by itself, sufficient to assert that "blood evidence . . . had been cleaned from the crime scene."  Indeed, there was strong evidence that no clean-up occurred:  no bloody or wet towels; no indications of wiping in the blood; and dust and dog treats on the floor.

Nevertheless, McCarrick argues that nothing in Paragraph G was "patently false" at the time he submitted his probable cause statement.  (Doc. 87 at 8.)  The disputed falsity of the statements in Paragraph G is a genuine issue of material fact that prevents the Court from

12

determining as a matter of law that probable cause existed.  *See Hoffmeyer v. Porter*, 758 F.3d 1065, 1068 (8th Cir. 2014) (citing *Giordano v. Lee*, 434 F.2d 1227, 1230 (8th Cir. 1970), for the proposition that the existence of probable cause is a question for the jury in § 1983 actions if genuine issues of material fact exist).   Under *Dowell*, the Court must reconstruct a probable cause statement by removing false statements.  Because there is a dispute over which facts to remove, the Court has no defined universe of facts on which to base its probable-cause determination.

In any event, McCarrick argues that the probable cause statement is enough even without Paragraph G.  Faria responds that the reconstructed probable cause statement must also include the Hupp Evidence.  McCarrick responds that the Fourth Amendment does not require the inclusion of exculpatory evidence and that therefore the omission of the Hupp Evidence will not support § 1983 relief.  (Doc. 139 at 6.)  In support, he cites *Stewart v. Wagner*, 836 F.3d 978, 983 (8th Cir. 2016), in which charges were filed based on a probable cause statement incorporating a witness's implication of Stewart but omitting that the same witness had previously implicated two other people by name.  *Id.*  Stewart later filed a § 1983 case alleging that the failure to include that exculpatory fact violated his constitutional rights.  *Id.*  The Eighth Circuit ultimately denied relief for a number of reasons, including that Stewart had failed to show that the Fourth Amendment required the inclusion of exculpatory statements.  *Id.* at 984.

The Court notes that the *Dowell* standard, which the parties agree is the appropriate method for evaluating Faria's Fourth Amendment claim and is quoted above, expressly contemplates both the inclusion of false statements and the exclusion of true statements.  762 F.3d at 777 ("To challenge probable cause, a plaintiff must show (1) police deliberately or recklessly included a false statement, or **omitted a truthful statement** from the affidavit; and (2) "the affidavit would not establish probable cause if the allegedly false information is ignored or

the **omitted information is supplemented**.") (emphasis added) (quoting *Mashek*, 606 F.3d at 928).   Thus, the Court will assess the existence of probable cause based on a reconstructed probable cause statement with Paragraph G removed and the Hupp evidence included.[6]

If Paragraph G is removed, the following inculpatory facts remain:  Faria reported that Betsy was dead; Faria told the emergency operator that he thought Betsy had committed suicide even though he could see numerous stab wounds, the knife in her neck, and slashes on her arms; Faria told the operator that he entered the house and called for Betsy even though her position on the floor would have made her immediately visible upon entry; the family dog was leashed in the backyard and Faria told police that he did not believe she would have allowed a stranger to leash her; there was no indication of forced entry; nothing appeared to be missing from the home; human blood was found on the inside of the hat Faria had been wearing that night; human blood was found on the light switch panel and slippers found in Faria's bedroom; Hupp told police that the Farias' marriage was strained and that Betsy was afraid of Faria; Hupp told police that Faria had, the week before Betsy was murdered, put a pillow over Betsy's face; a second knife was found under the pillow Betsy had been using, indicating that she feared for her safety; Faria showed "extreme deception" during the polygraph examination.  (*See* Doc. 105 at 45-48.)

With the Hupp Evidence added, the following exculpatory facts are present: Faria told police that he had made numerous stops both going to and coming from game night, all of which "were verified by Major Case Squad investigators." (*id*. at 46); Hupp and Betsy left a voicemail on Hupp's husband's cellphone at 7:04 p.m.; at 7:10 p.m., Faria was placing an order at an Arby's twenty-five miles—and a twenty-six minute drive—away; Faria called 911 from his home thirty minutes later; the medical examiner believed that the state of Betsy's body

---

[6] Because McCarrick argues that the Hupp Evidence need not have been included, he does not challenge its truth.

eliminated the possibility that Betsy was murdered in the short time window available; there was no DNA or blood under Faria's fingernails or on his clothes and CSIs determined there had not been a clean-up; Hupp was inconsistent in her statements to police as to whether she went inside the Farias' home when she dropped off Betsy; Betsy had made Hupp the beneficiary of a life insurance policy; Betsy had a missed call from Hupp at 7:27 p.m., about which Hupp gave varying explanations; Hupp described in detail a letter on Betsy's computer which implicated Faria but which Hupp told police she had never seen; Hupp had just finished showering when officers arrived to interview her and admitted to having showered when she arrived home from Betsy's house the night before.

This Court finds that the reconstructed probable cause statement is insufficient to support probable cause.  As an initial matter, and while not dispositive, the Court finds probative Cheney's assessment that the first probable cause statement—which lacked all of Paragraph G—was insufficient to pursue charges.  The Court assumes that Cheney's assessment would have been even more negative had the probable cause statement included the Hupp Evidence.  Further, the Court notes that the evidence against Faria was circumstantial and relies on the investigators' inferences, while there is direct evidence to support Faria's innocence—the medical examiner's assessment, the time-stamped receipts, his appearance on camera, the DNA testing of Faria's clothes and hands.  Meanwhile, nearly every piece of evidence that led investigators to suspect Faria—Hupp's statements about the Farias' marriage, the blood on the light switch and slippers, knowing where to find towels, the dog not trusting strangers—could equally support suspicion of Hupp, given that she visited the Faria home often and would have had a strong incentive to fabricate evidence implicating Faria.  In short, any circumstantial evidence of Faria's guilt is largely cancelled by evidence of his innocence, and vice versa, leaving the Court unable to say as

15

a matter of law that probable cause existed such that McCarrick did not violate Faria's Fourth Amendment rights.

The only unchallenged evidence tending to implicate Faria are his description of the death as a suicide and the negative polygraph results.  However, Faria told the 911 operator that Betsy had previously expressed suicidal intentions and his confusion could arguably be explained as the result of having returned home to find his wife dead on the floor.  As to the polygraph results, the Court believes they are not a basis for probable cause.  While they might raise suspicion of a suspect, they cannot, on their own, support probable cause, especially considering their questionable reliability and because they are not admissible evidence of guilt at trial.  Even together, these facts are insufficient to establish probable cause to believe that Faria was the murderer.

Still, McCarrick argues that he is entitled to qualified immunity.  Government actors are entitled to qualified immunity when they can show that their conduct did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Treats v. Morgan*, 308 F.3d 868, 871 (8th Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Courts ask two questions when resolving a government official's qualified-immunity claim:  "[Do] the facts, taken in a light most favorable to the party alleging an injury, show a violation of a constitutional or statutory right?" and, if so, was that right "so clearly established that it would have been 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted?'"  *Id.* at 871-72 (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). If the answer to either question is "No," the defendant is entitled to qualified immunity.

Regarding the first prong, McCarrick cites *Dowell* for the proposition that an officer accused of an improper Fourth Amendment seizure is entitled to qualified immunity if "he had 'merely *arguable* probable cause,' which is a mistaken but objectively reasonable belief the

16

suspect committed a criminal offense." 762 F.3d at 777 (quoting *McCabe v. Parker*, 608 F.3d 1068, 1078 (8th Cir. 2010)). He argues that, even after Paragraph G is removed and all of the Hupp Evidence is added, the reconstructed statement at least arguably supported probable cause. However, as discussed above, the Court concludes that the reconstructed probable cause statement, viewed in the light most favorable to Faria, does not support an objectively reasonable belief that he killed Betsy.

As to the second prong, McCarrick argues that Faria has failed to identify the particularized right of which he was allegedly deprived. (Doc. 87 at 18.) This argument fails; it has long been established that the Fourth Amendment prohibits seizure without "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion," otherwise known as probable cause, *Andrews v. Fuoss*, 417 F.3d 813, 817 (8th Cir. 2005), and the Court finds it inconceivable that this requirement would not be known to a reasonable police officer. Because McCarrick lacked an objectively reasonable belief in Faria's guilt, and because the right to be free from arrest without probable cause was clearly established, McCarrick is not entitled to qualified immunity.

Accordingly, this Court will deny summary judgment as to Count II.

### Count III - Seizure without probable cause (Cheney)

In Count III, Faria argues that he was arrested and detained without probable cause at Cheney's behest. He argues that she was deeply involved in the MCS investigation and made the final decision to file charges against Faria in spite of a lack of probable cause. (Doc. 7 at ¶¶ 459-79.) Specifically, he alleges she knew Paragraph G of McCarrick's probable cause statement included falsehoods; she ignored the Hupp Evidence; she refused to test the dog's paw for the presence of human blood; she assisted in the fabrication of a factual basis to prosecute Faria; and she prosecuted Faria in the absence of probable cause. (*Id.*)

17

Cheney argues that she is entitled to absolute immunity for any constitutional violation she allegedly committed while prosecuting Faria.  (Doc. 79 at 14.)  "The Supreme Court has long recognized that "prosecutors are absolutely immune from liability under § 1983 for their conduct in 'initiating a prosecution and in presenting the State's case' insofar as that conduct is 'intimately associated with the judicial phase of the criminal process.'"  *Woodworth v. Hulshof*, 891 F.3d 1083, 1089 (8th Cir. 2018) (quoting *Burns v. Reed*, 500 U.S. 478, 486 (1991)).  "[P]rosecutors are absolutely immune from damages claims arising out of their activities in initiating and presenting the state's case," *Lewellen v. Raff*, 843 F.2d 1103, 1113 (8th Cir. 1988), but "immunity [also] extends to 'actions preliminary to the initiation of a prosecution and actions apart from the courtroom.'" *Woodworth*, 891 F.3d at 1089.

"The decision of a prosecutor to file criminal charges is within the set of core functions which is protected by absolute immunity . . . even if the prosecutor makes that decision in a consciously malicious manner, or vindictively, or without adequate investigation, or in excess of his jurisdiction." *Williams v. Hartje*, 827 F.2d 1203, 1209 (8th Cir. 1987) (quoting *Myers v. Morris*, 810 F.2d 1437, 1446 (8th Cir. 1987)).  Likewise, interviewing witnesses and evaluating leads is within the scope of prosecutorial decision-making; "[n]ot all of an advocate's work is done in the courtroom.  For a lawyer to properly try a case, [s]he must confer with witnesses, and conduct some of h[er] own factual investigation." *Reasonover v. St. Louis Cty., Mo.*, 447 F.3d 569, 580 (8th Cir. 2006) (quoting *Cook v. Houston Post,* 616 F.2d 791, 793 (5th Cir. 1980)).  Still, immunity does not cover "administrative duties and those investigatory functions that do not relate to . . . the initiation of a prosecution or for judicial proceedings." *Woodworth*, 891 F.3d at 1089 (quoting *Buckley v. Fitzsimmons*, 509 U.S. 259, 272 (1993)).

Faria's primary argument against prosecutorial immunity is that Cheney was so involved with the MCS that she abandoned her prosecutorial role and assumed an investigative role,

18

gathering evidence against Faria.  In support, he cites deposition testimony from members of the MCS that Cheney was significantly more involved in the investigation than past prosecutors, that she regularly participated in MCS briefings, that she asked investigators to conduct the BlueStar test, and that, on at least one occasion, she directed MCS officers to re-interview witnesses. Because all of these activities took place before Cheney determined that she had probable cause to charge Faria, he argues that they could not have been related to his prosecution.

Cheney rejects Faria's factual allegations but further argues that prosecutorial immunity is so broad as to cover even what Faria alleges.  She argues that "investigation to secure the information necessary to the prosecutor's decision to initiate criminal proceedings is within the quasi-judicial aspect of the prosecutor's job and therefore is absolutely immune from civil suit for damages." *Lewellen*, 843 F.2d at 1114.

The Court concludes that, despite working closely with the MCS, Cheney was serving in her prosecutorial role of initiating and presenting the State's case.  While the Court agrees that ordering forensic testing or directing members of the MCS to re-interview witnesses might approach the edge of a prosecutor's role as advocate for the State—to the extent these disputed facts are true—it finds that the alleged action was ordinary investigative procedure "preliminary to the initiation of a prosecution" and therefore intimately associated with the judicial phase of the process.  *Woodworth*, 891 F.3d at 1089.  That the alleged action took place before Cheney sought charges against Faria does not alter the analysis.  *Reasonover*, 447 F.3d at 580; *Lewellen*, 843 F.2d at 1114.  The Court therefore concludes that Cheney is entitled to absolute prosecutorial immunity.

Accordingly, the Court will grant summary judgment on Count III to Cheney.

### Count IV – Conspiracy to violate Faria's civil rights (Cheney and Police Defendants)

In Count IV, Faria argues that the Defendants conspired to deprive him of his right to be free from unreasonable seizure in violation of the Fourth Amendment and to violate his due process rights under the Fifth and Fourteenth Amendments.  (Doc. 7 at ¶¶ 480-514.)   His complaint contains a litany of actions which he argues were undertaken as part of an agreed-upon plan by the Defendants to charge, prosecute, and convict him for murder based on false or fabricated evidence and despite significant evidence that Hupp was the true killer.  (*Id*.)

Conspiring to violate a person's constitutional rights gives rise to an independent cause of action.  To succeed, a plaintiff must show "(1) that the defendant[s] conspired with others to deprive [the plaintiff] of constitutional rights; (2) that at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and (3) that the overt act injured [the plaintiff]."  *White*, 519 F.3d at 814 (citing *Askew v. Millerd*, 191 F.3d 953, 957 (8th Cir. 1999)).  In addition, Plaintiff must "prove a deprivation of a constitutional right or privilege."  *Id*.

Faria asserts that Defendants conspired to help McCarrick and Cheney violate his Fourth Amendment right to be free from arrest and confinement in the absence of probable cause.  *Manuel*, 137 S. Ct. 918.  Having already found that Faria's Fourth Amendment claim against McCarrick survives summary judgment, the only remaining inquiry is whether there is evidence that the other defendants conspired with McCarrick to submit the allegedly fabricated probable cause statement.

Faria also argues that Defendants conspired to violate his Fifth and Fourteenth Amendment due process rights to be free from an intentional or reckless failure to investigate that shocks the conscience.  *Cooper v. Martin*, 634 F.3d 477, 481 (8th Cir. 2011) (citing *Brockinton v. City of Sherwood, Ark.*, 503 F.3d 667, 672 (8th Cir. 2007)).  The Eighth Circuit has

20

found that "the following circumstances indicate reckless or intentional failure to investigate that shocks the conscience: (1) evidence that the state actor attempted to coerce or threaten the defendant, (2) evidence that investigators purposefully ignored evidence suggesting the defendant's innocence, (3) evidence of systematic pressure to implicate the defendant in the face of contrary evidence." *Akins v. Epperly*, 588 F.3d 1178, 1184 (8th Cir. 2009).  In no event is negligence sufficient.  *Cooper*, 634 F.3d at 481.

Faria presents the following evidence in support of his conspiracy claims against the Police Defendants and Lincoln County:  McCarrick and Merkel fabricated evidence by reporting that the BlueStar test revealed evidence of a clean-up and a "path" of blood; Defendants supported this fabrication by ignoring CSIs' conclusion that no clean-up had occurred; Merkel lied about the failure of the camera during the BlueStar test; Betsy's daughter stated that McCarrick asked her not to sue Hupp for the life insurance proceeds until after the criminal trial for fear it would negatively impact the state's case; McCarrick encouraged Hupp to put the life insurance proceeds in trust to eliminate any argument that the money was motive for Hupp to kill Betsy; Defendants convinced Officer Michael Pirtle to report, years after the murder, having seen water droplets in the bathtub when he was clearing the home upon arriving on the night of the murder to support the theory that Faria had cleaned up; Harney and Merkel suggested to Hupp that she and Faria had been in the home together on the night of Betsy's murder; McCarrick lied in his probable cause statement about the state of Betsy's change in beneficiary; Defendants ignored alibi witnesses, the true time of death, Faria's corroborated timeline, the narrow window in which Faria could have killed Betsy, the absence of evidence of a clean-up, the lack of blood on Faria's clothes and body, Faria's consistent denials, third-party statements about Faria's character and temperament, evidence that Hupp was the true killer, and the medical examiner's conclusions; McCarrick failed to subpoena Hupp's cell phone records or search her

car; Defendants failed to investigate inconsistencies in Hupp's statements; Defendants improperly interviewed Hupp and her husband together; Defendants failed to further investigate the letter found on Betsy's computer that implicated Faria; Defendants failed to confirm Hupp's clothes were free of blood or corroborate her allegedly diminished physical ability; McCarrick said he was confident Faria was the murderer immediately after the polygraph; and McCarrick tried to intimidate Faria during an interview. (Doc. 105 at 84-99.) Faria argues that each one of these actions was proof of a coordinated effort either to frame him for Betsy's murder or to conceal others' attempts to do so.

The Court begins by repeating that Cheney's actions were within the scope of her duties as a prosecutor and that she is absolutely immune from suit and therefore entitled to summary judgment on this claim against her. Harney argues that he is also entitled to summary judgment because he had minimal involvement with the MCS and left the team before the BlueStar test was conducted. (Doc. 87 at 10.) Faria disputes this, asserting that deposition testimony indicates that Harney was involved in the collection of evidence, the treatment of the Farias' dog's paw, and preparing Hupp for testimony at the second trial. (Doc. 106 at ¶¶ 65-82.) Given that there is a genuine dispute of material fact as to Harney's role and involvement in the investigation, the Court will not separate him from the other Police Defendants in its summary judgment analysis.

Defendants first respond that the grand jury's decision to indict Faria shields them from Faria's allegations that he was wrongfully confined in the absence of probable cause. (Doc. 87 at 10.) Ordinarily, the finding of probable cause by a grand jury creates a per se legal justification for an arrest and prosecution. *Zike*, 646 F.3d at 512 (citing *Fisher v. Wal-Mart Stores, Inc.*, 619 F.3d 811, 820 (8th Cir. 2010)); *King v. Ryals*, 981 S.W.2d 151, 154 (Mo. Ct. App. 1998). That said, "Missouri courts have consistently held that a grand jury indictment amounts to a prima facie showing that probable cause existed for the prosecution and that this presumption is

22

conclusive *unless rebutted by evidence that false testimony was the basis of the charge* and that the falsity was discoverable upon reasonable investigation." *Anton v. Police Ret. Sys. of St. Louis*, 925 S.W.2d 900, 906 (Mo. Ct. App. 1996) (citing *Perry v. Dayton Hudson Corp.*, 789 S.W.2d 837, 841 (Mo. Ct. App. 1990)) (emphasis added). As discussed above, the Court cannot say whether the grand jury would have voted to indict based on the reconstructed probable cause statement, and therefore the Court finds that the indictment is insufficient to compel summary judgment.

Next, Defendants argue that their investigation was thorough, professional, and pursued in good faith. They assert that some of Faria's allegations might amount to negligence, but that negligence is insufficient to support a failure-to-investigate claim. *See Cooper*, 634 F.3d at 481. They also argue that Faria has not and cannot provide evidence that Defendants affirmatively agreed to frame him, citing *Reasonover*, 447 F.3d at 582, for the proposition that, to survive summary judgment, a plaintiff must "allege with particularity and specifically demonstrate material facts that the defendants reached an agreement." (citing *Marti v. City of Maplewood,* 57 F.3d 680, 685 (8th Cir. 1995)).

Faria responds that agreement can be proved by circumstantial evidence and that Defendants' particular and specific actions indicate a coordinated effort to frame him. (Doc. 105 at 101); *see Reasonover*, 447 F.3d at 582 ("allegations may include circumstantial evidence"). He argues that each act was an overt step towards his wrongful conviction. (Doc. 105 at 101.)

The Court begins by reiterating that there may have been evidence to support Police Defendants' suspicion that Faria had murdered Betsy, but, as discussed more fully in its analysis of Count II, that evidence was negated by evidence of his innocence and by evidence of Hupp's guilt. The Court believes, viewing all of the facts in the light most favorable to Faria, Police Defendants' actions could support a jury finding that they purposefully ignored evidence

suggesting Faria's innocence and that Police Defendants worked together to obtain Faria's conviction in spite of that evidence.  Likewise, the facts, taken in the light most favorable to Faria, support a circumstantial case that Police Defendants proceeded despite knowing that McCarrick's probable cause statement included false or fabricated evidence.  The Court therefore finds that McCarrick, Merkel, and Harney have failed to demonstrate that they are entitled to judgment as a matter of law on the merits of Count IV.

Police Defendants argue that they are entitled to qualified immunity on Count IV.  (Doc. 87 at 16-18.)  Again, to succeed, they must show that they did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known."  *Treats v. Morgan*, 308 F.3d 868, 871 (8th Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  The first prong is met:  "[A]n individual's right to be free from a reckless investigation or from the use of false evidence to secure a conviction was clearly established in 1989."  *Winslow v. Smith*, 696 F.3d 716, 738 (8th Cir. 2012).  Having found that the facts could support a finding that the Police Defendants violated Faria's Fourth, Fifth, and Fourteenth Amendment rights, the Court finds that Faria has presented evidence sufficient to meet the second prong.  As such, the Court concludes that Police Defendants are not entitled to qualified immunity on this count.

Accordingly, the Court will grant summary judgment on Count IV to Cheney and deny summary judgment as to McCarrick, Merkel, and Harney.

### Count VI – Liability under Monell (Lincoln County)

In his final count, Faria argues that Lincoln County is liable for Cheney's allegedly unconstitutional behavior because she was the final decision maker and had de facto authority to set policy for Police Defendants.  "A suit against a government officer in his official capacity is functionally equivalent to a suit against the employing governmental entity."  *Veach v. Bartels*

24

*Lutheran Home*, 627 F.3d 1254, 1257 (8th Cir. 2010) (citing *Baker v. Chisom*, 501 F.3d 920, 925 (8th Cir. 2007)).  "Congress did intend municipalities and other local government units to be included among those persons to whom § 1983 applies," but "did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort."  *Monell*, 436 U.S. at 690, 691 (emphasis deleted); *see also Pembaur v. City of Cincinnati*, 475 U.S. 469, 477 (1986) (applying the *Monell* analysis to counties).  Accordingly, to hold the employing governmental entity liable for its employee's alleged misconduct, a plaintiff must show that the alleged misconduct related to the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy."  *Monell*, 436 U.S. at 694.  In addition, the plaintiff must also show that the policy or custom was "the *moving force* behind the constitutional violation."  *Rogers v. City of Little Rock, Ark.*, 152 F.3d 790, 799 (8th Cir. 1998) (emphasis added).

Faria argues that Cheney was acting as the final decision maker with authority to set county policy regarding the MCS investigation.  Whether a defendant was a decision-maker with final authority is determined by state law.  Faria notes that the county prosecutor position was created by Missouri Revised Statute § 56.010, that prosecutors are elected by the county's voters pursuant to that same statute, and that the county pays their salary, all of which establish that they are county employees.

Lincoln County concedes that Cheney is its employee, duly elected by the voters of Lincoln County pursuant to state law.  Nonetheless, Lincoln County cites *State v. Todd*, 433 S.W.2d 550, 554 (Mo. 1968), for the proposition that "[t]he Attorney General is the chief legal officer of the State [and] the various offices of the prosecuting attorneys are 'carved out of' this overriding authority," suggesting that prosecutorial actions are undertaken on behalf of the State rather than the county.  It also cites *State v. Goree*, 546 S.W.2d 785, 788 (Mo. Ct. App. 1977),

which explained that "[t]he prosecutor represents the state" rather than the victims of crimes. Lincoln County represents that there is no Eighth Circuit precedent addressing this issue but offers cases from a number of other circuits that it asserts support its position: *Carter v. City of Philadelphia*, 181 F.3d 339, 353 (3d Cir. 1999) (quoting *Coleman v. Kaye*, 87 F.3d 1491, 1499 (3d Cir. 1996)) ("When 'enforcing their sworn duties to enforce the law . . . they act as agents of the State [but] when county prosecutors are called upon to perform administrative tasks unrelated to their strictly prosecutorial functions . . . the county prosecutor in effect acts on behalf of the county that is the situs of his or her office.'"); *D'Ambrosio v. Marino*, 747 F.3d 378, 386 (6th Cir. 2014) (quoting *Pusey v. City of Youngstown*, 11 F.3d 652, 659 (6th Cir. 1993)) ("Ohio prosecutors act as arms of the state—not of a municipality—when prosecuting state criminal charges, meaning that their "actions in prosecuting the charge . . . [may] not be attributed to the [municipality]."); *Owens v. Fulton Cty.*, 877 F.2d 947, 952 (11th Cir. 1989) ("The alleged violation of Owens' constitutional rights, however, arises out of the district attorney's exercise of discretion in the prosecution of state offenses, a state-created power.").  Because she was acting on behalf of the State, Lincoln County argues, Cheney was not executing the County's policy or custom.

Lincoln County acknowledges that these same cases recognize that a prosecutor can be deemed to be acting on behalf of the local government entity when performing administrative or managerial duties.  It notes that the analysis is similar to the prosecutorial-immunity analysis, in which a prosecutor is absolutely immune for conduct "intimately associated with the judicial phase of the criminal process," but not for administrative, managerial, or investigative conduct outside that process. *Woodworth*, 891 F.3d at 1089.  On that basis, Lincoln County argues that a finding that Cheney is immune necessarily means she was acting in her prosecutorial capacity—

26

and not as an administrator, manager, or investigator—such that she could not have been making or executing county policy.

Faria agrees that a finding of prosecutorial immunity bars *Monell* liability for Lincoln County. (Doc. 109 at 5.)  He argues, however, that Cheney went beyond her role as prosecutor and participated directly in the investigation in a way that stripped her of immunity and amounted to policy-making on behalf of Lincoln County.  (*Id.* at 5-8.)  In addition, Faria argues that Eighth Circuit precedent makes clear that "obtaining, manufacturing, coercing and fabricating evidence before filing formal charges" is not a prosecutorial function that entitles a prosecutor to immunity.  (*Id.* at 8 (quoting *McGhee v. Pottawattamie County*, 547 F.3d 922, 933 (8th Cir. 2008)).

The Court restates its conclusion that Cheney's involvement with the MCS was closely related to her decision to file charges and that therefore she is immune from suit based on that conduct.  *See Woodworth*, 891 F.3d at 1089.  The Court agrees with the parties that this conclusion precludes a finding of *Monell* liability for Lincoln County and concludes, on that basis, that Lincoln County is entitled to summary judgment.  *See Van de Kamp v. Goldstein*, 555 U.S. 335, 348–49 (2009) (holding that the finding of prosecutorial immunity also shields a county from *Monell* liability).

Finally, the Court briefly notes Lincoln County's argument that it is entitled to summary judgment because Cheney's conduct did not violate Faria's constitutional rights.  As stated above, the Court cannot say, as a matter of law, that Faria's constitutional rights were not violated.  Lincoln County argues that the grand jury indictment as proof that Faria's arrest, confinement, and prosecution were constitutional.  Likewise, as explained above, the grand jury's indictment is not conclusive proof of a constitutionally sound procedure, were as alleged here, it was based on false or fabricated evidence.  As such, the Court cannot conclude that

Lincoln County is entitled to summary judgment based on a lack of merit in Faria's constitutional claims.

Accordingly, the Court with grant Lincoln County's Motion for Summary Judgment on Count VI.

<strong>Conclusion</strong>

For the foregoing reasons, the Court finds that Cheney is absolutely immune to suit and will grant summary judgment to her.  In addition, the Court finds that Lincoln County is entitled to judgment as a matter of law on Count VI.  The Court concludes that Police Defendants have not demonstrated that they are entitled to judgment as a matter of law on the merits of Faria's claim and that they are entitled to qualified immunity and therefore will deny their motion for summary judgment.

<strong>II.   Defendants' <em>Daubert</em> Motions</strong>

<strong>Legal Standard</strong>

The federal rules of evidence and related case law require that an expert be qualified and that the expert's testimony be both reliable and relevant.  *See* Fed. R. Evid. 702; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).  An expert may be qualified by "knowledge, skill, experience, training, or education."  Fed. R. Evid. 702; *Kumho Tire Co.*, 526 U.S. at 150-51.

Reliability hinges on the sufficiency of the facts or data on which the opinion is based, the dependability of the principles and methods employed, and the proper application of the principles and methods to the facts of the case.  Fed. R. Evid. 702.  If the opinion is based solely or primarily on experience, the witness must connect the experience to the conclusion offered, must explain why the experience is a sufficient basis for the opinion, and must demonstrate the appropriateness of the application of the experience to the facts.  Fed. R. Evid. 702, Advisory Committee Notes.

To be relevant, the testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702.  Relevance requires the expert's testimony relate to an issue in the case. *See Daubert*, 509 U.S. at 591.  "[D]oubts regarding the usefulness of an expert's testimony" are resolved in favor of admissibility, *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 758 (8th Cir. 2006); *accord Johnson v. Mead Johnson & Co.*, 754 F.3d 557, 562 (8th Cir. 2014), because "[a]n expert's opinion should be excluded only if that opinion is so fundamentally unsupported that it can offer no assistance to the jury, *Synergetics, Inc. v. Hurst*, 477 F.3d 949, 956 (8th Cir. 2007) (internal quotation marks and citation omitted).

## Discussion

### Glenn Norton, Esq.

Plaintiff has retained retired Missouri Court of Appeals Judge Glenn A. Norton to opine on the reliability of his conviction at the first trial.  (Doc. 81-1.)  Plaintiff offers Norton to counteract any argument by Defendants that Plaintiff's prior conviction is evidence that Defendants conducted a thorough and fair investigation and prosecution.  (Doc. 104 at 9.) Plaintiff intends to offer Judge Norton's expert opinion that the trial court erred by excluding evidence of Pam Hupp as an alternative suspect and that therefore his conviction was unreliable. (Doc. 104.)

Defendants contend that Judge Norton's opinion is irrelevant, inappropriate, and inadmissible.  (Doc. 81.)  They argue that Judge Norton offers no opinion on any of the claims raised in this case, that the outcome of the first trial has no relevance because Plaintiff was tried a second time, and that an expert may not opine on legal conclusions.  (*Id.*)  They also argue that Judge Norton's opinion is unreliable given that he was not involved in Plaintiff's appeal and that the appellate panel that heard the appeal never reached the merits of Plaintiff's wrongful-conviction claim.  (*Id.*)

There is no dispute that Judge Norton is qualified by education and experience to provide expert testimony, given his lengthy and accomplished legal career.  Still, the Court believes that Judge Norton's opinion is not relevant, not necessary, and not admissible.

To begin, the Court agrees with Defendants that the "fairness" of Plaintiff's first trial is not at issue in this suit.  Plaintiff advances claims of unconstitutional seizure and conspiracy; he does not argue that he is entitled to § 1983 relief based on the trial court's error in excluding evidence of Hupp as an alternative suspect.  Thus, whether the trial court erred in excluding evidence of Hupp as an alternative suspect has no bearing on the claims Plaintiff does raise. Indeed, Judge Norton never opines that Cheney acted inappropriately in seeking to exclude that evidence and in relying on the trial court's ruling throughout Plaintiff's first trial.  (*See* Doc. 81-1.)  Thus, the reliability of Plaintiff's conviction has little, if any, relevance to his § 1983 claims.

Moreover, Judge Norton's expert opinion is not necessary for Plaintiff's intended purpose.  Plaintiff states that Judge Norton's testimony will demonstrate that Plaintiff's guilty verdict "was unreliable because the jury did not hear that the evidence was fabricated; did not hear exonerating evidence; and did not hear evidence that Pam Hupp was the true killer."  (Doc. 104 at 2.)  The jury does not need Judge Norton's testimony to reach that conclusion, given that Plaintiff intends to present significant evidence directly relating to all three of those assertions.  Put simply, any evidence of an unconstitutional arrest and prosecution is evidence that the resultant conviction was also flawed.

The Court further notes that Plaintiff has strong evidence that the jury's guilty verdict was unreliable:  the Missouri Court of Appeals reversed his conviction and he was acquitted by a judge in a new trial.  The Court struggles to understand how Judge Norton's expert opinion improves or expands on that evidence.  In short, Judge Norton's expert opinion is cumulative. Fed. R. Civ. P. 403.

Morover, a lay jury is capable of drawing the opinion that Judge Norton seeks to offer. Evidence that Plaintiff was arrested and prosecuted based on fabricated evidence and in spite of significant evidence of an alternative suspect necessarily supports the conclusion that Plaintiff's conviction is not reliable proof that the officers did nothing wrong. *See Williams v. Pro-Tec, Inc.*, 908 F.2d 345, 348-49 (8th Cir. 1990) (citing *Ellis v. Miller Oil Purchasing Co.*, 738 F.2d 269 (8th Cir. 1984)) ("Expert testimony may be properly excluded if the jury, being apprised of all the relevant facts, is equally able to draw the asserted conclusion."). As such, Judge Norton's opinion would not "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702.

Finally, the Court finds that Judge Norton seeks to offer an expert opinion on a legal conclusion based solely on speculation. The only relevant conclusion to be drawn from Judge Norton's opinion testimony is that the flawed conviction is evidence of a flawed investigation. Both "probable cause and qualified immunity are ultimately questions of law," and expert testimony may not be deployed to instruct the court on how to answer those questions. *Peterson v. City of Plymouth*, 60 F.3d 469, 475 (8th Cir. 1995) (citing *Estes v. Moore*, 993 F.2d 161, 163 (8th Cir. 1993)).

Accordingly, the Court will grant Defendants' motion and exclude Judge Norton's expert testimony.

### *Jeffrey J. Noble*

Plaintiff has retained retired police officer Jeffrey J. Noble to opine on the investigatory methods employed by the Police Defendants. He asserts that Noble's purpose is to opine on whether Police Defendants' actions fell within "generally-accepted and prevailing police investigatory practices and procedures." (Doc. 112 at 2.)

Defendants first argue that Noble is not qualified as an expert because he has almost no experience investigating homicides; because he has no relevant training in investigating homicides, BlueStar or other luminescence testing, polygraphy, DNA testing, or rigor mortis; and because he did not consult any authority to prepare for his expert opinion with the exception of an American Polygrapher's Association publication.  (Doc. 89 at 7-10.)

Plaintiffs represent that Noble has twenty-eight years' experience as a police officer, including tenure as deputy police chief of a department with 200 officers and 100 civilian employees.  (*Id*. at 7.)  He further represents that Noble "has extensive experience conducting internal administrative investigations," "extensive experience on matters involving police investigative procedures, misconduct and corruption," has extensively published and consulted on police investigations," and "has been retained as both a defense and a plaintiff's expert in over 130 cases in both federal and state trial courts."  (*Id*.)

The Court finds that Noble is qualified by "knowledge, skill, experience, training, or education."  Fed. R. Evid. 702; *Kumho Tire Co.*, 526 U.S. at 150-51.  His significant tenure in various levels of law enforcement, added to his experience in reviewing and assessing police investigations, is sufficient to establish that he has "technical, or other specialized knowledge" that can assist the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Civ. P. 702.  Defendants' arguments to the contrary go to the weight and credibility of Noble's testimony; Defendant is free to argue at trial that Noble's inexperience with murder investigations, lack of training in certain investigatory methods, and failure to research in preparation of his testimony reduce the value of that testimony.

Defendants next argue that Noble seeks to provide impermissible legal conclusions regarding probable cause and reasonableness—a necessary element for qualified immunity.  As noted above, both "probable cause and qualified immunity are ultimately questions of law," and

32

expert testimony may not be deployed to instruct the court on how to answer those questions. *Peterson*, 60 F.3d at 475.

Plaintiff concedes that Noble cannot opine on those legal conclusions but asserts that his use of the term "reasonable" refers to a lay investigator's description of accepted practices and procedures rather than the legal definition of reasonableness necessary to the legal determination of liability.  Likewise, he states that Noble's reference to probable cause is not an attempt to answer the legal question of whether such cause existed but rather to explain when and how an officer would reach that conclusion and whether that conclusion is justified based on the evidence in this case.  He asserts that Noble's opinions relate to investigatory best practices and how he would expect a competent police officer to respond when presented with the facts of this case.  Plaintiff suggests to the Court that Noble would testify without using terms such as "reasonable," or "reasonable officer" and would instead substitute conclusions such as that the Defendants' conduct "departs from generally-accepted and prevailing police investigative practice and procedure."  (Doc. 112 at 21.)

The Court believes expert testimony as to how a competent officer would interpret the evidence in this case would assist in determining whether probable cause existed and whether Defendants' conduct was reasonable. However, the Court agrees with Defendants that Noble's use of "reasonable" and "probable cause" could potentially confuse or mislead the jury and finds that such language cannot be used at trial.  The Court believes Noble's testimony can be presented in a way that eliminates this risk and that there are other methods to address any confusing use of terms at trial, including a corrective instruction from the Court.

Finally, Defendants argue that Noble opines as to the credibility of witnesses—bolstering Plaintiff's and denigrating Defendants'.  "'[A]n expert may not go so far as to usurp the exclusive function of the jury to weigh the evidence and determine credibility.'"  *Westcott v.*

*Crinklaw*, 68 F.3d 1073, 1076 (8th Cir. 1995) (quoting *United States v. Azure,* 801 F.2d 336, 340 (8th Cir. 1986)).  "Nor may an expert pass judgment on a witness' truthfulness in the guise of a professional opinion." *Westcott*, 68 F.3d at 1076 (citing *United States v. Whitted,* 11 F.3d 782, 785–86 (8th Cir. 1993)).

Plaintiff responds that Noble's opinion relates only to how Plaintiffs' conduct should be understood under, and whether Defendants' conduct aligns with, "generally-accepted and prevailing police investigative practice and procedure."  (*Id.*)  For instance, Noble opines that Plaintiff's cooperation, willingness to take a polygraph, and verified alibi, should be noted by an officer "as a matter of investigative procedure."  (*Id.* at 24.)  Likewise, Noble opines that the state of Plaintiff's clothes, the verifiable timeline, and the route Plaintiff drove are relevant to the Police Defendants' investigation.  Plaintiff argues that Noble merely provides a list of relevant considerations from which the jury can draw inferences as to the credibility of Plaintiff and Police Defendants.

It is axiomatic that testimony regarding credibility of the parties is inadmissible.  That said, the Court finds that Noble is positioned to testify about how the Police Defendants interpreted the evidence they gathered in a way that does not bear on the credibility of witnesses. Ultimately, the Court believes that, with some limitations that can be addressed before trial, Noble is able to offer helpful testimony regarding an investigator's assessment of a suspect's credibility without testifying as to that suspect's credibility.

Accordingly, the Court will deny Defendants' motion to exclude Noble's testimony.

### Conclusion

For the foregoing reasons,

**IT IS HEREBY ORDERED** that the Motion for Summary Judgment filed by Defendant Leah Askey-Chaney (Doc. 78), is **GRANTED.**

34

**IT IS FURTHER ORDERED** that the Motion for Summary Judgment filed by Defendant Lincoln County, Missouri (Doc. 82), is **GRANTED.**

**IT IS FURTHER ORDERED** that the Motion for Summary Judgement filed by Defendants Ryan McCarrick, Michael Merkel, and Patrick Harney  (Doc. 84), is **DENIED.**

**IT IS FURTHER ORDERED** that Defendants' Joint Motion to Exclude the Expert Testimony of Glenn Norton, Esq, (Doc. 80), is **GRANTED.**

**IT IS FINALLY ORDERED** that Defendants' Joint Motion to Exclude the Expert Testimony of Jeffrey J. Noble (Doc. 88), is **DENIED.**

A separate judgment will be filed contemporaneously.

Dated this 26th day of September, 2019.

_____

JOHN A. ROSS
UNITED STATES DISTRICT JUDGE